ORIGINAL

FILED
SEP 7 2006
U.S. COURT OF FEDERAL CLAIMS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

WELLS FARGO & COMPANY
and SUBSIDIARIES,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

No. 06-628 T

COMPLAINT

Plaintiff, Wells Fargo & Company and Subsidiaries, brings this action for a refund of Federal income taxes paid in connection with the Internal Revenue Service's adjustments to its Federal income tax return for the taxable year ending December 31, 2002. The adjustments are related to certain sale-leaseback transactions entered into as part of Plaintiff's established leasing business.

In support of its refund claim, Plaintiff alleges as follows:

JURISDICTION AND SUMMARY OF ACTION

1. Plaintiff, Wells Fargo & Company and Subsidiaries ("Wells Fargo"), brings this refund action, founded upon the Internal Revenue Code of 1986, as amended, for the recovery of Federal income taxes paid by Plaintiff for the taxable year ended December 31, 2002.

2. Defendant is the United States of America.

3. This Court has jurisdiction by reason of 28 U.S.C. §§ 1346(a)(1) and 1491(a)(1) and 26 U.S.C. § 7422.

4. Wells Fargo & Company is the successor in interest to three relevant corporations: "old" Wells Fargo & Company, Norwest Corporation ("Norwest"), and First Security Corporation ("First Security"). On November 2, 1998, "old" Wells Fargo merged into a subsidiary of Norwest. Following the merger, Norwest changed its name to Wells Fargo & Company. On October 25, 2000, Wells Fargo acquired First Security. For simplicity, because Wells Fargo is the successor in interest to these corporations, this Complaint will refer to the sale-leaseback transactions and income tax return at issue as if Wells Fargo had engaged in such transactions itself, unless otherwise specified.

5. Wells Fargo filed a timely Federal consolidated income tax return with the Internal Revenue Service ("IRS") for its 2002 tax year and timely paid its income tax of $2,477,980,709 as shown on the return.

6. Wells Fargo's name, address, and taxpayer identification number entered on the 2002 tax return are: Wells Fargo & Company and Subsidiaries; Wells Fargo Center, MAC N9305-164, Sixth and Marquette, Minneapolis, MN 55479; and 41-0449260, respectively.

7. During the taxable years 1997 through 2002, as part of its established leasing business, Wells Fargo entered into certain sale-leaseback transactions that the IRS has challenged ("Sale-Leaseback Transactions" or "Transactions"). These Transactions represent a small portion of the lease transactions entered into by Wells Fargo during this period of time, and can be divided into two categories: leases of domestic transit assets encouraged and approved by the Federal Transit Administration ("FTA Transactions") and leases of "qualified technological equipment" as defined in 26 U.S.C. § 168(i)(2) ("QTE Transactions"). Each of these categories of Sale-Leaseback Transactions is discussed further below.

8. On its 2002 Federal income tax return, Wells Fargo reported rental income with respect to the Sale-Leaseback Transactions and deducted depreciation of equipment, amortization of transaction expenses, and interest expense relating to the property and indebtedness incurred in these Transactions.

9. The IRS conducted a routine audit of Wells Fargo's Federal income tax return for the 2002 taxable year. As part of this audit, the IRS agreed to adjustments which reduced Wells Fargo's taxable income by $189,025,447. The IRS, however, disputed Wells Fargo's tax treatment of the Sale-Leaseback Transactions and, as a result, proposed an increase in Wells Fargo's taxable income in the amount of $115,174,203, which resulted in a net reduction of taxable income of $73,851,244 for the 2002 taxable year. The IRS also proposed a penalty under 26 U.S.C. § 6662, with respect to Wells Fargo's participation in the Sale-Leaseback Transactions.

10. The IRS issued Letter 950, dated April 22, 2005, together with two Forms 870, "Waiver of Restrictions on Assessment and Collection of Deficiency in Tax and Acceptance of Overassessment", to Wells Fargo. This letter reflected a refund of income tax in the amount of $25,874,224 for 2002 attributable to the reduction in taxable income described in paragraph 9, above. This refund was partially offset, however, by a penalty of $8,062,194 with respect to the Sale-Leaseback Transactions imposed pursuant to 26 U.S.C. § 6662.

11. On April 27, 2005, Wells Fargo signed the Forms 870.

12. On May 11, 2005, Wells Fargo filed a Form 1120X, "Amended U.S. Corporation Income Tax Return", with the IRS requesting a refund of erroneously paid Federal income tax for the 2002 taxable year. This refund claim stated that the IRS had erred by increasing Wells Fargo's taxable income for 2002 by $115,174,203 with respect to the Sale-Leaseback

Transactions and by $7,594,248 with respect to a proposed adjustment unrelated to the Sale-Leaseback Transactions. As a result, Wells Fargo requested a refund of $42,968,958 in tax. It also requested a refund of the $8,062,194 paid with respect to the penalty.

13. The requested refund is attributable to Wells Fargo's overpayment of Federal income tax and penalties with respect to its 2002 taxable year. A true and complete copy of this claim for refund is attached as Exhibit A.

14. Wells Fargo requests a refund of the overpayments of Federal income tax and penalties for its 2002 taxable year as stated in paragraph 12, plus interest and allowable costs.

15. No action on the claim for refund attached as Exhibit A has been taken by Congress or any agency of the United States, nor has it been the subject of any judicial proceeding, including any proceeding in the Tax Court of the United States.

16. Wells Fargo has timely filed this Complaint for a refund of Federal income taxes paid following the expiration of six months from the date of filing its refund claim, on May 11, 2005, as required under 26 U.S.C. § 6532(a)(1).

17. Wells Fargo is the sole owner of the claim included in Exhibit A and asserted herein, and has made no assignment thereof.

## FACTUAL BACKGROUND

### A. Wells Fargo

18. In 1852, Henry Wells and William Fargo founded Wells, Fargo & Co. to provide express delivery and banking services in the Western United States. While still in its early years, Wells Fargo participated in the stagecoach business to support its banking and express businesses. In 1905, Wells Fargo separated its banking and express delivery businesses. In 1968, the banking business was renamed Wells Fargo Bank, and in 1969, Wells Fargo Bank

formed a holding company, Wells Fargo & Company, which is referred to herein as "old" Wells Fargo.

