**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **WELLS FARGO & COMPANY and SUBSIDIARIES,** | ) | |
| **Plaintiff,** | ) | **No. 06-628 T** |
| **v.** | ) | **Judge Thomas C. Wheeler** |
| **THE UNITED STATES,** | ) | |
| **Defendant.** | ) | |

**JOINT PRELIMINARY STATUS REPORT**

Pursuant to Appendix A of the Rules of the United States Court of Federal Claims, and in response to the Court's Order dated January 19, 2007, the parties hereby file this Joint Preliminary Status Report.

**Does the court have jurisdiction over the action?**

(a) Yes, the parties agree that the Court has jurisdiction over this refund action for the recovery of Federal income taxes paid by Wells Fargo for the taxable year ended December 31, 2002. To the extent Wells Fargo's Complaint could be read to seek relief beyond a refund for the year 2002, the Court lacks jurisdiction. For purposes of clarification, Wells Fargo states that it does not seek a refund for any year other than 2002.

**Should the case be consolidated with any other case and, if so, why?**

(b) No, the parties agree that this case should not be consolidated with any other case.

**Should trial of liability and damages be bifurcated and, if so, why?**

(c) In the event of a trial in this case, the parties believe that separate trials on the questions of liability and damages are unnecessary, and all evidence necessary to resolve both questions should be presented together. We would ask the Court initially to determine the

question of liability only, and afterwards, depending upon the Court's ruling on the merits of the dispute, permit the parties a reasonable period to perform and agree upon any necessary computation of the tax and interest due, so that the parties can submit a stipulation as to the amount of any judgment. This will avoid devoting unnecessary attention to computations at trial.

**Should further proceedings in the case be deferred pending consideration of another case before this court or any other tribunal and, if so, why?**

(d) No.

**In cases other than tax refund actions, will a remand or suspension be sought and, if so, why and for how long?**

(e) NA.

**Will additional parties be joined? If so, the parties shall provide a statement describing such parties, their relationship to the case, the efforts to effect joinder, and the schedule proposed to effect joinder.**

(f) No.

**Does either party intend to file a motion pursuant to RCFC 12(b), 12(c), or 56 and, if so, what is the schedule for the intended filing?**

(g) Neither party has yet determined whether it will file a summary judgment motion under RCFC 56. As discovery proceeds, the United States intends to evaluate whether this case may be susceptible to disposition by summary judgment, as was the recently decided case *BB& T Corporation v. United States* 2007 WL 37798 (M.D.N.C. 2007) (court granted summary judgment in favor of the United States, finding that taxpayer was not entitled to tax benefits claimed from "lease-in/ lease-out" transaction.) The parties do not anticipate filing any motions under RCFC 12(b) or 12(c).

Wells Fargo may file a summary judgment motion with respect to the FTA Transactions (as defined below), based upon the provisions of section 849 of the American Jobs Creation Act of 2004.

**What are the relevant factual and legal issues?**

(h) Wells Fargo's Statement.

The Federal Government's Promotion & Approval of Transactions at Issue. During the period at issue in this case, the United States Federal Government, through the Federal Transit Administration (the "FTA") and the Department of Transportation (the "DOT"), actively encouraged domestic transit agencies operating public transit systems to enter into sale-leaseback transactions for their assets. The Federal government encouraged these transactions as part of its policy to promote innovative financing and funding options in order to reduce dependence on scarce Federal transit resources.

Approval by the FTA was required for any leasing transaction involving transit equipment originally acquired with FTA grants. During the relevant time period, the FTA required that each of the following conditions be satisfied before it would approve a sale-leaseback transaction for domestic transit assets: (a) the transaction provided for economic defeasance of the lessee's obligations as required by FTA Circular 7020.1; (b) the transaction resulted in positive taxable income, *i.e.*, a taxable profit for the lessor; and (c) the transaction produced a significant financial benefit for the lessee transit agency.

Consistent with FTA policy, Wells Fargo entered into seventeen sale-leasebacks of transit equipment with domestic transit agencies (the "FTA Transactions"). The FTA approved each of Wells Fargo's FTA Transactions in letters issued to the respective transit agencies, with the exception of the California Department of Transportation transactions. These transactions did not require FTA approval because the equipment had not been financed with FTA grants. In approving the FTA Transactions, the FTA understood that they would qualify as sale-leasebacks for Federal income tax purposes and would produce positive taxable income.

The FTA Transactions are very similar to five transactions that Wells Fargo entered into in 2003. The IRS has agreed that those transactions involved "Qualified Transportation Property" under section 849(b)(2) of the American Jobs Creation Act of 2004, and has allowed the federal tax benefits for those transactions.

