Exhibit A

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

MAY 20 2008

| | | |
|---|---|---|
| **WELLS FARGO & COMPANY and SUBSIDIARIES,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **No. 06-628 T** |
| | ) | **(Judge Thomas C. Wheeler)** |
| **THE UNITED STATES,** | ) | |
| **Defendant.** | ) | |

**NOTICE OF DOCUMENT REQUEST BY SUBPOENA**

PLEASE TAKE NOTICE that the United States has requested the production of documents from JPMorgan Chase & Company. The documents will be produced on June 16, 2008, at 555 4th Street, NW, Washington, DC 20001.

CORY A. JOHNSON
Attorney of Record
U.S. Department of Justice
Tax Division
Court of Federal Claims Section
Ben Franklin Station
Washington, DC 20044

JOHN A. DICICCO
Deputy Assistant Attorney General, Tax Division
DAVID GUSTAFSON
Chief, Court of Federal Claims Section
STEVEN I. FRAHM
Assistant Chief, Court of Federal Claims Section
JENNIFER P. WILSON
Trial Attorney
JOSEPH B. SYVERSON
Trial Attorney
RICHARD H. BOWLES
Trial Attorney

Of Counsel

May 20, 2008

# United States Court of Federal Claims

Wells Fargo & Co. and Subsidiaries

vs

No. 06-628T

THE UNITED STATES

## SUBPOENA

To JPMorgan Chase & Company
270 Park Avenue
New York, NY 10017

☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify in the above case.

PLACE OF TESTIMONY

COURTROOM

DATE AND TIME

☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

PLACE OF DEPOSITION

DATE AND TIME

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

See Attachment A

555 4th St. NW, Room 8322, Washington, DC 20001 — June 16, 2008, at 11:00 a.m.

PLACE — DATE AND TIME

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

PREMISES

DATE AND TIME

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. RULE 30(b)(6).

Attorney for Defendant — May 20, 2008

ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) — DATE

Joseph B. Syverson, JUSTICE DEPT., TAX DIVISION, COURT OF FEDERAL CLAIMS SECTION, P. O. BOX 26, BEN FRANKLIN STATION, WASHINGTON, DC 20044, (202) 307-6508

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER

NOTE - If the place of travel is more than 100 miles (by the shortest usual means of travel) from the place where the subpoena is served, or if the place of deposition is more than 100 miles from the place where the deponent resides, is employed or transacts business in person, the person served may regard the command as optional unless there is attached to the subpoena an order of the court requiring his/her appearance, notwithstanding the distance of travel. In any event, response to the subpoena will entitle the person to the fees and mileage allowed by law.

**PROOF OF SERVICE**

DATE PLACE

**SERVED**

SERVED ON (PRINT NAME) MANNER OF SERVICE

☐ Fees tendered for one day's attendance and mileage allowed by law.

(Fees and mileage need not be tendered when the subpoena is issued on behalf of the United States or an officer or agency thereof.)

**DECLARATION OF SERVICE**

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the proof of Service is true and correct.

Executed on ______________________
DATE

SIGNATURE OF SERVER

ADDRESS OF SERVER

Rule 45.

(c) Protection of Persons Subject to Subpoenas.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

(2)(A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph(d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy the materials or inspect the premises except pursuant to an order of the court. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3)(A) On timely motion, the court shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance; or

(ii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iii) subjects a person to undue burden.

(B) if a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information; or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute an resulting from the expert's study made not at the request of any party,

the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party on whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) Duties in Responding to Subpoena.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

ATTACHMENT A
(JP Morgan Chase & Company)

## **Definitions**

The following definitions shall apply in this subpoena unless otherwise noted:

A. "Document" means and includes all materials or data subject to production under Rule 45 of the Rules of the U.S. Court of Federal Claims ("RCFC") and all writings or recordings within the meaning of Fed. R. Evid. 1001. The term shall be broadly construed to include (but shall not be limited to) correspondence, electronic mail, notes, notations, contracts, brochures, agreements, deeds, leases, letters, memoranda, checks, bank statements, reports, analyses, projections, studies, records, corporate minutes, financial statements, financial records, accounting or audit work papers (including permanent work papers), spreadsheets, transcripts, recordings, and all other types of written or documentary materials. It includes all originals, copies, and non-identical copies (whether by reason of handwritten notations thereon or otherwise), regardless of whether the information is stored on paper, in electronic form, or through any other medium.

B. The term "person" shall be construed to mean and include an individual, trust, estate, partnership, company, corporation, governmental body, or other entity.

C. The words "identify," "identifying," or "identity":

(i) when used in reference to a natural person, include the full name, present home and business address, present or last known employer, and present business and home telephone numbers of the individual;

(ii) when used in reference to an entity other than a natural person, include

that entity's full name, the present or last known address of its principal office or place of business, the type of entity (e.g. corporation, partnership, unincorporated association, etc.), and present business telephone number of that entity;

(iii) when used in reference to a document, include the (1) nature of the document; (2) the name of each author or person by whom the document was written, prepared, recorded, made, or signed; (3) the dates each person or author identified participated in the writing, preparation, recording, marking or signing of the document; (4) the organization or entity which issued or promulgated the writing; (5) the date of the document; (6) to whom it was addressed or furnished; (7) the number of pages in the document; (8) the subject matter of the document; and (9) the name and current or last-known business and residential address and telephone numbers of each person having custody, control, or possession of such document.

D. The term "Plaintiff" refers to Wells Fargo & Company and Subsidiaries ("Wells Fargo"), and all predecessors, successors, and all presently or formerly affiliated entities, including Norwest Corporation, First Security Corporation, and First Security Leasing Company.

E. The term "Transaction(s)" refers to one or more of the Leasing Transaction(s) or Related Transaction(s) or any component thereof. The term "Leasing Transaction(s)" refers to the purported leasing transactions whose tax consequences are at issue in this case. The term "Related Transaction(s)" refers to all subordinate transactions that are a part of and are related to

the Leasing Transactions. For example, Related Transactions include loans, letters of credit, defeasance agreements, payment undertaking agreements, pledges, guarantees and consulting applicable to a Leasing Transaction. For each set of Leasing Transactions listed in the chart below, a non-exhaustive list of third parties with whom Plaintiff or its affiliates potentially entered into Related Transaction(s) is provided in the right-hand column of the following chart.

| | | |
|---|---|---|
| (i) | Belgacom Mobile, SA<br>*(December 19, 1997)* | Stichting Stella<br>First Security Bank<br>De Lage Laden Financial Services B.V.<br>RABO Merchant Bank N.V.<br>Merrill Lynch Capital Services |
| (ii) | Sonera, Ltd.<br>*(December 18, 1998)* | Societe Generale Bank Nederland N.V.<br>Societe Generale, acting through its branch office in Amsterdam<br>AIG Financial Products (Jersey) Limited<br>First Security Bank National Association |
| (iii) | Societe Francaise du Radiotelephone<br>*(April 1, 1999)* | Seimora V B.V. (B.V.)<br>First Security Bank N.A., as Trustee<br>Credit Commercial de France - Charterhouse S.A.<br>Credit Commercial de France - Paris Branch<br>Morgan Guaranty Trust Company of New York & Bayerische Landesbank |

| | | |
|---|---|---|
| (iv) | State of California Department of Transportation<br>*(May 4, 2000; December 18, 2001; May 21, 2002)* | State Street Bank and Trust Company of California, N.A.<br>AIG-FP Funding (Cayman) Limited<br>AIG-FP Special Finance (Cayman) Limited<br>AIG Financial Products (Jersey) Limited |
| (v) | Los Angeles County Metropolitan Transportation Authority<br>*(June 22, 2000)* | AIG – FP Funding (Cayman) Limited<br>AIG – FP Special Finance (Cayman) Limited<br>AIG Financial Products Limited<br>State Street Bank and Trust Company of California, N.A. |
| (vi) | Cathay Pacific Airways Limited<br>*(July 7, 2000)* | Wilmington Trust Company<br>Mercantile Leasing Company (No. 132)<br>Barclays Bank PLC<br>AIG Financial Products (Jersey) Limited<br>Wilmington Trust Company |
| (vii) | Peninsula Corridor Joint Powers Board<br>*(November 2, 2000; September 28, 2001)* | AIG-FP Funding (Cayman) Limited<br>AIG-FP Special Finance (Cayman) Limited<br>AIG Financial Products (Jersey) Limited ("AIGFPJ")<br>State Street Bank and Trust Company of California, N.A. |
| (viii) | Bay Area Rapid Transit<br>*(March 19, 2002)* | AIG-FP Funding (Cayman) Limited<br>AIG-FP Special Finance (Cayman) Limited<br>Financial Security Assurance Inc.<br>State Street Bank and Trust Company of California, N.A. |
| (ix) | Dallas Area Rapid Transit<br>*(July 10, 2002)* | FSA Global Funding Limited<br>Premier International Funding Company<br>Financial Security Assurance Inc. (FSA) |

| | | |
|---|---|---|
| (x) | Metropolitan Atlanta Rapid Transit Authority<br>*(September 27, 2002)* | Wilmington Trust Company<br>AE Global Investments, LLC<br>AE Global Asset Funding, LLC.<br>Ambac Assurance Corporation<br>Radian Asset Assurance, Inc. |
| (xi) | Metropolitan Transit Authority of Harris County, Texas<br>*(May 2, 2002; December 19, 2002)* | FSA Global Funding Limited (FSA Global)<br>Premier International Funding Corporation<br>Financial Security Assurance Inc (FSA)<br>ACE Guaranty Reinsurance Inc (ACE)<br>Ernst & Young, LLP |
| (xii) | New Jersey Transit Corporation<br>*(February 1, 2001; December 27, 2001)* | FSA Global Funding Limited<br>Premier International Funding Co.<br>Dexia Credit Local, New York Agency (Dexia)<br>Financial Security Assurance Inc. (FSA)<br>BB & T |
| (xiii) | Southern California Regional Rail Authority<br>*(August 22, 2002)* | AIG-FP Funding (Cayman) Limited<br>AIG Special Finance (Cayman) Limited<br>AIG Matched Funding Corp. (AIGMFC)<br>State Street Bank and Trust Company of California, N.A. |
| (xiv) | Southeastern Pennsylvania Transportation Authority<br>*(September 25, 2002)* | FSA Global Funding Limited<br>Premier International Funding Co. (Premier)<br>Wilmington Trust Company |
| (xv) | City and County of San Francisco (including the San Francisco Municipal Railway)<br>*(December 18, 2001)* | FSA Global Funding Limited<br>Premier International Funding Co. (Premier)<br>State Street Bank and Trust Company of California, National Association |

| | | |
|---|---|---|
| (xvi) | Washington Metropolitan Area Transit Authority<br>*(September 10, 2002)* | AIG-FP Funding (Cayman) Limited<br>AIG-FP Special Finance (Cayman) Limited<br>AIG Matched Funding Corp<br>Wilmington Trust Company |

F. The term "Morgan" refers to JPMorgan Chase and Company, and all predecessors, successors, parents, subsidiaries, all presently or formerly affiliated entities, including but not limited to Morgan Guaranty Trust Company, and all employees, partners, counsel, accountants, and/or other representatives of any of the foregoing.

