**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **WELLS FARGO & COMPANY and SUBSIDIARIES,** | ) | |
| **Plaintiff,** | ) | **No. 06-628 T** |
| **v.** | ) | **Judge Thomas C. Wheeler** |
| **THE UNITED STATES,** | ) | |
| **Defendant.** | ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S**

**<u>MOTION TO ENLARGE THE CURRENT SCHEDULE</u>**

Joel V. Williamson
MAYER BROWN, LLP
71 South Wacker Drive
Chicago, Illinois 60606
Tel: (312) 701-7229
Fax: (312) 706-9187
jwilliamson@mayerbrown.com

Attorney for Plaintiff

# INDEX


| | Page |
|---|---|
| **BACKGROUND** | 1 |
| **ANALYSIS** | 4 |
| **Information Available to Defendant Prior to Commencement of Litigation** | 4 |
| **Plaintiff's Prior Responses** | 5 |
| **Interrogatories 4, 7, 10 and 11** | 8 |
| **Fourth Request for Production** | 11 |
| **May 13th Production Did Not Delay Trial Preparation** | 14 |
| **Additional Pricing Runs** | 17 |
| **Missing Attachments** | 18 |
| **Selection of Test Transactions** | 19 |
| **Depositions** | 20 |
| **CONCLUSION** | 22 |

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **WELLS FARGO & COMPANY and SUBSIDIARIES,** | ) | |
| **Plaintiff,** | ) | **No. 06-628 T** |
| **v.** | ) | **Judge Thomas C. Wheeler** |
| **THE UNITED STATES,** | ) | |
| **Defendant.** | ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S**

**MOTION TO ENLARGE THE CURRENT SCHEDULE**

In preparation for a status conference with regard to the state of trial preparation, Plaintiff filed on June 5, 2008, its Status Report stating that it opposed an extension of the scheduling order. Also on June 5, 2008, Defendant filed The United States' Status Report and Motion to Enlarge the Current Schedule ("Defendant's Motion") requesting that all scheduled dates be delayed by three months. The Court allowed Plaintiff until June 13, 2008, to respond to Defendant's motion.

## BACKGROUND

The Preliminary Scheduling Order for this case entered on March 27, 2007, setting April 30, 2008, as the date for the end of fact discovery. During the status conference on January 3, 2008, Defendant first requested a six month enlargement of the schedule. The Court granted three month enlargement of the schedule. At the status conference on March 27, 2008, Defendant requested an additional three month enlargement. The Court denied that request and set a date for trial.

Defendant now renews its request, asserting that Plaintiff has failed to provide timely responses to discovery thereby creating a need for this enlargement of time. Plaintiff's view is that it has been extremely diligent in responding fairly to Defendant's extremely broad and vague discovery and that Defendant's ability to prepare its case has not been hampered by the matters discussed in its motion. Further, Plaintiff perceives the issue as Defendant's approach to discovery of trying to gather every scrap of paper on each of the Transactions in dispute from every conceivable party rather than using the extensive information already developed by the Internal Revenue Service—both at policy level and in the examination of these particular Transactions. As was the case in March, Defendant has yet to make the hard choices about where the disputes are and what facts are relevant to those disputes.

Defendant has thus far issued the following discovery to Plaintiff in this case.

| No. | Defendant's Discovery Request | Date |
|---|---|---|
| 1. | First Set of Interrogatories | 06/28/07 |
| 2. | First Request for Production | 06/28/07 |
| 3. | Second Set of Interrogatories | 12/04/07 |
| 4. | Second Request for Production | 12/04/07 |
| 5. | Third Set of Interrogatories | 03/07/08 |
| 6. | Third Request for Production | 04/22/08 |
| 7. | Fourth Set of Interrogatories | 04/22/08 |
| 8. | Fourth Request for Production | 04/25/08 |
| 9. | First Request for Admission | 04/25/08 |
| 10. | Fifth Request for Production | 05/14/08 |
| 11. | Second Request for Admission | 05/29/08 |
| 12. | Fifth Set of Interrogatories | 05/29/08 |

In addition, it has issued 39 requests for documents from third parties on the following dates:

**Defendant's Request for Production**

| No. | Name | Date |
|---|---|---|
| 1. | Deloitte & Touche LLP | 12/07/2007 |
| 2. | KPMG LLP | 12/07/2007 |
| 3. | Capstar Partners LLC | 12/26/2007 |
| 4. | Bay Area Rapid Transit (BART) | 01/03/2008 |
| 5. | Dallas Area Rapid Transit (DART) | 01/03/2008 |
| 6. | Los Angeles County Metropolitan Transportation Authority (LACMTA) | 01/03/2008 |

