EXHIBIT 1

| Form 886A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Schedule No. or<br>Exhibit 038 - 5 |
|---|---|---|
| Name of Taxpayer<br>Wells Fargo & Company and Subsidiaries | | Year/Period Ended<br>1999, 2000 |
| Lease | | |
| Belgacom Mobile SA | | |

## Gross Rents – Sale In Lease Out (SILO) Tax Shelter – Belgacom Mobile SA (BMSA)

| Wells Fargo Bank, MN (Co. #1007): | 1999 | 2000 |
|---|---|---|
| Per Return | $ (5,844,859) | $ (5,720,740) |
| As Corrected | $ 0 | $ 0 |
| Adjustment | $ 5,844,859 | $ 5,720,740 |

## ISSUES:

1. Whether Wells Fargo & Company and Subsidiaries (the Taxpayer) is entitled to deduct depreciation as a result of entering into this Sale-In/Lease-Out (SILO) transaction with BMSA (the Tax Exempt Entity)?

2. Whether the Taxpayer is entitled to deduct interest expenses as a result of entering into this SILO transaction?

3. Whether the Taxpayer is entitled to amortize transaction costs as a result of entering into this SILO transaction?

4. Whether the Taxpayer must report as taxable income the rental income paid to it by the Tax Exempt Entity in this SILO transaction?

5. Alternatively, whether the Taxpayer must report as taxable income original issue discount (OID) income as a result of entering into this SILO transaction?

6. Alternatively, whether IRC § 168(g)(3)(A) requires that the Property be depreciated over a period of 125 percent of the entire Head Lease term

## FACTS:

LEGEND

| | |
|---|---|
| Taxpayer | Wells Fargo & Company and Subsidiaries |
| Equity Investor | Wells Fargo Bank, MN., N.A. (Company #1007) (Formerly Norwest Bank, MN, N.A.) |
| Tax Exempt Entity 1 | Belgacom Mobile (Grantor of Equipment Rights / Sublessee) |
| Tax Exempt Entity 2 | Stichting Stella (Stichting - Lessee / Sublessor) |
| Grantor Trust | BMSA 1997-3 / First Security Bank, as Trustee (Grantee of Equipment Rights / Lessor) |

| Form 886A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Schedule No. or<br>Exhibit 038 - 5 |
|---|---|---|
| Name of Taxpayer<br>Wells Fargo & Company and Subsidiaries | | Year/Period Ended<br>1999, 2000 |
| Lease | | |
| Belgacom Mobile SA | | |

| | |
|---|---|
| Lender | De Lage Laden Financial Services B.V. |
| Payment Undertaker / Deposit Taker | RABO Merchant Bank N.V. |
| Equity Payment Undertaker | Belgacom via Merrill Lynch Capital Services |
| Custodian | |
| Property / Equipment | Mobile Telecommunication Switching Equipment |
| Property Location | Belgium |

**NOTE:** For purposes of this report, the terms taxpayer; equity owner; and grantor trust; will be used interchangeably to mean the taxpayer, since WFB as equity owner is a subsidiary of the taxpayer, and the grantor trust, which is ignored for tax purposes, acted on behalf of the taxpayer.

Legal discussion that refers to the "Tax Exempt Entity" encompasses both BMSA and Stichting Stella as tax exempt foreign entities.

OVERVIEW OF THE SILO TRANSACTION

Belgacom Mobile SA (BMSA) is located in Brussels, Belgium. On 12/19/1997, BMSA entered into two lease transactions with First Security Bank as trustee for the equity owner, Norwest Bank MN., Co. #1007, currently Wells Fargo Bank MN. (Taxpayer). The transactions were identified as BMSA 1997-3 & BMSA 1997-4. For each transaction, BMSA entered into Equipment Agreements that granted the Taxpayer equipment rights to some of BMSA's telecommunications equipment. The Equipment Agreements provided that they were to constitute a transfer of ownership in the equipment for U.S. income tax purposes. The terms of the agreements were until 1/2/2013 for the BMSA 97-3 transaction and until 1/2/2012 for BMSA 97-4. The total price of the equipment for both leases was $37,826,393 and was prepaid at the time of closing. The equipment was mobile telecommunications switching equipment and consisted of central office digital switches, and certain software and hardware for the telecommunications network currently installed at various locations in Belgium. The equipment for the BMSA 97-3 transaction had a value of $25,480,087 and had been placed in service since 11/1/1996. The BMSA 97-4 equipment was placed in service between 11/1/1995 and 10/31/1996 and had a value of $12,346,306. The equipment was treated by the Taxpayer as Qualified Technology Equipment (QTE), subject to 5 year depreciation, under IRC code section 168(i)(2).

The $25,480 that was prepaid for the BMSA 97-3 Equipment consisted of an equity commitment of $5,625,082 and a loan of $19,855,005. For the BMSA 97-4 lease, the prepayment was made up of an equity contribution of $2,679,493 and a loan of $9,666,813.

| Form 886A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Schedule No. or<br>Exhibit 038 - 5 |
|---|---|---|
| Name of Taxpayer<br>Wells Fargo & Company and Subsidiaries | | Year/Period Ended<br>1999, 2000 |
| Lease<br>Belgacom Mobile SA | | |

The lender for both transactions was De Lage Laden Financial Services B.V. Both loans were 100% defeased, by deposits made to Rabo Merchant Bank N.V., which were pledged toward the payment of all interest and principal due to the lender. Rabo Merchant Bank N.V. and De Lage Laden Financial Services B.V. are affiliated companies.

$4,494,000 of the equity commitment for BMSA 97-3 and $2,203,000 for BMSA 97-4 was defeased by BMSA's investment in interest rate swap agreements with Merrill Lynch Capital Services (MLCS). The agreements assigned the payment stream due from MLCS to a U.S. custodian for the benefit of Norwest Bank. The cash in the equity defeasance account will grow to cover the amount due the Taxpayer under the Early Buyout Option (EBO).

At the same time that the Equipment Agreements were entered into, First Security Bank as trustee entered into agreements to lease the equipment to Stichting Stella, a Netherlands foundation, which in turn entered into agreements to sublease the equipment back to BMSA. The lease and sublease terms last until 7/2/2011 for BMSA 97-3 and until 10/2/2010 for BMSA 97-4.

There is an EBO date of 1/2/2008 for the BMSA 97-3 lease and 1/2/2007 for BMSA 97-4. If the EBO is exercised, the equipment will ultimately be repurchased by BMSA for the amount specified by the sublease, lease and equipment agreements. As previously stated, the EBO purchase price will be covered by the investment growth of the defeased equity commitment. If the EBO is not exercised, the alternatives are to continue to use the equipment, with an option to renew the lease for 4 one year renewal terms, or require that the equipment be returned at the end of the base lease term.

