| Form 886A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Schedule No. or<br>Exhibit 038 - 5 |
|---|---|---|
| Name of Taxpayer<br>Wells Fargo & Company and Subsidiaries | | Year/Period Ended<br>1999, 2000 |
| Lease | | |
| Belgacom Mobile SA | | |

of the Loan and Security Agreement. In this SILO, under section 2.1 of the Additional Collateral Security Agreement, the Equity Collateral is pledged only to the Taxpayer;

b. The Equity Collateral portion of the Equipment Agreement payment, and any investment return earned on that portion, is paid or deposited by Stichting to the Equity Payment Undertaking Party. See the Transaction Confirmation to the Master Agreement. Taking such action, places the Equity Collateral beyond the reach of the Tax Exempt Entity's creditors; and/or

c. The Equity Collateral portion is designated to satisfy the equity portion of Lease rent, the Purchase Option price, or any Lease Termination Value payable by the Tax Exempt Entity to the Taxpayer in the event of any structured unwind of the transaction or default by the Tax Exempt Entity. See Schedule I of the Transaction Confirmation to the Master Agreement; Schedule A to the Participation Agreement; and Exhibits B, C and E of the Lease Agreement.

4. Percentage of Economic Defeasance of the Nonrecourse Loans.

In some SILOs, the amount of the Taxpayer's borrowing that is defeased may only equal ninety percent of the borrowing. The higher the percentage, the stronger the Government's position that no bona fide borrowing exists. In contrast, a one hundred percent defeasance, as in this SILO, presents the best case for the Government with respect to this factor.

5. Elimination of Credit Risk.

The Taxpayer may argue that it is subject to the credit risk, including the risk of bankruptcy, of the Payment Undertaker. According to this argument, the bankruptcy of the Payment Undertaker could result in the Taxpayer defaulting on the loan and hence forfeiting everything the Taxpayer has pledged under the Loan and Security Agreement, including the Taxpayer's rights under the Lease and the Equipment Agreement.[4] In addition to the provisions of the Payment Undertaking Agreement and the terms of the Deposit Account creating the Debt Defeasance, the Lender does not need an independent source of funds to make their nonrecourse loan or bear a significant risk of nonpayment because the SILO transaction documents here provide: (1) the Taxpayer has agreed in the Lender Security Packages to grant security interests in favor of the Lender in all its right, title, and interest in the Equipment Rights, the Equipment Agreement, any Equipment Agreement Supplement, the Lease, any Lease Supplement, the Sublease Security Agreement, the Manufactures' Consents, the Deposit Agreement, and Acceptable Substitute Collateral; (2) under the last

* * * *

[4] Though, as discussed above, not the Taxpayer's Equity Investment, including the Equity Collateral portion of the Head Lease payment, because the Equity Collateral is pledged only to the Taxpayer and not to the Lenders.

| Form 886A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Schedule No. or<br>Exhibit 038 - 5 |
|---|---|---|
| **Name of Taxpayer**<br>Wells Fargo & Company and Subsidiaries | | **Year/Period Ended**<br>1999, 2000 |
| **Lease** | | |
| Belgacom Mobile SA | | |

paragraph of section 16 of the Equipment Agreement, BMSA will not declare the Equipment Agreement in default or terminate the Equipment Agreement until the nonrecourse loans and accrued interest are paid in full; (3) the Lease is subject to security interests in favor of the Lenders; and,(4) all insurance policies are to list the Lender as one of the additional insured.

Although a remote bankruptcy risk would not, in and of itself, give substance to a SILO transaction, the risk of a default by the Payment Undertaker may be rendered even further unlikely through a guarantee from a well capitalized corporate affiliate of the Payment Undertaker.[5] Thus, such a guarantee of the Payment Undertaker's obligation would be another factor in the Government's favor. In this SILO transaction, the documents provided did not include a guarantee by an affiliate of the Payment Undertaker. However, there is a guarantee by Belgacom of BMSA's payment and performance obligations and in turn, BMSA has guaranteed the payment and performance obligations of Stichting. Both guarantees list the Equity Investor, the Trust Company, the Trustee, and the Lender as Beneficiaries.

In this SILO, any remaining credit risk is eliminated as much as possible through: (a) selecting only a highly-rated Tax Exempt Entity to participate in the transaction; (b) selecting only highly-rated Lenders and affiliates; and (c) requiring the Tax Exempt Entity to obtain a letter of credit if its credit rating falls. Belgacom SA, which is the guarantor for BMSA's obligations, had a Standard and Poor's rating of AA on its long term corporate debt as of 9/17/97. Merrill Lynch Derivative Products AG (MLDP), which provided the swap agreement for the Equity Deposit Collateral, had a Standard and Poor's long term counterparty rating of AAA. Merrill Lynch, itself had an AA- rating. Section 19(b) of the Participation Agreement also provides that if a downgrade event has taken place, BMSA must provide an Acceptable Letter of Credit.

6. <u>Single Entity and Special Purpose Corporation Transactions</u>.

The Lender for this SILO transaction was De Lage Laden Financial Services B.V. and the Payment Undertaking Party was RABO Merchant Bank N.V. **The lender and deposit taker are affiliates of the same company, rather than the same entity, otherwise all the steps in the single entity scenario, listed below, are the same.**

A single entity Lender/Payment Undertaker (the "single entity") is a strong factor in the Government's favor. This structure includes these steps:

* * * *

[5] Even in the unlikely event of default, the Taxpayer would still receive its Equity Investment because the Equity Collateral is not pledged on the nonrecourse loans.

| Form 886A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Schedule No. or<br>Exhibit 038 - 5 |
|---|---|---|
| Name of Taxpayer<br>Wells Fargo & Company and Subsidiaries | | Year/Period Ended<br>1999, 2000 |
| Lease | | |
| Belgacom Mobile SA | | |

a. The single entity, in its capacity as Lender, transfers an amount as a nonrecourse loan to the Taxpayer, which then uses the amount as part of the Head Lease / Equipment Agreement payment to the Tax Exempt Entity;

b. The Tax Exempt Entity transfers the same amount to the single entity in the latter's capacity as Payment Undertaker;

c. The single entity obligates itself, again in its capacity as Payment Undertaker, to use the amount to make Sublease rent payments to the Taxpayer;

d. The Taxpayer instructs the single entity, once again in its capacity as Payment Undertaker, to apply those Sublease payments to satisfy the Taxpayer's obligation to the single entity in the latter's capacity as Lender; and,

e. The Loan and Security Agreement directs the Payment Undertaker (the single entity) to make payment directly to the Lender so long as the loan is outstanding.

