**EXHIBIT 6**

30. **PACE–The Suburban Bus Division of the Regional Transit Authority ("PACE") 2003-2**

No supplemental response at this time.

**INTERROGATORY NO. 3.** Identify, by transaction, all studies, analyses, appraisals, legal opinions, forecasts, projections, and other due diligence performed or prepared by any person in connection with each of the Transactions and 2003 Transactions, including, but not limited to, the due diligence described in paragraphs 52 through 58 of the Complaint. Also identify the consultants and appraisers referred to and all other persons that performed such work referred to in those paragraphs, and all documents that mention, describe, or evidence such work.

**RESPONSE:**

Plaintiff objects to a request to identify all documents that mention, describe or evidence the work of all consultants, appraisers and others who performed due diligence on the FTA, QTE and QTP transactions as overbroad and unduly burdensome. All deal documents and most other documents pertaining to the FTA, QTE and QTP transactions would be responsive to this request.

The use of the word "all" in Interrogatory No. 3 also renders the request vague and ambiguous, as well as overbroad; the request does not adequately advise Wells Fargo of the specific information sought. *See, e.g.*, *Stovall v. Gulf and S. Am. Steamship Co.*, 30 F.R.D. 152, 154 (S.D. Tx. 1961) ("[h]ow can the court make enforceable orders with reference to 'all' of anything?"); *Sheffield Corp. v. George F. Alger Co.*, 16 F.R.D. 27, 29 (S.D. Ohio 1954) (condemning interrogatories that use the word "all"); *Aero Holdings*, 2000 WL 33170895. Plaintiff provides the following, good-faith response to the above request.

Wells Fargo was and is in the business of leasing; it has been making equity investments and acting as lessor and equity investor in leveraged leases for more than 25 years. By the end of 2003, the leasing business conducted by WFEFI had over 21,000 customers located in all 50 states. WFEFI employed almost 400 people and had over 30 offices located throughout the United States. Total assets exceeded $6 billion, of which $1 billion was invested in "large ticket" transactions, commonly known as leveraged leases, where the lessees were typically large, publicly held corporations. Traditionally, the large ticket leased assets included locomotives to the Class I railroads, railcars to domestic utilities, manufacturing equipment to various consumer product companies, and commercial aircraft to both major and regional airlines. The large ticket business also included lease-to-service-contracts, a form of leveraged lease transaction where WFEFI leased passenger locomotives and railcars, commuter light rail vehicles and mass transit and commuter buses to tax-exempt domestic transit agency lessees and municipalities. QTE Transactions were also a part of the large ticket leveraged leasing business from 1997 through 2000.

As described in paragraphs 52 – 58 of the Complaint, Wells Fargo methodically conducted due diligence on each of the FTA, QTE and QTP Transactions, as it did on all leveraged leases. Due diligence was generally conducted by the same people on all of the FTA, QTE and QTP transactions with the exception of the Belgacom transaction and those transactions done by First Security. *See* Plaintiff's Responses to United States' First Set of Interrogatories, previously submitted; the following is a summary of that information. Richard (Rich) Johnson, Vice President, WFEFI, oversaw the due diligence process. Don Oram, Equipment Manager, WFEFI, reviewed the equipment and drafted an Equipment Review Memorandum; he would also review the appraisal for reasonableness. Scott Seaborg, Assistant

Vice President of Credit, WFEFI, performed the credit analysis on most of the transactions (credit review on the lessee and on any strip provider); he was the primary drafter of most of the Credit Approval Presentations ("CAPs"). Mr. Seaborg did not work on the Belgacom, Sonera or Société Francaise transactions. Rob Engstrom checked the yields and pricing runs. The leasing consultant (e.g., Trinity Advisors, who specialized in lease-to-service-contracts) provided sample pricing runs and reviewed the structure. The CAPs (previously produced) are manifestations of the due diligence, they memorialize the due diligence process.