19. On November 2, 1998, "old" Wells Fargo merged into a subsidiary of Norwest, and Norwest changed its name to Wells Fargo & Company. The "new" Wells Fargo relocated its headquarters to San Francisco, "old" Wells Fargo's historical headquarters.

20. On October 25, 2000, Wells Fargo acquired First Security.

21. Today, Wells Fargo is a diversified financial services company providing banking, insurance, investment, mortgage and consumer finance services for more than 23 million customers through 6,200 stores, the internet and other distribution channels across North America and elsewhere internationally. Wells Fargo is the largest financial institution headquartered in the Western U.S., and is in the top 20 among all U.S. companies in profits and market value. As of June 30, 2006, it had total assets of $500 billion, 5th largest among U.S. bank holding companies.

B. **Wells Fargo's Leasing Business**

22. As part of the array of services it provides to its customers, Wells Fargo operates a leasing business through Wells Fargo Equipment Finance, Inc. ("WFEFI"), a separate wholly-owned subsidiary of Wells Fargo Bank, National Association. WFEFI represents a continuation of Norwest's historical leasing business, which has been in operation since 1972. WFEFI is one of the largest bank-owned equipment leasing and finance companies in the U.S., with $7.1 billion in assets. For simplicity, references herein to Wells Fargo include WFEFI.

23. While national banks are prohibited from engaging in many commercial activities, Federal law specifically authorizes national banks to engage in the leasing business. *See* 12 U.S.C. § 24; 12 C.F.R. § 225.28(b)(3). Wells Fargo is one of many financial institutions actively engaged in the leasing business.

24. Wells Fargo operates a leasing business in order to earn a profit and to meet the lease financing needs of its customers. Wells Fargo's leasing business is complementary to its banking business since both involve common areas of expertise such as credit analysis, industry knowledge, and collateral valuation. The leasing business also provides portfolio diversification for Wells Fargo's business.

25. Wells Fargo's corporate policies require diversification in the operation of its leasing business. This policy prohibits excessive concentration with respect to specific lessees, types of leased assets, industries, and geographic regions.

26. Prior to the merger with Wells Fargo, Norwest's leasing business had developed particular expertise with respect to the leasing of transportation assets, including locomotives, rail cars, heavy-duty trucks and trailers, as well as manufacturing and construction equipment.

27. The Sale-Leaseback Transactions at issue in this case represent less than 10 percent of Wells Fargo's total leasing portfolio. The Sale-Leaseback Transactions were consistent with the business objectives of Wells Fargo's leasing operations since they were expected to produce a significant economic profit and furthered Wells Fargo's objective of operating a diversified leasing portfolio.

**C. The Federal Government's Promotion of Sale-Leasebacks for Domestic Transit Assets and Wells Fargo's Investment in Such Transactions**

28. Throughout the time period involved in this case, the United States Federal government, through the Urban Mass Transit Administration (the "UMTA"), its successor, the Federal Transit Administration (the "FTA"), and the Department of Transportation (the "DOT"), actively encouraged domestic transit agencies operating public transit systems to enter into sale-leasebacks similar to those at issue in this case. The Federal government encouraged these

transactions as part of its policy to promote innovative financing and funding options in order to reduce dependence on scarce Federal transit resources.

29. Beginning in the early 1990s, the UMTA encouraged leasing transactions between domestic transit agencies and foreign lessors. The UMTA's policies regarding such transactions were set forth in Circular 7020.1, "Cross-Border Leasing Guidelines," April 26, 1990.

30. On January 26, 1994, President Clinton issued Executive Order 12893, "Principles for Federal Infrastructure Investments". The Executive Order directed federal agencies to "seek private sector participation in infrastructure investment and management," including investment in transportation assets.

31. In September 1998, in response to President Clinton's Executive Order, the FTA published a handbook entitled "Innovative Financing Techniques for America's Transit Systems." The handbook included detailed instructions on how to structure sale-leasebacks of transit equipment similar to those involved in this case.

32. Through the FTA website, publications, appearances at transit conferences, and meeting with transit agencies, the FTA actively encouraged sale-leasebacks of domestic transit assets during the time period involved in this case.

33. In March of 1997, Gordon J. Linton, the FTA Administrator, testified before Congress regarding the FTA's fiscal 1998 budget request. In his prepared testimony, Mr. Linton explained the FTA's implementation of sale-leasebacks as a means of "expand[ing] funding availability for transit." In June of 2002, Jennifer Dorn, one of Mr. Linton's successors, testified before Congress and again highlighted the FTA's support for leases as a means of providing funding for transit.

34. In 2003, the FTA sponsored a publication entitled "Financing Capital Investment: A Primer for the Transit Practitioner." This publication indicates that as of February 2002, the FTA had reviewed and approved approximately 40 sale-leaseback transactions involving domestic transit assets, which had produced a net benefit of over $470 million for the respective transit agencies. These sale-leasebacks included transit agencies all over the United States, including Atlanta, Chicago, St. Louis, Boston, New York, Miami, Pittsburgh, Seattle, Denver, Dallas, New Orleans, Houston, Los Angeles, Philadelphia, San Francisco, and Washington, D.C.

35. Approval by the FTA or its predecessor, the UMTA, was required for any leasing transaction involving transit equipment originally acquired with FTA or UMTA grants.

36. During the relevant time period, the FTA required that each of the following conditions be satisfied before it would approve a sale-leaseback transaction for domestic transit assets:

(a) the transaction provided for economic defeasance of the lessee's obligations as required by Circular 7020.1;

(b) the transaction resulted in positive income, *i.e.*, a taxable profit for the lessor; and

(c) the transaction produced a significant financial benefit for the lessee transit agency.

37. Circular 7020.1 required that domestic transit agencies entering into leasing transactions arrange for an "economic defeasance" of their lease obligations, including any purchase option. An "economic defeasance" is a deposit or similar arrangement in which the domestic transit agency would set aside funds as collateral sufficient to meet its lease obligations. The transit agency would, however, continue to be primarily liable with respect to its lease obligations. Throughout the time period involved in this case, the UMTA, FTA, and DOT would approve lease transactions only if they included economic defeasance arrangements.