In addition to the FTA Transactions, also at issue are eight sale-leaseback transactions involving "Qualified Technological Equipment" under I.R.C. § 168(i)(2).

Wells Fargo expects the United States to raise the legal issues stated below. A brief summary of the relevant facts follows each issue.

> Economic substance and business purpose. Wells Fargo is one of many financial institutions actively engaged in the leasing business. Wells Fargo operates a leasing business in order to earn a profit and to meet the lease financing needs of its customers. Wells Fargo's leasing business is complementary to its banking business since both involve common areas of expertise such as credit analysis, industry knowledge, and collateral valuation. The leasing business also provides portfolio diversification for Wells Fargo's business. Prior to the years at issue, Wells Fargo had developed expertise with respect to the leasing of transportation assets, including locomotives, rail cars, heavy-duty trucks and trailers, as well as manufacturing and construction equipment.
>
> The leasing transactions at issue have economic substance and business purpose because they were consistent with the business objectives of Wells Fargo's leasing operations. The transactions were expected to produce a significant economic profit and furthered Wells Fargo's objective of operating a diversified leasing portfolio. Wells Fargo's pre-tax economic return from the sale-leaseback transactions, as determined for accounting and financial reporting purposes, is expected to be in the range from approximately 11% to 22% or more.
>
> The form of Wells Fargo's sale-leaseback transactions should be respected for federal income tax purposes because Wells Fargo expected to earn a significant profit from the transactions. *Frank Lyon Co. v. United States*, 435 U.S. 561 (1978); *Johnson v. United States*, 11 Cl. Ct. 17 (1986). In addition, the FTA Transactions have a business purpose because they were encouraged by the Federal Government as a means of financing infrastructure improvements for domestic transit agencies.
>
> Benefits and burdens of ownership. Each transfer from a lessee to Wells Fargo as part of the sale-leaseback transactions qualifies as a sale for Federal income tax purposes because (i) the agreement transferred the benefits and burdens of ownership to Wells Fargo, (ii) Wells Fargo's purchase price was equal to the fair market value of the property (as determined by an independent appraiser), and (iii) there is a reasonable possibility that Wells Fargo can recoup its investment in the leased equipment and earn a profit from the equipment's income producing potential and residual value.
>
> Each of the sale-leaseback transactions was structured as a sale-leaseback in which Wells Fargo acquired the benefits and burdens

of ownership of the equipment in question from the seller/lessee and leased the equipment back to the lessee for a period no greater than 80% of the remaining useful life of the equipment as of the closing date.

Wells Fargo has all of the substantive economic rights associated with its status as a owner of property. The terms of the transactions are in compliance with decades of settled law regarding the taxation of leasing investments. Therefore, the transactions should be respected in accordance with their form.

The United States' Statement

In this case, plaintiff claims it has overpaid its taxes for the year 2002, and seeks a refund of approximately $51 million. Plaintiff's claim is based on its participation in at least 25 SILO (sale-in/ lease-out) transactions in that year. Plaintiff argues that these transactions provide it with approximately $169 million of additional deductions for interest, depreciation, and other expenses. Plaintiff has the burden of proving it is entitled to these deductions.

SILO shelters, like those engaged in by plaintiff, have been designated by the IRS as "listed transactions" for purposes of the disclosure requirements set forth in sections 6111 and 6112 of the Internal Revenue Code and section 1.6011-4(b)(2) of the Treasury Regulations. *See* Notice 2005-13. They are sold, typically by promoters, to generate large tax benefits for the purchasing taxpayer. In a SILO – as is true in the SILO transactions at issue here – the counter-party is a tax-indifferent entity, such as a governmental entity or foreign company, that cannot use deductions for depreciation, interest, and other expenses. For a fee, a paper transaction is created in which the tax indifferent party purports to sell, and then lease-back, certain assets. The tax indifferent party, however, continues to operate and use the assets, and never transfers the benefits and burdens of ownership – nothing really changes. Additionally, the purported "sale" and "lease" payments, and "borrowing costs" incurred, merely form a circular flow of funds between the parties and a cooperating bank -- the timing and amounts of rent and interest payments, for instance, are identical and offset each other. The taxpayer is out-of-pocket only the accommodation fee paid to the tax indifferent counterparty and the transaction costs for the shelter. Through the defeasance of rent payments, guarantees and other agreements, any risk of default or non-payment on the obligations relating to the purported sale and lease of the property are also eliminated, In substance, therefore, the shelter is a paper sale of tax benefits, and not a true sale or lease of the assets.