**Instructions**

A. Documents produced should be organized and labeled to correspond with the numbered requests in this subpoena or produced as they are kept in the ordinary course of business. A document control number ("Bates-stamp") also should be affixed or stamped on each page of all documents produced.

B. If any document or portion of a document is not produced based on a claim of privilege, you must make the claim expressly and provide a privilege log in which you describe the nature of the documents, communications or things not produced or disclosed in a manner that, without revealing the alleged privileged information, will enable the United States and the Court to assess the applicability of the claimed privilege.

C. If you intend to produce any documents in electronic form, please call Joseph B. Syverson (202-307-6508), counsel for the United States, before producing the material to discuss the format for such a production.

D. The time scope for these requests is 1996 through the present.

**Document Requests**

1. All documents relating to any of the Transactions, including, but not limited to:

   (a) all correspondence relating to the Transactions;

   (b) all documents that refer to, discuss, or relate to the inception, promotion, marketing of the Transactions, including, but not limited to, all mandates and requests for bids or proposals;

   (c) all documents concerning the solicitation or referral of participants for the Transactions, including, but not limited to, documents reflecting or referring to how or why Morgan or any other participants, advisors, arrangers, appraisers or consultants, were contacted, selected or became involved;

   (d) All contracts, agreements, and other governing documents relating to the Transactions, including all documents reflecting any amendments, renegotiations, side-agreements, or changes to the terms of any such contracts or agreements;

   (e) All documents related to the negotiation of any of the terms of any of the Transactions, including but not limited to any draft of any document described in the preceding subparagraph;

   (f) All documents related to Morgan's internal consideration, analysis, and approval of any of the Transactions or any part thereof;

   (g) All documents related to Morgan's investigation, consideration, or analysis of the credit risks, if any, associated with Morgan's participation

in the transactions, including but not limited to

(i) any documents relating to any investigation, consideration, or analysis of the creditworthiness of Plaintiff or any other equity investor or participant in any of the Leasing Transactions,

(ii) any documents relating to any investigation, inspection, or analysis of any of the property that was the subject of the Leasing Transactions, and

(iii)any credit files maintained by Morgan in connection with any of the Transactions;

(h) All documents related to any account with Morgan that was created, maintained, or otherwise affected in connection with any of the Transactions, including but not limited to

(i) any statement of account for any of the foregoing,

(ii) any wire transfer or other document reflecting any transfer of funds to or from any of the foregoing, and

(iii)all confirmations or other records of any trade or other transaction entered into in connection with any of the foregoing;

(i) all documents concerning the potential risks or benefits to any participant in the Transactions;

(j) all documents concerning options or elections available to any participant in the Transactions under the terms of the operative agreements, including but not limited to, documents relating to the likelihood of any option or

election being selected or occurring and the potential costs and benefits of any option or election;

(k) all documents concerning the tax treatment or reporting relating to the Transactions;

(l) all documents relating to the financial reporting of the Transactions, and any related assumptions;

(m) all documents relating to regulatory reporting relating to the Transactions, and any related assumptions;

(n) all documents relating to equity investors in addition to Plaintiff participating in the Transactions;

(o) all documents relating to the participation of other equity investors in the Transactions or in substantially similar transactions at or about the same time involving substantially similar assets or property (*e.g.*, a separate "tranche"); and

(p) documents reflecting transfers made or recorded in connection with the Transactions, including documents reflecting the amounts, timing, method, and participants in any such transfers or accounting entries; and

(q) all notices, certifications or other documents sent to any participant in the Transactions.

2. All correspondence and other documents reflecting communication with third parties regarding the Transactions, which third parties include, but are not limited to, those entities listed in the chart in Paragraph E of this document's Definitions

section and equity investors in the Transactions in addition to Plaintiff.

3. All correspondence and other documents provided to or received from the Federal Transit Administration and/or the Department of Transportation regarding the Transactions.

4. All documents relating to promotional, marketing, or presentation materials, including, but not limited to, documents distributed at conferences or seminars, regarding the type of transaction described in IRS Revenue Ruling 2002-69, 2002-2 C.B. 760 (copy attached hereto as Exhibit A) or IRS Notice 2005-13, 2005-9 I.R.B. 630 (copy attached hereto as Exhibit B), or regarding purported sale-in, lease-out leveraged lease transactions.

5. All documents reflecting Morgan's fees related to the Transactions, how those fees were determined, and who paid the fees.

6. All documents reflecting Morgan's established practices and procedures, if any, relating to its internal review, analysis, and approval of transactions similar to the Transactions in which Morgan was involved or similar to any component of any such Transaction, including but not limited to nonrecourse loans, pledges, letters of credit, and payment undertakings.

7. Documents in your possession, custody or control sufficient to identify all of the partners, officers, employees, and agents of Morgan who performed work related to the Transactions.

8. A copy of all versions of Morgan's document retention policies in effect at any time from 1996 through the present.

H
Rev. Rul. 2002-69, 2002-44 I.R.B. 760, 2002-2 C.B. 760, 2002 WL 31272941 (IRS RRU)

Internal Revenue Service (I.R.S.)
IRS RRU

Revenue Ruling
BUSINESS EXPENSES; INTEREST; LEASE-IN/LEASE-OUT TRANSACTIONS

Released: October 12, 2002
Published: November 4, 2002

**Section 163.--Interest**, *26 CFR 1.162-17: Interest deduction in general.*

May a taxpayer deduct currently, under § 163, interest paid or incurred in connection with a lease-in/lease-out (LILO) transaction that properly is characterized as conferring only a future interest in property.

**Section 162.--Trade or Business Expenses**, *26 CFR 1.162-11: Rentals.*

**Business expenses; interest; lease-in/lease-out transactions.** A taxpayer may not deduct currently, under sections 162 and 163 of the Code, rent and interest paid or incurred in connection with a lease-in/lease-out (LILO) transaction that properly is characterized as conferring only a future interest in property. Rev. Rul. 99-14 modified and superseded.

**Business expenses; interest; lease-in/lease-out transactions.** A taxpayer may not deduct currently, under sections 162 and 163 of the Code, rent or interest paid or incurred in connection with a lease-in/lease-out (LILO) transaction that properly is characterized as conferring only a future interest in property.

ISSUE
May a taxpayer deduct currently, under §§ 162 and 163 of the Internal Revenue Code, rent and interest paid or incurred in connection with a "lease-in/lease-out" ("LILO") transaction?

FACTS
*X* is a U.S. corporation. *FM* is a foreign municipality that has historically owned and used certain property. As of 1997, it is estimated that the property has a remaining useful life of 50 years and a fair market value of $100 million. *BK1* and *BK2* are banks. None of these four parties is related to any of the others.

On January 1, 1997, *X* and *FM* entered into a LILO transaction under which *FM* leased the property to *X* under a "Headlease," and *X* immediately leased the property back

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

to *FM* under a "Sublease." The term of the Headlease is 40 years. The primary term of the Sublease is 20 years. Moreover, as described below, the Sublease also may be renewed for a term of 10 years ("put renewal term") at the option of *X*. *X*'s right to possess the property under the Headlease for the first 20 years is substantially the same as *FM*'s right to possession under the Sublease for the primary term.

The Headlease requires *X* to make two rental payments to *FM* during its 40-year term: (1) an $89 million prepayment at the beginning of year 1; and (2) a postpayment at the end of year 40 that has a discounted present value of $8 million. For federal income tax purposes, *X* and *FM* allocate the prepayment ratably to the first 6 years of the Headlease and the future value of the postpayment ratably to the remaining 34 years of the Headlease.

The Sublease requires *FM* to make fixed, annual rental payments over both the primary term and, if exercised, the put renewal term. The fixed, annual payments during the put renewal term are equal to 90 percent of the amounts that (as of January 1, 1997) are projected to be the fair market value rental amounts for that term.

To partially fund the $89 million Headlease prepayment, *X* borrows $54 million from *BK1* and $6 million from *BK2*. Both loans are nonrecourse, have fixed interest rates, and provide for annual debt service payments that fully amortize the loans over the 20-year primary term of the Sublease. The amount and timing of the debt service payments mirror the amount and timing of the Sublease payments due during the primary term of the Sublease. The remaining $29 million of the Headlease prepayment is provided by *X*.

Upon receiving the $89 million Headlease prepayment, *FM* deposits $54 million into a deposit account with an affiliate of *BK1* and $6 million into a deposit account with an affiliate of *BK2*. The deposits with the affiliates of *BK1* and *BK2* earn interest at the same rates as the loans from *BK1* and *BK2*. *FM* directs the affiliate of *BK1* to pay *BK1* annual amounts equal to 90 percent of *FM*'s annual rent obligation under the Sublease (that is, amounts sufficient to satisfy *X*'s debt service obligation to *BK1*). The parties treat these amounts as having been paid from the affiliate to *FM*, then from *FM* to *X* as rental payments, and finally from *X* to *BK1* as debt service payments. In addition, *FM* pledges the deposit account to *X* as security for *FM*'s obligations under the Sublease, while *X*, in turn, pledges its interest in *FM*'s pledge to *BK1* as security for *X*'s obligations under the loan from *BK1*. Similarly, *FM* directs the affiliate of *BK2* to pay *BK2* annual amounts equal to 10 percent of *FM*'s annual rent obligation under the Sublease (that is, amounts sufficient to satisfy *X*'s debt service obligation to *BK2*). The parties treat these amounts as having been paid from the affiliate to *FM*, then from *FM* to *X* as rental payments, and finally from *X* to *BK2* as debt service payments. Although *FM*'s deposit with the *BK2* affiliate is not pledged, the parties understand that *FM* will use the account to pay the remaining 10 percent of *FM*'s annual rent obligation under

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the Sublease.