**Defendant's Request for Production**

| No. | Name | Date |
|---|---|---|
| 7. | Metropolitan Atlanta Rapid Transit Authority (MARTA) | 01/03/2008 |
| 8. | Metropolitan Transit Authority of Harris County, Texas (Houston Metro) | 01/03/2008 |
| 9. | New Jersey Transit Corporation (NJ Transit) | 01/03/2008 |
| 10. | Peninsula Corridor Joint Powers Board (PCJPB) | 01/03/2008 |
| 11. | San Francisco Municipal Transportation Agency (SFMTA) | 01/03/2008 |
| 12. | Southeastern Pennsylvania Transportation Authority (SEPTA) | 01/03/2008 |
| 13. | Southern California Regional Rail Authority (SCRRA) | 01/03/2008 |
| 14. | State of California Department of Transportation (CALTRANS) | 01/03/2008 |
| 15. | Washington Metropolitan Area Transit Authority (WMATA) | 01/03/2008 |
| 16. | Allco Finance Corp. | 01/10/2008 |
| 17. | Bank of America | 01/10/2008 |
| 18. | CIBC World Markets Corp. | 01/10/2008 |
| 19. | Cornerstone Financial Advisors | 01/10/2008 |
| 20. | Global Capital Finance Americas LLC | 01/10/2008 |
| 21. | LIATI Group LLC | 01/10/2008 |
| 22. | Macquarie Corporate Finance USA | 01/10/2008 |
| 23. | McCalley Consulting | 01/10/2008 |
| 24. | Ross Financial | 01/10/2008 |
| 25. | American Appraisal Associates | 03/18/2008 |
| 26. | Deloitte & Touche (Global Office) | 03/18/2008 |
| 27. | Ernst & Young LLP | 03/18/2008 |
| 28. | Marshall & Stevens | 03/18/2008 |
| 29. | Mercer Management Consulting | 03/18/2008 |
| 30. | Pricewaterhouse Coopers | 03/18/2008 |
| 31. | R.L. Banks & Associates | 03/18/2008 |
| 32. | Tyler & Co. | 03/18/2008 |
| 33. | Rabobank Netherlands | 05/16/2008 |
| 34. | AIG Financial Products Limited | 05/20/2008 |
| 35. | Bayerische Landesbank | 05/21/2008 |
| 36. | Financial Security Assurance, Inc. | 05/20/2008 |
| 37. | JPMorgan Chase & Company | 05/20/2008 |
| 38. | Merill Lynch & Co., Inc. | 05/20/2008 |
| 39. | Exchange of Information Request from The United States to the Kingdom of Belgium | 05/20/2008 |

Given the breadth of the discovery requests, the responses to Defendant's requests have been voluminous. As stated in Defendant's motion it has already received over 500,000 pages of documents.

In addition, since May 15th, Defendant has issued at least 18 Notices of Deposition.

## ANALYSIS

*Information Available to Defendant Prior to Commencement of Litigation*

Defendant suggests that this case was a blank slate regarding these Transactions and that only by reviewing every piece of paper can it understand the transactions in issue and develop its positions. Instead, Defendant at a high policy level has been developing its positions of structures similar to the Transactions in issue for many years. In February 2005, Defendant issued a notice setting forth its position on sale-leaseback transactions similar to those in issue. I.R.S. Notice 2005-13, 2005-1 C.B. 630 (February 28, 2005). A Coordinated Issue Paper dealing with these issues was released on June 29, 2005. Importantly, Defendant's pronouncements indicate that the Defendant bases its position on the basic structure rather than on minute details of individual transactions.

Not only did Defendant have a general position with respect to structures similar to the ones in issue, it had substantial knowledge with respect to these Transactions. These Transactions have been the subject of federal income tax audits by Defendant since 2002. The results of these examinations are detailed reports discussing the structure of the Transaction, including diagrams and analysis of the economic consequences of the Transaction. The report prepared for the Belgacom Transaction is attached as Exhibit 1. In addition, during the audit, detailed records were obtained. Attached as Exhibit 2 is an index of some of the records regarding the Transactions that Defendant assembled during the audit. Starting in 2002, the Revenue Agents conducting the audit of these Transactions received guidance from the Internal Revenue Service's Advisor on Leasing (Exhibit 3) and, starting 2004, a Special Trial Attorney. (Exhibit 4)

Defendant has not been in the dark about how these transactions work. Defendant has had detailed knowledge of the Transactions for many years and the tools to make the tough choices about what proof to pursue. However, Defendant's discovery does not reflect a focusing of the issues. This can readily be seen in Defendant's Fifth Request for Production, which continues to cast a broad net. See Exhibit 5.

*Plaintiff's Prior Responses*

Plaintiff regards Defendant's First and Second Sets of Interrogatories and Request for Production as highly objectionable and raised those objections when it submitted its responses. Nonetheless, Plaintiff has attempted to respond in a reasonable manner to these requests. As Plaintiff has noted, prior to Plaintiff supplementing its responses on May 13, 2008, Plaintiff had already provided over 188,000 pages of documents and 250 pages of narrative responses.

Since the bulk of this material was provided in response to Defendant's Interrogatory 3[1] it is first worthwhile to examine that request in more detail.