<u>GROUPING OF THE TAXPAYER'S SILO TRANSACTIONS</u>

Based on a review of the operative and legal documents in this SILO provided by the Taxpayer (the SILO transaction documents), an audit determination has been made that two of the SILO leases entered into by the Taxpayer are structurally similar. Although the dollar amounts and effective dates may differ slightly per the SILO transaction documents, the underlying structure and legal basis of the transactions, based on the SILO transaction documents, are so similar that an audit determination for one is appropriate for the other. The SILO leases grouped together for purposes of this RAR include: Belgacom BMSA1997-3 and Belgacom BMSA 1997-4. For this Revenue Agent Report (RAR), an administrative decision has been made to address in detail the underlying facts, and applicable law, for Belgacom, BMSA 1997-3 and to apply the conclusions reached for that lease to include Belgacom, BMSA 1997-4. Please note that a consolidated spreadsheet is attached hereto for each SILO lease that is part of this RAR. This audit determination to address in detail the underlying facts, applicable law, and audit conclusions for the Belgacom, BMSA 1997-3 applies equally to each of the listed SILO transactions in this group because they all share the same: (1) Closing Date;

| Form 886A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Schedule No. or<br>Exhibit 038 - 5 |
|---|---|---|
| Name of Taxpayer<br>Wells Fargo & Company and Subsidiaries | | Year/Period Ended<br>1999, 2000 |
| Lease<br>Belgacom Mobile SA | | |

(2) Tax Exempt Entity; (3) Lender(s); (4) Payment Undertaker/Deposit Taker; (5) interest rates; (6) type of Property; (7) Promoter; and, (8) type of Equity Collateral.

BACKGROUND INFORMATION ON THE TAXPAYER

The Taxpayer is the parent company of a number of subsidiaries and files a consolidated tax return. Among the specific subsidiaries included in the Taxpayer's consolidated group is WFB (formerly Norwest Bank, MN.), a wholly owned subsidiary of the Taxpayer. The taxpayer is a diversified financial services company providing banking, insurance, investments, mortgage banking and consumer finance through banking branches, the internet and other distribution channels to consumers, commercial businesses and financial institutions in all 50 states of the U.S. and in other countries.

BACKGROUND INFORMATION ON THE TAX EXEMPT ENTITY

Belgacom Mobile S.A. is located in Brussels Belgium. It is the leading mobile communications provider in Belgium. It is owned 75% by Belgacom S.A., which is a major national and international telecommunications provider in Belguim. At the time of the transaction Belgacom S.A. was owned 49% by the Belgium State, 17.5% by Ameritech, 16.5% by Teledanmark and 10.9% by Singapore Telecom.

The main items of equipment for the BMSA 97-3 transaction are digital switches, and includes central office digital switches, upgrades, expansions, service enhancements and improvements. The equipment is critical to the overall functionality of BMSA's telecommunications network. A detail list of the equipment is provided in Exhibit A of the Appraisal Report.

The equipment was manufactured by Alcatel. The purchase Agreement was dated 9/26/1996 and the equipment was placed in service by BMSA by November 1, 1996. BMSA had fully paid the purchase price of the equipment to the manufacturer prior to this transaction. In addition, the debt, if any, that had previously been incurred by BMSA in originally acquiring the equipment is not a part of and in no manner connected to this SILO transaction.

THE SILO TRANSACTION: TRANSACTION DOCUMENTS

On December 19, 1997 (the Closing Date), the parties entered into this SILO transaction by executing each of the following documents:

| Form 886A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Schedule No. or<br>Exhibit 038 - 5 |
|---|---|---|
| Name of Taxpayer<br>Wells Fargo & Company and Subsidiaries | | Year/Period Ended<br>1999, 2000 |
| Lease<br>Belgacom Mobile SA | | |

The Participation Agreement

The Taxpayer, the Tax Exempt Entity, and the Lender executed this document on the Closing Date. Pursuant to the provisions of the Participation Agreement, the Taxpayer and the Tax Exempt Entity also executed the Equipment Agreement, the Lease Agreement, and the Sublease Agreement, among other transaction documents. The Taxpayer and the Tax Exempt Entity must enter into these three additional Agreements or the SILO transaction will be not be completed. In this SILO transaction, section 3, Conditions Precedent to the Obligations of the Participants and of the Trustee, of the Participation Agreement requires the Taxpayer and the Tax Exempt Entity to enter into the Equipment Agreement, the Lease Agreement and the Sublease Agreement.

The Equipment Agreement

The Taxpayer and BMSA executed this document on the Closing Date, as required by the Participation Agreement. In this SILO, under the Witnesseth Clauses and section 2, the Taxpayer is granted Equipment Rights from BMSA for a period totaling 15.04 years. The Basic Term of the Agreement is for a period of 10.04 years, extending from the Closing Date until the date on which the Tax Exempt Entity may exercise its Purchase Option.

The Equipment Agreement and exhibits in this SILO include the following provisions: (1) net Equipment Agreement provisions in sections 4, 6, 8 and 10; (2) options available in sections 9, 12, 13, 14, and 16; (3) security interests held by the parties in sections 3, 4, 5, 9, 12, 17 and 18; and (4) the amount of basic payments in section 3 of the Equipment Agreement, and page 10 of Appendix A of the Participation Agreement.

The Lease Agreement

Also on the Closing Date and as required by the Participation Agreement, the Taxpayer and Stichting Stella executed the Lease Agreement.

In this SILO, under the Witnesseth Clauses and section 2, Stichting immediately leases the Property back from the Taxpayer. The Lease Term is for a period of 13.54 years. The Basic Lease Term is 10.04 years, extending from the Closing Date until the date on which Stichting may exercise its Purchase Option.

The Lease Agreement and attachments in this SILO include the following provisions: (1) net lease provisions in sections 4, 6, 8, 10 and 21; (2) options available in sections 9, 12, 13,14, 16 and 17, including the amount of the Purchase Option fixed price in Exhibit E; (3) security interests held by the parties in sections 6, 11, 16, 17, 18, and 20; (4) the basic rent amount in section 3 and Exhibit B; and, (5) a requirement that in the event of any loss of the

| Form 886A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Schedule No. or<br>Exhibit 038 - 5 |
|---|---|---|
| Name of Taxpayer<br>Wells Fargo & Company and Subsidiaries | | Year/Period Ended<br>1999, 2000 |
| Lease | | |
| Belgacom Mobile SA | | |

property, for example due to casualty, or in the event of any default by Stichting, Stichting will make a large Lease Termination Value payment to the Taxpayer, funded substantially with the Payment Undertaking Agreement funds and the Equity Collateral.