**A special purpose corporation does not appear to have been used in this SILO transaction.**

Transactions involving a special purpose corporation, often set up as a direct subsidiary of the Lender, are not substantially different from the single entity structure. In this structure, the special purpose subsidiary of the Lender may act as the Payment Undertaker. Often, the amount paid by the Tax Exempt Entity to the special purpose corporation for acting as the Payment Undertaker, and the special purpose corporation's obligation to pay Lease rent, are the only asset and liability, respectively, of the special purpose corporation.

Thus, either the single entity structure or the special purpose corporation structure favors the Government, particularly where the obligations of the Payment Undertaker are guaranteed.

7. Right of the Tax Exempt Entity to Share in any Savings Resulting from Refinancings.

In this SILO transaction, there was no provision in the Lease Agreement that gives BMSA the right to participate in any savings if the Taxpayer refinances the debt. However in section 17 of the Participation Agreement, upon the request of BMSA, the Taxpayer agrees to cooperate with BMSA with a view towards causing a refinancing of the Loan Certificates and to cause adjustments to Basic Rent, Termination Values, Stipulated Loss Values, and the Agreed Purchase Option Price, in accordance with section 3(d) of the Lease.[6] All out of pockets costs

* * * *

[6] As noted above, the Lease rent schedule typically matches the debt service schedule.

| Form 886A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Schedule No. or<br>Exhibit 038 - 5 |
|---|---|---|
| Name of Taxpayer<br>Wells Fargo & Company and Subsidiaries | | Year/Period Ended<br>1999, 2000 |
| Lease<br>Belgacom Mobile SA | | |

of such refinancing will be borne by BMSA. This factor favors the Government because it indicates the lack of an effective transfer of rights from BMSA to the Taxpayer under the Equipment Agreement. Because the Taxpayer purportedly has invested its funds, in the form of debt and equity, in order to purportedly purchase the Property via the Equipment Agreement, such a refinancing provision effectively allows BMSA to share in the Taxpayer's diminution of the cost of its investment.

8. <u>The Nature or History of the Property makes it Highly Unlikely that the Tax Exempt Entity will Not Exercise its Purchase Option at the end of the Sublease Term</u>.

In some instances, the nature of the Property itself makes it more likely that the Tax Exempt Entity will exercise the Purchase Option, for example, where real estate is the Property subject to the SILO. In other instances, the history of the Property, rather than its nature, make it highly likely that the Tax Exempt Entity will exercise its Purchase Option. Both factors favor the Government.

In this SILO transaction, the equipment is used to provide essential services. There is no functioning telecommunications system without the switching equipment. If the EBO is elected, BMSA can acquire the property with the defeased funds and not have to use any of its own funds. If BMSA does not elect the EBO, it has the option at the end of the Sublease term to either purchase all the equipment for Fair Market Sales Value on that date, renew the Sublease for up to 4 one year terms, or return of the Property.

On page 2 of the Taxpayer's CAP Report under the return of the Equipment Option it states that the return provisions of the lease are strict. Because of the return conditions, it is not considered likely that the lessee would return the equipment at lease expiry. If the lessee elected to return the equipment, all the equipment must be returned at the lessee's expense to such site or sites in Europe as designated by NEFI (subsidiary of Taxpayer). When delivered, the equipment must be in the same working order as when initially leased by NEFI to the lessee and must meet the original equipment manufacturer specifications required for continued eligibility for maintenance by the manufacturer. The Lessee will pay any costs for the relevant manufacturer to bring the equipment up to the current hardware and software release revision and engineering change level to re-certify the equipment as eligible for maintenance by the manufacturer. In addition, the lessee will pay all installation costs required to install the equipment at the site specified by NEFI in conformity with the installation standards of the manufacturer.

Page 4 of the Cap report states that the cash in the equity defeasance will accrue to cover the EBO at year 10. The EBO is expected to be exercised. However, if the EBO is not exercised, the cash in the deposit account will be sufficient to cover all free cash flow due to the Taxpayer as Owner Participant over the remainder of the lease term, but will not cover the

| Form 886A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Schedule No. or Exhibit 038 - 5 |
|---|---|---|
| Name of Taxpayer<br>Wells Fargo & Company and Subsidiaries | | Year/Period Ended<br>1999, 2000 |
| Lease | | |
| Belgacom Mobile SA | | |

residual at lease maturity. If the lease runs to full maturity, Belgacom will most likely purchase the equipment for Fair Market Value. The equipment is expected to have a value in place to Belgacom which would comfortably cover the Taxpayer's residual position. A stated above, the equipment return provisions are onerous to Belgacom. The cost to comply with the return provisions would most likely exceed the residual position by a comfortable margin providing significant economic incentive for Belgacom to simply purchase the equipment. It is for these reasons that the EBO will most likely be exercised at year 10.

9. Mutual and Reciprocal Obligations Pertaining to the Various Principal and Cash Flows.

Many sale/leaseback transactions are structured so that the seller/lessee's rent payment equals the buyer/lessor's debt service. Such is the case in this SILO transaction and, in isolation, would not generally constitute a significant factor in the Government's favor. Other factors that weigh in the Government's favor, when combined with this offset, include:

(a) One hundred percent Debt Defeasance; and

(b) where the Equity Collateral portion of the Equipment Agreement payment is invested in a manner such that maturity of the investment provides amounts matching the amounts and payment dates on the Purchase Option.