Wells Fargo had an Institutional Risk Committee that evaluated sovereign risk ratings and agency ratings. *See, e.g.*, Bates Nos. WPF168486 – WPF168512. Statistical data and other information on US transit agencies was obtained from various websites. *See, e.g.*, Bates Nos. WPF168848 – WPF168849. Total credit exposure to any entity, including guarantors, was monitored. *See, e.g.*, Bates Nos. WPF168850 - WPF168890, specifically WPF168854.

On October 15, 1999, after the merger of Wells Fargo and Norwest Bank Minnesota, N.A. ("Norwest"), Mr. Johnson recommended increasing WFEFI's total portfolio limit to $300 million and maximum customer exposure limit to $20 million. *See* Bates Nos. WPF178037 – WPF178038. By June 6, 2001, WFEFI's due diligence process was formally documented in a "Front End Guidance" document, pursuant to which leveraged lease transactions were evaluated according to the following guidelines:

Description of Desirable Customers:

- International with a primary focus on domestic businesses, utilities and public service agencies
- [Domestic with an] AQR of 1 or 2, with consideration for 3s in exceptional situations

Equipment:

- Corporate, utility, passenger and freight railcars and locomotives

- Machinery and equipment used in manufacturing products of all types
- Transportation equipment
- Aircraft, flight simulators and other ground support equipment
- Telecommunications equipment
- High technology equipment including computers and peripherals
- Ships, tankers and barges
- Agricultural processing equipment and plants
- Chemical and petroleum processing equipment and plants
- Construction and mining equipment
- Office furnishings and fixtures

Lease Term:

- 5-29 years for the base lease term but not more than 80% of the useful life of the equipment

Lease Structure:

- Conventional leveraged lease
- QTE lease
- Lease to service contract
- Synthetic lease
- All structures may include sale/leaseback or lease/leaseback
- Other true lease structures as approved by management

Equipment Cost:

- Original cost from $10MM-$100MM
- $3-30MM initial equity investment including origination fees and expenses
- Invested equity and fees range from 15-45% of OEC

Residual Values:

- Booked residual value ranges from 10-60% of OEC
- Residuals may be higher if guaranteed by a credit worthy third party or defeased
- Booked residual must be supported by third party appraisal from a qualified expert and approved by internal equipment management
- Third party appraisals must be provided by major firms with demonstrated expertise and history and be acceptable to management

Legal Opinions:

- Qualified outside counsel must provide opinions regarding validity and enforceability of contract, clear title to property and compliance with existing law

- Tax opinions must be provided by outside counsel stating that the transaction is a "true lease" for tax purposes and validating lessor's ability to claim depreciation on the equipment and deduct interest expense on the non-recourse debt
- Only "should" or "will" level opinions are acceptable from outside counsel
- Internal counsel must review and approve work of outside corporate and tax counsel
- External counsel must be a nationally recognized firm with expertise in the leveraged lease business and acceptable to internal (WFC) counsel
- Documentation of all transactions must meet industry norms to insure salability in the secondary market.

Tax Department Authorization:

- WFC's Corporate Tax Department must approve all transactions for tax capacity [i.e., sufficient taxable income to utilize tax benefits] and tax benefits as outlined in transaction description
- CAPs must include a section on tax risks of the transaction and describe economic/yield impact of loss of tax benefits
- Transaction structure and tax risk for new products must be approved by Corporate Tax prior to providing a written proposal to or bidding a transaction for a prospective lessee

Other Expert Opinions:

- Third party experts used for QTE, service contract and other opinions must be provided by major firms with a demonstrated expertise in the topic, a history in the industry and be acceptable to management

Use of Trustees:

- Equity trustee must be a nationally recognized bank or commercial trust company with demonstrated expertise in servicing leveraged leases
- Referrals will be made to Wells Fargo's trust business where possible
- Debt and defeasance trustee must meet the same criteria as equity trustee and be approved by management

Concentration Limit Within Business Segment:

- 15-20% of WFEFI's total = portfolio limit
- 10% of WFEFI's total assets = industry limit
- 10% of WFEFI's total assets = equipment type limit
- $50MM = WFEFI exposure guidance for AQR 1 & 2 rated lessees