38. Transit agencies viewed the economic defeasance of their lease obligations as an important feature in view of the uncertain nature of funding for public transit – *i.e.*, the agencies wanted to be sure they would have sufficient funding to meet their future lease obligations.

39. Consistent with FTA policy, during 2000-2002, Wells Fargo entered into seventeen sale-leasebacks of transit equipment with domestic transit agencies (the "FTA Transactions"). The FTA Transactions are set forth below:

| Seller/Lessee | Equipment Involved | Investment Year(s) |
|---|---|---|
| Los Angeles County Metropolitan Transportation Authority | Railcars | 2000 |
| State of California Department of Transportation | Railcars | 2000, 2001, 2002 |
| Peninsula Corridor Joint Powers Board | Railcars | 2000, 2001 |
| New Jersey Transit Corporation | Railcars/Buses | 2001 (2) |
| Bay Area Rapid Transit | Rail Traffic Control Equipment | 2002 |
| City and County of San Francisco | Railcars | 2002 |
| Metropolitan Transit Authority of Harris County, Texas | Buses | 2002 (2) |
| Dallas Area Rapid Transit | Buses | 2002 |
| Southern California Regional Rail Authority | Railcars | 2002 |
| Washington Metropolitan Area Transit Authority | Railcars | 2002 |
| Southeastern Pennsylvania Transportation Authority | Railcars | 2002 |
| Metropolitan Atlanta Rapid Transit Authority | Railcars | 2002 |

40. The FTA approved each of Wells Fargo's FTA Transactions in letters issued to the respective transit agencies, with the exception of the California Department of Transportation transactions. These transactions did not require FTA approval because the equipment had not been financed with FTA grants.

41. In approving the FTA Transactions, the FTA understood that they would qualify as sale-leasebacks for Federal income tax purposes.

42. The American Jobs Creation Act of 2004 (the "Act"), signed by President Bush on October 22, 2004, contains provisions which would have the effect of deferring tax deductions with respect to leasing transactions similar to the Sale-Leaseback Transactions. The relevant provisions of the Act are effective only for leases entered into after March 12, 2004, and thus do not apply to the Sale-Leaseback Transactions.

43. The Act contained a special rule stating that the Act does not apply to leases of "qualified transportation property" ("QTP"). QTP is defined as leased transit property which was submitted for approval to the FTA after June 30, 2003 and before March 13, 2004, and which was approved by the FTA before January 1, 2006.

44. The IRS has publicly stated that sale-leasebacks of QTP are consistent with congressional intent and that the tax benefits associated with such transactions should be sustained.

45. Wells Fargo entered into five sale-leasebacks of QTP property during 2003. These transactions are:

| Seller/Lessee | Equipment |
|---|---|
| Chicago Transit Authority | Buses |
| Alameda-Contra Costa Transit District | Buses (2) |

| | |
|---|---|
| PACE (Suburban Bus Division of Regional Transportation Authority) | Buses (2) |

46. The IRS has indicated that it will not challenge Wells Fargo's transactions involving sale-leasebacks of QTP property.

47. Wells Fargo's sale-leasebacks of QTP property are substantially similar to the FTA Transactions.

48. The FTA approved Wells Fargo's sale-leasebacks of QTP property in the same manner and following the same standards as it approved the FTA Transactions.

**D. Wells Fargo's QTE Transactions**

49. During this same time period, Wells Fargo also entered into sale-leasebacks of "qualified technological equipment" as defined by 26 U.S.C. § 168(i)(2) ("QTE Transactions"). The QTE Transactions offered a higher pre-tax yield than other sale-leaseback transactions available to Wells Fargo at the time. In addition, the QTE Transactions provided for diversification of Wells Fargo's leasing portfolio.

50. Wells Fargo entered into eight QTE Transactions as set forth below:

| Seller/Lessee | Equipment Involved | Investment Year(s) |
|---|---|---|
| Belgacom Mobile, SA | Telecommunication equipment | 1997 |
| Sonera, Ltd. | Telecommunication equipment | 1998 |
| Societe Francaise du Radiotelephone | Telecommunication equipment | 1999 (3) |
| Cathay Pacific Airways Limited | Flight simulators | 2000 (3) |

51. The equipment involved in each of the QTE Transactions is "qualified technological equipment," as defined by 26 U.S.C. § 168(i)(2).

E. **Wells Fargo's Due Diligence Process**

52. Before entering into each Sale-Leaseback Transaction, Wells Fargo engaged in an extensive due diligence process. As part of this process, Wells Fargo investigated and considered many factors, including (i) the lessee's business operations and creditworthiness; (ii) the economic return and accounting income from each Transaction; (iii) the quality of the equipment and its function in the lessee's operations; (iv) the useful life and expected collateral and residual value of the equipment; (v) the diversification of the leasing portfolio as a result of entering into the proposed Transaction; and (vi) the terms of each Sale-Leaseback Transaction. Wells Fargo also considered the potential risks and benefits associated with its residual value interest in the leased equipment. In the leasing context, residual value refers to the remaining useful life and value of an asset at the end of the lease of that asset.

53. In the case of the FTA Transactions, Wells Fargo took into account additional relevant factors, such as (i) the funding sources of the relevant transit agency, (ii) the risk of non-appropriation of funding, and (iii) the nature of the service provided by the transit agency.

54. In the case of the QTE Transactions, Wells Fargo took into account additional relevant factors, such as (i) the political, legal, and economic climate of the country in which the QTE equipment was located and (ii) the conditions in the industry in which the QTE equipment was used.

55. Wells Fargo retained well-known, experienced consultants to assist in its review of each Sale-Leaseback Transaction.

56. Wells Fargo retained an experienced and qualified independent appraiser to perform a comprehensive valuation of the equipment involved in each Sale-Leaseback Transaction. The appraiser provided a valuation of the fair market value of the equipment. The appraiser also studied economic useful life data concerning the leased equipment to determine its

useful life, remaining useful life, and residual value. Finally, the appraiser reviewed the different options available to the participants under the terms of the proposed Transaction.