> Here, under well-established law, the tax benefits that plaintiff claims as a result of the SILO transactions must be disregarded. Pursuant to the economic substance, substance-over-form, and step-transaction doctrines, the SILO transactions did not, in substance, involve a sale of the assets, and plaintiff did not become the owner of the assets for tax purposes. At most, the transactions would constitute guaranteed financing or investment arrangements, and plaintiff's interests in the assets would be, at most, contingent future interests. *See e.g., BB&T Corp. v. United States*, 2007 WL 37798; and *Frank Lyon Co. v. United States*, 435 U.S. 561 (1978). Accordingly, plaintiff is not entitled to take deductions for depreciation of the assets, for interest on funds allegedly borrowed to "purchase" the assets, or for amortization of transaction costs. On the other hand, plaintiff also need not report the "rental" payments under the SILO transactions as income.
>
> Plaintiff states above that it is engaged generally in the leasing business, beyond the SILO transactions at issue here. That may be, but those other leasing deals cannot provide the economic substance, or other elements required under the applicable law, in order for the SILO transactions to be respected for tax purposes. *See Coltec Industries Inc. v. United States*, 454 F.3d 1340 (Fed. Cir. 2006). Additionally, plaintiff claims that some of the SILO transactions were purportedly "approved" by the FTA, for its own purposes. The FTA does not review transactions for their tax consequences and has no authority to make tax determinations. Thus, whatever review the FTA did conduct cannot establish, in this *de novo* proceeding, that the SILO transactions meet the requirements of the applicable tax law.

**What is the likelihood of settlement? Is alternative dispute resolution contemplated?**

(i) It is unlikely the case will be settled. Therefore, it is unlikely that alternative dispute resolution would be beneficial.

**Do the parties anticipate proceeding to trial? Does either party, or do the parties jointly, request expedited trial scheduling and, if so, why? A request for expedited trial scheduling is generally appropriate when the parties anticipate that discovery, if any, can be completed within a 90-day period, the case can be tried within 3 days, no dispositive motion is anticipated, and a bench ruling is sought. The requested place of trial shall be stated. Before such a request is made, the parties shall confer specifically on this subject.**

(j) Unless summary judgment motions are filed, and granted, the parties anticipate proceeding to trial. The parties do not request expedited trial scheduling.

**Are there special issues regarding electronic case management needs?**

(k) The parties do not currently anticipate any special issues regarding electronic case management.

**Is there other information of which the court should be aware at this time?**

(l) No, the parties agree that there is no other information of which the court should be aware at this time.

**Discovery**. The parties are currently discussing how to structure discovery and how to best present the case to the Court. Wells Fargo's complaint seeks a tax refund based on its participation in at least 25 sale-leaseback transactions. The counterparties in these transactions, from whom discovery will be sought, include many domestic governmental entities and foreign corporations. The parties anticipate, therefore, that substantial discovery will be required. In light of the number of transactions, the parties are discussing whether or not it is appropriate or feasible to concentrate discovery on certain transactions, and present, at least initially, a smaller number of transactions to the Court for decision. Because these discussions are still ongoing, and the parties' conclusions on these issues depend on discovery yet to be completed, the parties propose the preliminary discovery schedule set forth below, and that the Court hold a status hearing in five months to consider any modification of the schedule and any recommendations of the parties regarding further proceedings. Wells Fargo would oppose any extension of the fact discovery schedule beyond that stated below.

| | |
|---|---|
| Close of Fact Discovery | April 30, 2008 |
| Expert Reports Due | June 15, 2008 |
| Expert Rebuttal Reports Due | July 15, 2008 |
| Expert Discovery Closes | August 15, 2008 |

Respectfully submitted this 12th day of March, 2007.

/s/ Thomas C. Durham
Thomas C. Durham
MAYER, BROWN, ROWE & MAW LLP
71 South Wacker Drive
Chicago, Illinois 60606
Tel: (312) 701-7216
Fax: (312) 706-9187
tdurham@mayerbrownrowe.com

Attorney for Plaintiff

/s/ Cory A. Johnson
Cory A. Johnson
Attorney of Record

U.S. Department of Justice
Tax Division
Court of Federal Claims Section
P.O. Box 26, Ben Franklin Station
Washington D.C. 20044
Tel: 202- 307-3046
Fax: 202-514-9440

Eileen J. O'Connor
Assistant Attorney General
David Gustafson
Chief, Court of Federal Claims Section
Steven I. Frahm
Assistant Chief, Court of Federal Claims Section

Of Counsel