As a result of the foregoing arrangement, *X*'s obligation to make the property available under the 20-year primary term of the Sublease is completely offset by *X*'s right to use the property under the Headlease. *X*'s obligation to make debt service payments on the loans from *BK1* and *BK2* is completely offset by *X*'s right to receive Sublease rentals from *FM*. Moreover, *X*'s exposure to the risk that *FM* will not make the rent payments is further limited by the arrangements with the affiliates of *BK1* and *BK2*. In the case of the loan from *BK1*, *X*'s economic risk is eliminated through the defeasance arrangement. In the case of the $6 million loan from *BK2*, *X*'s economic risk, although not eliminated, is substantially reduced through the deposit arrangement. As a result, neither bank requires an independent source of funds to make the loans, or bears significant risk of nonpayment. In short, during the primary Sublease term, the transaction is characterized by reciprocal and circular obligations that offset one another.

At the end of the Sublease primary term, *FM* has a fixed-payment option to purchase from *X* the Headlease residual (the right to use the property beyond the Sublease primary term subject to the obligation to make the rent postpayment) for a fixed exercise price equal to 105 percent of the amount that (as of January 1, 1997) is projected to be the future fair market value of the Headlease residual. If *FM* exercises the option, the transaction is terminated at that point, and *X* receives the exercise price of the option and is not required to make any portion of the postpayment due under the Headlease. If *FM* does not exercise the option, *X* may elect to (1) use the property itself for the remaining term of the Headlease, (2) lease the property to another person for the remaining term of the Headlease, or (3) compel *FM* to lease the property for the 10-year put renewal term of the Sublease. If *FM* does not exercise the fixed-payment option and *X* exercises its put renewal option, *X* will receive rents that are equal to 90 percent of the amounts that are (as of January 1, 1997) projected to be the fair market rents for that term. If the actual fair market rents in 20 years turn out to be less than the amount specified in the put renewal option and *FM* does not exercise the fixed-payment option, *X* will be able to compel *FM* to lease the property for rents that are greater than the then fair market rental value. Thus, as a practical matter, the fixed-payment option and put renewal option operate to "collar" the value of the Headlease residual during the primary term.

In addition, *X* has nominal exposure to *FM*'s credit under the fixed-payment option and, if exercised, the put renewal term. At the inception of the transaction, *X* requires *FM* to invest $15 million of the Headlease prepayment in highly-rated debt securities that will mature in an amount sufficient to fund the fixed amount due under the fixed-payment option, and to pledge these debt securities to *X*. This arrangement ensures that *FM* is able to make the payment under the fixed-payment option. Having economically defeased both its rental obligations under the Sublease and its fixed-payment under the fixed-payment option, *FM* keeps the remaining portion of the Headlease prepayment as its return on the transaction. If *FM* does not

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

exercise the fixed-payment option and *X* exercises the put renewal option, *X* can require *FM* to purchase a letter of credit guaranteeing the put renewal rents. If *FM* does not obtain the letter of credit, *FM* must exercise the fixed-payment option.

For tax purposes, *X* claims deductions for interest on the loans and for the allocated rents on the Headlease. *X* includes in gross income the rents received on the Sublease. If the fixed-payment option is exercised, *X* also includes the option price and recaptures rent deductions taken during the primary Sublease term that are attributable to the postpayment it is no longer required to make.

LAW AND ANALYSIS

*X* and *FM*'s allocations of the prepayment and the postpayment for federal income tax purposes meet the uneven rent test contained in proposed § 467 regulations (§ 1.467-3(c)(2)(i)), and under those regulations the Headlease would not be treated as a disqualified leaseback or long-term agreement subject to constant rental accrual. Because this LILO transaction was entered into after June 3, 1996, and on or before May 18, 1999, the provisions of the proposed regulations are available. *See* § 1.467-9(c). For later years, however, final § 467 regulations effective May 18, 1999, treat the prepayment of rent as resulting in a deemed loan from *X* to *FM* and require the imputation of interest income to *X.* § 1.467-4. Moreover, *X*'s rent deduction would be subject to proportional rent rules that reflect the time value of money concept. *See* § 1.467-2(c).

The substance of a transaction, not its form, governs its tax treatment. *Gregory v. Helvering*, 293 U.S. 465 (1935). In *Frank Lyon Co. v. United States*, 435 U.S. 561, 573 (1978), the United States Supreme Court stated, "In applying the doctrine of substance over form, the Court has looked to the objective economic realities of a transaction rather than to the particular form the parties employed." The Court evaluated the substance of the transaction in *Frank Lyon* to determine that it was indeed a sale/leaseback, as it was structured, rather than a financing. The Court subsequently relied on its approach in *Frank Lyon* to recharacterize a sale and repurchase of federal securities as a loan, finding that the economic realities of the transaction did not support the form chosen by the taxpayer. *Nebraska Dep't of Revenue v. Loewenstein*, 513 U.S. 123 (1994).

Where parties have in form entered into two separate transactions that result in offsetting obligations, the courts often have collapsed the offsetting obligations and recharacterized the two transactions as a single transaction. In *Rogers v. United States*, 281 F.3d 1108 (10th Cir. 2002), the part-owner (Fogelman) of a professional baseball team that was organized as an S corporation borrowed money from the S corporation. The nonrecourse loan was secured by Fogelman's ownership interest in the corporation and his existing option to purchase the rest of the shares from the taxpayer (Kauffman), the other owner of the team. Fogelman also granted the corporation an option to purchase both his shares and his existing option to buy Kauffman's shares. The option price was an amount equal to the out-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

standing loan balance. The corporation exercised its option immediately but deferred closing until the due date of Fogelman's loan, five months later. On that date, Fogelman transferred his shares in the corporation to the corporation in lieu of its foreclosure on the loan. The corporation claimed that the shares had no value at that time and deducted the loan amount as a bad debt, which was passed through to Kauffman.

The court in *Rogers* applied the substance over form doctrine to collapse the loan and the option transaction into a redemption of Fogelman's stock in exchange for cash. Fogelman had no incentive to repay the loan because any reduction in the loan balance would reduce the option price. The immediate exercise of the option precluded any attempt by Fogelman to repay the loan and keep the stock. On the basis of those facts, among others, the court held that the substance of the transaction was a sale of Fogelman's stock to the corporation.

In *Bussing v. Commissioner*, 88 T.C. 449, *reconsideration denied*, 89 T.C. 1050 (1987), a Swiss subsidiary of a computer leasing company (AG) purchased computer equipment in a sale/leaseback transaction involving a five-year lease. Subsequently, AG purportedly sold the equipment to a domestic corporation (Sutton), which in turn purportedly sold interests in the equipment to the taxpayer (Bussing) and four other individual investors. Bussing acquired his interest in the computer equipment subject to the underlying lease by paying cash, short-term promissory notes, and a long-term promissory note to Sutton. Bussing then leased his interest in the equipment back to AG for nine years. The rents due Bussing from AG equaled Bussing's annual payments on the long-term promissory note to Sutton for the first three years and were supposed to generate nominal annual cash flow thereafter.

The court first disregarded Sutton's participation in the transactions on substance over form grounds. It then held that Bussing's long-term indebtedness also must be disregarded because it was completely offset by AG's rent payments in a "purported sale-leaseback pursuant to which the respective lease and debt obligations flow between only two parties." *Id.* at 458. The court stated,

> The respective obligations between AG and Bussing cancel each other out. Any possible claim by AG with respect to the note is fully offset by AG's rental obligation to Bussing.... Bussing, effectively, will never be required to make any payments on his debt obligation, a feature of the transaction that we believe the parties intended to achieve.

*Id.* After collapsing the offsetting loan and lease, the court concluded that Bussing had acquired an interest in a joint venture with AG and the other investors to the extent of his cash payment only.

Courts have similarly disregarded the parties' obligations in purported installment sales where the taxpayer received an installment note that was offset by some other arrangement between the two parties, indicating that the maker of the note would not be called upon to pay the installment obligation. *See Rickey v. Commis-*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*sioner*, 502 F.2d 748 (9th Cir. 1974), *aff'g* 54 T.C. 680 (1970). Although taxpayers are entitled to arrange the terms of a sale in order to qualify for the installment method, "the arrangements must have substance and must reflect the true situation rather than being merely the formal documentation of the terms of the sale." *Id.* at 752-53, quoting 54 T.C. 680 at 694. *See also United States v. Ingalls*, 399 F.2d 143 (5th Cir. 1968); *Blue Flame Gas Co. v. Commissioner*, 54 T.C. 584 (1970); *Greenfield v. Commissioner*, T.C. Memo. 1982-617; *Big "D" Development Corp. v. Commissioner*, T.C. Memo. 1971-148, *aff'd per curiam*, 453 F.2d 1365 (5th Cir.1972).

Similarly, the Headlease and Sublease impose offsetting obligations that must be disregarded, regardless of whether other components of the LILO transaction are respected. During the first 20 years of its term, the Headlease confers to X a right to use the property that is immediately reversed by the Sublease grant to FM of substantially the same right to use property. In the LILO transaction, the Sublease interest retained by *FM* is of the same nature as the Headlease interest conveyed to *X*. Because the transfer and retransfer of the right to possess the property for the first 20 years are disregarded as offsetting obligations, the transaction that remains is, at best, a transfer of funds from *X* to *FM* in exchange for *FM's* obligation to repay those funds and provide *X* the right to begin to lease the property in 20 years.

An analogous situation occurs when the conveyance of property is accompanied by the retention of some interest in the same property. If the interest retained is of substantially the same nature as the interest conveyed, only a future interest is conveyed. In *McCully Ashlock v. Commissioner*, 18 T.C. 405 (1952), *acq.*, 1952-2 C.B. 1, taxpayer had acquired property through a deed dated June 6, 1945. The seller, however, had retained the right to possession and rentals through August 15, 1947. The court found that taxpayer had acquired only a future interest in the property because "the trustees [sellers] not only retained the rents legally but they also retained control and benefits of ownership." *Id.* at 411. Consequently, rentals from the property were income to the seller.