> 3. Identify, by transaction, all studies, analyses, appraisals, legal opinions, forecasts projections, and other due diligence performed or prepared by any person in connection with each of the Transactions and 2003 Transactions, including, but not limited to, the due diligence described in paragraphs 52 through 58 of the Complaint. Also identify the consultants and appraisers referred to and all other persons that performed such work referred to in those paragraphs, and all documents that mention, describe, or evidence such work.

Attached as Exhibit 6 is the portion of Plaintiff's Response that includes its objections to this request, its general procedures with respect to examining these Transactions and the specific details related to due diligence for the BART Transaction.[2]

[1] Defendant's First Request for Production consisted of two requests which seek any documents referenced in or relied on in preparing the interrogatories.

Defendant's Second Set of Interrogatories and Request for Production are extremely broad requests relating to all of the cash flows associated with the transactions and the tax, financial accounting and regulatory reporting associated with those cash flows. For example, Interrogatory 4 asks:

> 4. For each Transaction, identify and describe in detail the actual amount and date of all purported equity investments, loans, rent payments, debt service payments, deposits, purchases or provisions of collateral or security, pledges, fees and transactional costs, and any other transfers or receipts of money, funds, securities or other assets that have been made or received to date by plaintiff and other parties to the Transactions, and identify the documents that reflect those payments, deposits, pledges, transfers or receipts. Please state in your answer the actual transferor, recipient and custodian, and whether transfers or payments were actually made or constructively made through accounting entries.

Interrogatories 5 and 6 restate this request to cover payments required by the agreements in the future and payments that might be made in the future. Interrogatory 7 asks Plaintiff to identify the operative documents for each transaction. Interrogatories 8 and 9 ask about "pricing runs," which will be discussed in more detail below. Interrogatories 10 through 14 inquire about the tax, financial and regulatory accounting for these transactions. Document Request 3 asks for "All documents identified, described, mentioned or referred to in your responses to the United States' Second Set of Interrogatories."

Plaintiff indicated in its response that it objected to these requests as vague, overbroad and unduly burdensome. Moreover, no genuine dispute appears to exist with respect to the amounts involved in the various Transactions. Defendant did an extensive examination of Plaintiff and raised no issues regarding the amounts in dispute. Exhibit 1. Indeed, the Revenue Agent's Report explicitly states that the exhibits attached to that report trace out the cash flows that Defendant is now requesting the Plaintiff to recreate:

---

[2] Comparable details were provided for the other Transactions.

> The audit team has prepared "Excel" worksheets outlining various aspects of this SILO and incorporating Leasing software Reports provided by the Taxpayer as Exhibits. These worksheets are reflected in the following:
>
> (1) cash flow from closing through the Purchase Option date [Exhibit 1];
> (2) cash flow from closing through the full term [Exhibit 2];
> (3) tax reporting from closing through the Purchase Option date [Exhibit 3];
> (4) tax reporting from closing through the full term [Exhibit 4];
> (5) internal rate of return calculations from closing through the Purchase Option date [Exhibit 5]
> (6) internal rate of return calculations from closing through the full term [Exhibit 6]; and
> (7) original issue discount income analysis [Exhibit 7].

Exhibit 1 at page 8.

Moreover, the production that the Defendant has made pursuant to this Court's Order of May 8, 2008, confirms that Defendant already reviewed detailed information about these cash flows. As an example, Plaintiff has attached as Exhibit 8 some work papers relating to the Sonera Transaction that include excerpts from the various agreements that schedule out the terms of the agreements for the transaction. Significantly, although the Court's Order directed Defendant to respond to Request 12, which seeks documents that Defendant intends to use to show that the amounts reported by Plaintiff for tax or accounting purpose were different than what was shown on the schedules attached to the reports Defendant prepared during the examination of Plaintiff, Defendant has identified no documents as responsive to that request. There simply is no basis for a dispute about these matters.

Defendant has not lacked knowledge about the cash flows and the tax and accounting treatment that would hamper its trial preparation. Defendant has had for a long time exhaustive information on those subjects. If Defendant believes some gap still exists in its understanding, it should ask about the gap rather than making requests that are so sweeping Plaintiff has no idea what information would actually be useful.

Notwithstanding that Plaintiff regarded the requests as objectionable and involving matters not in dispute, Plaintiff attempted to provide responses that provided substantial information about the cash flows required by the documents and the process used for reporting these amounts for tax, financial and regulatory purposes. Attached as Exhibit 7 is Plaintiff's Response to United States Second Set of Interrogatories. In addition, by the end of February, 2008, Plaintiff had produced approximately 188,000 pages of documents to Defendant.