The Subease Agreement

Also on the Closing Date and as required by the Participation Agreement, Stichting and BMSA executed the Sublease Agreement.

In this SILO, under the Witnesseth Clauses and section 2, BMSA immediately subleases the Property from Stichting. The Sublease Term parallels the Lease Term of 13.54 years. The Basic Sublease Term of 10.04 years, which extends from the Closing Date until the date on which BMSA may exercise its Purchase Option is also the same as the Lease Agreement.

The Sublease Agreement and attachments in this SILO include the following provisions: (1) net lease provisions in sections 6, 8 and 10; (2) options available in sections 9, 12, 13,14, and 16, including the amount of the Purchase Option fixed price in Exhibit E; (3) security interests held by the parties in sections 11, 16, and 18; (4) the Sublease basic rent amount in section 3 and Exhibit B; and, (5) a requirement that in the event of any loss of the property, for example due to casualty, or in the event of any default by BMSA, BMSA will make a large Sublease Termination Value payment to the Taxpayer, funded substantially with the Payment Undertaking Agreement funds and the Equity Collateral. In addition, under section 19 of the Participation Agreement, BMSA is required to provide a Letter of Credit if its long term unsecured debt rating were to fall below a S&P rating of A+.

Loan and Security Agreement

Also on the Closing Date and as required by the Participation Agreement, the Taxpayer and the Lender executed this document. In addition, the parties executed a Loan Certificate for the loan, memorializing the borrowing of the nonrecourse loan amount from the Lender.

The Loan and Security Agreement and attachments in this SILO contain provisions pertaining to: (1) a security granted by the Taxpayer to the Lender, ensuring that the nonrecourse loan returns to the Lender, in the Granting Clause and section 4; (2) the amount of interest to be paid on the loan in section 2 and Annex A of the Loan Certificate; (3) the amount of the loan in section 2.01 and the Loan Certificate; (4) the nonrecourse nature of the loan in section 2.02 and the Loan Certificate; (5) the purpose for making the loan in the Recitals; (6) transfer of the rent payments due from the Tax Exempt Entity to the Taxpayer directly to the Lender as the Taxpayer's loan repayments, in the Granting Clause; and, (7) the Lender's right under section 4.03 to directly enforce the Secured Obligations in the Payment Undertaking Agreement in the case of a default and for as long as the Taxpayer's interest is

| Form 886A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Schedule No. or<br>Exhibit 038 - 5 |
|---|---|---|
| Name of Taxpayer<br>Wells Fargo & Company and Subsidiaries | | Year/Period Ended<br>1999, 2000 |
| Lease | | |
| Belgacom Mobile SA | | |

subject to the lien of the Loan and Security Agreement. Significantly, the Lender is not granted a security interest in the Equity Collateral.

The Deposit Agreement

See the discussion below on Funding of the SILO transaction for more information on the role this document plays in the SILO transaction.

Additional Collateral Security Agreement (Equity Collateral Agreement)

The Taxpayer and Stichting executed this document on the Closing Date, as required by the Participation Agreement. This transaction document includes provisions: (1) creating the Equity Defeasance, in the Witnesseth Clauses; (2) granting a secured priority interest to the Taxpayer in the Equity Collateral, but not to the Lender, in sections 2, 4 and 5; and (3) specifying the type of Equity Collateral, in sections 1 and 2.

Additional Collateral Deposit Agreement / Master Agreement (Equity Deposit Account)

Merrill Lynch Capital Services and Stichting executed this document on the Closing Date, as required by the Participation Agreement. This transaction document plus attachments include provisions: (1) setting the amount of the Equity Collateral, in section 2 of the Transaction Confirmation document; (2) setting the date of the maturity amount, in Schedule I to the Transaction Confirmation, and Schedule A of the Participation Agreement; and, (3) providing terms under which the Equity Collateral will be paid to the Taxpayer, in section 3 of the Transaction Confirmation.

Custody Agreement

This SILO Transaction does not have a Custody Agreement.

Letter of Credit

In this SILO, under certain circumstances specified in the Participation Agreement, BMSA is required to obtain a letter of credit for the Taxpayer's benefit. In this SILO, section 19(b) of the Participation Agreement refers to this requirement.

Under section 19(b)(iv) of the Participation Agreement, if any Letter of Credit is required, it will be issued by a Qualified Bank in favor of the Trustee and the Equity Investor. The Letter of Credit provides additional security to the Taxpayer that the Tax Exempt Entity will pay all its rent due to the Taxpayer. Under section 19(b)(iii), upon receipt of the Letter of Credit, the Additional Collateral Deposit Agreement shall be released from the Lien of the Additional

| Form 886A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Schedule No. or<br>Exhibit 038 - 5 |
|---|---|---|
| Name of Taxpayer<br>Wells Fargo & Company and Subsidiaries | | Year/Period Ended<br>1999, 2000 |
| Lease | | |
| Belgacom Mobile SA | | |

Collateral Security Agreement. If the Lessee does not exercise the EBO Purchase Option, then BMSA shall provide, within 20 Business Days after the date the Lessee can no longer exercise the EBO Purchase Option, a first priority perfected security interest in collateral to secure the lessee's obligations under the Operative Documents in an amount sufficient to pay the Equity Portion of Basic Rent due and payable after the EBO date.

Excel Worksheets

The audit team has prepared "Excel" worksheets outlining various aspects of this SILO and incorporating Leasing software Reports provided by the Taxpayer as Exhibits. These worksheets are reflected in the following:

(1) cash flow from closing through the Purchase Option date [Exhibit 1];
(2) cash flow from closing through the full term [Exhibit 2];
(3) tax reporting from closing through the Purchase Option date [Exhibit 3]
(4) tax reporting from closing through the full term [Exhibit 4];
(5) internal rate of return calculations from closing through the Purchase Option date [Exhibit 5]
(6) internal rate of return calculations from closing through the full term [Exhibit 6]; and
(7) original issue discount income analysis [Exhibit 7].

**OTHER DOCUMENTS OBTAINED:**

ABC Pricing Reports

These were prepared for the Taxpayer as part of its bid package and include provisions regarding: (1) depreciation deduction schedule; (2) amount of rent due from Stichting; (3) interest expense deduction schedule; and (4) interest rate charged on the nonrecourse loan.

Appraisal

The appraisal was prepared by American Appraisal Associates and includes provisions pertaining to: (1) the fair market value of the Property subject to the SILO; (2) the useful life of the Property subject to the SILO; (3) various options available to the parties at the EBO/Purchase Option date; and (4) the likelihood that each option will be exercised.