In this SILO, each of these factors are found in: (a) section 2.01 and Annex A of the Loan and Security Agreement; and sections 1.01, 2.01 and Schedules A and B of the Deposit Agreement; (b) Exhibit E to the Lease Agreement; Schedule I of the Transaction Confirmation of the Additional Collateral Deposit Agreement ( Master Agreement); and Schedule A of the Participation Agreement.

10. Purchase of Future Interest with the Taxpayer's Promise to make a Future Payment

This document has assumed that if the Taxpayer is treated as having purchased only a future interest, the Taxpayer has paid for that future interest on the Closing Date with the Equity Investment. However, in some SILOs, the facts may indicate that the Taxpayer has purchased a future interest, but has done so not with a payment on the Closing Date, but rather with a promise to make a future payment which would be due upon expiration of the Lease Basic Term.

If the facts support this recharacterization of the transaction, the Taxpayer would likely be treated as the owner, for U.S. tax purposes, of the Equity Collateral. The treatment of the

| Form 886A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Schedule No. or<br>Exhibit 038 - 5 |
|---|---|---|
| Name of Taxpayer<br>Wells Fargo & Company and Subsidiaries | | Year/Period Ended<br>1999, 2000 |
| Lease | | |
| Belgacom Mobile SA | | |

Taxpayer as the owner of the Equity Collateral is discussed further below, concerning the potential recharacterization of the transaction as a financing arrangement.

In this SILO transaction, the taxpayer made an Equipment Agreement prepayment equal to 100% of the equipment cost. Item 10 does not apply to the facts in this SILO transaction.

Summary of Future Interest Argument

Because the transfer and retransfer of the rights to possess the Property for the Basic Terms of the Equipment Agreement, the Lease and the Sublease are disregarded as negating each other, the transaction that remains is, at best, a transfer of funds from the Taxpayer to the Tax Exempt Entity in exchange for the latter's obligation to repay those funds and provide the Taxpayer the right to begin to exercise its options at the end of the Lease / Sublease Basic Term, but only if the Tax Exempt Entity does not exercise the Purchase Option. Accordingly, the Taxpayer has not obtained an ownership interest in the Property, and is not entitled to its claimed depreciation deductions under § 168. In addition, since the Taxpayer has no current ownership interest, it would not have rental income under the Lease, as the Taxpayer would not have entered into an Equipment Agreement and Lease as of the Closing Date. The Equity Investment and the transaction costs incurred by the Taxpayer will be basis in the computation of the gain or loss upon exercise of the Purchase Option.

In addition, the amortization of the transaction costs are not currently deductible under §162.

Internal Revenue Code § 163

As detailed above, disregarding the Taxpayer's borrowing is an important element of the Future Interest argument, in that such disregard of the loans indicates that the Taxpayer did not purchase a present ownership interest. However, disregarding the loan is not essential to the Service's position. Even if, arguably, the Taxpayer is treated as having borrowed funds, the funds have not been used to acquire a present ownership interest entitling the Taxpayer to its claimed deductions and amortizations. All borrowed funds are deposited by the Taxpayer in the Deposit Account with the Payment Undertaker in which the Taxpayer does not have a security interest or is loaned to the Tax Exempt Entity under the alternate Financing Arrangement argument. Therefore, the Service also argues that under § 163 the nonrecourse loans in this SILO have no substance.

Legal Analysis

Internal Revenue Code § 163(a) generally allows taxpayers a deduction for all interest paid or accrued within the taxable year on indebtedness. Case law generally defines the term

| Form 886A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Schedule No. or<br>Exhibit 038 - 5 |
|---|---|---|
| Name of Taxpayer<br>Wells Fargo & Company and Subsidiaries | | Year/Period Ended<br>1999, 2000 |
| Lease | | |
| Belgacom Mobile SA | | |

"interest" to mean the amount that one has contracted to pay for the use or forbearance of money. See, e.g., Old Colony R. Co. v. Commissioner, 284 U.S. 552 (1932); Deputy v. duPont, 308 U.S. 488 (1940).

The nonrecourse loans in SILOs must be disregarded because, while allegedly financing the Head Lease / Equipment Agreement advance rent payment, they lack substance. In Bridges v. Commissioner, 39 T.C. 1064, aff'd, 325 F.2d 180 (4th Cir. 1963), the taxpayer "borrowed" funds from banks, used the funds to purchase Treasury notes, which the banks held as collateral, and ultimately sold the same notes to satisfy the taxpayer's debts. The Tax Court's rationale for disallowing the taxpayer's deductions of prepaid interest applies equally to this SILO:

> [Taxpayer] at no time had the uncontrolled use of any additional money, of the bonds, or of the interest on the bonds. He assumed no risk of a rise or fall in the market price of the bonds and could not take advantage of such. His payment to the bank was not for the use or forbearance of money; it was for the purchase of a rigged sales price for the bonds and for a tax deduction. [Taxpayer] incurred no genuine indebtedness, within the meaning of the statute, and as a payment of interest, this transaction was also a sham.

Id., at 1078-79.

The Tax Court further stated that § 163 presupposes that the alleged debt not be a sham or incurred in a sham transaction. Rather, "interest", as used in the statute has a commercial connotation; that is, regardless of any tax consequences resulting therefrom, the amounts paid as interest must have commercial reality, there must be some valid commercial reason for paying interest, and the borrower must in fact receive something in the transaction itself which would warrant payment of interest. Accordingly, to be deductible, the amounts paid must constitute interest and represent compensation for the use or forbearance of money. Where the taxpayer cannot benefit economically from the transaction except through tax deductions, the amount paid is not for the use or forbearance of money. Knetsch v. United States, supra. The Bridges court also noted, "We doubt that the bank at any time actually had any of its money out on loan or that its portfolio of Treasury notes actually changed. The transaction merely provided the 'facade' of a loan." Id., at 1077.