Return Objectives for Business Segment:

- Yields are to be measured using the multiple investment sinking fund method

- Tax rate assumptions are to include the current maximum Federal Rate and a composite state rate (currently 37.73%) with no AMT or "4th & 40" adjustment unless notice is provided by the Corporate Tax Department that these conditions apply
- Pre-tax effective yields are to be targeted at spreads of 250-500 bps over the 10 year amortizing COF (cost of funds) as provided by Management Sciences
- Pre-Tax effective yields are based on calculations using pricing models provided by qualified third parties with demonstrated expertise and wide acceptance in the industry
- Documentation of all assumptions used in transaction pricing and copies of the final pricing run are to be provided to accounting and included in the transaction file
- Yields based on pricing models provided by third parties must be validated by WFEFI's internal accounting staff prior to transaction funding
- Pricing assumptions must be reviewed and approved by external tax counsel
- CAPs must include a comparison of the yield for a publicly traded bond with an unsecured rating equal to and a maturity equal or as close as possible to that of the lessee

Structural Requirements for QTE Leases and Lease-to-Service Contracts with Foreign Corporations and Municipal Agencies:

- The non-recourse debt must be fully defeased and the equity investment must be partially defeased by a credit worthy third party (AQR 1 or 2) or with securities held directly by a trust company for the benefit of the equity investor
- The equity defeasance funds must be invested in U.S. Treasuries, U.S. Agencies or AAA/Aaa rated Corporates
- Credit exposure concentration limits may be waived for defeasance providers when a security interest in the equity defeasance collateral is granted to the equity investor
- Any "strip" exposure (for the difference between the equity investment and the stipulated loss value) must be collateralized by a letter of credit, surety bond or insurance agreement from a credit worthy third party (AQR 1 or 2)
- Mark-to-market coverage must be purchased (or provided for) for the potential exposure between the stipulated loss value and the liquidation proceeds of the defeasance collateral in the event of an early termination or default by the lessee

*See* Bates Nos. WPF043086 – WPF043090.

Mr. Johnson attended leasing conferences to stay abreast of industry trends and developments. FTA personnel spoke at some of these conferences. For example, Paul L. Marx of the FTA gave a presentation at the Structured Finance Institute's December 2002 conference; his presentation was titled "Domestic Leasehold: A Federal Perspective." Mr. Johnson's handwritten notes on Mr. Marx's presentation materials show that the IRS and the FTA had communicated about leveraged leasing transactions, and that "until the IRS issues hard and fast

regs, FTA will continue to OK these deals." *See* Bates Nos. WPF178009 – WPF178010. Additionally, William P. Sears, Chief Counsel of the FTA, made a presentation at the November 2002 Capstar Partners Leasing Conference. This presentation reviewed major principles governing the FTA's legal review of leveraged lease deals. The written synopsis of presentation materials states that the FTA looks for mechanisms designed to ensure stability over the sublease term, such as defeasance, guarantees, fixed purchase options and the mandatory use of a special purpose trust to act as sublessor. *See* Bates Nos. WPF178011 – WPF178023. The presentation materials also referenced FTA Circular 7020.1, Cross-Border Leasing Guidelines (April 26, 1990) [also covers domestic leases] and Chapter 2 ("Cross-Border & Domestic Leases") from FTA's publication entitled Innovative Financing Techniques (which was available on the Internet at www.fta.dot.gove/library/prolicy/IFT/ift2.htm).

WFEFI kept track of leasing transactions reviewed each year (whether accepted, rejected, pending, funded, lost or committed) through "Pipeline Reports." WFEFI routinely rejected transactions which did not meet its stated criteria. *See* Bates Nos. WPF178028; WPF178029; WPF178030 – WPF178031; WPF178032 – WPF178034.

On October 24, 2001, Mr. Johnson sent Andrew Rupprecht (Senior Vice President, WFEFI) an email which described leveraged lease-to-service contracts, a modified form of traditional leveraged lease. *See* Bates Nos. WPF178035 – WPF178036.