57. During the relevant time period, Wells Fargo investigated a number of transactions similar to the Sale-Leaseback Transactions. After an extensive due diligence process, Wells Fargo chose to invest in the Sale-Leaseback Transactions versus other similar transactions offered to it because of the following:

(a) Economic return consistent with the leasing business's objectives;

(b) Significant pre-tax yields;

(c) Front-loaded earnings under FASB accounting rules;

(d) Collateral value in the event of default;

(e) Relatively low risk;

(f) Tax benefits of leasing and tax capacity to utilize those tax benefits;

(g) The financial strength of the lessees; and

(h) The financial strength and political stability of the relevant state and/or local government in which the assets are located, in the case of the FTA Transactions, or the country in which the assets are located, in the case of the QTE Transactions.

58. Wells Fargo expected to earn a significant pre-tax profit from each Sale-Leaseback Transaction. Wells Fargo's pre-tax economic return from the Sale-Leaseback Transactions, as determined for accounting and financial reporting purposes, is expected to be in the range from approximately 11% to 22% or more.

### F. General Structure of Wells Fargo's Sale-Leaseback Transactions

59. Each of the Sale-Leaseback Transactions was structured as a sale-leaseback in which Wells Fargo acquired the benefits and burdens of ownership of the equipment in question from the seller/lessee and leased the equipment back to the lessee for a period no greater than

80% of the remaining useful life of the equipment. The use of sale-leasebacks has a long and accepted history in tax law, including detailed guidance provided by the IRS's own "true lease" guidelines. *See, e.g., Frank Lyon Co. v. United States*, 435 U.S. 561 (1978), Rev. Proc. 75-21, and Rev. Proc. 2001-28.

60. For Federal income tax purposes, a sale is the transfer of the benefits and burdens of ownership in an asset in exchange for money.

61. Generally, a lease is an arrangement where one party (the "lessor") has a property interest in an asset or a right to use an asset and provides possession and the right to use that asset to another party (the "lessee") for a fixed period of time in exchange for payment of rent.

62. For Federal income tax purposes, a lease arrangement will be respected as a "true lease" (instead of a loan or other form of transaction) if the lessor retains sufficient benefits and burdens of ownership. This determination generally depends on whether the lessor has a meaningful equity investment in the asset throughout the entire lease term and a meaningful residual interest in the asset at the end of the lease term. Decades of judicial authority have found a 20% residual value to be meaningful. Thus, if at the end of the lease term, the asset is expected to have a remaining useful life (and remaining value) equal to at least 20% of its original estimated useful life (and original cost), the arrangement will be respected for Federal income tax purposes as a true lease (or sublease, as the case may be).

63. The lessor in a lease transaction can use either equity or a combination of equity and debt to finance the purchase or lease of the asset. When a lessor uses non-recourse debt to finance the purchase or lease of the asset, the transaction is called a leveraged lease.

64. In a typical leveraged lease transaction, an investor purchases an asset and borrows money to finance some or all of the purchase price. The investor then leases the asset to

a third party who uses the asset in its business operations. In this type of transaction, it is a common business practice for the investor to lease the asset to the party which originally sold or leased it to the investor, *i.e.*, a "sale-leaseback" transaction.

65. In leveraged lease transactions the lessor will earn profits from the rent payments it receives and from the residual value of the property once the lease expires. Additionally, a leveraged lease transaction will often provide a benefit in the form of a limited tax deferral, in which an amount of Federal income tax that would otherwise have been paid one year is deferred until a later year. This is so because leveraged lease transactions often produce losses for Federal income tax purposes in the early years of the transaction due to depreciation, amortization of transaction costs, and interest deductions. These losses are offset by profits or gains for Federal income tax purposes in the later years of the transaction. This tax deferral effect of leveraged lease transactions is provided for in the Internal Revenue Code and has been approved by the courts and the IRS for many years.

66. Wells Fargo entered into each of the Sale-Leaseback Transactions for the principal purpose of earning a profit from rental income and from the residual value of the leased property.

67. For administrative convenience, Wells Fargo formed a trust to enter into the various leases and other agreements that were involved in the Sale-Leaseback Transactions. The role of the trust does not affect the tax treatment of each Sale-Leaseback Transaction. Thus, for simplicity, this Complaint describes the Sale-Leaseback Transactions as if Wells Fargo had directly purchased the relevant equipment.

68. On the closing date of each Sale-Leaseback Transaction, Wells Fargo purchased the relevant equipment by making a cash payment to the seller/lessee equal to the fair market value of the equipment, as determined by the independent appraiser.

69. Wells Fargo funded the purchase price of the equipment by investing its own cash and by borrowing the remaining portion of the purchase price from third-party lenders ("Lenders"). Wells Fargo also paid transaction costs in connection with entering into each Sale-Leaseback Transaction.

70. Following the purchase of the equipment by Wells Fargo, Wells Fargo leased the equipment back to the seller/lessee ("Lease") for a period which does not exceed 80% of the equipment's remaining useful life. Each seller/lessee is required to pay rent to Wells Fargo under the terms of the Lease.

71. At the end of each Lease the equipment is expected to have a remaining useful life of at least 20% of its remaining useful life as of the date of Wells Fargo's purchase, as determined by the independent appraiser retained by Wells Fargo. Tax law has long recognized that if an asset has a residual life at the end of the lease of 20% of the asset's original useful life, then the lease qualifies as a "true lease" for Federal income tax purposes.

72. Each Sale-Leaseback Transaction set out the terms under which Wells Fargo leased the equipment to the lessee. While each Lease was separately negotiated and contained different terms, the Leases generally contained provisions standard in the leasing business regarding events of default by the lessee. Events of default by a lessee include, but are not limited to:

(a) Failure to pay rent;

(b) Any material inaccuracy in the representations made by the lessee or one of its affiliates;

(c) Failure to maintain or modify the equipment in accordance with the lessees' own maintenance standards, industry standards, and the manufacturer's required maintenance procedures;

(d) Failure to comply with return covenants;

(e) Failure to prevent or remove liens on the equipment;

(f) Failure to comply with covenants regarding transfers of interest or maintenance of security interests in the equipment; and

(g) A bankruptcy declaration under governing law.

73. Wells Fargo's remedies upon a default include, but are not limited to, causing the lessee to return the equipment to Wells Fargo.

74. Each of the Sale-Leaseback Transactions contains an option for the lessee to purchase the equipment at a fixed price at or near the end of the Lease term. The appraiser determined that the lessees are unlikely to exercise these options because the fixed purchase price for the equipment exceeds the equipment's expected fair market value as of the purchase option date.