Similarly, in *Kruesel v. United States*, 63-2 U.S. Tax Cas. (CCH) ¶ 9714 (D. Minn. 1963), the court concluded that taxpayer had transferred only a future, remainder interest in property and reserved a life estate. The government had unsuccessfully argued that taxpayer had sold its entire interest in the property and the taxpayer's amount realized on the sale included the value of a right to occupancy provided to the taxpayer by the buyer.

In contrast, in *Alstores Realty Corp. v. Commissioner*, 46 T.C. 363 (1966), *acq.*, 1967-2 C.B.1, the court held that a sale of property accompanied by the reservation of a right of occupancy did not result in the transfer of only a future interest because the seller's right of occupancy was in the nature of a leasehold interest, because the purchaser acquired the benefits and burdens of ownership of the property.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Alstores* can be distinguished from *McCully Ashlock* and *Kruesel*. *McCully Ashlock* and *Kruesel* conclude that where a retained interest is of the same nature as the interest conveyed, only a future interest has been transferred. In *Alstores*, the interests were not of the same nature.

Similarly, the LILO transaction is distinguishable from the transaction involved in *Comdisco, Inc. v. Commissioner*, 756 F.2d 569 (7th Cir. 1985). In that case, equipment was subject to end user leases, and the lessor of that equipment assigned an interest to taxpayer in a transaction designed to give the taxpayer investment tax credits. The taxpayer's entitlement to the credits depended on whether it had the status of lessee/sublessor. In concluding that it did, the court noted a number of factors that supported taxpayer's claim that it had acquired a leasehold interest. The taxpayer was obligated to the lessor in the event of a default by the sublessee. The taxpayer relet certain equipment after one sublease had expired. In connection with another sublease, the taxpayer was responsible for rent to its assignor in excess of amounts paid by the sublessee directly to the assignor. The court also emphasized the regulatory restrictions on direct leases between the assignor and the end users. *Id.* at 576-77. Unlike *Comdisco*, in the LILO transaction the headlessor and the sublessee are the same party. Further, in the LILO transaction the headlessee/sublessor is not materially exposed to the risk that the sublessee will fail to make rent payments.

Section 162(a)(3) permits a deduction for rentals and other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property. Because *X* does not acquire a current leasehold interest in the property, it is not entitled to current deductions for rent. The $29 million "equity" portion of the Headlease prepayment is, effectively, a payment for at most *X*'s right under the Headlease to lease the property 20 years hence for a term of 20 years. (Economically, $29 million is an overpayment for the value of any right that *X* obtains to lease the property in the future. *X* was willing to overpay in this manner, however, in order to induce *FM* to participate in the transaction.). In accordance with § 467, the $29 million "equity" portion of the Headlease prepayment is deductible over the 20-year residual term of the Headlease (the 10-year put renewal term and the 10-year "shirttail" period). Alternatively, in the event *FM* exercises its fixed-price option at the end of the primary term of the Sublease, *X* will have gain or loss equal to the difference between the option price and *X*'s cost of acquiring a right to the Headlease residual term. Section 1001.

The remainder of the Headlease prepayment, $60 million, must be disregarded, because the "loans" that purportedly finance this portion of the Headlease prepayment are without substance. In *Bridges v. Commissioner*, 39 T.C. 1064, *aff'd* 325 F.2d 180 (4th Cir. 1963), taxpayer "borrowed" funds from banks and used the funds to purchase Treasury notes, which the banks held as collateral and ultimately sold to satisfy taxpayer's debts. The court's rationale for disallowing taxpayer's deductions of prepaid interest is equally applicable here:

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

> [P]etitioner at no time had the uncontrolled use of any additional money, of the bonds, or of the interest on the bonds. He assumed no risk of a rise or fall in the market price of the bonds and could not take advantage of such. His payment to the bank was not for the use or forbearance of money; it was for the purchase of a rigged sales price for the bonds and for a tax deduction. Petitioner incurred no genuine indebtedness, within the meaning of the statute, and as a payment of interest, this transaction was also a sham.

*Id.* at 1078-79. Neither *X* nor *FM* obtain use of the "borrowed" funds. The "loans" purportedly are made to finance *X*'s acquisition of the Headlease interest. But that leasehold interest is substantially offset by an interdependent Sublease with the Headlessor. What remains can only be enjoyed after 20 years and after the loans have been "repaid" using "rents" from a Sublease that itself lacks substance. Under the circumstances, the loans are disregarded.

Although this ruling refers to a foreign municipality and its property, the analysis and holding apply as well to LILO transactions that involve or include domestic tax-exempt or tax-indifferent entities.

HOLDING

A taxpayer may not deduct currently, under §§ 162 and 163, rent or interest paid or incurred in connection with a LILO transaction that properly is characterized as conferring only a future interest in property.

Where appropriate, the Service will continue to disallow the tax benefits claimed in connection with LILO transactions upon other grounds, including that the substance over form doctrine requires their recharacterization as financing arrangements and that they are to be disregarded for lack of economic substance.

EFFECT ON OTHER DOCUMENTS

Rev. Rul. 99-14, 1999-1 C.B. 835, is modified and superseded.

DRAFTING INFORMATION

The principal author of this revenue ruling is John Aramburu of the Office of Associate Chief Counsel (Income Tax & Accounting). For further information regarding this revenue ruling, contact Mr. Aramburu at (202) 622-4960 (not a toll-free call).

Rev. Rul. 2002-69, 2002-44 I.R.B. 760, 2002-2 C.B. 760, 2002 WL 31272941 (IRS RRU)
END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

C

Internal Revenue Service (I.R.S.)

Notice
TAX-EXEMPT LEASING INVOLVING DEFEASANCE
Released: February 11, 2005
Published: February 28, 2005

Tax-exempt leasing involving defeasance. This notice disallows tax benefits claimed by taxpayers who enter into sale-in, lease-out (SILO) transactions and identifies SILOs as listed transactions.

The Internal Revenue Service and the Treasury Department are aware of types of transactions, described below, in which a taxpayer enters into a purported sale-lease-back arrangement with a tax-indifferent person in which substantially all of the tax-indifferent person's payment obligations are economically defeased and the taxpayer's risk of loss from a decline, and opportunity for profit from an increase, in the value of the leased property are limited. This notice alerts taxpayers and their representatives that these transactions are tax avoidance transactions and identifies these transactions, and substantially similar transactions, as listed transactions for purposes of § 1.6011-4(b)(2) of the Income Tax Regulations and §§ 6111 and 6112 of the Internal Revenue Code. This notice also alerts parties involved with these transactions of certain responsibilities that may arise from their involvement with these transactions.

FACTS

X is a U.S. taxpayer. FP is a tax-in-different person that owns and uses certain property. [FN1] BK1, BK2, BK3, and BK4 are banks. None of these parties is related to any other party, unless otherwise indicated.

Situation 1

On the closing date of January 1, 2003 ("Closing Date"), X and FP enter into a purported sale-leaseback transaction under which FP sells the property to X, and X immediately leases the property back to FP under a lease ("Lease"). The purchase and sale agreement and the Lease are nominally separate legal documents. Both agreements, however, are executed pursuant to a comprehensive participation agreement, which provides that the parties' rights and obligations under any of the agreements are not enforceable before the execution of all transaction documents.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

The Lease requires FP to make rental payments over the term of the Lease ("Lease Term"). As described below, the Lease also provides that under certain conditions, X has the option ("Service Contract Option") to require FP to identify a party ("Service Recipient") willing to enter into a contract with X to receive services provided using the leased property ("Service Contract") that commences immediately after the expiration of the Lease Term. The Service Recipient must meet certain financial qualifications, including credit rating and net capital requirements, and provide defeasance or other credit support to satisfy certain of its obligations under the Service Contract. If FP cannot locate a qualified third party to enter into the Service Contract, FP or an affiliate of FP must enter into the Service Contract. The aggregate of the Lease Term plus the term of the Service Contract ("Service Contract Term") is less than 80 percent of the assumed remaining useful life of the property.

On the Closing Date, the property has a fair market value of $105x and X makes a single payment of $105x to FP. To fund the $105x payment, X provides $15x in equity and borrows $81x from BK1 and $9x from BK2. Both loans are nonrecourse and provide for payments during the Lease Term. Accrued but unpaid interest is capitalized as additional principal. As of the Closing Date, the documents reflect that the sum of the outstanding principal on the loans at any given time will be less than the projected fair market value of the property at that time. The amount and timing of the debt service payments closely match the amount and timing of the Lease payments due during the Lease Term.

FP intends to utilize only a small portion of the proceeds of the purported sale-leaseback for operational expenses or to finance or refinance the acquisition of new assets. Upon receiving the $105x purchase price payment, FP sets aside substantially all of the $105x to satisfy its lease obligations. FP deposits $81x with BK3 and $9x with BK4. BK3 may be an affiliate of BK1, and BK4 may be an affiliate of BK2. The deposits with BK3 and BK4 earn interest sufficient to fund FP's rent obligations as described below. BK3 pays annual amounts equal to 90 percent of FP's annual rent obligation under the Lease (that is, amounts sufficient to satisfy X's debt service obligation to BK1). Although FP directs BK3 to pay those amounts to BK1, the parties treat these amounts as having been paid from BK3 to FP, then from FP to X as rental payments, and finally from X to BK1 as debt service payments. In addition, FP pledges the deposit with BK3 to X as security for FP's obligations under the Lease, while X, in turn, pledges its interest in FP's pledge to BK1 as security for X's obligations under the loan from BK1. Similarly, BK4 pays annual amounts equal to 10 percent of FP's rent obligation under the Lease (that is, amounts sufficient to satisfy X's debt service obligation to BK2). Although FP directs BK4 to pay these amounts to BK2, the parties treat these amounts as having been paid from BK4 to FP, then from FP to X as rental payments, and finally from X to BK2 as debt service payments. Although FP's deposit with BK4 is not pledged, the parties expect that the amounts deposited with BK4 will remain available to pay the remaining 10 percent of FP's annual rent obligation under the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Lease. FP may incur economic costs, such as an early withdrawal penalty, in accessing the BK4 deposit.