*Interrogatories 4, 7, 10 and 11*

As Defendant notes on page 6 of Defendant's Motion, at the end of March and the beginning of April, Defendant raised questions about certain aspects of Plaintiff's responses to certain interrogatories. Plaintiff believes that its response was adequate and that Defendant fully has information with respect to the cash flows and tax and financial reporting for these transactions. Nonetheless, with respect to Interrogatory 4, Plaintiff gave a detailed explanation of how to use the operative documents to determine the payments required. Further, as Plaintiff has repeatedly stressed, Defendant already audited the cash flows from these Transactions and Defendant has not produced a single document that it believes supports the conclusion that the results are in any way different than the dash flows that the Internal Revenue Service previously determined.

With respect to Interrogatory 7, Defendant asked not only about the documents that were in effect during the years in issue, but also any later changes. It took some time to gather these documents because Plaintiff obtained not only the new Transactional deal documents but all correspondence and other background material that it could locate.[3]

---

[3] As discussed below, Defendant's Fifth Request for Production seeks this material.

Interrogatory 10 deals with financial accounting for these transactions. Plaintiff does allege that one reason it entered into these transactions is that it expected highly favorable financial earnings from these transactions. But although Plaintiff's expectations regarding financial accounting and its actual reporting for financial purposes are relevant to this litigation, this case is not an audit of the correctness of the amounts reported for financial accounting purposes.

Interrogatory 10 asks:

> 10. Describe in detail, by transaction and year, how each of the Transactions has been reported by plaintiff to date for financial reporting purposes, including the items and amounts of income, revenue, expense, loss, asset, reserve or liability reported, and identify all documents reflecting such reporting. Include in your answer the assumptions plaintiff made as part of determining the appropriate financial reporting treatment and whether plaintiff considered each item and amount to be "material" for financial reporting purposes.

Plaintiff regards its answer to this interrogatory as appropriate. See Exhibit 7, pages 14-16. Plaintiff indicated that the transactions were reported as leveraged leases pursuant to FASB 13, that it reported them by entering the cash flows set forth in the operative documents into a computer program named InfoAnalysis. This program is used to book all of Plaintiff's leveraged leases, and it in turn feeds into a computer program called InfoLease, which is Plaintiff's lease accounting software. InfoLease, in turn feeds into the general ledger that goes into Plaintiff's financial statements. Plaintiff also provided a schedule showing the taxable and financial income by lessee for each year of the transactions.[4] All of the transactions are treated in the same way, and in fact are treated the same way as Plaintiff's other traditional leveraged leases.

[4] That Plaintiff expected these favorable financial results is clearly shown by the Credit Approval Presentations that were prepared to obtain approval to enter into these transactions. The first page of these presentations show the first page the expected yield.

Defendant raised the issue that Plaintiff's response had not stated Plaintiff's assumptions. Trying to elaborate on this was extremely difficult because Plaintiff believes that it is taking the terms of the agreements that have been entered into and applying the relevant accounting standards. Hence, it did not identify any assumptions at the time of its initial response. When Defendant asked what assumptions were made regarding the exercise of options, additional inquiries were made. Finding the answer was difficult because, when computing its financial income, Plaintiff does not make an assumption about whether options will be exercised. Hence, efforts to obtain an answer to which option was assumed led to dead ends. Instead, if various alternatives result in different results for financial reporting, Plaintiff has a conservative policy of reporting based on the alternative that results in the lowest returns for financial purposes.

Similarly, Defendant asked about what assumptions Defendant made about residual values. Again Plaintiff viewed the residual value as a fact based on the specific facts regarding the deals. However, once Defendant specifically inquired about how Plaintiff determined which yields to report or the residual values used, Plaintiff did not quibble about whether these were assumptions but instead found the answers to the question.

It took some time to resolve these questions but why this information would impact Defendant's preparation is far from obvious. Plaintiff disagrees with Defendant's statement on page 8 of Defendant's Motion that the Plaintiff's claim that financial accounting benefits was a motivating factor for entering these Transactions requires an investigation of all the underlying cash flows. What Plaintiff did for financial accounting purposes is relevant only in so far as the financial reporting was a factor in deciding to enter into these Transactions. Defendant already knew the returns for financial accounting purposes that Plaintiff expected when the Transaction was approved, the financial accounting standard that Plaintiff applied in computing those returns and the actual financial income that was reported. Even if an analysis of the underlying cash

flows could somehow prove that the amounts reported were in some way incorrect, these are nonetheless the returns that Plaintiff expected and actually reported in its audited financial statements.

Defendant has had the expected yields for these Transactions from the credit reports that were done with respect to these Transactions and the financial income that was actually reported. To the extent Defendant wants to inquire in depositions about the role of financial accounting played in entering into these transactions, that information has also been available. Plaintiff does not believe the schedule should be enlarged so that Defendant can satisfy itself that Plaintiff properly applied FASB 13 in computing its income for accounting purposes.

Defendant also complains that Plaintiff did not produce all of the bank regulatory reports referred to its answer to Interrogatory 11. The March 2007 reports were produced because in that period, the accounting for these Transactions changed and the reports included a discussion of the change. In all other periods, these Transactions are included in the total amounts being shown, similar to all of Plaintiff's leveraged leases, but are not separately discussed and therefore were not responsive. Nonetheless, if the Court thinks it would be of use to Defendant, Plaintiff can gather and produce all the reports that include income from the Transactions even if these Transactions are not discussed in any way.