Deposit Deed of Pledge

This agreement was entered into on the closing date between Stichting as Pledgor, the Taxpayer, as Pledgee, and Rabo Merchant Bank, as Deposit Bank. It provides that Stichting created a first priority pledge on the Deposit in favor of the Taxpayer.

| Form 886A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Schedule No. or<br>Exhibit 038 - 5 |
|---|---|---|
| Name of Taxpayer<br>Wells Fargo & Company and Subsidiaries | | Year/Period Ended<br>1999, 2000 |
| Lease<br>Belgacom Mobile SA | | |

Deposit Deed of Repledge

This agreement was entered into on the closing date between the Taxpayer as Repledgor, the Lender, as Repledgee, and Rabo Merchant Bank, as Deposit Bank. It provides that the Taxpayer created a first priority pledge by way of repledge on the Deposit in favor of the Lender as security for the full and punctual payment of the Secured Indebtedness.

Dutch Supplemental Pledge to Loan and Security Agreement

This agreement was entered into on the closing date between the Taxpayer and the Lender. It provides that the Taxpayer, as Pledgor, has granted the Lender a first priority right of pledge in the collateral as security for the prompt payment of the Secured Obligations. The First Priority Pledge is in addition to, and not in lieu of, the security rights created by the Loan Agreement.

Dutch Supplemental Pledge to Sublessor Assignment

This agreement was entered into on the closing date between Stichting and BMSA. It provides that Stichting, as Pledgor, grants to BMSA as security for the prompt payment of all the secured obligations when due, a second priority right of pledge in respect of the Collateral, subject to the same limitations on the rights of BMSA with respect to such Collateral that are set forth in the US Agreement (The Second Priority Pledge).

Dutch Supplemental Pledge to Sublease Security

This agreement was entered into on the closing date between Stichting as Lessee and the Taxpayer as Lessor. It provides that Stichting grants the Taxpayer a first priority right of Pledge in Stichting's interest in and under the Sublease.

Guarantee Agreement

This agreement was entered into on the closing date by BMSA to guarantee the punctual payment of Stichting's obligations, as Lessee, to the Equity Investor, the Trust Company, the Trustee, and the Lender.

Lease Security Agreement

This agreement was entered into on the closing date between the Taxpayer, as Lessor, and Stichting, as Lessee. It provides that as security for punctual performance of the Lessor's Obligations, the Taxpayer grants, bargains, pledges, sells, assigns, transfers, conveys,

| Form 886A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Schedule No. or<br>Exhibit 038 - 5 |
|---|---|---|
| Name of Taxpayer<br>Wells Fargo & Company and Subsidiaries | | Year/Period Ended<br>1999, 2000 |
| Lease | | |
| Belgacom Mobile SA | | |

mortgages, warrants and confirms to the Lessee a security interest in, mortgage on, and pledge of all the Equipment Rights and proceeds therefrom.

Lessee Guarantee

This agreement was entered into on the closing date. It provides that Belgacom will unconditionally and irrevocably guarantee the payment and performance obligations of BMSA to the Equity Investor, the Trust Company, the Trustee, and the Lender.

Sublease Security Agreement

This agreement was entered into on the closing date between Stichting as Lessee and the Taxpayer as Lessor. Stichting granted the Taxpayer a security interest in all its rights and interest in, to and under the Sublease (the Collateral).

Sublessor Assignment

This agreement was entered into on the closing date between Stichting as Assignor and BMSA as Assignee. It provides that as security for the punctual performance and observance by Stichting of all its obligations to BMSA, Stichting grants, bargains, pledges, sells, assigns, transfers, conveys, mortgages, warrants and confirms to BMSA a security interest in, and Lien upon, all right, title and interest of Stichting in, to and under the Lease Security Agreement and the other Operative Documents and the Equipment and all proceeds thereof.

Taxpayer's internal documents pertaining to the SILO transaction

Credit Approval Presentation (CAP) Report which includes background information and the structure of the transaction; an analysis of the credit worthiness of BMSA and other parties to the transaction; and the risk rating of the transaction.

An internal memo dated 12/16/1997, discussing and approving BMSA's request to use an interest rate swap agreement to fund the equity defeasance account.

The Tax Opinion discussing the structure of the SILO and why the Taxpayer is entitled to its claimed deductions

Two tax opinion letters dated 12-22-1997 were received by the taxpayer from Winston & Strawn. The taxpayer refused to provide the opinion letters, citing attorney-client and attorney work product privileges.

| Form 886A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Schedule No. or<br>Exhibit 038 - 5 |
|---|---|---|
| Name of Taxpayer<br>Wells Fargo & Company and Subsidiaries | | Year/Period Ended<br>1999, 2000 |
| Lease | | |
| Belgacom Mobile SA | | |

THE SILO TRANSACTION: FUNDING

These transactions always include at least two circular flows of funds designed to eliminate all or nearly all credit risk to the Taxpayer and the Lenders. Due to the circular flows, the Tax Exempt Entity's payment obligations in SILOs are usually 100 percent, or nearly 100 percent, economically defeased.[1]

Funding of this SILO transaction is accomplished as follows. All transfers and borrowings occur on the Closing Date.

1. The Taxpayer funds the Grantor Trust with the amount of $5,625,082, the Taxpayer's total Equity Investment.

2. The Taxpayer (through its Grantor Trust) borrows the total amount of $19,855,055 in the form of nonrecourse financing from the Lender.

3. Using the funds obtained from the Taxpayer and the funds borrowed by the Taxpayer, the Grantor Trust transfers the amount of $25,480,087 to BMSA under the Equipment Agreement. This payment is intended to be a purchase for federal income tax purposes.

4. Under section 3(d) of the Sublease Agreement, BMSA prepays its Sublease rent to Stichting in the amount of $25,480,087.

5. Stichting enters into a Deposit Agreement (Payment Undertaking Agreement) with an affiliate of the Lender.

Under this Agreement, amounts are released periodically to pay Stiching's rent due under the Lease Agreement. Significantly, the amount of interest paid by the Payment Undertaker on the Deposit Account is equal to the amount of interest charged by the Lender on the nonrecourse loan. Further, the timing and amount of the rent payment due to the Taxpayer generally equals the timing and amount of the loan payment amount due to the Lender from the Taxpayer. Plus, the interest rate paid by the Payment Undertaker on the Deposit Account equals the interest rate charged the Taxpayer on the nonrecourse loan. Also, the nonrecourse loan from the Lender provides for annual payments that will amortize most of the loan over the Basic Term of the Lease. Moreover, as in most SILOs, the Lender requires the Taxpayer to assign the Lease rent payment to it; thus, although the parties account for periodic payments from the Payment Undertaker to the Tax Exempt Entity, then to the Taxpayer and finally to the Lender, typically the funds flow only from the Payment Undertaker to the Lender.