In addition, the interest expense claimed by the Taxpayer from this SILO is disallowed under § 163 as interest expense may not be deducted when it is incurred in transactions "that can not with reason be said to have purpose, substance, or utility apart from their anticipated tax consequences." Sheldon v. Commissioner, 94 T.C. 738, 760 (1990) (quoting Goldstein v. Commissioner, 364 F.2d 734, 740 (2d Cir. 1966)). Thus, transactions merit respect and give rise to deductible interest only if there is some tax-independent purpose for the transactions. Further, the Service may disallow an interest deduction on the grounds that "transactions which do not vary control or change the flow of economic benefits are to be dismissed from

| Form 886A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Schedule No. or<br>Exhibit 038 - 5 |
|---|---|---|
| Name of Taxpayer<br>Wells Fargo & Company and Subsidiaries | | Year/Period Ended<br>1999, 2000 |
| Lease<br>Belgacom Mobile SA | | |

consideration" if they "do not appreciably change the taxpayer's financial position." ACM Partnership v. Commissioner, 157 F.3d 231, 248 (3d Cir. 1998)(quoting Weller v. Commissioner, 270 F.2d 294, 297 (3d Cir. 1959)).

A seminal case interpreting § 163 is Goldstein v. Commissioner, 364 F.2d 734 (2d Cir. 1966), aff'g 44 T.C. 284 (1965). For the Second Circuit, the underlying purpose of § 163(a) was difficult to articulate given the extreme broadness of this provision (deduction permitted for "all interest paid or accrued within the taxable year on indebtedness."). However, the Court found the statute not entirely unlimited in its application; rather, reflecting Congressional policy of encouraging only purposive activity, § 163 did not permit a deduction for interest paid or accrued in loan arrangements without purpose, substance, or utility apart from their anticipated tax consequences. Moreover, the Service need not always first label a purported loan transaction a "sham" in order to deny a deduction for interest paid in connection with the loan. See also Lee v. Commissioner, 155 F.3d 584 (2d Cir. 1998), aff'g and remanding T.C. Memo. 1997-172, rejecting the broader idea expressed in Rice's Toyota World, Inc. v. Commissioner, 752 F.2d 89 (4th Cir. 1985), (whether a debt contracted in return for an expected tax benefit will support an interest deduction depends simply on whether the debt itself is genuine.)

Additionally, the mere fact that a promissory note is given does not prove the existence of a loan if there was no indebtedness existing which the note evidences. Rather, the simple expedient of drawing up papers has never been recognized as controlling for tax purposes when the objective economic realities are to the contrary. Frank Lyon, 435 U.S. at 573 (quoting Commissioner v. Tower, 327 U.S. 280, 291 (1946)). In addition, even if all papers signed purport to show legitimate debt, in sham transactions such papers often are executed solely for the purpose of obtaining tax deductions. Meyer v. Commissioner, T.C. Memo. 1986-328 (no indebtedness in substance existed in transaction with circular funding).

Moreover, in Greenfield v. Commissioner, T.C. Memo. 1982-617, the court found it significant that the parties structured the transaction so that the loan was "repaid" by mere bookkeeping entries. Further, the interest rate and monthly payment on the notes were identical. Thus, "The fact that no repayment would ultimately be necessary, due to the contemporaneous obligations incurred ... severely undercuts [taxpayers'] characterization of the cash receipt as a loan." See Blue Flame Gas Co. v. Commissioner, 54 T.C. 584 (1970)(alleged loan not respected where payments took the form of bookkeeping entries, the loan was in the exact amount of the rent due under the leases, and repayment dates of the loan and rent payments were intentionally designed to coincide).

Since the nonrecourse loans in this SILO lack substance, the Taxpayer is not entitled to any interest deductions. Under the Future Interest argument, the Taxpayer acquires, for its Equity Investment, only a contingent future interest in the property. The loans have not

| Form 886A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Schedule No. or<br>Exhibit 038 - 5 |
|---|---|---|
| Name of Taxpayer<br>Wells Fargo & Company and Subsidiaries | | Year/Period Ended<br>1999, 2000 |
| Lease<br>Belgacom Mobile SA | | |

enabled the Taxpayer to obtain either cash or the proceeds of cash. Thus, there is no use or forbearance of money.

Facts Supporting Disallowance of Interest Expense under § 163

Claimed interest expenses resulting from the nonrecourse loan between the Taxpayer and the Lender in this SILO transactions will not be recognized under § 163 because:

1. The nonrecourse loans lack substance since there is no meaningful credit risk to any party.

The Lenders are not at risk as they retain total control over the nonrecourse loan funds due to the Deposit Agreement, under which an affiliate controls the entire nonrecourse loan amount, and the Loan and Security Agreement with their pledges and security arrangements in the Lender's favor. In addition, the Tax Exempt Entity agrees not to terminate the Equipment Agreement until the Lender is paid in full, the Lease provides for direct payment of the Tax Exempt Entity's rent to the Lender, and the Lender may take action against the Payment Undertaker[7]. In this SILO, the following documents contain provisions related to the Lender's total control over the nonrecourse loans, the Tax Exempt Entity's agreement not to terminate the Equipment Agreement until the Lender is fully paid, direct payment from the Deposit Account to the Lender, and the Lender's rights against the Payment Undertaker: (1) the Granting Clause of the Loan and Security Agreement, and section 2.01 of the Deposit Agreement; (2) the last paragraph of section 16 of the Equipment Agreement; (3) section 2.04 of the Deposit Agreement and (4) section 4.03 of the Loan and Security Agreement.

Regarding the loan from the Lender, the Taxpayer's economic risk is remote due to the deposit arrangement with the affiliated Payment Undertaker. Further, section 2.01 of the Deposit Agreement imposes significant restrictions on the Tax Exempt Entity's interest in the Deposit Account with this Deposit Undertaker. Because of the economic defeasance, the pledges and security arrangements made on the Lender's behalf, in the Granting Clause of the Loan and Security Agreement, and the Tax Exempt Entity's obligation for the Termination Value under sections 13, 14, and 16 of the Lease Agreement, nonpayment by the Tax Exempt Entity does not leave the Taxpayer at any risk for repaying the loan balances. Lastly, under section 2.02 of the Loan and Security Agreement, the very nature of the nonrecourse debt means this borrowing cannot affect the Taxpayer's financial position.