Legal opinions contained in the closing binders for each transaction have already been produced in both the IRS examination and in Plaintiff's Rule 26 production. As described in Plaintiff's Responses to United States' First Set of Interrogatories, previously submitted, each transaction had a qualified appraiser, experienced consultants that provided a QTE or service contract opinion, and a leading law firm that provided a tax opinion.

## FTA TRANSACTIONS

### 1. Bay Area Rapid Transit ("BART") 2002

Don Oram reviewed draft equipment appraisal reports, draft QTE reports and other information in the course of reviewing and recommending the BART Transaction. *See, e.g.*, Bates Nos. WPF170119 – WPF170227; WPF170228 – WPF170261; WPF170262; WPF170263; WPF170264 – WPF170301; WPF170302 – WPF170393; WPF170394 – WPF170427; WPF170466; WPF170467 – WPF170599; WPF170600; WPF170601 – WPF170709; WPF170710; WPF170711; WPF170712; WPF170713 – WPF170746; WPF170788 – WPF170821; WPF170822 – WPF170823; WPF170864 – WPF170996; WPF170997 – WPF171034. In an Inter-Office Memorandum dated December 7, 2001 to Mr. Johnson and Mr. Seaborg, Mr. Oram concluded that Equipment Management found the BART Transaction to be acceptable. *See* Bates Nos. WPF074596 – WPF164457; WPF007361.

Mr. Johnson communicated with Jonathan Savar, Associate Director and Head of Domestic Municipal Leasing, Macquarie, concerning various aspects of the BART Transaction, including due diligence related to the equipment, appraisal report and transaction volume. *See* Bates Nos. WPF164461; WPF164474.

Information concerning Financial Security Assurance Inc. ("FSA") was reviewed, including an Investor's Overview describing the bond insurance industry and FSA. *See* Bates Nos. WPF164500 - WPF164535.

Scott Seaborg provided a credit analysis of the BART Transaction, including a review of the lessee and equity strip provider. The results of this analysis were presented in a CAP for internal review and approval of the BART Transaction. *See* Bates Nos. WPF164536 - WPF164595; WPF007467-WPF007500.

Analyses and studies prepared by ratings agencies concerning interest rates, bond insurers and the re-insurance industry were reviewed in the course of analyzing the BART Transaction. *See* Bates Nos. WPF164596 - WPF164627; WPF164628 - WPF164629; WPF007730-WPF007731. Financial information, credit ratings and industry analysis were also reviewed in the course of analyzing the BART Transaction. *See* Bates Nos. WPF007561-WPF007688; WPF007727-WPF007729; WPF007732-WPF007736; WPF007742-WPF007748; WPF007914-WPF007980.

Mr. Johnson coordinated with financial advisors at CIBC, including Irmie Loosen, Karen Weinberg and Greg Hurst, concerning the pricing runs for the BART Transaction. Pricing runs were used by internal Wells Fargo accounting personnel, primarily Rob Engstrom, to book the lease and ensure the data was correct and the numbers tied to Wells Fargo's financial and economic objectives. *See* Bates Nos. WPF007501 - WPF007546; WPF007689 - WPF007713; WPF007722 - WPF007725.

2. **State of California Department of Transportation ("CALTRANS") 2000**

Mr. Oram reviewed draft equipment appraisal reports, draft service contract opinions and other information in the course of reviewing and recommending the CALTRANS 2000 Transaction. *See, e.g.,* Bates Nos. WPF171035; WPF171036; WPF171037 – WPF171046. Mr. Oram emailed Mr. Johnson his thoughts on the CALTRANS equipment on March 8, 2000. *See* Bates No. WPF164387. At the suggestion of Mr. Johnson, Mr. Oram contacted Scott Rivello, an appraiser at PwC, about the CALTRANS equipment. Mr. Oram emailed the results to Mr. Johnson. *See* Bates Nos. WPF168362; WPF164408; WPF164406 – WPF164407; WPF168513 - WPF168514.