75. At the end of the Lease, the lessee is obligated to return the equipment to Wells Fargo in the same condition as when the lessee received it, ordinary wear and tear excepted.

76. In entering into the Sale-Leaseback Transactions, Wells Fargo assumed a significant amount of risk, including the risk that the lessee would not be able to make or would refuse to make its required rent payments, risks with respect to its collateral, the risk that the lessee would go bankrupt, and the risk that the leased equipment would be damaged or otherwise suffer an unanticipated diminution in value.

77. In loaning money to Wells Fargo, the Lenders assumed the risk that Wells Fargo would be unable to make the required loan payments.

78. As is typical in conservatively structured commercial transactions, each Sale-Leaseback Transaction included a number of features that were designed to reduce the financial risks assumed by the parties. For any given Transaction, these features may have included collateral deposits, pledges of collateral, and an early buy-out option. However, these features did not and could not insulate Wells Fargo or the other parties from all risks presented by the Transactions. Furthermore, as stated above, in the case of the FTA Transactions, the FTA required the lessees to provide for the economic defeasance of their lease obligations.

## COUNT ONE: THE IRS'S TAX TREATMENT OF THE SALE-LEASEBACK TRANSACTIONS IS ERRONEOUS

### A. The Sale-Leaseback Transactions Should Be Respected Because Wells Fargo Retains Sufficient Benefits and Burdens of Ownership With Respect To Its Interest in the Leased Equipment.

79. Wells Fargo incorporates by reference and re-alleges the facts set forth in paragraphs 1 through 78 above.

80. The Sale-Leaseback Transactions entered into by Wells Fargo were leveraged lease transactions because a portion of Wells Fargo's investment was financed through non-recourse loans from various Lenders.

81. Each transfer from a lessee to Wells Fargo as part of the Sale-Leaseback Transactions qualifies as a sale for Federal income tax purposes because (i) the agreement transferred the benefits and burdens of ownership to Wells Fargo, (ii) Wells Fargo's purchase price was equal to the fair value market of the property (as determined by the independent appraiser), and (iii) there is a reasonable possibility that Wells Fargo can recoup its investment in the leased equipment from its income producing potential and residual value.

82. Each Sale-Leaseback Transaction involves a Lease from Wells Fargo to the lessee that qualifies as a lease for Federal income tax purposes because (i) each Lease transferred

possession of the property interest in return for the obligation to pay rent and provided for transfer of possession back to Wells Fargo in the event of a default, (ii) the term of each Lease was no greater than 80% of the equipment's expected useful life, and (iii) Wells Fargo's return depended upon the residual value of the property at the end of the respective Lease.

83. As a result of entering into each Sale-Leaseback Transaction, Wells Fargo acquired the benefits and burdens of ownership with respect to its interest in the relevant equipment.

**B. Wells Fargo Properly Reported the Sale-Leaseback Transactions on Its 2002 Federal Income Tax Return.**

84. Wells Fargo properly reported income and claimed deductions on its 2002 Federal income tax return in connection with the Sale-Leaseback Transactions.

85. The lessees in the Sale-Leaseback Transactions are required to make rent payments to Wells Fargo. Wells Fargo properly accrued income on its 2002 Federal income tax return with respect to these payments in accordance with the terms of the Leases.

86. As the owner of the equipment purchased pursuant to the Sale-Leaseback Transactions, Wells Fargo properly reported depreciation deductions on its 2002 Federal income tax return.

87. Wells Fargo properly reported deductions for accrual of interest expense with respect to its loans from the Lenders involved in each Sale-Leaseback Transaction on its 2002 Federal income tax return.

88. Wells Fargo properly reported deductions for the amortization of transaction costs incurred with respect to the Sale-Leaseback Transactions on its 2002 Federal income tax return.

## COUNT TWO: WELLS FARGO IS ENTITLED TO A REFUND OF TAXES IN CONNECTION WITH THE SALE-LEASEBACK TRANSACTIONS FOR 2002

89. Wells Fargo incorporates by reference and re-alleges the facts set forth in paragraphs 1 through 88 above.

90. Pursuant to 26 U.S.C. §§ 61 and 467, Wells Fargo properly included $54,053,081 in rental income on its Federal income tax return for the 2002 taxable year with respect to its right to receive rental income under the terms of the Sale-Leaseback Transactions.

91. Pursuant to 26 U.S.C. § 167, Wells Fargo properly deducted $96,741,766 in depreciation deductions on its Federal income tax return for the 2002 taxable year in connection with the Sale-Leaseback Transactions.

92. Pursuant to 26 U.S.C. § 167, Wells Fargo properly deducted $2,201,164 for transaction costs on its Federal income tax return for the 2002 taxable year as the result of the amortization of transaction costs related to the Sale-Leaseback Transactions.

93. Pursuant to 26 U.S.C. § 163, Wells Fargo properly deducted $70,284,355 in interest expense on its Federal income tax return for the 2002 taxable year as a result of interest accruing on the loans it obtained to fund a portion of the purchase price of the FTA and QTE equipment.

94. The IRS proposed to disallow all of Wells Fargo's deductions for (i) the depreciation of the FTA and QTE equipment, (ii) the interest payments required to be made to the Lenders, and (iii) the amortization of transaction costs.

95. The IRS also proposed to reduce Wells Fargo's rental income by the amount of rental payments due from the lessees under each Lease.

96. The IRS also proposed an accuracy related penalty under 26 U.S.C. § 6662 in the amount of $8,062,194 for an alleged underpayment of tax for 2002.

97. These proposed adjustments had the effect of recalculating Wells Fargo's taxable income for its 2002 taxable year as if Wells Fargo had not engaged in any of the Sale-Leaseback Transactions.

98. These proposed changes by the IRS increased Wells Fargo's taxable income for the 2002 taxable year by a net amount of $115,174,203.

99. The IRS's disallowance of the FTA Transactions is contrary to the Federal government's policy of encouraging sale-leaseback transactions to increase private funding of public transit assets.