FP is not legally released from its rent obligations. X's exposure to the risk that FP will not make the rent payments, however, is substantially limited by the arrangements with BK3 and BK4. In the case of the loan from BK1, X's economic risk is remote due to the deposit arrangement with BK3. In the case of the loan from BK2, X's economic risk is substantially reduced through the deposit arrangement with BK4. X's obligation to make debt service payments on the loans from BK1 and BK2 is completely offset by X's right to receive Lease rentals from FP. As a result, neither bank bears a significant risk of nonpayment. [FN2]

FP has an option ("Purchase Option") to purchase the property from X on the last day of the Lease Term ("Exercise Date"). Exercise of the Purchase Option allows FP to repurchase the property for a fixed exercise price ("Exercise Price") that, on the Closing Date, exceeds the projected fair market value of the property on the Exercise Date. The Purchase Option price is sufficient to repay X's entire loan balances and X's initial equity investment plus provide X with a predetermined after-tax rate of return on its equity investment.

At the inception of the transaction, X requires FP to invest $9x of the $105x payment in highly rated debt securities ("Equity Collateral"), and to pledge the Equity Collateral to X to satisfy a portion of FP's obligations under the lease. [FN3] Although the Equity Collateral is pledged to X, it is not among the items of collateral pledged to BK1 or BK2 in support of the nonrecourse loans to X. The Equity Collateral upon maturity, when combined with the balance of the deposits made with BK3 and BK4 and the interest on those deposits, fully funds the amount due if FP exercises the Purchase Option. This arrangement ensures that FP is able to make the payment under the Purchase Option without an independent source of funds. Having economically defeased both its rental obligations under the Lease and its payment obligations under the Purchase Option, FP keeps the remaining $6x, subject to its obligation to pay the Termination Value (described below) upon the happening of certain events specified under the Lease.

If FP does not exercise the Purchase Option, X may elect to (1) take back the property, or (2) exercise the Service Contract Option and compel FP either to (a) identify a qualified Service Recipient, or (b) enter (or compel an affiliate of FP to enter) into the Service Contract as the Service Recipient for the Service Contract Term. If X exercises the Service Contract Option, the Service Recipient must pay X predetermined minimum capacity payments sufficient to provide X with a minimum after-tax rate of return on its equity investment. The Service Recipient also must reimburse X for X's operating and maintenance costs for providing the services.

As a practical matter, the Purchase Option and the Service Contract Option collar X's exposure to changes in the value of the property. If the value of the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

property is at least equal to the Purchase Option Exercise Price, FP likely will exercise the Purchase Option. Likewise, FP likely will exercise the Purchase Option if FP concludes that the costs of the Service Contract Option exceed the costs of the Purchase Option. Moreover, FP may exercise the Purchase Option even if the fair market value of the property is less than the Purchase Option Exercise Price because the Purchase Option is fully funded, and the excess of the Exercise Price over the projected value may not fully reflect the costs to FP of modifying, interrupting, or relocating its operations. If the Purchase Option is exercised, X will recover its equity investment plus a predetermined after-tax rate of return. Conversely, if the Purchase Option is not exercised, X may compel FP to locate a Service Recipient to enter into the Service Contract in return for payments sufficient to provide X with a minimum after-tax rate of return on its equity investment, regardless of the value of the property.

Throughout the Lease Term, X has several remedies in the event of a default by FP, including a right to (1) take possession of the property or (2) cause FP to pay X specified damages ("Termination Value"). Likewise, throughout the Service Contract Term, X has similar remedies in the event of a default by the Service Recipient. On the Closing Date, the amount of the Termination Value is slightly greater than the purchase price of the property. The Termination Value fluctuates over the Lease Term and Service Contract Term, but at all times is sufficient to repay X's entire loan balances and X's initial equity investment plus a predetermined after-tax rate of return. The BK3 deposit, the BK4 deposit and the Equity Collateral are available to satisfy the Termination Value during the Lease Term. If the sum of the deposits plus the Equity Collateral is less than the Termination Value, X may require FP to maintain a letter of credit. During the Service Contract Term, the Service Recipient will be required to provide defeasance or other credit support that would be available to satisfy the Termination Value. As a result, X in almost all events will recover its investment plus a pre-tax rate of return.

For tax purposes, X claims deductions for interest on the loans and for depreciation on the property. X does not include the optional Service Contract Term in the lease term for purposes of calculating the property's recovery period under §§ 168(g)(3)(A) and 168(i)(3). X includes in gross income the rents received on the Lease. If the Purchase Option is exercised, X also includes the Exercise Price in calculating its gain or loss realized on disposition of the property.

The form of the sale from FP to X may be a head lease for a term in excess of the assumed remaining useful life of the property and an option for X to purchase the property for a nominal amount at the conclusion of the head lease term. In some variations of this transaction, the participation agreement provides that if X refinances the nonrecourse loans, FP has a right to participate in the savings attributable to the reduced financing costs by allowing FP to renegotiate certain terms of the transaction, including the Lease rents and the Purchase Option price.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Situation 2

The facts are the same as in Situation 1 except for the following.

The Lease does not provide a Service Contract Option. In lieu of the Purchase Option described in Situation 1, FP has an option ("Early Termination Option") to purchase the property from X on the date ("ETO Exercise Date") that is 30 months before the end of the Lease Term. Exercise of the Early Termination Option allows FP to terminate the Lease and repurchase the property for a fixed exercise price ("ETO Exercise Price") that on the Closing Date, exceeds the projected fair market value of the property on the ETO Exercise Date. The Early Termination Option price is sufficient to repay X's entire loan balances and X's initial equity investment plus a predetermined after-tax rate of return on its equity investment. The balance of the Equity Collateral combined with the balance of the deposits made with BK3 and BK4 and the interest on those deposits fully fund the amount due under the Early Termination Option.

If FP does not exercise the Early Termination Option, FP is required to obtain residual value insurance for the benefit of X, pay rents for the remaining Lease Term, and return the property to X at the end of the Lease Term ("Return Option"). The residual value insurance must be issued by a third party having a specified minimum credit rating and must provide that if the actual residual value of the property is less than a fixed amount ("Residual Value Insurance Amount") at the end of the Lease Term, the insurer will pay X the shortfall. On the Closing Date, the Residual Value Insurance Amount is less than the projected fair market value of the property at the end of the Lease Term. If FP does not maintain the residual value insurance coverage for the entire Lease Term remaining after the ETO Exercise Date, FP will default and be obligated to pay X the Termination Value. If FP does not exercise the Early Termination Option, the rents for the remaining Lease Term plus the Residual Value Insurance Amount are sufficient to provide X with a minimum after-tax rate of return on the property, regardless of the value of the property. As a practical matter, the Early Termination Option and the Return Option collar X's exposure to changes in the value of the property. At the end of the Lease Term, FP also may have the option to purchase the property for the greater of its fair market value or the Residual Value Insurance Amount.

For tax purposes, X claims deductions for interest on the loans and for depreciation on the property. X treats a portion of the property as qualified technological equipment within the meaning of § 168(i)(2). X depreciates that portion of the property over five years under § 168(g)(3)(C). X treats a portion of the property as software. X depreciates that portion of the property over 36 months under § 167(f)(1)(A).

X includes in gross income the rents received on the Lease. If the Early Termination Option is exercised, X also includes the ETO Exercise Price in calculating its gain or loss realized on disposition of the property.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

In some variations of this transaction, if the Early Termination Option is not exercised, the Lease rents payable to X may increase for the portion of the Lease Term remaining after the ETO Exercise Date.

ANALYSIS

The substance of a transaction, not its form, governs its tax treatment. Gregory v. Helvering, 293 U.S. 465 (1935). In Frank Lyon Co. v. United States, 435 U.S. 561, 573 (1978), the Supreme Court stated that "[i]n applying the doctrine of substance over form, the Court has looked to the objective economic realities of a transaction rather than to the particular form the parties employed." The Court evaluated the substance of the particular transaction in Frank Lyon to determine that it should be treated as a sale-leaseback rather than a financing arrangement. The Supreme Court described the transaction in Frank Lyon as "a genuine multiple-party transaction with economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaning-less labels attached." Frank Lyon, 435 U.S. at 584. The Court subsequently relied on its approach in Frank Lyon to recharacterize a sale and repurchase of federal securities as a loan, finding that the economic realities of the transaction did not support the form chosen by the taxpayer. Nebraska Dep't of Revenue v. Loewenstein, 513 U.S. 123 (1994).

A sale-leaseback will not be respected unless the owner/lessor acquires and retains "significant and genuine attributes" of a traditional owner, including "the benefits and burdens of ownership." Coleman v. Commissioner, 16 F.3d 821, 826 (7th Cir. 1994) (citing Frank Lyon, 435 U.S. at 582-84). Considering the totality of the facts and circumstances in the transactions described in Situations 1 and 2, X does not acquire the benefits and burdens of ownership and consequently cannot claim tax benefits as the owner of the property. The transactions described above are, in substance, fundamentally different from the sale-leaseback transaction respected by the Court in Frank Lyon.

First, in Frank Lyon, the sales proceeds were used to construct the lessee's new headquarters. In contrast, in the transactions described above, substantially all of the $105x sales proceeds are immediately set aside by FP to satisfy its obligations under the Lease and to fund FP's exercise of the Purchase Option or the Early Termination Option. As a condition to engaging in the transactions, FP economically defeases substantially all of its rent payment obligations and the amounts due under the Purchase Option or the Early Termination Option by establishing and pledging the deposit with BK3 and the Equity Collateral. Moreover, even though FP may not pledge the deposit with BK4, FP fully funds its remaining rent obligations with the BK4 deposit and may have limited rights to access the funds held in that deposit. Consequently, the only capital retained by FP is the remaining $6x portion of the sales proceeds that represents FP's fee for engaging in the transaction.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Second, in Frank Lyon, the taxpayer bore the risk of the lessee's nonpayment of rent, which could have forced the taxpayer to default on its recourse debt. The Court concluded that the taxpayer exposed its business well-being to a real and substantial risk of nonpayment and that the long-term debt affected its financial position. Frank Lyon, 435 U.S. at 577. In contrast, in the transactions described above, economic defeasance renders the risk to X of FP's failure to pay rent remote. Moreover, because of the economic defeasance, X's right to receive the Equity Collateral upon the exercise of the Purchase Option, and FP's obligation with respect to the Termination Value, a failure by FP to satisfy its lease obligations does not leave X at risk for repaying the loan balances or forfeiting its equity investment.