*Fourth Request for Production*

Plaintiff objected entirely to Defendant's Fourth Request for Production. In essence this request attempted to have Plaintiff obtain extremely expansive information regarding the foreign leasing transactions in issue from the foreign lessees. This request incorporated by reference any document that might be responsive to any other document request served on Plaintiff. In

addition, it set forth substantial new requests, which were clearly unreasonable. For example, 23(b)(vi) requests:

> vi. All documents relating to how any Foreign Lessee reported any of the Leasing Transactions for financial reporting and/or accounting purposes, including, but not limited to, the Foreign Lessee's financial statements for the calendar year in which such Foreign Lessee first entered into a Leasing Transaction through the present, the Foreign Lessee's annual reports for the calendar year in which such Foreign Lessee first entered into a Leasing Transaction through the present, and documents reflecting the accounting entries the Foreign Lessee made to account for the Leasing Transactions and the assumptions made in connection with the financial reporting, including general journals, ledgers, worksheets, underlying accounting workpapers, and communications with the Foreign Lessee's accountants;

Some of the requests are not even limited to the property subject to the leases in dispute. Request 23(u) seeks:

> u. All documents evidencing, substantiating, or describing any foreign Lessee's capital equipment expenditures for any time from the calendar year in which such Foreign Lessee first entered into a Leasing Transaction to present.

Similarly Request 23(v)(ii) seeks:

> ii. The size and location of each wireless subnetworks of such Foreign Lessee, including but not limited to the wireless subnetworks or any portions thereof that constitute any Leasing Transaction Property, for all times from the calendar year in which such Foreign Lessee first entered into a Leasing Transaction to present.

Plaintiff examined its rights under the operative documents for these transactions to request documentation from the foreign parties. While the language varies, there are provisions enabling Plaintiff to make requests for information. However, all of these are conditioned on the request being reasonable. While Plaintiff's initial reaction was to send the request "as is," it ultimately decided that it was inappropriate to put this burden on a foreign party and that making such a request would reduce the likelihood of any response from the foreign party. It then

considered whether it could unilaterally submit a more limited request, but concluded that it had no way of ranking in importance Defendant's request. Finally, Plaintiff decided the proper course was to object to this request and ask that Defendant make a more targeted request that Plaintiff could send to the foreign party.

The review of the documents and the decision process took some time. However, it is not correct that Plaintiff waited until the expiration of the 30 days to respond. The production date for the Fourth Request was May 28th and Plaintiff responded to Defendant on May 22nd. Further, Defendant has always had the ability to make a request for documents pursuant to tax treaties. Moreover, on May 20th, two days before it learned of Plaintiff's position, submit a request for the documents related to Belgacom Mobile, S.A. pursuant to the treaty between the U.S. and Belgium.

Defendant on June 5, 2008, provided Plaintiff with a narrower, although still significant request for documents from the foreign counterparties. Plaintiff was still concerned that the scope of the requests will hamper cooperation and asked Defendant to consider narrowing it further. At the same time, Plaintiff indicated it would send this narrower request on as it eliminated requests of the type set forth above. Plaintiff also provided Defendant with a copy of the draft letter it would send. Defendant advised Plaintiff on June 10, 2008, that it could not narrow the request further and these requests for documents were faxed or emailed, and express mailed, to all of the foreign lessees on June 11, 2008.

As we discussed with the Court in March, while it is true that foreign discovery is more difficult, the existence of foreign parties is not a surprise. Defendant knew of these foreign parties at the outset of this case. Defendant could have initiated the treaty procedure in January when the document requests were served on the transit agencies. Indeed, nothing would have

stopped the requests being made much earlier. Given that the requests being made are for virtually every document, the delay is hardly attributable to using its review of the existing documents to focus the requests.

*May 13th Production Did Not Delay Defendant's Trial Preparation*

Although Defendant points to its receipt of 35,000 pages[5] of documents from Plaintiff in mid-May as a reason to enlarge the schedule, nine of the 39 third party requests for production were made after May 15th. Although these appear identical to the eight requests that were issued shortly before the March hearing at which the Court commented that the schedule allowed four months for completion of fact discovery, Defendant did not serve these until approximately two months later. The most recent third party requests are still very broad and do not attempt to refine any points that were learned as a result of the prior 500,000 pages of documents produced. Instead, Defendant continues to ask for every conceivable document from every conceivable party. For example, the request to Financial Security Assurance, Inc., which acted as the "strip surety provider" in a number of transactions, starts with a request for "[a]ll documents relating to any of the Transactions," which includes but is not limited to the documents requested in subparagraphs (a) through (q). Further, the request is not limited to documents involving the transactions at issue but also seeks documents regarding similar transactions.