* * * *

[1] Although the Tax Exempt Entity is not legally released from its rent obligations notwithstanding the Deposit Account, the Debt Defeasance effectively substitutes for a legal defeasance provision.

| Form 886A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Schedule No. or<br>Exhibit 038 - 5 |
|---|---|---|
| Name of Taxpayer<br>Wells Fargo & Company and Subsidiaries | | Year/Period Ended<br>1999, 2000 |
| Lease<br>Belgacom Mobile SA | | |

In this SILO, the Deposit Agreement (Payment Undertaking Agreement) with an affiliate of the Lender includes provisions pertaining to: (1) the amount transferred by Stichting to an affiliate of the Lender in section 1.01, 2.01 and Schedule B; (2) creation of the Deposit Account to hold the transferred nonrecourse loan amount, in section 2.01; (3) the conditions under which the Payment Undertaker[2] may withdraw funds from the Deposit Account, in section 2.03; (4) the terms under which amounts withdrawn from the Deposit Account are to be paid to the Lender, in section 2.04 and Schedule A; (5) all security/pledge agreements, in sections 2.04, 3.02 and 4.02; (6) the interest rate paid on the Deposit Account, in sections 1,01 and 2.03 and as reflected in Schedules A and B; (7) dates and amounts of each payment to be made from the Deposit Account, in section 2.03 and Exhibit A; and (8) the return of the full amount of its nonrecourse loan to the Lender, in Schedules A and B.

6. The Taxpayer and the Tax Exempt Entity enter into the Additional Collateral Deposit Agreement (Equity Collateral Agreement).

As noted above, per the provisions of this Agreement, Stichting uses funds obtained from the Taxpayer to purchase a highly-rated security (the Equity Collateral). In this SILO, Stichting uses $4,494,000 to purchase an Interest Rate Swap Agreement with Merrill Lynch Capital Services, Inc. At the maturity date of January 2, 2008, the securities will mature to the amount of $6,859,337. This amount is sufficient to permit Stichting / BMSA to exercise its Purchase Option without expending any of its own funds.

The combination of the Additional Collateral Deposit Agreement and the Additional Collateral Security Agreement, plus the purchase of the highly-rated securities under these Agreements, establishes the Equity Defeasance, which insures that the Tax Exempt Entity has the funds needed to exercise the Purchase Option and guarantees the Taxpayer a fixed return on its Equity Investment. Notably, the Taxpayer does not pledge any rights it has in the Equity Collateral to its nonrecourse loan obligation. The Equity Defeasance is the second circular flow of funds found in all SILO transactions. In addition, this amount is the Taxpayer's return on its Equity Investment.

7. In addition, the Taxpayer pays $427,050 in fees and expenses (the transaction costs)[3], for a total Taxpayer contribution of $6,052,132 (Equity Investment + transaction costs).

* * * *

2 Although the Payment Undertaker may also be called the Deposit Holder or Deposit Taker, this document will use the term Payment Undertaker.

3 In most SILOs, the Participation Agreement defines "transaction costs" as being those fees paid to the promoter, advisor, and appraiser, as well as fees paid to attorneys who provide various legal opinions. These "transaction costs" are usually 1-2% of the Head Lease amount (or asset value). In this document, the term "transaction costs" does not refer to the Accommodation Fee paid to the Tax Exempt Entity as part of the Taxpayer's Equity Investment.

| Form 886A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Schedule No. or<br>Exhibit 038 - 5 |
|---|---|---|
| Name of Taxpayer<br>Wells Fargo & Company and Subsidiaries | | Year/Period Ended<br>1999, 2000 |
| Lease | | |
| Belgacom Mobile SA | | |

THE SILO TRANSACTION: OPTIONS AVAILABLE TO THE PARTIES

Near the end of the Lease and Sublease terms, the parties have available several options: (1) the Tax Exempt Entity may exercise its EBO Purchase Option at a fixed price, thereby purchasing the Taxpayer's interest in the Equipment Agreement; (2) the Tax Exempt Entity may return the Property to the Taxpayer; (3) the Tax Exempt Entity may elect an end of term Purchase Option for an amount equal to the Fair Market Sales Value of the Equipment on that date, thereby purchasing the Taxpayer's interest in the Equipment Agreement; or (4) the Tax Exempt entity may elect the Lease / Sublease Renewal Option for up to four lease renewal terms. In this SILO, sections 12, and 13 of the Equipment Agreement, the Lease Agreement and the Sublease Agreement contain provisions pertaining to the options available.

Under the Tax Exempt Entity's EBO Purchase Option in this SILO, the amount of the Equity Collateral on the maturity date equals the fixed price of the Purchase Option, and the Tax Exempt Entity will not have to use any of its own funds to continue its operation, control, and possession of its Property subject to the SILO. Further, if the Tax Exempt Entity exercises its Purchase Option in this SILO, the Equipment Agreement and the entire transaction terminates.

In the second option, available in all SILO transactions, the Tax Exempt Entity may return the Property to the Taxpayer under the Lease / Sublease. Presumably, under this option, the Tax Exempt Entity must expend its own funds to secure replacement Property in order to continue its daily business activity. Ultimately, under this option, the Property returns to the Tax Exempt Entity at the expiration of any shirttail period.

Under the third option available in this SILO transaction, the Tax Exempt entity may elect to purchase the equipment at the end of the lease term, for the then fair market sales value of the equipment. Presumably, under this option, the Tax Exempt Entity may have to expend some of its own funds if the market value of the equipment exceeds the value of the Equity Collateral.

Alternatively, if the Tax Exempt Entity decides not to exercise the Purchase Options or to return the Equipment, the Tax Exempt Entity may elect to renew the leases for up to four lease / sublease renewal terms. Ultimately, the Property returns to the Tax Exempt Entity under all these options.

In this SILO transaction, under section 14 of the Equipment, Lease and Sublease Agreements, the Tax Exempt Entity has another option, the Voluntary Termination Option (VTO). Under this option, at any time after 5 years from the closing date, BMSA may terminate the Lease / Sublease as to any items of equipment that it has determined to be obsolete or surplus. Alternatively, no more than once per year, it may substitute replacement property for

| Form 886A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Schedule No. or<br>Exhibit 038 - 5 |
|---|---|---|
| Name of Taxpayer<br>Wells Fargo & Company and Subsidiaries | | Year/Period Ended<br>1999, 2000 |
| Lease | | |
| Belgacom Mobile SA | | |

the terminated equipment. If the VTO is elected, BMSA must arrange for sale of the terminated equipment and must pay the total realized selling price to the Taxpayer, plus the difference between the net sale proceeds received and the Termination Value of the equipment.