The Tax Exempt Entity is protected through receipt of all the funds needed to make its rent payments at the beginning of the transaction. The Tax Exempt Entity in this SILO receives

* * * *

[7] Where a single entity serves as both Lender and Payment Undertaker, the obligation to the Lender is presumably satisfied through bookkeeping entries, and there is no need for any "action" to enforce the obligation to make payment.

| Form 886A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Schedule No. or<br>Exhibit 038 - 5 |
|---|---|---|
| Name of Taxpayer<br>Wells Fargo & Company and Subsidiaries | | Year/Period Ended<br>1999, 2000 |
| Lease | | |
| Belgacom Mobile SA | | |

all the funds it needs to pay rent to the Taxpayer under the transaction documents, as shown in section 3(b) of the Equipment Agreement; section 3(d) of the Sublease Agreement; Exhibit B of the Lease; sections 1.01, 2.01 and Schedule A of the Deposit Agreement; and the Transaction Confirmation and Schedule I to the Additional Collateral Deposit Agreement ( Master Agreement). Moreover, restrictions are placed on withdrawals from the Deposit Account, so that only rent payments may be made from the account. See sections 2.01, and 2.04 of the Deposit Agreement and section 3 of the Transaction Confirmation of the Additional Collateral Deposit Agreement (Master Agreement).

2. Neither the Taxpayer nor the Tax Exempt Entity obtains use of the funds.

Upon receipt of funds from the Taxpayer, the Tax Exempt Entity immediately deposits the full amount of the nonrecourse loan into the Deposit Account via the Deposit Agreement. In this SILO, see sections 1.01 and 2.01 and Schedule B of the Deposit Agreement. The Deposit Account is then used only to make the Tax Exempt Entity's rent payments to the Taxpayer, which in turn immediately forwards the full amount of the rent received to the Lender. In this SILO, see section 2.03 of the Deposit Agreement. In addition, under section 2.04 of Deposit Agreement, the nonrecourse loans are satisfied through direct payments from the Deposit Undertaker to the Lender. Further, the various security arrangements noted above ensure that the Lender never loses control of the nonrecourse loan funds. See Bridges v. Commissioner, supra. In this SILO, see sections 1.01, 2.01 and 2.04 of the Deposit Agreement.

3. As discussed above, the Taxpayer's right to use the Property under the Equipment Agreement during the Lease Basic Term is subject to the Taxpayer's mutual and reciprocal obligation to make the Property available to Stichting during the Basic Term of the Lease and for Stichting in turn to make it available to BMSA for its use during the Sublease term.

The following sections of the transaction documents in this SILO contain the mutual and reciprocal obligations regarding the Property:

(a) section 2 (Participation) and section 3 (Conditions Precedent to Obligations of the Participants and of the Trustee) of the Participation Agreement requires the Taxpayer, Stichting, and BMSA to enter into the Equipment Agreement, the Lease and the Sublease as a requirement for entering into the transaction;

(b) sections 4, 6, 8, and 10 of the Equipment Agreement, sections 4, 6, 8, 10 and 21 of the Lease Agreement, and sections 6, 8, and 10 of the Sublease Agreement refer to the net lease nature of the transaction and combine to return the use and possession of the Property to BMSA, offsetting any possible leasehold interest the Taxpayer could have during the Lease Basic Term (until the first date on which the Early Buyout/Purchase Option may be exercised);

| Form 886A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Schedule No. or<br>Exhibit 038 - 5 |
|---|---|---|
| Name of Taxpayer<br>Wells Fargo & Company and Subsidiaries | | Year/Period Ended<br>1999, 2000 |
| Lease | | |
| Belgacom Mobile SA | | |

(c) sections 6, 8, and 10 of the Equipment Agreement allow the Taxpayer to absolve itself of any maintenance and/or insurance obligations under the Equipment Agreement by causing the Lessee or the Sublessee to incur the costs. In fact, BMSA as Sublessee, was totally responsible for all maintenance and insurance obligations under the Sublease Agreement; and

(d) sections 9 of the Equipment, Lease and Sublease Agreements provide symmetry of treatment in the event of any equipment loss. These provisions combine to return the use and possession of the Property to BMSA, negating any possible ownership interest the Taxpayer could have during the Lease / Sublease Basic Terms. For this reason, the nonrecourse loan should be disregarded as the purported ownership interest it financed is not valid.

4. The nonrecourse loans are to be paid with the rent due the Taxpayer under the Lease, which lacks substance.

Under the Equipment Agreement and Lease, the amount of rent to be paid by the Tax Exempt Entity exactly equals the amount of the Taxpayer's loan payments to the Lender. In addition, the annual rent obligation due from the Tax Exempt Entity to the Taxpayer is always an amount sufficient to satisfy the Taxpayer's debt service obligations to the Lender. Thus, there is no change in the Taxpayer's economic position in regard to its loan repayments. The Deposit Account and Deposit Agreement with the Lender's affiliate thus ensure that the Taxpayer need not expend any of its own funds to make the loan payments. In addition, the amount of interest charged by the Lender on its nonrecourse loan exactly equals the amount of interest paid on the Deposit Account. See Blue Flame Gas Co. v. Commissioner, supra. Therefore, the Tax Exempt Entity's economic position does not change under the Sublease, other than to benefit from the Accommodation Fee paid to it by the Taxpayer to induce the Tax Exempt Entity to enter into the SILO. In this SILO, these transaction documents contain provisions under which the amount of rent due the Taxpayer equals the amount of the Taxpayer's loan repayments, the interest obligations on the Lender's part, and demonstrate that neither the Tax Exempt Entity's or the Taxpayer's economic position changes: a) Exhibit B of the Lease Agreement; b) Annex A of the Loan and Security Agreement; and c) Schedule A of the Deposit Agreement.