100. The adjustments made by the IRS to Wells Fargo's taxable income and the imposition of a penalty for the 2002 taxable year are contrary to controlling tax law, and Wells Fargo is entitled to a complete refund of the $51,031,152 of Federal income taxes and penalties it erroneously paid with respect to the Sale-Leaseback Transactions.

**COUNT THREE: WELLS FARGO IS ENTITLED TO A REFUND OF TAXES**
**DEMAND FOR JUDGMENT**

WHEREFORE, Wells Fargo respectfully requests that this Court enter judgment in its favor and against the Defendant in the amount listed below, plus interest and costs allowed by law, and provide such other relief as the Court may deem just.

| Taxable Year | Refund Requested |
|---|---|
| 2002 | $51,031,152 |

Respectfully submitted this 6th day of September, 2006.

Respectfully Submitted,

[signature]

Thomas C. Durham
MAYER, BROWN, ROWE & MAW LLP
71 South Wacker Drive
Chicago, Illinois 60606
Tel: (312) 701-7216
Fax: (312) 706-9187
tdurham@mayerbrownrowe.com

Attorney for Plaintiff

OF COUNSEL:

Andrew T. Gardner
Wells Fargo & Company
90 South 7th Street
MAC: N9305-164
Minneapolis, MN 55479
Tel: (612) 667-3955
Fax: (612) 667-2868

David F. Abbott
MAYER, BROWN, ROWE & MAW LLP
1675 Broadway
New York, New York 10019
Tel: (212) 506-2500
Fax: (212) 262-1910

William A. Schmalzl
Kelly M. Glynn
Brian W. Kittle
MAYER, BROWN, ROWE & MAW LLP
71 South Wacker Drive
Chicago, Illinois 60606
Tel: (312) 782-0600
Fax: (312) 701-7711

Corporate Tax Department
MAC N9305-164
Sixth and Marquette
Minneapolis, MN 55479
612 667-6975
612 667-2868 Fax

May 10, 2005

Mr. Michael G. Karel
Internal Revenue Service
6040 Earle Brown Drive, Rm 300
Brooklyn Center, MN 55430-9956

RE: Wells Fargo & Company and Subsidiaries
EIN: 41-0449260
Taxable Years: 12/31/01; 12/31/02

Dear Mr. Karel:

The Taxpayer is in receipt of a 30-Day Letter, dated April 22, 2005, and the attached report of the Examining Agent ("Examiner"), for the taxable years ended December 31, 2001 and December 31, 2002. While the Taxpayer disagrees with some parts of the report, the Taxpayer signed a Form 870, "Waiver of Restrictions on Assesment and Collection of Deficiency in Tax and Acceptance of Overassessment," and returned it to the Examiner on April 28, 2005. As discussed previously with the Examiner, the Taxpayer is filing claims for refund concurrently herewith for the unagreed issues disallowed by the Examiner in the 30-Day Letter.[1] The Taxpayer expects that these claims will be denied in full by the Examiner. The Taxpayer hereby protests the unagreed issues disallowed by the Examiner set forth in the 30-Day Letter, and the expected denial of the Taxpayer's claim involving such issues.

1. Conference

The Taxpayer appeals the findings of the Examiner and expected denial of the claim for refund for the unagreed issues, and requests a hearing before the Appeals Office.

2. Name and Address of Taxpayer

Wells Fargo & Company and Subsidiaries
Corporate Tax Department
MAC N9305-164
1600 Wells Fargo Center
Sixth and Marquette

EXHIBIT
A

[1] The claim filed herewith also includes an affirmative issue related to deferred loan fees, which is discussed in this Protest.

Minneapolis, MN 55479
(612) 667-7321 (Mark Hager)

### 3. Taxable Years Involved

Taxable Years Ended: December 31, 2001 and December 31, 2002

### 4. Itemized List of Unagreed Adjustments

The attached copy of Form 4549-B, Income Tax Examination Changes, from the 30-Day Letter dated April 22, 2005 indicates the proposed changes and findings that are unagreed. For purposes of this Protest, the adjustments are identified from the 2001 and 2002 claim as follows:[2]

Disallowed Form 1120 Items as Originally Filed

| Issue | Description | 2001 Amount | 2002 Amount |
|---|---|---|---|
| A. | SILO Belgacom (Issue #26) | $5,587,929 | $1,663,147 |
| B. | SILO Sonera (Issue #27) | $8,907,903 | $4,294,377 |
| C. | SILO Cegetel/SFR (Issue #28) | $39,914,702 | $20,337,340 |
| D. | SILO Caltrans I (Issue #29) | $5,215,757 | $5,377,835 |
| E. | SILO LACMTA (Issue #30) | $3,897,235 | $3,983,727 |
| F. | SILO Cathy Pacific (Issue #31) | $9,750,645 | $9,837,910 |
| G. | SILO PCJPB (Issue #32) | $4,385,230 | $4,291,979 |
| H. | SILO BART (Issue #33) | -0- | $15,114,952 |
| I. | SILO Caltrans II 2001 (Issue #34) | $1,161,768 | $4,664,968 |
| J. | SILO Caltrans II 2002 (Issue #35) | -0- | $1,489,856 |
| K. | SILO DART (Issue #36) | -0- | $5,803,182 |
| L. | SILO MARTA (Issue #37) | -0- | $2,491,840 |
| M. | SILO Metro 2002 WFI (Issue #38) | -0- | $4,616,990 |
| N. | SILO NJT 2001 – WI (Issue #39) | $2,874,578 | $3,442,777 |
| O. | SILO NJT – WF1 (Issue #40) | $3,396,788 | $9,436,450 |
| P. | SILO PCJPB II (Issue #41) | $2,529,239 | $4,544,008 |
| Q. | SILO SCRRA (Issue #42) | -0- | $2,898,560 |
| R. | SILO SEPTA (Issue #43) | -0- | $3,132,227 |
| S. | SILO SFMR/CCSF (Issue #44) | -0- | $3,578,216 |
| T. | SILO WMATA (Issue #45) | -0- | $3,862,911 |
| U. | SILO Metro 2002 WF2 (Issue #46) | -0- | $330,951 |
| | Subtotal SILO | $87,621,774 | $115,174,203 |
| V. | Sec. 6662 Penalty | $6,133,524 | $8,062,194 |

Disallowed Claim Items as amended per Forms 1120X

| Issue | Description | 2001 Amount | 2002 Amount |
|---|---|---|---|
| W. | Net Operating Loss Carryforward (#20) | $19,557,608 | |

Affirmative Claims

| Issue | Description | 2001 Amount | 2002 Amount |
|---|---|---|---|
| X. | Deferred Loan Fees (#12) | $126,873,698 | $7,594,248 |

### 5. Summary of Protested Adjustments and Affirmative Issues

[2] Parenthetical references are to the Issue No. in Form 4549-B, Income Tax Examination Changes.