Third, in Frank Lyon, the taxpayer's return was dependent on the property's value and the taxpayer's equity investment was at risk if the property declined in value. The economic burden of any decline in the value of the property is integral to the determination of tax ownership. See, e.g., Swift Dodge v. Commissioner, 692 F.2d 651 (9th Cir. 1982). In the transactions described above, X bears insufficient risk of a decline in the value of the property to be treated as its owner for tax purposes. In Situation 1, regardless of a decline in the value of the property, X can recover its entire investment, repay both loans, and obtain a minimum after-tax rate of return on its equity investment by exercising the Service Contract Option. Similarly, in Situation 2, a decline in the value of the property will not prevent X from recovering its entire investment, repaying both loans and obtaining a minimum after-tax rate of return on its equity investment through the rents for the remaining Lease Term plus the Residual Value Insurance Amount under the Return Option. The failure of FP to satisfy its obligations under the Service Contract Option in Situation 1 or the Return Option in Situation 2 results in default and obligates FP to pay X the Termination Value. In both Situation 1 and Situation 2, the BK3 and BK4 deposits and Equity Collateral are available to fund FP's obligations upon termination of the Lease. Thus, in both situations, X has substantially limited its risk of loss regardless of the value of the property upon termination of the Lease.

Fourth, the combination of FP's Purchase Option and X's Service Contract Option in Situation 1, and FP's Early Termination Option and continued rent and residual value insurance obligations under the Return Option in Situation 2, significantly increase the likelihood that FP will exercise its Purchase Option in Situation 1 and its Early Termination Option in Situation 2 even if the fair market value of the property is less than the Purchase Option Exercise Price or ETO Exercise Price, respectively, because both options are fully funded and the excess of the exercise price over the leased property's fair market value may not fully reflect the costs to FP of modifying, interrupting, or relocating its operations. See Kwiat v. Commissioner, T.C. Memo. 1992-433 (ostensible lessor did not possess the benefits and burdens of ownership because reciprocal put and call options limited the risk of economic depreciation and the benefit of possible appreciation); see

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

also Aderholt Specialty Co. v. Commissioner, T.C. Memo. 1985-491; Rev. Rul. 72-543, 1972-2 C.B. 87. In contrast, in Frank Lyon, the lessee's decision regarding the exercise of its purchase option was not constrained by a lessor's right to exercise a reciprocal option similar to the Service Contract Option or the Return Option described in Situations 1 and 2, respectively. Similarly, X's opportunity to recognize a return through refinancing the BK1 and BK2 loans is also limited in those cases in which FP has a right to participate in any savings attributable to reduced financing costs, such as through renegotiation of the Lease rents and the Purchase Option price. See Hilton v. Commissioner, 74 T.C. 305 (1980), aff'd, 671 F.2d 316 (9th Cir. 1982) (arrangement whereby lessor and lessee shared the savings from any refinancing of lessor's nonrecourse debt was a factor supporting holding to disregard form of sale-leaseback transaction).

In the transactions described above, X does not have a meaningful interest in the risks and rewards of the property. Thus, X does not acquire the benefits and burdens of ownership of the property and does not become the owner of the property for U.S. federal income tax purposes. In substance, the transactions described above are merely a transfer of tax benefits to X, coupled with X's investment of the Equity Collateral for a predetermined aftertax rate of return.

Furthermore, in appropriate cases, the Service may challenge the purported tax benefits from these transactions on additional grounds, including (1) that the substance over form doctrine requires recharacterization of the arrangement as a financing arrangement, or (2) that the loans from BK1 and BK2, in substance, do not involve the use or forbearance of money, do not constitute valid indebtedness for tax purposes, and that any interest nominally paid or accrued on the loans is not deductible. Cf. Rev. Rul. 2002-69, 2002-2 C.B. 760 (disregarded offsetting obligations in a LILO arrangement gave the taxpayer, at most, a future interest in the property).

The American Jobs Creation Act of 2004, P.L. 108-357, 118 Stat. 1418 (the "Act"), was enacted on October 22, 2004. Section 847 of the Act amended §§ 167 and 168 to provide that service contracts that follow a lease must be included in the lease term and to modify the recovery period for qualified technological equipment and computer software subject to a lease with a tax-exempt entity. Section 848 of the Act added new § 470, which suspends losses for certain leases of property to tax-exempt entities. See H.R. Rep. No. 755, 108th Cong., 2d Sess., at 660, 662-663 (2004). These amendments generally are effective for leases entered into after March 12, 2004. [FN4]

Transactions that are the same as, or substantially similar to, the transactions described in this notice are identified as "listed transactions" for purposes of § 1.6011-4(b)(2) and §§ 6111 and 6112 effective February 11, 2005, the date this notice is released to the public. Independent of their classification as "listed transactions," transactions that are the same as, or substantially similar to, the transactions described in this notice may already be subject to the requirements

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

of § 6011, § 6111, or § 6112, or the regulations thereunder. Persons required to disclose these transactions under § 1.6011-4 who fail to do so may be subject to the penalty under § 6707A. [FN5] Persons required to disclose or register these transactions under § 6111 who have failed to do so may be subject to the penalty under § 6707(a). Persons required to maintain lists of investors under § 6112 who have failed to do so (or who fail to provide such lists when requested by the Service) may be subject to the penalty under § 6708(a). In addition, the Service may impose penalties on parties involved in these transactions or substantially similar transactions, including accuracy-related penalties under § 6662 or § 6662A.

The Service and the Treasury Department recognize that some taxpayers may have filed tax returns taking the position that they were entitled to the purported tax benefits of the types of transactions described in this notice. These taxpayers should consult with a tax advisor to ensure that their transactions are disclosed properly and to take appropriate corrective action.

DRAFTING INFORMATION

For further information regarding this notice, contact John Aramburu at (202) 622-4960 (not a toll-free call).

FN1. In some instances, FP meets the definition of a tax-exempt entity under section 168(h)(2). In other instances, FP does not meet that definition but possesses attributes, such as net operating losses, that render FP tax indifferent.

FN2. The arrangement by which FP sets aside the funds necessary to meet its obligations under the Lease may take a variety of forms other than a deposit arrangement involving BK3 and BK4. These arrangements include a loan by FP to X, BK1 or BK2; a letter of credit collateralized with cash or cash equivalents; a payment undertaking agreement; prepaid rent (regardless of whether X finances a portion of the purchase price by borrowing from BK1 or BK2); a sinking fund arrangement; a guaranteed investment contract; or financial guaranty insurance.

FN3. The arrangement by which the return of X's equity investment plus a predetermined after-tax return on such investment is provided may take a variety of forms other than an investment by FP in highly rated debt securities. For example, FP may be required to obtain a payment undertaking agreement from an entity having a specified minimum credit rating.

FN4. Leases or purported leases of Qualified Transportation Property described in section 849(b) of the Act are not identified as listed transactions subject to the terms of this notice.

FN5. Section 6707A applies to returns and statements due after October 22, 2004. See Notice 2005-11, 2005-7 I.R.B. 493.

Notice 2005-13, 2005-9 I.R.B. 630, 2005 WL 327549 (IRS NOT), 2005-1 C.B. 630

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

CERTIFICATE OF SERVICE

I certify that service of the foregoing document has, this 20 day of May, 2008, been made on counsel for the plaintiff by mailing a copy thereof, in a postage prepaid envelope, to the following address:

Joel V. Williamson
Mayer Brown LLP
71 South Wacker Drive
Chicago, Illinois 60606

U.S. Department of Justice
Tax Division
Court of Federal Claims Section
Post Office Box 26
Ben Franklin Post Office
Washington, D.C. 20044
(202) 307-6440
Fax (202) 514-9440

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 06-628 T
(Judge Thomas C. Wheeler)

WELLS FARGO & COMPANY and SUBSIDIARIES,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

**UNITED STATES' FIFTH REQUEST FOR PRODUCTION**

The United States requests, pursuant to Rules 26 and 34 of the Rules of the United States Court of Federal Claims (RCFC), that Plaintiff produce the documents described below for inspection and copying.

Consistent with the provisions of RCFC 34 that a production "request shall specify a reasonable time, place, and manner of making the inspection and performing the related acts, it is hereby specified that a representative of Plaintiff shall make such documents available for inspection and copying at the offices of Defendant's counsel, Cory A. Johnson, Room 8108, Judiciary Center Building, 555 4th Street, N.W., Washington, D.C. 20001 at 10:00 a.m., on June 15, 2008, or at such other time or location, and in such manner as is mutually agreed upon by both parties.

The documents produced shall be organized and labeled to correspond to the particular request to which they are responsive, and, as so organized and labeled, the documents shall be produced as they are kept in the usual course of business, to the extent possible. It is further requested that Plaintiff identify in its written response each document (or portion thereof) or category of documents withheld from production, and state with respect thereto the specific ground(s) for objection with sufficient particularity to permit the matter to be brought before the Court.

The definitions applicable to the United States' First Set of Interrogatories apply to the following Requests for Production. In addition, the following definitions shall apply in this request unless otherwise noted:

A. "Document" means and includes all materials or data subject to production under Rule 34 of the Rules of the U.S. Court of Federal Claims ("RCFC") and all writings or recordings within the meaning of Fed. R. Evid. 1001. The term shall be broadly construed to include (but shall not be limited to) correspondence, electronic mail, notes, notations, contracts, brochures, agreements, deeds, leases, letters, memoranda, checks, bank statements, reports, analyses, projections, studies, records, corporate minutes, financial statements, financial records, accounting or audit work papers (including permanent work papers), spreadsheets, transcripts, recordings, and all other types of written or documentary materials. It includes all originals, copies, and non-identical copies (whether by reason of handwritten notations thereon or otherwise), regardless of whether the information is stored on paper, in electronic form, or through any other medium.

B. The term "person" shall be construed to mean and include an individual, trust, estate,

partnership, company, corporation, governmental body, or other entity.