> 6. All documents reflecting FSA's established practices and procedures, if any, relating to its internal review, analysis, and approval of transactions similar to the Transactions or similar to any component of any of the Transactions, including but not limited to nonrecourse loans, pledges, letters of credit, and payment undertakings.

---

[5] Defendant's Motion at page 5 incorrectly refers to 35,000 documents. Although there are many one page documents produced, 35,000 is the number of pages and not the number of documents.

The subpoena for Financial Security Assurance, Inc. without the attached Revenue Ruling and IRS Notice is attached as Exhibit 9.[6]

In addition, Plaintiff was served the United States' Fifth Request for Production with a return date of June 15, 2008, copy attached as Exhibit 5. Defendant's Fifth Request for Production consists of 21 requests for documents. While still extremely sweeping, these requests do identify certain categories of documents in their entirety that had been previously requested only if only they related to a specific activity. For example, Defendant now requests

> 28. All correspondence with, documents reflecting communication with, and other documents sent to or received from any participant, advisor, consultant, attorney, arranger or other third-party in connection with the Leasing Transactions.
>
> 37. All documents related to the negotiation of any of the terms of any of the Transactions, including but not limited to any draft of any of the Leasing Transaction governing documents.

Previously such documents would only have been responsive to the extent that they demonstrated an analysis or some other type of due diligence that would bring it within the scope of Interrogatory 3 discussed above or some other specific request. Similarly, Defendant now asks for

> 29. All documents concerning, reflecting or relating to the consideration, review or evaluation of the actual or potential risks, gain, costs, benefits or burdens of plaintiff's participation in the Leasing Transactions.
>
> 39. All notices and certifications sent to or received by any participant in the Leasing Transactions, including, but not limited to, notices regarding defaults, lack of defaults, payment of rent and payment of interest.

Previously, Defendant had only requested a vague subset of such documents.

---

[6] The subpoena to Financial Security Assurance, Inc. is substantially identical to the one served on JP Morgan, which was attached to Plaintiff's June 2nd Status Report.

Given the Court's direction to cooperate fully with Defendant and seeing the consistent scope of third party discovery Plaintiff re-examined the files that it had previously gathered to determine whether under a broader interpretation of the vague language discussed above, these documents might be responsive to some of the existing requests. Further, Plaintiff obtained files from the various Trustees to learn if there were any additional documents that might be responsive to a broad reading of these requests. As a result, Plaintiff decided to supplement its production.

In fact, many of the documents that Plaintiff produced as responsive to a liberal interpretation of the first and second requests turn out to be much more directly responsive to Defendant's Fifth Request for Production, whose production date is June 15, 2008. As can be seen from the beginning and ending bates ranges in the appendix to Defendant's Motion, a very sizable number of the additional documents produced as responsive to Interrogatory 3[7] are one or two page documents. These are hardly detailed analyses of the merits of the transaction so whether they are within the scope of interrogatories search for documents analyzing the transaction is ambiguous. See, e.g., Exhibits 11, 12, and 13. However, since any email exchange during the negotiation of a transaction might be interpreted as some evidence that the deal was being evaluated, the decision was made to produce these documents as responsive to Interrogatory 3. Since these emails are between transaction participants, they would now certainly be responsive to Request 28 quoted above. Similarly, Plaintiff decided to produce in May the annual credit reviews of these Transactions that were prepared in subsequent years. Those are directly covered now by Request 29. In summary, Defendant's First and Second Requests were very vague and difficult to interpret. Plaintiff made a reasonable effort to respond despite those ambiguities, producing almost 200,000 pages of documents. Further, when it saw

[7] Interrogatory 3 was set forth in full on page 5 above.

the scope of the third-party requests, it provided even more documents. However, as the Fifth Request for Production shows, if Defendant wanted all of a specific type of document, Defendant could have asked for it directly prior to May 14, 2008. If Defendant wanted all correspondence between any parties to these Transactions, that request could have been made long ago. Instead, Defendant waited until the Fifth Request to make this and other requests that could have been made earlier. Had Plaintiff not voluntarily produced additional documents in May under a broad reading of existing requests, those documents would now be included in the production to be made in response to the Fifth Request.

*Additional Pricing Runs*

Defendant also complains about receiving 1,300 pages of pricing information. Defendant's Motion at 8. What is being referenced here is an additional set of pricing runs (also sometimes called ABC runs). It is true that Plaintiff found another set of these recently and has produced them. But once one understands what a pricing run is, it becomes apparent these new documents are much less significant to this dispute than Defendant's discussion would indicate.

To help the Court understand what a pricing run is, one is attached as Exhibit 13. Pricing runs are an important tool for the people negotiating these deals and a new version will be produced as the terms of the transaction change. Various payment schedules from these pricing runs are used to prepare schedules in the operative documents for the transaction. Plaintiff provided all copies of the pricing reports that it located. Since it is difficult to tell whether two pricing runs for the same deal are identical[8], Plaintiff had previously identified a set of the pricing runs that had the information that matched the final documents.