All options present in this SILO transaction result in a payment to the Taxpayer sufficient to repay the Taxpayer's entire loan balances and initial Equity Investment, plus a fixed after-tax rate of return.

Tax Deductions Claimed

An analysis of the tax deductions claimed by the Taxpayer and rent income reported by the Taxpayer as a result of entering into this SILO transaction is shown in the table chart below. The analysis is based on the Taxpayer's return for 1999 and 2000; ABC Pricing Reports 3.1 and 5.1; and Sch. M-1 information provided by the Taxpayer. The following income and expenses were reported during the current audit cycle for the BMSA 1997- 3 and BMSA 1997-4 leases:

| Year | Rent Income | Depreciation | Interest Expense | Fee Amortization | Sch. M-1 Difference | Net Loss |
|---|---|---|---|---|---|---|
| 1999 | 3,721,023 | (7,565,279) | (1,952,841) | (47,763) | 0 | (5,844,859) |
| 2000 | 3,721,023 | (7,565,279) | (1,828,731) | (47,763) | 10 | (5,720,740) |

**LEGAL ANALYSIS:**

The deductions and amortizations claimed related to the BMSA SILO are disallowed and rental income reported eliminated under the following legal arguments:

A. Purchase of a Future Interest

B. Substance Over Form: Financing Arrangement

C. Depreciation Recovery Period under Internal Revenue Code § 168.

**Purchase of a Future Interest**

Legal Analysis

The substance of a transaction, not its form, governs its tax treatment. Gregory v. Helvering, 293 U.S. 465 (1935). In Frank Lyon Co. v. United States, 435 U.S. 561, 573 (1978),

| Form 886A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Schedule No. or<br>Exhibit 038 - 5 |
|---|---|---|
| Name of Taxpayer<br>Wells Fargo & Company and Subsidiaries | | Year/Period Ended<br>1999, 2000 |
| Lease | | |
| Belgacom Mobile SA | | |

the Supreme Court stated, "In applying the doctrine of substance over form, the Court has looked to the objective economic realities of a transaction rather than to the particular form the parties employed." The Court subsequently applied this approach in Frank Lyon to recharacterize a sale and repurchase of federal securities as a loan, finding that the economic realities of the transaction did not support the form chosen by the taxpayer. Nebraska Department of Revenue v. Loewenstein, 513 U.S. 123 (1994).

A sale-leaseback will not be respected unless the owner/lessor acquires and retains "significant and genuine attributes" of a traditional owner, including "the benefits and burdens of ownership." Coleman v. Commissioner, 16 F.3d 821, 826 (7th Cir. 1994) (citing Frank Lyon, 435 U.S. at 582-84). The SILO transaction described here is, in substance, fundamentally different from the sale-leaseback transaction respected by the Court in Frank Lyon. Considering the totality of the facts and circumstances in SILO transactions, the Taxpayer does not acquire the benefits and burdens of ownership, and consequently cannot claim tax benefits as the owner of the property because:

1. Unlike in Frank Lyon, only a relatively small portion of the Equity Investment (the Accommodation Fee) could possibly be used by the Tax Exempt Entity for its operation of the Property subject to the SILO or for any other purpose.

2. In Frank Lyon, substantially all of the recourse loan proceeds were used for construction of the new headquarters. In this SILO, the entire nonrecourse loan proceeds from the Lender were deposited in the Deposit Account, pursuant to the Deposit Agreement. Because the Deposit Account is held by an affiliate of the Lender, the entire amount of the nonrecourse loan is returned to the Lender and neither the Taxpayer nor the Tax Exempt Entity are able to use the funds for any purpose. That is, one hundred percent defeasance of the debt exists from the Closing Date. In addition, the funds in the Deposit Account are pledged to the Lender, so neither the Taxpayer nor the Tax Exempt Entity may use any of the nonrecourse loan funds. Also, the Deposit Agreement here includes provisions that the Tax Exempt Entity's rent, due to the Taxpayer, should be paid directly to the Lender as long as the nonrecourse loan has a balance due. See sections 1.01, 2.01 and 2.04 of the Deposit Agreement and the Granting Clause of the Loan and Security Agreement.

3. As noted above, the recourse loan proceeds in Frank Lyon were used in the actual construction of the bank building. In this SILO, the same situation can never exist as to the nonrecourse loan since the Property subject to the SILO was purchased, constructed, and/or manufactured prior to the beginning of the transaction and funds separate from the nonrecourse loans from the Lender were used in that purchase.

4. In Frank Lyon the taxpayer bore the risk of the lessee's nonpayment of the rent, which could force the taxpayer to default on the recourse debt. In this SILO, the combination of the

| Form 886A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Schedule No. or<br>Exhibit 038 - 5 |
|---|---|---|
| Name of Taxpayer<br>Wells Fargo & Company and Subsidiaries | | Year/Period Ended<br>1999, 2000 |
| Lease | | |
| Belgacom Mobile SA | | |

Debt Defeasance, nonrecourse debt, and the security agreement and pledge for the Deposit Account make such default risk remote. Even if that remote event should occur, the Taxpayer will not be at risk for repaying the nonrecourse loan balances, given the nature of that type of funding. In addition, the Taxpayer will not be at risk for forfeiting the portion of its Equity Investment held in the Equity Defeasance account or its fixed return because the Lender does not have a security interest in those securities (the Equity Collateral).

5. In contrast to the Taxpayer's position in this SILO, the taxpayer in Frank Lyon was at risk for its equity investment. The fact that the buyer/lessor is at risk for its equity investment in a sale/leaseback transaction is a key factor supporting the treatment of the transaction as one in which the benefits and burdens of ownership pass from the seller/lessee (here, the Tax Exempt Entity) to the buyer/lessor (the Taxpayer). In a true lease, the buyer/lessor's equity risk is typically evident from the fact that the buyer/lessor is at risk for any loss or decline in the value of the property during the leaseback term or in the residual value of the property at the conclusion of the leaseback term. In this SILO transaction, most of the Taxpayer's Equity Investment is deposited in an Equity Defeasance Account designed to ensure that the Taxpayer will recoup those funds through the Tax Exempt Entity's exercise of the Purchase Option. Accordingly, no risk exists that the Taxpayer will suffer from any loss in value during the Lease Basic Term. Further, the Purchase Option eliminates the value of the Equipment Agreement residual. In addition, if BMSA's credit rating is downgraded, it is required to obtain a Letter of Credit in an amount equal to 120% of the amount, if any, by which the LC Termination Value for such LC Period exceeds the Expected Fair Market Value of the Additional Collateral Deposit Agreement on such date. Moreover, the Taxpayer's Equity Investment is not at risk as the Equity Collateral is pledged to the Taxpayer by the security arrangements. The only possible risk the Taxpayer could face here would occur during the "shirttail" period occurring after expiration of the Lease / Sublease terms. However, exercise of the Purchase Option by the Tax Exempt Entity eliminates even this potential residual value risk.