## Substance Over Form: Financing Arrangement Alternative Argument

### Legal analysis

Using the facts above, an alternative argument may be made that the Taxpayer should be treated as not having purchased any future interest, but rather as having acted as a lender in a financing transaction. Under this argument and recharacterization of the SILO transaction, the "proceeds" of the loan would in most cases equal (a) the Taxpayer's Equity Investment or,

| Form 886A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Schedule No. or<br>Exhibit 038 - 5 |
|---|---|---|
| Name of Taxpayer<br>Wells Fargo & Company and Subsidiaries | | Year/Period Ended<br>1999, 2000 |
| Lease<br>Belgacom Mobile SA | | |

alternatively, (b) the Equity Collateral amount. In this SILO, the amount of the Taxpayer's Equity Investment is $5,625,082 and the amount of the Equity Collateral is $4,494,000.

Treatment of the Taxpayer's Equity Investment as a Loan

The facts and circumstances here indicate that the Taxpayer has loaned the amount of its Equity Investment to the Tax Exempt Entity, for ultimate purchase of the Equity Collateral. Thus, the Taxpayer would be treated as having interest income received from Tax Exempt Entity, which would be treated as a borrower. In addition, that the transaction is a financing arrangement will be evidenced further by the likelihood that Tax Exempt Entity will exercise the Purchase Option so that the Taxpayer simply obtains a fixed return on its investment. As previously stated, page 5 of the Taxpayer's CAP Report concluded that most likely the EBO would be exercised.

Accordingly, the Taxpayer has, in reality, made a loan to the Tax Exempt Entity, which will be repaid through "rent" payments, exercise of the Purchase Option, or a Lease/Sublease Termination Value payment. Therefore, the claimed depreciation deductions may be disallowed under § 168 because the transaction is merely a loan of an amount equal to the Taxpayer's Equity Investment, and not a change in ownership of the Property. The transaction costs are to be amortized over the life of the "loan" under this alternative Financing Arrangement argument.

At the same time, the facts and circumstances indicate that the nonrecourse loan from the Lender to the Taxpayer should be disregarded. See the discussion of § 163 above as it pertains to the nonrecourse loan.

Treatment of the Equity Collateral as a Loan

Alternatively, the facts and circumstances indicate that the Taxpayer should be treated as holding the benefits and burdens of ownership in the Equity Collateral. In that case, the Taxpayer should be treated as deriving interest income on the Equity Collateral portfolio. This characterization of the transaction would include treating the Taxpayer as the owner of the Equity Collateral portfolio.

In this SILO transaction, the Taxpayer's Equity Commitment was $5,625,082, of which, Stichting, as Lessee transferred $4,494,000 to Merrill Lynch Capital Services, Inc., the Equity Deposit Undertaker, for purchase of a Swap Agreement (the Collateral). Stichting then pledged the Collateral to the Taxpayer, via the Grantor Trust, under the Additional Collateral Security Agreement. In section 2.1 of that Agreement the Taxpayer was given a first priority perfected security interest in the collateral and all amounts due and payable by the Swap Parties under the Collateral Deposit Agreement.

| Form 886A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Schedule No. or<br>Exhibit 038 - 5 |
|---|---|---|
| Name of Taxpayer<br>Wells Fargo & Company and Subsidiaries | | Year/Period Ended<br>1999, 2000 |
| Lease | | |
| Belgacom Mobile SA | | |

Interest Income/OID Income

The Taxpayer generates income from its equity payment to the Tax Exempt Entity under this alternative Financing Arrangement argument. Under this alternative argument, the Taxpayer may be required to report original issue discount income. See Internal Revenue Code §§ 1271-1275. This argument is based on the determination that the Taxpayer has made a loan to the Tax Exempt Entity in the amount of the Taxpayer's total Equity Investment and that this amount, plus accrued but unpaid interest, is returned to the Taxpayer when the Purchase Option is exercised.

**DEPRECIATION RECOVERY PERIOD FOR QTE PROPERTY: ALTERNATIVE ARGUMENT**

Internal Revenue Code § 168(g)(1) provides an alternative depreciation system for certain tangible property used predominantly outside the United States and " any tax-exempt use property." [8] Accordingly, § 168(g) applies to this SILO because it includes a foreign Tax Exempt Entity and therefore tangible property used predominantly outside the U.S.

Section 168(g)(3)(A) contains special rules for determining the depreciable period for any "tax-exempt use property subject to a lease" and § 168 (g)(3)(C) applies specifically to QTE. The provisions of § 168(h)(1)(A) define "tax-exempt use property" generally as any tangible property, except nonresidential real property, leased to a tax-exempt entity. Under § 168(g)(3)(A), the depreciable recovery period for such property "shall in no event be less than 125 percent of the lease term." (emphasis added) The Service relies on this statute, especially the emphasized language, for its alternative position that because the Taxpayer entered into a SILO transaction, it must depreciate the Property over 125 percent of the entire lease term.

In contrast to the terms of § 168(g)(3)(A), § 168(g)(3)(C) provides that for QTE, the recovery period for purposes of § 168(g)(2) shall be 5 years. The Taxpayer may rely on this section for its position.

The Service's position is based on:

1. Section 168(g)(3)(A) expressly states that the recovery period for tax-exempt use property "shall in no event" be less than 125 percent of the lease term.

* * * *

[8] Section 168(g)(2)(A) contains the general alternative depreciation rule of straight line recovery over periods of various class lives of property as found in section 168(g)(2)(C).

| Form 886A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Schedule No. or<br>Exhibit 038 - 5 |
|---|---|---|
| Name of Taxpayer<br>Wells Fargo & Company and Subsidiaries | | Year/Period Ended<br>1999, 2000 |
| Lease | | |
| Belgacom Mobile SA | | |

In contrast, no such language exists in § 168(g)(3)(C), upon which the Taxpayer may rely.