A-U. The Examiner erred in disallowing the Taxpayer's deduction of $87,621,774 in 2001 and $115,174,203 in 2002 for losses related to so-called "sale-in/lease-out" ("SILO") transactions.

V. The Examiner erred in assessing accuracy-related penalties aggregating $14,195,718 relating to the disallowed deduction in Issues A-U.

W. The Examiner erred in disallowing $19,557,608, which is a portion of the Net Operating Loss carried forward from the tax period ending 10/25/2000 for First Security Leasing Company.

X. The Taxpayer may be entitled to deduct an additional $126,873,698 in 2001 and $7,594,248 in 2002 related to deferred loan fees depending on how the issue is resolved for prior years.

**6. Statement of Facts and Law**

**A-U. Whether the Examiner erred in disallowing deductions for losses incurred in connection with the Taxpayer's so-called SILO transactions.**

The Examiner erred in disallowing the Taxpayer's deduction of $87,621,774 in 2001 and $115,174,203 in 2002 for losses related to SILOs.

This is the same issue in dispute for prior taxable years, which are currently at Appeals. See, for example, Issue E in the 2000 Protest (a copy of the excerpt is attached as Exhibit 1). This issue is further discussed in our Supplemental Protest to Appeals, dated February 4, 2005 (a copy is attached as Exhibit 2). The disposition of the issue in the prior years will likely determine how this issue is resolved for 2001 and 2002.

**V. Whether the Examiner erred in asserting the accuracy-related penalty for negligence under IRC §6662 with respect to the Taxpayer's so-called SILO transactions.**

This is the same issue in dispute for 2000, and is discussed in Issue J in the 2000 Protest (a copy of the excerpt is attached as Exhibit 3). The disposition of Issue J in 2000 will likely determine how this issue is resolved for 2001 and 2002.

**W. Whether the Examiner erred in disallowing a portion of the Net Operating Loss Carryforward.**

<u>Statement of Facts</u>

Wells Fargo & Company acquired First Security Corporation ("First Security") on October 25, 2000. Following the acquisition, final tax returns were filed for the various First Security subsidiaries. The total taxable income/loss of the First Security entities was a Net Operating Loss ("NOL") of $186,810,451. This NOL was eligible to be

carried forward to the Taxpayer's returns. The Taxpayer used $51,844,868 of the NOL in 2000, and filed Form 1120X on March 24, 2003 to use $143,882,132 of the NOL in 2001.

Included in the total NOL as of October 25, 2000 was a loss of $25,992,376 specifically related to First Security Leasing Company. Of this amount, $6,434,768 was used in the Taxpayer's December 31, 2000 tax return, and $19,557,608 was claimed for 2001 on Form 1120X filed on March 24, 2003. The Examiner audited this amount and determined that deductions from two SILO transactions (Cegetel/SFR discussed in Issue C above) were included in the October 25, 2000 tax return year that generated the loss. The total deduction attributed to these SILOs was $20,557,701. The Examiner notified the Taxpayer that this amount would be disallowed along with the other 2001 SILO transactions. However, because the statute of limitations was closed for First Security's October 25, 2000 tax year and the Taxpayer's December 31, 2000 tax year, the Examiner instead offset the $19,557,608 remaining NOL carryforward to 2001.

Statement of Law and Analysis

The SILO transactions disallowed here are also in dispute in Issue C above. Accordingly, this issue will be resolved on the same basis as Issue C.

**X. Affirmative Claim – Deferred Loan Fees**

The Taxpayer may be entitled to additional deductions related to deferred loan fees and, therefore, claims these potential deductions as a protective measure.

The Examiner disallowed $79,369,550 in 1997 and $26,806,077 in 1998 related to the Taxpayer's proper application of the "Principal Reduction Method" of accounting for deferred loan fees as described in Revenue Procedure 94-29 and Revenue Procedure 97-37. This issue is currently at Appeals for taxable years 1997-2000. See, for example, Issue K in the 1997 and 1998 Protest (a copy of the excerpt is attached as Exhibit 4).

In 2001, the Taxpayer recorded a Schedule M-1 adjustment (increase in income) of $52,235,347. This was a protective measure; the amount reflects the maximum possible adjustment in the Government's favor that could occur in 2001 based on the possible resolution of this issue for prior years at Appeals.[3] If the Examiner's position in 1997 and 1998 is ultimately sustained at Appeals, the Taxpayer will be entitled to reverse this increase in income in 2001. The Examiner concurs with this reversal. See Form 5701-30 for 2001 (Issue #12 in the Report), which provides as follows:

> Taxpayer reduced their loan fees for the 2001 tax year by $52,235,347. Taking into account prior years adjustments, which are still at Appeals, this will cause a $52,235,347 adjustment for deferred loan fees in

[3] For example, if a settlement was reached at Appeals to allow deductions based on the Principal Reduction method only through December 31, 1998, a Schedule M-1 income adjustment would be required in years after 1998 (totaling $52,235,347) to fully reverse the 1998 cumulative balance as of December 31, 1998.

Taxpayer's favor for the 2001 year. The Taxpayer should file a claim to protect their interest in this issue.

However, if the Taxpayer's position on deferred loan fees is sustained at Appeals, the Taxpayer will be entitled to adjust this amount in a manner consistent with this position. This adjustment would include a reversal of the $52,235,347, plus all additional Schedule M-1 adjustments computed under the Principal Reduction Method. In 2001 the cumulative deferred loan fee balance increased by $74,638,351. Thus, the Taxpayer would be entitled to a deduction of $126,873,698 ($52,235,347 + $74,638,351) for 2001. In 2002, the balance increased by $7,594,248. Consequently, the Taxpayer would be entitled to a deduction of $7,594,248 in 2002.