C. The words "identify," "identifying," or "identity":

(i) when used in reference to a natural person, include the full name, present home and business address, present or last known employer, and present business and home telephone numbers of the individual;

(ii) when used in reference to an entity other than a natural person, include that entity's full name, the present or last known address of its principal office or place of business, the type of entity (e.g. corporation, partnership, unincorporated association, etc.), and present business telephone number of that entity;

(iii) when used in reference to a document, include the (1) nature of the document; (2) the name of each author or person by whom the document was written, prepared, recorded, made, or signed; (3) the dates each person or author identified participated in the writing, preparation, recording, marking or signing of the document; (4) the organization or entity which issued or promulgated the writing; (5) the date of the document; (6) to whom it was addressed or furnished; (7) the number of pages in the document; (8) the subject matter of the document; and (9) the name and current or last-known business and residential address and telephone numbers of each person having custody, control, or possession of such document.

D. The term "Leasing Transactions" refers to all of the transactions identified in paragraphs 39 and 50 of the Complaint.

E. The term "plaintiff" refers to Wells Fargo & Company and Subsidiaries ("Wells Fargo"), and all predecessors, successors and presently or formerly affiliated entities.

F. The term "representatives" includes, but is not limited to, Plaintiff's counsel, employees, agents, and/or advisors.

G. The terms "you" and "your" means Wells Fargo and its representatives, and all presently or formerly affiliated entities.

H. The term "participants" refers to any participant in any of the Transactions, including, but not limited to, Plaintiff, other equity investors, banks, lenders, promoters, arrangers, advisors, consultants, and appraisers.

I. The term "Leasing Transaction Property" refers to the assets or property which were the subject of any of the Leasing Transactions, including but not limited to any assets or property which became the subject of the Leasing Transactions by virtue of any amendment or alteration.

J. The term "End of Lease Option" refers to any option or election concerning the use, lease or ownership of any Leasing Transaction Property subsequent to the closing date of any of the Leasing Transactions, including, but not limited to, any purchase option, lease renewal option, return option or service contract option.

The documents to be produced are as follows:

24. All documents submitted to or received from the Federal Transit Administration or United States Department of Transportation relating to the Leasing Transactions, including, but not limited to, correspondence and any statements, certifications or opinions concerning the effect on Federal income tax revenue of the Leasing Transactions.

25. All documents relating to or mentioning an approval by the FTA of any of the Leasing Transactions, or the effect or meaning of such approval.

26. All documents and work-papers concerning a calculation, estimate, certification or opinion of the effect on Federal income tax revenue of the Leasing Transactions.

27. All internal correspondence and documents reflecting communications (including email and memoranda) concerning the consideration, review and approval of the Leasing Transactions.

28. All correspondence with, documents reflecting communication with, and other documents sent to or received from any participant, advisor, consultant, attorney, arranger or other third-party in connection with the Leasing Transactions

29. All documents concerning, reflecting or relating to the consideration, review or evaluation of the actual or potential risks, gain, costs, benefits or burdens of plaintiff's participation in the Leasing Transactions.

30. All documents relating to an End-of-Lease Option of any of the Leasing Transactions, including documents concerning the benefits, burdens, costs, risks, exercise or likelihood of any such option.

31. All documents concerning an evaluation, review or analysis of plaintiff's "tax capacity" during the time period 1997 through 2002, and its search for, review of and participation in the Leasing Transactions in order to utilize that tax capacity. (See ¶ 57(f) of plaintiff's Complaint.)

32. All documents relating to conferences, seminars, meetings, and other events at which SILOs, LILOs, leveraged-leasing, or tax-advantaged leasing transactions were discussed.

33. All documents relating to conferences, seminars, meetings, and other events at which representatives of the Federal Transit Administration or United States Department of Transportation were present and innovative financing techniques or leveraged leasing involving public transit agencies were discussed.

34. All promotional or marketing materials, presentations, solicitations and other documents received from Capstar, Trinity, Allco Finance Corp., Cornerstone or other promoters, arrangers, or leasing consultants relating to SILO's, LILO's, or tax-advantaged leveraged leasing.

35. All documents that refer to, discuss, or relate to the inception, promotion, or marketing of the Leasing Transactions, including, but not limited to, all mandates and requests for bids or proposals.

36. All documents concerning the solicitation or referral of participants for the Leasing Transactions, including, but not limited to, documents reflecting or referring to how or why plaintiff or any other participants, advisors, arrangers, appraisers or consultants, were contacted, selected or became involved.

37. All documents related to the negotiation of any of the terms of any of the Transactions, including but not limited to any draft of any of the Leasing Transaction governing documents.

38. All documents related to plaintiff's internal consideration, analysis, and approval of any of the Transactions or any part thereof.

39. All notices and certifications sent to or received by any participant in the Leasing Transactions, including, but not limited to, notices regarding defaults, lack of defaults, payment of rent and payment of interest.

40. Documents reflecting plaintiff's criteria, guidelines or policies for evaluation, review, and approval of leasing transactions, and for the monitoring and review of ongoing participation in leasing transactions, including any "Front End Guidance," applicable to transportation assets, QTE assets and telecommunications/ electronic equipment assets for the period 1992 through the 2005.

41. All "Pipeline Reports" for the period 1992 through 2005.

42. Documents setting forth plaintiff's "stated criteria" for leasing transactions. (See p. 18 of Plaintiff's First Supplemental Response to United States' First Set of Interrogatories.)

43. Documents related to or reflecting plaintiff's inspection of the Leasing Transaction Property at any time from 1997 through the present.

44. Documents reflecting the disposition and current use of the Alcatel telecom equipment for which the Nokia equipment was substituted in the Belgacom Leasing Transaction.

45. Documents reflecting a direction or request by the Federal Transit Administration that any terms be included or changed in the Leasing Transactions' operative agreements and documents.

Respectfully submitted,

*s/ Cory A. Johnson*
CORY A. JOHNSON
Attorney of Record
U.S. Department of Justice
Tax Division
Court of Federal Claims Section
Post Office Box 26
Ben Franklin Station
Washington, D.C. 20044
TEL: (202) 307-3046
FAX: (202) 514-9440
Cory.A.Johnson@usdoj.gov

JOHN A. DICICCO
Deputy Assistant Attorney General
DAVID GUSTAFSON
Chief, Court of Federal Claims Section
STEVEN I. FRAHM
Assistant Chief
JENNIFER P. WILSON
Trial Attorney
JOSEPH B. SYVERSON
Trial Attorney
RICHARD H. BOWLES
Trial Attorney

*s/ Steven I. Frahm*
Of Counsel

May 14, 2008

CERTIFICATE OF SERVICE

I certify that service of the foregoing document has, this 14th day of May, 2008, been made on counsel for the plaintiff by emailing and mailing a copy thereof, in a postage prepaid envelope, to the following address:

Joel V. Williamson
Mayer Brown LLP
71 South Wacker Drive
Chicago, Illinois 60606

__________________________
U.S. Department of Justice
Tax Division
Court of Federal Claims Section
Post Office Box 26
Ben Franklin Post Office
Washington, D.C. 20044
(202) 307-6440
Fax (202) 514-9440

Exhibit C

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 06-628 T
(Judge Thomas C. Wheeler)

WELLS FARGO & COMPANY and SUBSIDIARIES,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

**UNITED STATES' FOURTH REQUEST FOR PRODUCTION**

APR 25 2008

The United States requests, pursuant to Rules 26 and 34 of the Rules of the United States Court of Federal Claims (RCFC), that Plaintiff produce the documents described below for inspection and copying.

Consistent with the provisions of RCFC 34 that a production "request shall specify a reasonable time, place, and manner of making the inspection and performing the related acts, it is hereby specified that a representative of Plaintiff shall make such documents available for inspection and copying at the offices of Defendant's counsel, Cory A. Johnson, Room 8108, Judiciary Center Building, 555 4th Street, N.W., Washington, D.C. 20001 at 10:00 a.m., on May 28, 2008, or at such other time or location, and in such manner as is mutually agreed upon by both parties.

The documents produced shall be organized and labeled to correspond to the particular request to which they are responsive, and, as so organized and labeled, the documents shall be produced as they are kept in the usual course of business, to the extent possible. It is further requested that Plaintiff identify in its written response each document (or portion thereof) or category of documents withheld from production, and state with respect thereto the specific ground(s) for objection with sufficient particularity to permit the matter to be brought before the Court.

The definitions applicable to the United States' First Set of Interrogatories apply to the following Requests for Production. In addition, the following definitions shall apply in this request unless otherwise noted:

A. "Document" means and includes all materials or data subject to production under Rule 34 of the Rules of the U.S. Court of Federal Claims ("RCFC") and all writings or recordings within the meaning of Fed. R. Evid. 1001. The term shall be broadly construed to include (but shall not be limited to) correspondence, electronic mail, notes, notations, contracts, brochures, agreements, deeds, leases, letters, memoranda, checks, bank statements, reports, analyses, projections, studies, records, corporate minutes, financial statements, financial records, accounting or audit work papers (including permanent work papers), spreadsheets, transcripts, recordings, and all other types of written or documentary materials. It includes all originals, copies, and non-identical copies (whether by reason of handwritten notations thereon or otherwise), regardless of whether the information is stored on paper, in electronic form, or through any other medium.

B. The term "person" shall be construed to mean and include an individual, trust, estate,

partnership, company, corporation, governmental body, or other entity.

C. The words "identify," "identifying," or "identity":

(i) when used in reference to a natural person, include the full name, present home and business address, present or last known employer, and present business and home telephone numbers of the individual;

(ii) when used in reference to an entity other than a natural person, include that entity's full name, the present or last known address of its principal office or place of business, the type of entity (e.g. corporation, partnership, unincorporated association, etc.), and present business telephone number of that entity;

(iii) when used in reference to a document, include the (1) nature of the document; (2) the name of each author or person by whom the document was written, prepared, recorded, made, or signed; (3) the dates each person or author identified participated in the writing, preparation, recording, marking or signing of the document; (4) the organization or entity which issued or promulgated the writing; (5) the date of the document; (6) to whom it was addressed or furnished; (7) the number of pages in the document; (8) the subject matter of the document; and (9) the name and current or last-known business and residential address and telephone numbers of each person having custody, control, or possession of such document.