[8] It is highly likely that many of these newly provided reports are exact duplicates of the reports that were previously provided but verifying that is very difficult as these reports are essentially pages and pages of individual numbers.

Plaintiff did discover an additional set of these pricing runs and, since Defendant has asked for all such reports, it produced those as well. But it is hard to imagine why the Defendant would be spending time reviewing them or what information it could hope to find by doing so. Defendant already has a report that contains the information used to produce the schedules for the operative document and the amount of taxable and financial income that is being reported for these Transactions. If these reports are the same, no new information results. If the reports are different, then that represents another variation of the transaction that was not implemented.

*Missing Attachments*

Defendant correctly notes that in the course of reviewing the documents, there have been instances where documents were incomplete or missing attachments. As was discussed at the status conference on March 14, 2008, Defendant's much smaller production similarly had missing and incomplete documents. When Defendant has advised Plaintiff of such gaps, Plaintiff has tried to fill in those gaps.

The motion cites the missing exhibits to the WMATA, Houston Metro and Belgacom credit approval presentations. These credit approval presentations had been produced as part of Plaintiff's original production under Rule 26. When the omission was identified, Plaintiff searched for and produced the missing Exhibits or, in the case of the Belgacom Transaction (one of the oldest transactions in issue), determined that such exhibits could no longer be found.

While having the attachments in the original production would obviously be preferable, these documents are hardly going to change the course of this case. The missing exhibits in Houston Metro consisted of the following:

- FAST Financial Statement Spreadsheet: Metropolitan Transit Authority of Harris County, Texas
- FAST Financial Statement Spreadsheet: Enterprise Fund of Metropolitan Transit Authority of Harris
County, Texas
- FAST Financial Statement Spreadsheet: Financial Security Assurance
- Financial Statements: ACE Guaranty Re, Inc.
- EXHIBITS

A – Related Exposure Summary
B – Transaction Flow Chart
C – Service Contract Structure, Scenarios, and Discussion
D – Default Scenario Summary
E – Collateral Valuation Summary for the proposed transaction with Metro Transit
F – Financial Guaranty Industry Information
G – Financial Strength Analysis for Financial Security Assurance, Inc.
H – Financial Strength Analysis for ACE Guaranty Re, Inc.
I – Summary of Rating Analyst Reports for FSA and ACE Guaranty
J – Detailed Discussion on Interest Rate Risk on the Proposed Transaction

While the financial statements of Houston Metro may be of interest to Wells Fargo in deciding whether to enter into these Transactions, the specific information in these schedules is not critical to the tax treatment of them. While the Transaction Flow Chart might aid in analyzing the Transaction, the basic structure of these Transactions is similar and other Flow Charts were available. Moreover, the Revenue Agent's Report for this Transaction included a Cash Flow chart that contained much of the same information.

*Selection of Test Transactions*

Defendant also complains about the Plaintiff's failure to identify "representative transactions" until March as somehow hindering Defendant's trial preparation. Defendant's Motion at 3. While the Transactions are individually negotiated and have unique factors,[9] they all share features that Defendant has asserted prevent Plaintiff from receiving the expected tax

[9] Defendant's Motion at p. 2, n, 2 argues that the individual nature of these Transactions requires a longer period of review. Plaintiff disagrees. As discussed above, Defendant has a position on particular leasing structures that focus on specific features. These Transactions were individually reviewed by Defendant during the income tax examinations of Defendant. The possibility that a review of all the documents in each of these Transactions will uncover a theory that has heretofore been overlooked is incredibly small and the trial should not be delayed for that remote possibility.

results. These Transactions also all share features with other Transactions in Plaintiff's overall leasing business. Hence, from Plaintiff's perspective, focusing on a limited number of Transactions at trial is a matter of each side choosing the Transactions it would like to make the focus of its proof. As we discussed with the Court in March, on August 29, 2007, Plaintiff suggested that each side choose two Transactions and offered to allow Defendant to substitute two other Transactions if upon further examination it did not regard those as appropriate for trial. Defendant at that time and for a long period thereafter was insistent that until it reviewed all of the Transactions, it could not make a choice. As discussed with the Court previously, Defendant was clear that it intended to pursue discovery on all Transactions before making a selection. Since no agreement seemed possible, Plaintiff wanted to keep its options open since additional information might become available that would lead it to make a different choice. Plaintiff did not see that as hindering Defendant as Defendant consistently stated it needed to review all the Transactions before it could make a decision.

When no progress had been made by March, Plaintiff decided that it needed to make a choice so that it could advise Defendant of specific individuals whom it may call at trial with respect to those Transactions, and Plaintiff did so. We are pleased that Defendant has now reached a point where the parties have been able to select five Transactions and look forward to finalizing that agreement.