6. In this SILO transaction, no regulatory restrictions exist, in contrast to the situation in Frank Lyon, where federal regulations required independent third party ownership of the property. Accordingly, the Tax Exempt Entity will always retain the benefits and burdens of ownership. Further, all Leases are net leases, showing that the Tax Exempt Entity retains the benefits and burdens of ownership, and, in some instances, the Tax Exempt Entity continues to claim depreciation, a prime indicator of ownership.

7. In Frank Lyon, no additional deductions were created. In this SILO, however, depreciation deductions unavailable to the Tax Exempt Entity for US tax purposes are transferred to the Taxpayer as this SILO is structured by the parties, thereby creating new deductions that would not exist outside the SILO transaction.

8. The Court in Frank Lyon concluded that there was no compulsion to exercise the Purchase Option. In contrast, in this SILO transaction, the combination of the Equity

| Form 886A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Schedule No. or<br>Exhibit 038 - 5 |
|---|---|---|
| Name of Taxpayer<br>Wells Fargo & Company and Subsidiaries | | Year/Period Ended<br>1999, 2000 |
| Lease<br>Belgacom Mobile SA | | |

Defeasance, ensuring that the Tax Exempt Entity need not expend any of its own funds to continue its uninterrupted possession of the Property it needs everyday to operate, as well as historical and political considerations, and in some instances, legal prohibitions on ownership of the Property, virtually guarantee exercise of the Purchase Option.

Moreover, where parties have in form entered into separate transactions that result in offsetting obligations, courts often have collapsed those offsetting obligations and recharacterized the two transactions as a single transaction. In Rogers v. United States, 281 F.3d 1108 (10th Cir. 2002), a part-owner/shareholder of a professional baseball team organized as a Subchapter S corporation borrowed money from the S corporation. The nonrecourse loan was secured by the shareholder's ownership interest in the corporation and his existing option to purchase the rest of the shares from the other co-owner of the team. The shareholder also granted the corporation an option to purchase both his shares and his existing option to buy the other co-owner's shares. The option price was an amount equal to the outstanding loan balance. The corporation exercised its option immediately but deferred closing until the due date of the shareholder's loan, five months later.

The Rogers court applied the substance over form doctrine to collapse the loan and the option transaction into a redemption of the shareholder's stock in exchange for cash. The shareholder had no incentive to repay the loan because any reduction in the loan balance would reduce the option price. The immediate exercise of the option prevented any attempt by the shareholder to repay the loan and keep his stock. Based on the offsetting loan and option, as well as other facts, the court held that the substance of the transaction was a sale of the shareholder's stock to the corporation. Similarly, in this SILO, the offsetting obligations pertaining to possession of the Property permit the Service to collapse the SILO and disregard the Taxpayer's apparent interest.

In Bussing v. Commissioner, 88 T.C. 449, reconsideration denied, 89 T.C. 1050 (1987), a Swiss subsidiary of a computer leasing company (AG) purchased computer equipment in a sale/leaseback transaction involving a five-year lease. Subsequently, AG purportedly sold the equipment to a domestic corporation (Sutton), which in turn purportedly sold interests in the equipment to the taxpayer (Bussing) and four other individual investors. Bussing acquired his interest in the computer equipment subject to the underlying lease by paying cash, short-term promissory notes, and a long-term promissory note to Sutton. Bussing then leased his interest in the equipment back to AG for nine years. The rents due Bussing from AG equaled Bussing's annual payments on the long-term promissory note to Sutton for the first three years and were supposed to generate nominal annual cash flow thereafter.

The court first disregarded Sutton's participation in the transactions on substance over form grounds. It then held that Bussing's long-term indebtedness also must be disregarded because it was completely offset by AG's rent payments in a "purported sale-leaseback

| Form 886A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Schedule No. or<br>Exhibit 038 - 5 |
|---|---|---|
| Name of Taxpayer<br>Wells Fargo & Company and Subsidiaries | | Year/Period Ended<br>1999, 2000 |
| Lease | | |
| Belgacom Mobile SA | | |

pursuant to which the respective lease and debt obligations flow between only two parties." Id., at 458. The court stated,

> The respective obligations between AG and Bussing cancel each other out. Any possible claim by AG with respect to the note is fully offset by AG's rental obligation to Bussing. . . . Bussing, effectively, will never be required to make any payments on his debt obligation, a feature of the transaction that we believe the parties intended to achieve.

Courts have similarly disregarded the parties' obligations in purported installment sales where the taxpayer received an installment note that was offset by some other arrangement between the two parties, indicating that the maker of the note would not be called upon to pay the installment obligation. See Rickey v. Commissioner, 502 F.2d 748 (9th Cir. 1974), aff'g 54 T.C. 680 (1970). Although taxpayers are entitled to arrange the terms of a sale, "the arrangements must have substance and must reflect the true situation rather than being merely the formal documentation of the terms of the sale." Id. at 752-53, quoting 54 T.C. at 694. See also United States v. Ingalls, 399 F.2d 143 (5th Cir. 1968); Blue Flame Gas Co. v. Commissioner, 54 T.C. 584 (1970); Greenfield v. Commissioner, T.C. Memo. 1982-617 (notes disregarded since cash loan from buyer and taxpayer's installment note were to be paid through offsetting book entries); Big "D" Development Corp. v. Commissioner, T.C. Memo. 1971-148, aff'd per curiam, 453 F.2d 1365 (5th Cir. 1972)(cross indebtedness lacking in reality where full receipt of the total consideration merely awaited the command of the seller).

In summary, this SILO is not the sort of multiparty transaction encouraged by business and regulatory realities whose form must be respected under Frank Lyon. In substance and reality, it is a transaction in which dominion and control over the Property remains with the Tax Exempt Entity, at a minimum throughout the Lease / Sublease Basic Term, so that the Taxpayer's interest is appropriately recharacterized as, at most, a future interest in the Property. Moreover, when the Tax Exempt Entity exercises the Purchase Option, dominion and control over the Property necessarily remains with the Tax Exempt Entity because the entire SILO transaction terminates at that point. Lastly, as in every SILO, the Property here ultimately returns to the Tax Exempt Entity after the Equipment Agreement expires.