2. The textual relationship of §§ 168(g)(3)(A) and 168(g)(3)(C).

No express language explains the interactions among subparagraphs 168(g)(3)(B) through (E) with subparagraph (A). Therefore, any interpretation of the interaction of subparagraph (C) to subparagraph (A) should logically apply to the interaction of subparagraphs (B),(D), and (E). Subparagraphs (B) through (E) either provide in their plain language the specified recovery periods for their respective categories of property, irrespective of whether the property is also tax-exempt use property or, alternatively, do not so provide and thus subject each of their respective categories, if leased to a tax-exempt entity, to the 125 percent of the lease term minimum recovery period as provided for in subparagraph (A).[9]

3. Although excluding QTE from the tax-exempt use property recovery period may conceivably be consistent with the legislative history of the Tax Reform Act of 1968 amending § 168(g)(3), no such legislative history supports excluding the property subject to subparagraphs (B), (D), and (E) .

The JCT General Explanation of the Tax Reform Act of 1986 (the 1986 Act) states:

> The Act retains the rules for tax-exempt use property, including the rules that (1) increase the recovery period used for purposes of computing depreciation to a period not less than 125 percent of the lease term, if this period would be longer than the depreciation period otherwise applicable to the property, and (2) treat QTE with a lease term that exceeds five years as having a recovery period of five years.[10]

Thus, this language indicates that the professed intent of the 1986 Act was to maintain the then-existing leasing rules for tax-exempt use property. Excluding the categories of property contained in subparagraphs (B), (D), and (E) from the 125 percent recovery rule would not preserve the *status quo* as intended. Rather, such exclusion would have greatly narrowed the

* * * *

9 Subparagraphs (D) and (E) use language identical to that in subparagraph (C), providing, respectively, for a 5 years recovery period for automobiles and light general purpose trucks and a 40 year recovery for all Internal Revenue Code § 1245 property that is real property with no class life. Although subparagraph (B), providing special class lives for nine categories of property, does not contain language identical to that in subparagraph (C), it also modifies the recovery period of § 168(g)(2) for certain property.

10 Joint Comm. On Tax., 99th Cong. 2d Sess., General Explanation of the Tax Reform Act of 1986, at 106 (1987). See also S.Rep. No. 99-313, 99th Cong. 2d Sess.

| Form 886A | Department of the Treasury - Internal Revenue Service<br>**Explanation of Items** | Schedule No. or Exhibit 038 - 5 |
|---|---|---|
| **Name of Taxpayer**<br>Wells Fargo & Company and Subsidiaries | | **Year/Period Ended**<br>1999, 2000 |
| **Lease** | | |
| Belgacom Mobile SA | | |

tax-exempt leasing rules.[11] Further, no exclusions for these types of property were included when the tax-exempt leasing rules were added to the Code by the Deficit Reduction Act of 1984. Further, no legislative history exists for the 1986 Act or subsequent legislation, demonstrating that Congress never intended to create broad exclusions to the 125 percent recovery period for tax-exempt use property.

4. Although the legislative history states that QTE property has a recovery period of 5 years even where the property is subject to a lease term greater than 5 years, that legislative history must be read in the context of the tax-exempt leasing rules existing before the 1986 Act.

The Service's position is based on the following: (a) Prior to 1986, § 168(j) stated, "In the case of any tax-exempt use property, the recovery period ... shall be not less that 125 percent of the lease term." Note that the successor language to prior § 168(j)(2)(A) is found in § 168(g)(3)(A), upon which the Service relies. Significantly, the difference between these two sections is that § 168(g)(3)(A) applies to "tax-exempt use property subject to a lease." ; (b) Prior § 168(j)(5)(A) contained the rule, now included in § 168(h)(3)(A), that tax-exempt use property did not include QTE where the lease was for 5 years or less; (c) Prior § 168(j)(5)(B) provided that QTE leased for more than 5 years and not used predominantly outside the U.S. had a 5 year recovery period. Thus, the statement in the legislative history quoted above shows that Congress believed that the 5 year recovery rule for QTE applied only to property used predominantly outside the U.S.; (d) The quoted statement also supports a conclusion that Congress intended to keep the 5 year recovery period for QTE despite the fact that prior § 168(j)(5)(B) was not retained in the 1986 Act; and, (e) Under prior § 168, the term QTE had no significance outside the tax-exempt leasing rules. Whether property was QTE was relevant only if the property was tax-exempt use property because there was no special recovery rule for QTE that was not also tax-exempt use property. Therefore, the rules contained in prior § 168(j)(5) had to override prior § 168(j)(2)(A), as otherwise there was no purpose or reason for including special rules for QTE.

5. Taxpayers relying on the legislative history to depreciate QTE used predominantly outside the U.S. must necessarily ignore the phrase "not used predominantly outside the United States", and therefore must concede that Temp. Treas. Reg. section 1.168(j)-1T is not correct, at least in part.

The Taxpayer should not rely on the legislative history because: (a) the statement is inaccurate as to QTE that is tax-exempt use property and used predominantly outside the U.S. ; (b) the legislative history states, "The bill retains the rules for tax-exempt use property."; (c)

* * * *

[11] If leased to a tax-exempt entity, these types of property would be subject to straight line depreciation. However, they would not be subject to the minimum recovery period of 125 percent of the lease term.

| Form 886A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Schedule No. or<br>Exhibit 038 - 5 |
|---|---|---|
| Name of Taxpayer<br>Wells Fargo & Company and Subsidiaries | | Year/Period Ended<br>1999, 2000 |
| Lease | | |
| Belgacom Mobile SA | | |

under prior § 168(j)(5)(B), QTE that received 5 year period recovery treatment did not include QTE used predominantly outside the U.S. but there is no similar limit in current § 168 (g); (d) although § 168(g) applies to property predominantly used outside the U.S., there is no special recovery period rule for QTE that is also tax-exempt use property if used outside of the U.S. ; (e) under both subparagraphs (A) and (C) of section 168, the recovery period subject to modification depends on where the property is used predominantly. Accordingly, the legislative history is inaccurate in certain circumstances with the language of § 168 itself, even if one concluded that at least some QTE already had a 5 year recovery period; and, (f) the changes to the Temporary Regulations made in 1992 do not support the Taxpayers' position since those changes were only to a cross reference when the Regulations pertaining to certain elections under the Code were finalized and renumbered.