Under the penalties of perjury, I declare that I have examined the facts stated in this Protest, including any accompanying documents, and, to the best of my knowledge and belief, they are true, correct, and complete.

Michael E. Newburg
Senior Vice President & Director of Tax

May 10, 2005

Form **1120X** (Rev. December 2001)
Department of the Treasury
Internal Revenue Service

# Amended U.S. Corporation Income Tax Return

OMB No. 1545-0132

For tax year ending ▶ 12/31/02 (Enter month and year.)

Please Type or Print

Name: Wells Fargo & Company and Subsidiaries
Number, street, and room or suite no. (If a P.O. box, see instructions.): Wells Fargo Center; MAC N9305-164; Sixth and Marquette
City or town, state, and ZIP code: Minneapolis, MN 55479

Employer identification number: 41-0449260

Telephone number (optional)

Enter name and address used on original return (If same as above, write "Same.")

Internal Revenue Service Center where original return was filed ▶ Ogden, UT

## Fill in Applicable Items and Use Part II To Explain Any Changes

**Part I** Income and Deductions (see instructions)

| | | (a) As originally reported or as previously adjusted | (b) Net change — increase or (decrease) — explain in Part II | (c) Correct amount |
|---|---|---|---|---|
| 1 Total income (Form 1120 or 1120-A, line 11) | 1 | 45,818,726,810 | 0 | 45,818,726,810 |
| 2 Total deductions (total of lines 27 and 29c, Form 1120 or lines 23 and 25c, Form 1120-A) | 2 | 38,448,662,312 | 122,768,451 | 38,571,430,763 |
| 3 Taxable income. Subtract line 2 from line 1 | 3 | 7,370,064,498 | (122,768,451) | 7,247,296,047 |
| 4 Tax (Form 1120, line 31, or Form 1120-A, line 27) | 4 | 2,460,168,679 | (51,031,152) | 2,409,137,527 |
| **Payments and Credits (see instructions)** | | | | |
| 5a Overpayment in prior year allowed as a credit | 5a | 304,034,088 | 0 | 304,034,088 |
| b Estimated tax payments | b | 1,811,250,000 | 0 | 1,811,250,000 |
| c Refund applied for on Form 4466 | c | | | |
| d Subtract line 5c from the sum of lines 5a and 5b | d | 2,115,284,088 | 0 | 2,115,284,088 |
| e Tax deposited with Form 7004 | e | 395,000,000 | 0 | 395,000,000 |
| f Credit from Form 2439 | f | | | |
| g Credit for Federal tax on fuels | g | 0 | 0 | 0 |
| 6 Tax deposited or paid with (or after) the filing of the original return | 6 | | | 0 |
| 7 Add lines 5d through 6, column (c) | 7 | | | 2,510,284,088 |
| 8 Overpayment, if any, as shown on original return or as later adjusted | 8 | | | 50,115,407 |
| 9 Subtract line 8 from line 7 | 9 | | | 2,460,168,679 |
| **Tax Due or Overpayment (see instructions)** | | | | |
| 10 Tax due. Subtract line 9 from line 4, column (c). If paying by check, make it payable to the "United States Treasury." ▶ | 10 | | | 0 |
| 11 Overpayment. Subtract line 4, column (c), from line 9 ▶ | 11 | | | 51,031,152 |
| 12 Enter the amount of line 11 you want: Credited to 20__ estimated tax ▶ Refunded ▶ | 12 | | | 51,031,152 |

**Sign Here**

Under penalties of perjury, I declare that I have filed an original return and that I have examined this amended return, including accompanying schedules and statements, and to the best of my knowledge and belief, this amended return is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

▶ [signature] Signature of officer    5/11/05 Date    ▶ V.P. Title

**Paid Preparer's Use Only**

Preparer's signature ▶    Date    Check if self-employed ☐    Preparer's SSN or PTIN

Firm's name (or yours if self-employed), address, and ZIP code ▶    EIN    Phone no.

For Paperwork Reduction Act Notice, see page 4.
ISA
STF FED4288F.1

Form **1120X** (Rev. 12-2001)

**Part II** **Explanation of Changes to Items in Part I** (Enter the line number from page 1 for the items you are changing, and give the reason for each change. Show any computation in detail. Also, see **What To Attach** on page 3 of the instructions.)

If the change is due to a net operating loss carryback, a capital loss carryback, or a general business credit carryback, see Carryback Claims on page 3, and check here . . . . . . . . . . ▶ ☐

See Attached.

# Wells Fargo & Company and Subsidiaries

## EIN 41-0449260

## Tax Year Ended December 31, 2002

## Statement Regarding Changes Reflected in this Amended Return

Wells Fargo & Company and Subsidiaries is correcting the following items for the taxable year ended December 31, 2002:

| Detail List of Reported Changes to Taxable Income | Amount of Taxable Income Claimed as Refund |
|---|---|
| 1. Wells Fargo Bank, N.A. (EIN #94-1347393) | $98,518,614 |
| 2. Wells Fargo Bank, N.A. (EIN $94-1347393) | $7,594,248 |
| 3. Wells Fargo Equipment Finance, Inc. (EIN #41-0982880) | $11,640,975 |
| 4. Wells Fargo Bank Northwest, N.A. (EIN #87-0131890) | $5,014,614 |
| Subtotal Reduction in Taxable Income | $122,768,451 |
| Subtotal Reduction in Tax | $42,968,958 |
| **Penalty Items** | |
| 5. Wells Fargo & Company (EIN #41-0449260) | $8,062,194 |
| Total Refund of Tax and Penalty | $51,031,152 |

### Explanation of Changes to Reported Amounts

1. Wells Fargo Bank, N.A. is claiming for refund amounts related to so-called "sale-in/lease-out" ("SILO") transactions.

2. Wells Fargo Bank, N.A. is claiming for refund amounts attributable to deferred loan fees accounted for under the Principal Reduction Method.

3. Wells Fargo Equipment Finance, Inc. is claiming for refund amounts related to SILO transactions.

4. Wells Fargo Bank Northwest, N.A. is claiming for refund amounts related to SILO transactions.

5. Wells Fargo & Company is claiming for refund the accuracy related penalty assessed under Internal Revenue Code Section 6662.