D. The term "Foreign Lessees" refers to Belgacom Mobile S.A., Societe Francaise du

Radiotelephone, Sonera, Ltd., and Cathay Pacific Airways Limited, and all predecessors, successors, parents, subsidiaries, and all presently or formerly affiliated entities of any of the foregoing, including but not limited to Belgacom S.A., and all employees, partners, counsel, accountants, and/or other representatives of any of the foregoing.

E. The term "Leasing Transactions" refers to the purported leasing transactions that the foreign lessees entered into with Plaintiff, directly or through intermediary entities, and all related transactions entered into in connection with the leasing transactions, including, but not limited to, related loans, letters of credit, defeasance agreements, payment undertaking agreements, consulting engagements, and any amendments or alterations to any of the foregoing.

F. The term "Leasing Transaction Participants" refers to any participant in any of the Leasing Transactions, including, but not limited to, Plaintiff, other equity investors, banks, lenders, promoters, arrangers, advisors, consultants, and appraisers.

G. The term "Leasing Transaction Property" refers to the assets or property which were the subject of any of the Leasing Transactions, including but not limited to any assets or property which became the subject of the Leasing Transactions by virtue of any amendment or alteration.

H. The term "End of Lease Option" refers to any option or election concerning the use, lease or ownership of any Leasing Transaction Property subsequent to the closing date of any of any of the Leasing Transactions, including, but not limited to, any purchase option, lease renewal option, return option or service contract option.

<u>The documents to be produced are as follows</u>:

23. All of the following documents, to the extent such documents are in the possession, custody, or control of any of the Foreign Lessees, and are in the control of Plaintiff by virtue of any Tax Indemnity Agreement with any of the Foreign Lessees:

a. Any document that is responsive to any request for production of documents served on Plaintiff by Defendant;

b. All documents relating to any of the Leasing Transactions, including, but not limited to:

i. All contracts, agreements, and other governing documents relating to the Leasing Transactions, including all documents reflecting any amendments, renegotiations, side-agreements, or changes to the terms of any such contracts or agreements;

ii. All documents relating to the consideration, recommendation, planning, approval, implementation or monitoring of any of the Leasing Transactions;

iii. All documents which any Foreign Lessee reviewed or relied upon in its approval and consideration of any of the Leasing Transactions;

iv. All documents relating to a financial, accounting, economic, legal or tax analysis, evaluation, opinion or forecast concerning any of the Leasing Transactions;

v. All correspondence and other documents reflecting communications relating to any of the Leasing Transactions, in whatever form maintained;

vi. All documents relating to how any Foreign Lessee reported any of the Leasing Transactions for financial reporting and/or accounting purposes, including, but not limited to, the Foreign Lessee's financial statements for the calendar year in which such Foreign Lessee first entered into a Leasing Transaction through the present, the Foreign Lessee's annual reports for the calendar year in which such Foreign Lessee first entered into a Leasing Transaction through the present, and documents reflecting the accounting entries the Foreign Lessee made to account for the Leasing Transactions and the assumptions made in connection with the financial reporting, including general journals, ledgers, worksheets, underlying accounting workpapers, and communications with the Foreign Lessee's accountants;

vii. All offering and/or presentation materials relating to any of the Leasing Transactions, including but not limited to, any bid package, mandate, request for proposal, bid and conditions, summary of terms and conditions, equity investment memorandum, and/or private placement memorandum;

viii. All "ABC" reports, pricing reports or equity strip calculations relating to any of the Leasing Transactions;

ix. All documents relating to an appraisal of any of the Leasing Transaction Property, including, but not limited to, all correspondence, documents and information provided to an appraiser and engagement agreements or letters;

x. All loan and/or credit files related to any of the Leasing Transactions,

including, but not limited to, any internally prepared executive summary, transaction summary, credit request, leasing application or other similar documents;

xi. All notices or applications to, and approvals from, any governmental or regulatory agency and/or any third party entity with respect to any of the Leasing Transactions;

c. All documents relating to any legal, contractual and/or other condition that could potentially affect, compel, restrict or inhibit the exercise or occurrence of any End of Lease Option;

d. All documents that discuss or describe economic, financial or practical consequences, requirements or forecasts of any End of Lease Option, including, but not limited to, documents concerning funds that any Foreign Lessee could use and/or intend to use in order to exercise or satisfy any End of Lease Option;

e. All documents reflecting any Foreign Lessee's use of the funds it received in connection with any of the Leasing Transactions;

f. All documents that discuss, describe, or relate to any plans or intentions pertaining to the end of any lease or sublease period that is part of any of the Leasing Transactions, including but not limited to plans or intentions regarding any End of Lease Option;

g. All documents that identify any Foreign Lessee's employees and/or representatives involved with and/or having any role in any of the Leasing Transactions, including without limitation any organizational chart for the time

period of any of the Leasing Transactions involving such Foreign Lessee and for the present time;

h. Documents reflecting legal or equitable interests in any of the Leasing Transaction Property, including, but not limited to, any leasehold interests, liens, or other contractual, security, or legal or equitable interests or rights relating to any of the Leasing Transaction Property;

i. Documents relating to any Foreign Lessee's initial acquisition of any Leasing Transaction Property, including documents reflecting the original cost of the property, the design and specifications for the property, the placed in service date(s) and expected useful life;

j. All documents evidencing any and all insurance coverage of any of the Leasing Transaction Property for the time period beginning two years prior to the first Leasing Transaction entered into by such Foreign Lessee through the present.

k. All documents concerning any Foreign Lessee's tax treatment of any of the Leasing Transactions under its applicable domestic law, at the national or subnational level, including, but not limited to:

  i. Any domestic tax return filed by any Foreign Lessee at any time from the calendar year in which such Foreign Lessee first entered into a Leasing Transaction to present;

  ii. All correspondence with any domestic tax authorities concerning any of the Leasing Transactions or the tax treatment thereof;

  iii. All correspondence with any domestic tax authority concerning any of the

Leasing Transaction Property;

iv. All documents concerning any of the Leasing Transactions that any Foreign Lessee provided to any domestic tax authority;

l. Documents reflecting any substantial repairs, modifications, and improvements to any of the Leasing Transaction Property;

m. The document(s) which sets forth any Foreign Lessee's repair and maintenance protocol for any of the Leasing Transaction Property;

o. The document(s) which sets forth any Foreign Lessee's repair and maintenance protocol for property substantially similar to any of the Leasing Transaction Property;

p. All documents relating to the promotion, arranging or marketing of sale-in, lease-out, lease-in, lease-out or leveraged lease transactions;

q. All documents relating to the tax benefits or consequences of sale-in, lease-out, lease-in, lease-out or leveraged lease transactions;

r. Documents reflecting any plans or proposals for the use of any Leasing Transaction Property, or substantially similar property;

s. All communications and documents sent to or received from Mayer Brown or any other representative of Plaintiff relating to this case or any of the Leasing Transactions;

t. Any licenses any Foreign Lessee (other than Cathay Pacific Airways Limited) obtained for operation of any wireless communications networks at any time from the calendar year in which such Foreign Lessee first entered into a Leasing

Transaction to present, or any amendments or modifications to any such license;

u. All documents evidencing, substantiating, or describing any foreign Lessee's capital equipment expenditures for any time from the calendar year in which such Foreign Lessee first entered into a Leasing Transaction to present;

v. All documents evidencing, substantiating, or describing any of the following for any Foreign Lessee (other than Cathay Pacific Airways Limited):

   i. The number of such Foreign Lessee's subscribers for all times from the calendar year in which such Foreign Lessee first entered into a Leasing Transaction to present, including the number of subscribers for each different type of service such Foreign Lessee offers;

   ii. The size and location of each wireless subnetworks of such Foreign Lessee, including but not limited to the wireless subnetworks or any portions thereof that constitute any Leasing Transaction Property, for all times from the calendar year in which such Foreign Lessee first entered into a Leasing Transaction to present;

   iii. The capacity, including but not limited to the number of lines that can be accommodated, of each of such Foreign Lessee's wireless subnetworks, including but not limited to the wireless subnetworks or any portions thereof that constitute any Leasing Transaction Property, for all times from the calendar year in which such Foreign Lessee first entered into a Leasing Transaction to present;

w. All documents evidencing, discussing, debating, or otherwise pertaining to the

understanding of any of the parties to the Leasing Transactions of your obligations under any End of Lease Option;

x. All contracts or other agreements between any Foreign Lessee and any vendors of any Leasing Transaction Property or substantially similar property, affiliates of such vendors, third-party distributors of any Leasing Transaction Property or substantially similar property, or any other person, pertaining to Leasing Transaction Property or substantially similar property, including but not limited to:

   i. All contracts or other agreements by which such Foreign Lessee initially purchased or otherwise acquired any Leasing Transaction Property or substantially similar property;

   ii. Any service or maintenance contracts or other agreements pertaining to any Leasing Transaction Property or substantially similar property.

Respectfully submitted,

Cory Johnson by JBS

CORY A. JOHNSON
Attorney of Record
U.S. Department of Justice
Tax Division
Court of Federal Claims Section
Post Office Box 26
Ben Franklin Station
Washington, D.C. 20044
TEL: (202) 307-3046
FAX: (202) 514-9440
Cory.A.Johnson@usdoj.gov

JOHN A. DICICCO
Deputy Assistant Attorney General
DAVID GUSTAFSON
Chief, Court of Federal Claims Section
STEVEN I. FRAHM
Assistant Chief
JENNIFER P. WILSON
Trial Attorney
JOSEPH B. SYVERSON
Trial Attorney
RICHARD H. BOWLES
Trial Attorney

Steven Frahm

Of Counsel

April 25, 2008

CERTIFICATE OF SERVICE

I certify that service of the foregoing document has, this 25 day of April, 2008, been made on counsel for the plaintiff by mailing a copy thereof, in a postage prepaid envelope, to the following address:

Joel V. Williamson
Mayer Brown LLP
71 South Wacker Drive
Chicago, Illinois 60606

Yacharech

U.S. Department of Justice
Tax Division
Court of Federal Claims Section
Post Office Box 26
Ben Franklin Post Office
Washington, D.C. 20044
(202) 307-6440
Fax (202) 514-9440