*Depositions*

Defendant suggests that there are more than 100 people with knowledge about the case. That is a true statement. But it does not mean that all of those people should or will be deposed in this case. Choices must be made about who to depose and what witnesses to call. The first step is to decide what Transactions on which to focus and that now appears done. But even for

those Transactions, not every knowledgeable person needs to be called as a witness or deposed. As Plaintiff has indicated, these Transactions were done in the course of its regular leveraged leasing business, which it has been engaged in since the 1970's. While the individuals are different, there typically are people playing similar roles in the various Transactions. Even for the selected Transactions, Plaintiff is not convinced that it will be necessary to include a witness from each Transaction for each of these roles.

The four individuals that Plaintiff initially identified by name are the core people at Plaintiff who operate this line of business. There are other people within Plaintiff who touch on various aspects of the Transactions, such as accounting, but those roles are much less significant in understanding the nature of these Transaction. Plaintiff listed hundreds of names in discovery of people who had knowledge – in response to Defendant's request that Plaintiff identify all individuals with "knowledge" of the Transactions. But clearly only a small subset would have sufficient information to warrant calling them as a witness. Once Plaintiff decided which Transactions to use as the focus of explaining how these Transactions fit into its business, it named specific individuals who it may call. (While these are people Plaintiff might call, Plaintiff has not determined whether it will actually call all of them.) While Defendant undoubtedly will wish to depose additional people, Defendant cannot reasonably expect to depose or call 100 witnesses in this matter.

Plaintiff does not control third-party witnesses and the foreign witnesses present a problem for Plaintiff as well. We have been informed by Belgacom that they will not voluntarily allow depositions and that two of the people we have listed are no longer with the company and Plaintiff has provided that information to Defendant. At this time, Plaintiff does not know whether it will be able to obtain the presence of these individuals at trial although it still expects that if it calls a witness from Belgacom, it would still be one of the listed individuals.

Plaintiff has indicated that it is willing to discuss extending the schedule for depositions but wants to do it in an organizer manner so that an extension does not simply shift the depositions to a later date. Although Defendant since May 15, 2008, has issued at least 18 notices of deposition, Plaintiff does not know all the depositions Defendant is contemplating. Once Defendant advises Plaintiff of everyone it seeks to depose, the parties can discuss what can be accomplished under the existing schedule and what will need to carryover. Plaintiff certainly would agree to a deferred deposition of the Belgacom witnesses if such a deposition can be arranged. But the need to depose at most three witnesses does not seem a basis for extending the trial date.

Defendant asserts that Plaintiff will not be harmed by the delay. Plaintiff disagrees. As stated above, Defendant has determined that this class of transactions does not achieve the desired tax benefit. A significant majority of the Transactions at issue here have the distinguishing characteristic of being promoted by the Defendant as part of its national transportation policy. The Defendant and the local transit agencies initiated these transactions and brought them to investors such as Plaintiff. These Transactions served an important public policy and Plaintiff wants the opportunity to tell its story before Defendant has a chance to prevail in a series of weaker cases and then claim this is just one more in the chain. Indeed, Defendant already suggests that in light of other decisions that this case may be appropriate for summary judgment. Plaintiff has a particularly compelling story to tell and wants to tell it as soon as possible.

## CONCLUSION

Defendant has and had at the outset of this case substantial information about these Transactions. Through discovery Defendant has even more documents. Plaintiff has not failed

to provide information that warrants an enlargement of the schedule. Indeed, much of the volume of new documents about which Defendant complains are actual documents that are only clearly called for in its Fifth Request for Production. Hence, Plaintiff's proactive effort to expansively produce documents actually accelerated receipt of information. More time for discovery is not going to bring focus to this case. These are major transactions with numerous independent third parties, including well-known transit agencies around the country. The operative documents they signed set forth the terms of their agreement and those legal relations are what should be the focus. More discovery is not going to add in understanding these Transactions.

Accordingly, the existing schedule should be kept with necessary exceptions to accommodate an appropriate number of depositions.

Respectfully submitted this 13th day of June, 2008.

/s/ Joel V. Williamson
Joel V. Williamson
MAYER BROWN, LLP
71 South Wacker Drive
Chicago, Illinois 60606
Tel: (312) 701-7229
Fax: (312) 706-9187
jwilliamson@mayerbrown.com

Attorney for Plaintiff

CERTIFICATE OF SERVICE

I, Joel V. Williamson, hereby certify that on this 13th day of June, 2008, I caused the foregoing Plaintiff's Response to Defendant's Motion to Enlarge the Current Schedule to be served upon the United States by UPS and email, to the following:

Cory A. Johnson
U.S. Department of Justice
Tax Division
Court of Federal Claims Section
555 Fourth Street, N.W.
Washington, D.C. 20001
Cory.A.Johnson@usdoj.gov
*Counsel for Defendant*

Dated: June 13, 2008

Joel V. Williamson by U/AS

JOEL V. WILLIAMSON
Mayer Brown LLP
71 South Wacker Drive
Chicago, Illinois 60606
Tel: (312) 701-7229
Fax: (312) 706-9187
jwilliamson@mayerbrown.com

Attorney for Plaintiff