Facts Supporting the Future Interest Argument

It is important to note that any analysis of a SILO transaction should be based on the totality of the facts and circumstances of the transaction. Although a factor-by-factor analysis is appropriate, it is essential to remember the overall structure and cash flows of the transaction. In this SILO as structured by the parties here, the following facts show that the Taxpayer purchased only a contingent future interest because it did not retain the benefits and burdens of ownership:

| Form 886A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Schedule No. or<br>Exhibit 038 - 5 |
|---|---|---|
| Name of Taxpayer<br>Wells Fargo & Company and Subsidiaries | | Year/Period Ended<br>1999, 2000 |
| Lease | | |
| Belgacom Mobile SA | | |

1. <u>Mutual and Reciprocal Obligations of Equipment Agreement, Lease and Sublease</u>.

Although a typical sale/leaseback transaction conveys ownership rights to the buyer/lessor and tenancy rights to the seller/lessee, there are several significant differences between that transaction and this SILO. In this SILO transaction, these provisions of the Equipment Agreement, the Lease Agreement and the Sublease Agreement found in section 3, of the Participation Agreement - Conditions Precedent to Obligations of the Participants and of the Trustee; and the Witnesseth Clauses and section 2 of the Equipment, the Lease and the Sublease Agreements requires that the Taxpayer to acquire the equipment rights from BMSA, and lease the equipment to Stichting, which in turn subleased it back to BMSA. The net lease nature of the agreements is referred to in sections 4, 6, 8 and10 of the Equipment Agreement; sections 4, 6,8,10 and 21 of the Lease; and sections 6, 8, and 10 of the Sublease. In the Equipment Agreement it states that the Taxpayer shall maintain, replace parts and insure the equipment at its sole cost and expense or cause the Lessee or Sublessee to incur the costs at their sole cost and expense. Under the Sublease Agreement, BMSA in fact was solely responsible for all maintenance, parts and insurance on the equipment, allowing the Taxpayer to absolve itself of those obligations. Annex A to the Loan and Security Agreement, Exhibit B to the Lease Agreement, and Schedule A to the Deposit Agreement combine to show that the Debt portion of the rent up to the EBO date is equal to the Debt repayments. Section 1.01 of the Deposit Agreement defines the Deposit Rate as being the same as the Debt Rate. Sections 9 of the Equipment, Lease and Sublease Agreements provide symmetry of treatment in the event of any equipment loss. These provisions combine to return the use and possession of the Property to BMSA, negating any possible ownership interest the Taxpayer could have during the Lease / Sublease Basic Term:

a. The Property is subject to mutual and reciprocal obligations whereby the Taxpayer cannot immediately exercise its right to use the Property because it has agreed to lease the Property to Stichting during the Lease Basic Term, which in turn subleased it back to BMSA for its use, operation, and possession during the Sublease Basic Term.

b. The amount of rent due to the Taxpayer from the Tax Exempt Entity during the Lease Basic Term equals the amount of the Taxpayer's loan repayment to the Lender. This mutual and reciprocal obligation ensures that the Taxpayer does not have to expend its own funds to meet its obligation.

c. The amount of interest paid on the Deposit Account by the Payment Undertaker equals the amount of interest charged by its affiliate Lender, another form of mutual and reciprocal obligation.

d. A provision that allows the Taxpayer to absolve itself of any maintenance and/or insurance obligation under the Equipment Agreement by requiring that Stichting as Lessee or BMSA as Sublessee incur the costs; and,

| Form 886A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Schedule No. or<br>Exhibit 038 - 5 |
|---|---|---|
| Name of Taxpayer<br>Wells Fargo & Company and Subsidiaries | | Year/Period Ended<br>1999, 2000 |
| Lease<br>Belgacom Mobile SA | | |

e. A provision that creates total symmetry between an event of loss for the Equipment Agreement and an event of loss for the Lease and Sublease, thus assuring the Taxpayer of a Termination Value sufficient to pay off the debt and return the Taxpayer's Equity Investment.

2. <u>The Debt Defeasance.</u>

The economic defeasance of Stichting's rent obligation under the Lease and, consequently, the Taxpayer's borrowing, occurs through the execution of the Deposit Agreement. Pursuant to this Agreement, the Payment Undertaker obligates itself to service the Lease rent payable to the Taxpayer. The Taxpayer, in turn, instructs the Payment Undertaker to make those payments directly to the Lender to service the Taxpayer's loan. Further, the Lease rent schedule matches the debt service schedule in timing and amounts. The Loan and Security Agreement also directs the Payment Undertaker to make payments directly to the Lender so long as the loan is outstanding. See the Granting Clause of the Loan and Security Agreement; section 2.04 of the Deposit Agreement; Exhibit B to the Lease Agreement; Annex A to the Loan and Security Agreement; and Schedule A to the Deposit Agreement. Moreover, the Deposit Agreement states in sections 2.01 and 4.09 that the defeased amount is no longer subject to the credit risks, including the bankruptcy risk, of the Tax Exempt Entity.

3. <u>The Equity Collateral Portion of the Taxpayer's Equity Investment is Deposited in a Defeasance Account and is Not at Risk (the Equity Defeasance).</u>

In this SILO, the Equity Collateral portion of the Taxpayer's Equity Investment was the $4,494,000 million amount transferred to Stichting and used by that entity to purchase an Interest Rate Swap Agreement, which is pledged by Stcihting to the Taxpayer. The return of this equity component is a factor in the Government's favor. In this SILO it is evident that this equity component will be returned to the Taxpayer through rent payments, the Purchase Option, and/or a Lease Termination Value payment. See sections 3, 13, 14 and Exhibits B, C, D and E of the Lease Agreement; section 2.1 of the Additional Collateral Security Agreement; and Schedule I of the Transaction Confirmation to the Additional Collateral Deposit Agreement (Master Agreement).

A key factor strengthening the Service's recharacterization of this transaction as a contingent future interest is the absence of any credible risk that the buyer/lessor (the Taxpayer) may lose its equity in the case of, for example, destruction of the Property without adequate insurance or a decline in the Property's value and a default by the seller/sublessee (the Tax Exempt Entity). Evidence that the Taxpayer's Equity Investment is not at risk in this SILO includes:

a. The Equity Collateral portion of the Equipment Agreement payment is not among the items of collateral pledged to the Lender. See item F of the Granting Clause, and section 3.05