**TAXPAYER'S POSITION**:

1. The head lease of the equipment from the head-lessor/lessee to the equity investor constitutes a sale for tax purposes, and the equity investor is treated as the owner of the equipment.

2. The sublease from the equity investor back to the head-lessor/sublessee constitutes a true lease in accordance with the Service's true lease guidelines in Rev. Proc. 75-21. In addition, the lease constitutes a true lease in accordance with applicable judicial authority, such as the "economic substance" and "sham transaction" doctrines, and "benefits and burdens of ownership" principles. Accordingly, the equity investor is the owner and lessor of the equipment.

3. In the case of the Belgacom transaction, the equity investor, as the owner of the equipment (which constitutes QTE as defined in IRC section §168(i)(2)), is entitled to depreciation deductions applicable to "5-year property" under IRC §168(e)(3)(B) and/or amortization deductions over a 36-month recovery period under IRC §167(f) for any software component of the equipment.

4. The nonrecourse loan used to finance the equipment constitutes true debt. Consequently, the equity investor is entitled to interest deductions under IRC §163. This conclusion is unaffected by the economic (as opposed to legal) defeasance in the transaction, which is analogous to the judicially-approved use of lessee debt. See, e.g., Hudspeth v. Commissioner, 509 F.2d 124 (9th Cir. 1975); Torres v. Commissioner, 88 T.C. 702 (1987); Larsen v. Commissioner, 89 T.C. 1229 (1987); Mukerji v. Commissioner, 87 T.C. 926 (1986).

5. The equity investor is entitled to amortize the applicable transaction costs over the life of the transaction.

| Form 886A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Schedule No. or<br>Exhibit 038 - 5 |
|---|---|---|
| Name of Taxpayer<br>Wells Fargo & Company and Subsidiaries | | Year/Period Ended<br>1999, 2000 |
| Lease<br>Belgacom Mobile SA | | |

**CONCLUSION:**

**Purchase of a Future Interest – BMSA 97- 3 & 4 Transactions**

It is determined that the depreciation deductions claimed by Wells Fargo & Company and Subsidiaries (WFC) in the amount of $7,565,279 for each of the taxable years ended 12/31/1999 and 12/31/2000 as a result of entering into a Sale In/Lease Out (SILO) transaction with Belgacom Mobile SA (BMSA) are disallowed because WFC merely purchased a future interest.

Further, it is determined that the interest expense deductions claimed by WFC in the amounts of $1,952,841, and $1,828,731 in the taxable years ended 12/31/1999 and 12/313/2000, respectively, as a result of entering into a SILO transaction with BMSA are disallowed under Internal Revenue Code § 163 because the nonrecourse loan from De Lage Laden Financial Services B.V. lacks substance, neither WFC, Stichting Stella (Stichting) nor BMSA obtained use of the funds, the leasehold interest purportedly financed by the nonrecourse loan is substantially offset by the Lease with Stichting and Sublease to BMSA so that WFC is only purchasing a future interest, and the purported nonrecourse loan is to be paid from rents due WFC under a Lease that lacks substance.

Further, it is determined that the transaction costs amortized by WFC in the amount of $47,763 for each of the taxable years ended 12/31/1999 and 12/31/2000, as a result of entering into a SILO transaction with BMSA are disallowed because the expenses are capital expenditures with respect to the future interest purchased by WFC.

Further, since the SILO entered into with WFC presents only a purchase of a future interest, no recognizable taxable rental income accrued in the taxable years ended 12/31/1999 and 12/31/2000. Accordingly, WFC's taxable income in the taxable years ended 12/31/1999 and 12/31/2000 is reduced in the amount of $3,721,023 for each year.

**Substance Over Form/Financing Arrangement Alternative – BMSA 97- 3 & 4**

Alternatively, it is determined that the depreciation deductions claimed by WFC in the amount of $7,565,279 for each of the taxable years ended 12/31/1999 and 12/31/2000, as a result of entering into a SILO transaction with BMSA are disallowed because this transaction was a financing arrangement rather than a true lease.

Further and in the alternative, it is determined that the amount financed does not include the proceeds of the nonrecourse loan, and thus the interest expense deductions claimed by WFC in the amounts of $1,952,841 and $1,828,731 in the taxable years ended 12/31/1999 and

| Form 886A | Department of the Treasury - Internal Revenue Service<br>Explanation of Items | Schedule No. or<br>Exhibit 038 - 5 |
|---|---|---|
| Name of Taxpayer<br>Wells Fargo & Company and Subsidiaries | | Year/Period Ended<br>1999, 2000 |
| Lease | | |
| Belgacom Mobile SA | | |

12/31/2000, respectively, as a result of entering into a SILO transaction with BMSA are disallowed under Internal Revenue Code § 163.

Further and in the alternative, because the transaction is in substance a financing, no recognizable taxable rental income accrued in the taxable years ended 12/31/1999 and 12/31/2000. Accordingly, WFC's taxable income in the taxable years ended 12/31/1999 and 12/31/2000 is reduced in the amount of $3,721,023 for each year.

Further and in the alternative, WFC's taxable income in the taxable years ended 12/31/1999 and 12/31/2000 is increased in the amounts of $322,570 and $334,634, respectively, as it failed to report taxable original issue discount income resulting from entering into a SILO transaction with BMSA, which transaction was a financing arrangement and loan to BMSA from WFC, rather than a true lease. See Exhibit 7 for Computations.

| OID Income: | 12-31-1999 | 12-31-2000 |
|---|---|---|
| BMSA 97-3 | $219,635 | $227,890 |
| BMSA 97-4 | $102,935 | $106,744 |
| Total | $322,570 | $334,634 |
| | ======= | ======= |

**Depreciation Recovery Period/Alternative**

Alternatively, it is determined that the depreciation deductions claimed by WFC in the amount of $7,565,279 for each of the taxable years ended 12/31/1999 and 12/31/2000 as a result of entering into a SILO transaction with BMSA are partially disallowed under Internal Revenue Code section 168 because WFC used an incorrect depreciation recovery period.