**EXHIBIT 7**

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **WELLS FARGO & COMPANY and SUBSIDIARIES,** | ) | |
| **Plaintiff,** | ) | **No. 06-628 T** |
| **v.** | ) | **Judge Thomas C. Wheeler** |
| **THE UNITED STATES,** | ) | |
| **Defendant.** | ) | |

**PLAINTIFF'S RESPONSES TO**
**UNITED STATES' SECOND SET OF INTERROGATORIES**

Pursuant to Rules of the United States Court of Federal Claims ("RCFC") 33, Plaintiff, Wells Fargo & Company and Subsidiaries ("Wells Fargo"), provides the following responses to the United States' Second Set of Interrogatories, subject to the objections and limitations specified below, as well as those specified in Plaintiff's Reponses to United States' First Set of Interrogatories and Plaintiff's First Supplemental Reponses to United States' First Set of Interrogatories. Without limiting the foregoing, Plaintiff specifically restates that each of the Interrogatories 4 through 15 is vague, overbroad and unduly burdensome.

Defendant's Interrogatories are particularly objectionable in light of the fact that Defendant previously conducted an audit of Plaintiff in which it examined these transactions. The audit did not raise any issues with respect to the amount or timing of any cash flows associated with these transactions. Moreover, Defendant prepared and attached to the audit report detailed schedules that matched exactly the amounts reported on the tax returns and schedules prepared by or for Plaintiff, the taxpayer. Seeking exhaustive information on all aspects of cash flows, tax reporting and accounting treatment, after having already examined the

same and finding no disagreements with Plaintiff's figures, is clearly overbroad and unduly burdensome.

Pursuant to RCFC 26(a), Plaintiff hereby notifies Defendant that it may rely upon any document produced in this Plaintiff's Response United States' Second Set of Interrogatories or the accompanying Plaintiff's Response to United States' Second Request for Production, or in any of its discovery productions to date, in support of its claims and/or defenses in the trail of this matter. Plaintiff is continuing to review the matters subject to this proceeding and will supplement and/or correct its responses to include information thereafter acquired and reviewed, as required under RCFC 26(e).

## RESPONSES TO INTERROGATORIES

**INTERROGATORY NO. 4.** For each Transaction, identify and describe in detail the actual amount and date of all purported equity investments, loans, rent payments, debt service payments, deposits, purchases or provisions of collateral or security, pledges, fees and transactional costs, and any other transfers or receipts of money, funds, securities or other assets that have been made or received to date by plaintiff and other parties to the Transactions, and identify the documents that reflect those payments, deposits, pledges, transfers or receipts. Please state in your answer the actual transferor, recipient and custodian, and whether transfers or payments were actually made or constructively made through accounting entries.

**RESPONSE:**

Plaintiff has answered the interrogatory fully, with narrative response and pinpoint document citations, for an example transaction: Metropolitan Transit Authority of Harris County, Texas (METRO-2002-WF1). Accordingly, the following response relates to Metro-2002-WF1 (the

"Transaction"). Additionally, Plaintiff has attached as Table A a list that identifies the closing documents, and closing indexes, for all 25 transactions at issue, which permits Defendant to identify the provisions and information it seeks for each transaction. See also WPF185444-WPF185490, InfoLease payment history documents provided herewith. Plaintiff continues to review all of the transactional documents, and will supplement the information reflected in Table A, as needed.

1. Equity Investment: The equity investment is referred to as the Owner Participant's Commitment in this transaction. Schedule 1 to Appendix A of the Participation Agreement (WPF024777) along with the Pricing Runs (WPF025772- WPF025800; WPF025801- WPF025829; WPF025830- WPF025858) and the Closing Cash Flow Memorandum (WPF025720- WPF025724) identify and describe the equity investment in the Transaction. The Closing Cash Flow Memorandum (WPF025720- WPF025724) identifies the transferor, etc. and how the transfer/payment was made.

2. Loans: The Loan and Security Agreement (WPF024933- WPF024968), the Loan Certificate (WPF024969- WPF024973; WPF024974- WPF024978; WPF024979- WPF024983), the Pricing Runs (WPF025772- WPF025800; WPF025801- WPF025829; WPF025830- WPF025858) and the Closing Cash Flow Memorandum (WPF025720- WPF025724) identify and describe the loans in the Transaction. The Closing Cash Flow Memorandum (WPF025720- WPF025724) identifies the transferor, etc. and how the transfer/payment was made.

3. Rent Payments: The Head Lease Supplement (WPF024819- WPF024830), the Lease Supplement (WPF024895- WPF024911; WPF025269- WPF025281; WPF025348- WPF025362) and the Pricing Runs (WPF025772- WPF025800; WPF025801- WPF025829; WPF025830- WPF025858) identify and describe the rent payments in the Transaction. The Closing Cash Flow Memorandum (WPF025720- WPF025724) identifies the transferor, etc. and how the transfer/payment was made for the Head Lease rent. The Lessee is obligated to make scheduled rent payments to the Lessor under the Lease Agreement (WPF024831- WPF024894).

4. Debt Payments: The Loan Certificate (WPF024969- WPF024973; WPF024974- WPF024978; WPF024979- WPF024983) and the Pricing Runs (WPF025772- WPF025800; WPF025801- WPF025829; WPF025830- WPF025858) identify and describe the debt payments in the Transaction. The Trust is obligated to make scheduled debt payments to the Lender under the Loan and Security Agreement (WPF024933- WPF024968).

5. Deposits, Collateral, Security or Pledges:

   a. The Debt Payment Agreement (WPF025011- WPF025036) provides security for the Lessee's obligations to the Lessor. The Debt Payment Undertaker agrees to undertake the Lessee's scheduled payment obligations. Pursuant to the Debt Payment Instruction (WPF025037- WPF025039) the Lessor authorizes the Debt Payment Undertaker to make all scheduled payments directly to the Lender. The Debt Payment Undertaker's obligations under the Debt Payment Agreement are

secured by Financial Guaranty Insurance (WPF025040- WPF025049; WPF025050- WPF025059; WPF025060- WPF025069). The Closing Cash Flow Memorandum (WPF025720- WPF025724) identifies the transferor, etc. and how the transfer/payment was made for the Debt Payment Agreement.

b. The Custody Agreement (WPF025246- WPF025281; WPF025325- WPF025346; WPF025406- WPF025427) and the Account Pledge and Security Agreement (WPF025159- WPF025182; WPF025301- WPF025324; WPF025382- WPF025405) provide the deposit account and collateral for the Lessee's obligations to the Lessor. (For the collateral amounts see Schedule I of Confirmation of Interest in Account Collateral at WPF025760; WPF025764;WPF024607). The difference, if any, in the collateral value and the Lessee's obligation is secured by the FSA and the ACE Insurance and Indemnity Agreements (WPF025070- WPF025086; WPF025087- WPF025103) and the issuance of the related Financial Guaranty Insurance Policies (WPF024912- WPF024932; WPF025282- WPF025300;WPF025363- WPF025381; WPF025104- WPF025123; WPF026488- WPF026505; WPF025124- WPF025141). The Closing Cash Flow Memorandum (WPF025720- WPF025724) identifies the transferor, etc. and how the transfer/payment was made for the deposit account and lease collateral.

6. Fees & Transactional Costs: Appendix A to the Participation Agreement (WPF024747- WPF024777) provides a definition for "Transaction Costs". The Closing Cash Flow

Memorandum (WPF025720- WPF025724) identifies the transferor, etc. and how the transfer/payment was made for several of these costs. The pricing runs also reflect the total fees and amortization thereof.

7. Other Transfers or Receipts of Money, Funds, Securities or Other Assets: The Closing Cash Flow Memorandum (WPF025720- WPF025724) identifies the transferor, etc. and how the transfer was made for the remaining funds (NPV benefit) after the transfer of the lease collateral amount and the Debt Undertaking Fee.

**INTERROGATORY NO. 5.** For each Transaction, describe in detail the amounts and dates of all purported equity investments, loans, rent payments, debt service payments, deposits, purchases or provisions of collateral or security, pledges, fees and transactional costs, and any other transfers or receipts of money, funds, securities or other assets that plaintiff and other parties to the Transaction are currently obligated to make or receive in the future, and identify the documents that contain the terms or formulas that will determine the amount and date of the payments, deposits, pledges, transfers or receipts. Please state in your answer the actual transferor, recipient and custodian, and whether transfers or payments will be actually made or constructively made through accounting entries.

**RESPONSE:**

Plaintiff has answered the interrogatory fully, with narrative response and pinpoint document citations, for an example transaction: Metropolitan Transit Authority of Harris County, Texas (METRO-2002-WF1). Accordingly, the following response relates to Metro-2002-WF1 (the "Transaction"). Additionally, Plaintiff has attached as Table A a list that identifies the closing

documents, and closing indexes, for all 25 transactions at issue, which permits Defendant to identify the provisions and information it seeks for each transaction. Plaintiff continues to review all of the transactional documents, and will supplement the information reflected in Table A, as needed.

1. Rent Payments: The Lease Supplement (WPF024895- WPF024911; WPF025269- WPF025281; WPF025348- WPF025362) and the Pricing Runs (WPF025772- WPF025800; WPF025801- WPF025829; WPF025830- WPF025858) identify and describe the rent payments in the Transaction. The Lessee is obligated to make scheduled rent payments to the Lessor under the Lease Agreement (WPF024831- WPF024894).

2. Debt Payments: The Loan Certificate (WPF024969- WPF024973; WPF024974- WPF024978; WPF024979- WPF024983) and the Pricing Runs (WPF025772- WPF025800; WPF025801- WPF025829; WPF025830- WPF025858) identify and describe the debt payments in the Transaction. The Trust is obligated to make scheduled debt payments to the Lender under the Loan and Security Agreement (WPF024933- WPF024968).

3. Collateral or Security: The Debt Payment Agreement (WPF025011- WPF025036) provides security for the Lessee's obligations to the Lessor. The Debt Payment Undertaker agrees to undertake the Lessee's scheduled payment obligations. Pursuant to

the Debt Payment Instruction (WPF025037- WPF025039) the Debt Payment Undertaker makes all scheduled payments directly to the Lender.

**INTERROGATORY NO. 6.** For each Transaction, describe in detail the amounts and dates of all purported equity investments, loans, rent payments, debt service payments, deposits, purchases or provisions of collateral or security, pledges, fees and transactional costs, and any other transfers or receipts of money, funds, securities or other assets that you contend may occur or be required in the future by plaintiff and other parties to the Transaction, and identify the documents that contain terms or formulas that will determine the amount and date of the payments, deposits, loans, pledges, transfers or receipts. Please describe in your answer all alternative sets or scenarios, if any, of such payments, transfers, deposits, loans or receipts, and the different elections or events that would cause, or be required for, each alternative.

**RESPONSE:**

It is impossible to predict all of the possible scenarios that may result in additional payments or other transfers of funds in the future for transactions that will last 20-30 years. However, Plaintiff has answered the interrogatory fully for a number of possible scenarios, with narrative response and pinpoint document citations, for an example transaction: Metropolitan Transit Authority of Harris County, Texas (METRO-2002-WF1). Accordingly, the following response relates to Metro-2002-WF1 (the "Transaction"). Additionally, Plaintiff has attached as Table A a list that identifies the closing documents, and closing indexes, for all 25 transactions at issue, which permits Defendant to identify the provisions and information it seeks for each transaction. Plaintiff continues to review all of the transactional documents, and will supplement the information reflected in Table A, as needed. As noted, the following are possible scenarios, but

there are others that may or may not result in additional payments or transfers in the future including, but not limited to, payment defaults; bankruptcy of any of the parties involved; non-payment defaults such as failure to maintain adequate insurance; or credit downgrades of any of the parties involved (e.g., the recent credit struggles of Ambac and FSA, two parties involved in a number of the Transactions).

1. Debt Payment Undertaker Fails to Make Scheduled Payment: Pursuant to the Debt Payment Agreement (WPF025011- WPF025036), the Debt Payment Undertaker agrees to undertake the Lessee's scheduled payment obligations. If the Debt Payment Undertaker fails to make a scheduled payment, then the Financial Guaranty Insurance (WPF025040- WPF025049; WPF025050- WPF025059; WPF025060- WPF025069) would provide payment for the Debt Payment Undertaker's obligations.

2. Event of Loss: The Lease Agreement (WPF024831- WPF024894) contains a section regarding Event of Loss. The Lease Supplement (WPF024895- WPF024911; WPF025269- WPF025281; WPF025348- WPF025362) identifies the scheduled Stipulated Loss Values in the Transaction. Pursuant to the Debt Payment Agreement (WPF025011- WPF025036), the Debt Payment Undertaker shall be responsible for the scheduled debt portion of the Stipulated Loss Value. Pursuant to the Account Pledge and Security Agreement (WPF025159- WPF025182; WPF025301- WPF025324; WPF025382- WPF025405) the deposit and collateral accounts are available for the equity portion of the Stipulated Loss Value. The difference in the collateral value and the Lessee's remaining Stipulated Loss Value obligation is covered by the scheduled payment calculation in the FSA Financial Guaranty Insurance Policies (WPF024912-

WPF024932; WPF025282- WPF025300; WPF025363- WPF025381) or in the alternative the ACE Guaranty Insurance Policies (WPF025104- WPF025123; WPF026488- WPF026505; WPF025124- WPF025141).

3. Termination Event: The Lease Agreement (WPF024831- WPF024894) contains a section regarding Termination. The Lease Supplement (WPF024895- WPF024911; WPF025269- WPF025281; WPF025348- WPF025362) identifies the scheduled Termination Values in the Transaction. Pursuant to the Debt Payment Agreement (WPF025011- WPF025036), the Debt Payment Undertaker shall be responsible for the scheduled debt portion of the Termination Value. Pursuant to the Account Pledge and Security Agreement (WPF025159- WPF025182; WPF025301- WPF025324; WPF025382- WPF025405) the deposit and collateral accounts are available for the equity portion of the Termination Value. The difference in the collateral value and the Lessee's remaining Termination Value obligation is covered by the scheduled payment calculation in the FSA Financial Guaranty Insurance Policies (WPF024912- WPF024932; WPF025282- WPF025300; WPF025363- WPF025381) or in the alternative the ACE Guaranty Insurance Policies (WPF025104- WPF025123; WPF026488- WPF026505; WPF025124- WPF025141).

4. Purchase Option: Although not expected to be exercised because the fixed price of the purchase option is in excess of the expected fair market value of the equipment, the Lessee has a purchase option at the end of the lease term. The Lease Agreement (WPF024831- WPF024894) contains a section regarding the Purchase Option. The

Lease Supplement (WPF024895- WPF024911; WPF025269- WPF025281; WPF025348- WPF025362) and the Pricing Runs (WPF025772- WPF025800; WPF025801- WPF025829; WPF025830- WPF025858) identify the Purchase Option price for the Transaction. If the Purchase Option is exercised the Lessee is obligated to pay the Purchase Option price pursuant to the scheduled payments in the Lease Supplement. The Debt Payment Agreement (WPF025011- WPF025036) and the Account Pledge and Security Agreement (WPF025159- WPF025182; WPF025301- WPF025324; WPF025382- WPF025405) are available as security for the Purchase Option price.

5. Service Contract Option: If the purchase option is not exercised, the Lessor has a service contract option at the end of the lease term. The Participation Agreement (Exhibit C: WPF024721- WPF024746) and the Lease Agreement (WPF024831- WPF024894) contain a section regarding the Service Contract Option. Exhibit C of the Participation Agreement and the Pricing Runs (WPF025772- WPF025800; WPF025801- WPF025829; WPF025830- WPF025858) identify the fees associated with the Service Contract Option for the Transaction. Under the Service Contract Option, the Service Recipient agrees to pay Service Fees to the Service Operator.

6. Return Option: If the purchase option is not exercised, the Lessor has a return option at the end of the lease term. If the Lessor selects the Return Option, the Lessor bears all risks related to the equipment. The Lease Agreement (WPF024831- WPF024894) contains a section regarding the Return Option. Under the Return Option the Lessee is obligated to return the equipment to the Lessor, and the Lessor pursuant to the calculation

contained in the Lease Agreement is obligated to repay the Prepaid Rent Loan Balance at Lease Expiration Date.

**INTERROGATORY NO. 7.** For each Transaction, identify the original governing agreements and documents, any amendments or modifications to those agreements and documents, and the agreements and documents that you believe currently govern each Transaction, including the payment of, transfer of, receipt of or right to any funds, securities or assets in the future.

**RESPONSE:**

Plaintiff has answered the interrogatory fully, with narrative response and pinpoint document citations, for an example transaction: Metropolitan Transit Authority of Harris County, Texas (METRO-2002-WF1). Accordingly, the following response relates to Metro-2002-WF1 (the "Transaction"). Additionally, Plaintiff has attached as Table A a list that identifies the closing documents, and closing indexes, for all 25 transactions at issue, which permits Defendant to identify the provisions and information it seeks for each transaction. Plaintiff continues to review all of the transactional documents, and will supplement the information reflected in Table A, as needed. In particular, we will be providing additional response regarding the Belgacom and SFR Daphne 5 transactions, in which an option has been exercised, and equipment has been exchanged, respectively.

The Index of Closing Documents for the Transaction is located at Bates WPF024600-WPF024607 and identifies the agreements that govern the Transaction. The following Bates Number ranges include the Index of Closing Documents and identify relevant documents for this

Transaction: WPF024600-WPF025768; WPF025772- WPF025858 {Pricing Runs}; WPF025862-WPF025964 {Appraisal}; WPF026235- WPF026505{Service Contract Opinion}. While the pricing runs, appraisal and service contract opinion are not contractual documents per se, we have included them in this response because these documents are frequently referenced in connection with the Transactions to which they pertain.

**INTERROGATORY NO. 8.** For each transaction, identify the "ABC" files or reports, or other reports, files or documents setting forth or summarizing the actual or potential cash-flows, revenue, liabilities, income, expenses, deductions, costs, transfers and receipts of funds or assets, fair market value of assets, rates of return, financial accounting treatment, tax treatment, or other assumptions, terms or projections for the Transaction, that plaintiff reviewed and/or relied upon in deciding whether to enter into the Transaction.

**RESPONSE:**

Wells Fargo reviewed and relied upon many materials in evaluating the transactions. See generally Plaintiff's response to Interrogatory No. 3, and as supplemented by Plaintiff's First Supplemental Responses to United States' First Set of Interrogatories. Wells Fargo reviewed and relied upon the pricing runs in evaluating the transactions. Attached as Table B is a list of pricing runs dated on or before the respective closing dates of the transactions to which they relate. Plaintiff notes that the IRS reviewed the pricing runs and made its own schedules of cash flows, etc., which it attached to the Notices of Proposed Adjustment in this matter.

**INTERROGATORY NO. 9.** For each transaction, identify the "ABC" files or reports, or other reports, files or documents that you believe set forth, in whole or in part, the actual or potential cash-flows, revenue, liabilities, income, expenses, deductions, costs, transfers and receipts of funds or assets, fair market value of assets, rates of return, financial accounting treatment, tax treatment, or other assumptions, terms or projections for the Transaction.

**RESPONSE:**

Many documents may reflect the information sought by this interrogatory. See generally Plaintiff's response to Interrogatory No. 3, as supplemented by Plaintiff's First Supplemental Responses to United States' First Set of Interrogatories, and Plaintiff's response to Interrogatory No. 7. The pricing runs reflect the economics of the respective transactions. Attached as Table C is a list of pricing runs dated after the respective closing dates of the transactions to which they relate; see also Plaintiff's response to Interrogatory No. 8. Plaintiff notes that the IRS reviewed the pricing runs and made its own schedules of cash flows, etc., which it attached to the Notices of Proposed Adjustment in this matter.

**INTERROGATORY NO. 10.** Describe in detail, by transaction and year, how each of the Transactions has been reported by plaintiff to date for financial reporting purposes, including the items and amounts of income, revenue, expense, loss, asset, reserve or liability reported, and identify all documents reflecting such reporting. Include in your answer the assumptions plaintiff made as part of determining the appropriate financial reporting treatment and whether plaintiff considered each item and amount to be "material" for financial reporting purposes.

**RESPONSE:**

See the documents produced in response to Request for Production of Documents Nos. 6-7.

Plaintiff understands Defendant's reference to reporting for "financial reporting purposes" to refer to the financial statements of Wells Fargo & Company and consolidated subsidiaries presented in accordance with generally accepted accounting principles ("GAAP") included in reports filed with the United States Securities and Exchange Commission. Such reports include Plaintiff's Annual Report on Form 10-K and Quarterly Reports on Form 10-Q filed pursuant to the Securities Exchange Act of 1934.

The Transactions have been accounted for and reported in accordance GAAP the same way other leveraged leases are, including the following accounting pronouncements that cover lease accounting:

- Statement of Financial Accounting Standards No. 13, *Accounting for Leases* ("FAS 13")
- FASB Staff Position 13-2, *Accounting for a Change or Projected Change in the Timing of Cash Flows Relating to Income Taxes Generated by a Leveraged Lease Transaction* ("FSP 13-2")

In accordance with FAS 13, the lease receivables, net of unearned income and nonrecourse debt, are included in loan assets. Based on the projected cash flow analysis for the lease term, unearned and deferred income is amortized to income at a constant rate only in those years of the lease term in which the net investment is positive. In the years in which the net investment is not positive, no income is recognized on the leveraged lease.

The Transactions are accounted for in the same manner as other leveraged leases in the lease portfolio of Wells Fargo Equipment Finance, Inc. ("WFEFI"). WFEFI is a wholly-owned subsidiary of Wells Fargo Bank, National Association ("WFB"). The Transactions are subject to the same internal accounting controls as other leveraged leases, and recorded to the same corresponding general ledger accounts. InfoAnalysis is the system used by WFEFI to recreate the pricing to ensure that it reconciles to the final ABC pricing runs. InfoLease is the system used by WFEFI to record the leases. For all leveraged leases, including the Transactions, the pricing is recreated in InfoAnalysis and then uploaded to InfoLease. The InfoLease data is recorded to the general ledger. The assumptions for leveraged leases, including the Transactions, would customarily include determination of projected cash flows based on the terms of the lease and nonrecourse debt, residual value, and timing of related tax benefits, all as reflected in the final pricing runs.

Because there have been no changes in the terms of the operative agreements, the amounts originally booked in InfoLease for the Transactions have not changed, with the exception of the Belgacom transaction. However, Plaintiff, as required, adopted FSP 13-2 effective January 1, 2007. FSP 13-2 relates to the accounting for leveraged lease transactions for which there have been cash flow estimate changes based on when income tax benefits are recognized. Upon adoption of FSP 13-2, Plaintiff recorded a cumulative effect of change in accounting principle to reduce the beginning balance of 2007 retained earnings by $71 million after tax ($115 million pretax).

**INTERROGATORY NO. 11.** Describe in detail, by transaction and year, how each of the Transactions has been reported to date for bank or financial regulatory purposes by plaintiff and any affiliate of plaintiff, including the items and amounts of income, revenue, expense, loss, asset, liability or reserves reported, and identify all documents reflecting such reporting. Include in your answer the classification of risk for each reported asset and the classification (or capital tier) for each reported liability.

**RESPONSE:**

See the documents produced in response to Request for Production of Documents No. 9.

The Transactions have been accounted for and reported in accordance with GAAP as described in response to Interrogatory No. 10. Plaintiff understands Defendant's reference to reporting for "bank or financial regulatory purposes" to refer to those financial regulatory reports filed by Plaintiff or its affiliates with federal bank regulators.

The principal financial regulatory reports filed by Plaintiff or its affiliates include:

- Federal Reserve System Form FR Y-9C, *Consolidated Financial Statements for Bank Holding Companies* ("Form FR Y-9C") – filed by Wells Fargo & Company
- Federal Financial Institutions Examination Council (FFIEC) Form 031, *Consolidated Reports of Condition and Income for a Bank with Domestic and Foreign Offices* ("Call Report") – filed by WFB

The Instructions for both Form FR Y-9C and the Call Report (collectively, the "Instructions") require that the financial regulatory reports present the financial condition and

results of operations of the respective bank or bank holding company in accordance with GAAP unless otherwise specified in the Instructions.

The Instructions covering Lease Accounting do not specify any required departures from GAAP. Accordingly, the financial regulatory reports for each of Wells Fargo & Company and WFB reflect GAAP treatment for all leveraged leases, including the Transactions. The lease receivables, net of unearned income and nonrecourse debt, are included in loan assets. Based on the projected cash flow analysis for the lease term, unearned and deferred income is amortized to income at a constant rate only in those years of the lease term in which the net investment is positive. In the years in which the net investment is not positive, no income is recognized on the leveraged lease.

As discussed in response to Interrogatory No. 10, Plaintiff, as required, adopted FSP 13-2 effective January 1, 2007. In accordance with GAAP, the financial regulatory reports for each of Wells Fargo & Company and WFB reflect a cumulative effect adjustment to reduce the 2007 beginning balance of retained earnings by $71 million after tax ($115 million pretax).

For credit risk management purposes, asset classification is based on the asset quality rating ("AQR"), which is reflected in the Credit Approval Presentation. For risk-based capital purposes, the Transactions' loan assets are risk-weighted using a factor of 100%, in accordance with capital guidelines published by the federal banking agencies.

**INTERROGATORY NO. 12.** Describe in detail, by transaction and year, how each of the Transactions has been reported for federal income tax purposes by plaintiff and any affiliate of

plaintiff on federal tax returns for tax years 1997 through 2006, including, but not limited to, the amounts and type of any deduction, loss, gain, income, revenue, credit, basis or tax benefit. Identify the tax returns and specific sections of those tax returns that reflect the reporting and any supporting work-papers. Include in your answer any assumptions made as part of determining the appropriate tax treatment and reporting.

**RESPONSE:**

See the documents produced in response to Request for Production of Documents Nos. 10-11.

Although the process for preparing the applicable tax return may have evolved over this period of time, the overall process was substantially similar throughout. Wells Fargo acquired First Security in October 2000, and therefore cannot describe the process used to prepare First Security's returns for the period prior to the acquisition.

The following describes the process used for preparing the tax return for 2002, the year at issue. Rob Engstrom, the accountant at WFEFI responsible for booking the Transactions and other leveraged leases into InfoLease, maintained two types of spreadsheets for all of WFEFI's leveraged leases. He sent John Lande, the Tax Manager responsible for preparing the tax returns with respect to the leveraged leases, these two spreadsheets. One spreadsheet showed the balance sheet for each leveraged lease and the other showed the book-to-tax differences for each leveraged lease. There are separate spreadsheets for each entity that holds leveraged leases. Most of the leveraged leases at issue are now held by WFB (previously held by Wells Fargo Bank Minnesota, N.A. until 2004); the First Security leases are held by Wells Fargo Bank Northwest, N.A. (Cathay Pacific) and WFEFI (SFR).

The above-described spreadsheets were used to compute the Schedule M adjustments related to all leveraged leases held by a given entity in the aggregate, including the Transactions; such spreadsheets include transaction-by-transaction detail for all leveraged leases, including the Transactions, but the items of income, deduction, etc. are reported on the tax return on an aggregate basis. Using the leveraged leases held by Wells Fargo Bank Minnesota during 2002 as an example, the two spreadsheets provided by Rob Engstrom at WFEFI to John Lande in the Corporate Tax Department are labeled "Wells Fargo Leveraged Leases 2002 Taxable Income" and "FASB 96 Basis Information Wells Fargo MPLS Leveraged Leases Tax Year Ending 12/31/02". The taxable income spreadsheet calculates an aggregate book-to-tax difference for all of Wells Fargo Bank Minnesota's leveraged leases, including the Transactions, of ($166,614,782). The FASB 96 spreadsheet, which uses a balance sheet approach, calculates an aggregate Schedule M adjustment for all of Wells Fargo Bank Minnesota's leveraged leases, including the Transactions, of ($166,615,109), a difference of $327. Plaintiff uses the balance sheet approach to prepare its tax return. Accordingly, a Schedule M adjustment of ($166,615,108) is reflected in the "T9" tax return workpaper for Wells Fargo Bank Minnesota. Finally, the tax balance sheet for Wells Fargo Bank Minnesota, which summarizes the deferred tax timing differences for the year, indicates a Schedule M adjustment related to the T9 workpaper in the amount of ($166,615,108). Similar leveraged lease spreadsheets provided by WFEFI, T9 workpapers, and tax balance sheet workpapers for the other entities and years were produced in response to Request for Production of Documents Nos. 10-11.

While other staff accountants may have prepared the returns for these entities, John Lande had primary responsibility for the T9 workpaper and reporting the appropriate Schedule M adjustments related to leveraged leases.

Because there have been no defaults on the terms of the operative agreements, the amount of taxable income or loss related to the Transactions reported to date is the same as those calculated in the leveraged lease spreadsheets provided by WFEFI. However, Plaintiff decided not to claim the amount of the taxable loss related to the Transactions on its originally filed tax returns for 2004, 2005, and 2006. Plaintiff instead has filed or will file amended returns claiming the taxable losses related to the Transactions. The "Schedule M-1 Summary" workpaper for 2004, 2005, and 2006 for Wells Fargo Bank, Wells Fargo Bank Northwest, and WFEFI show a permanent difference labeled "Leasing Transactions" related to the T9 workpaper. This amount represents the amount of aggregate taxable loss from the Transactions that Plaintiff did not claim on its originally filed returns.

The IRS was provided, and presumably reviewed, the leveraged lease spreadsheets provided by WFEFI and the tax return workpapers. The IRS prepared its own schedules, which tie to the leveraged lease spreadsheets provided by WFEFI, and attached them to its Notices of Proposed Adjustment.

**INTERROGATORY NO. 13.** Identify the individuals, whether employed by plaintiff or a third-party, who participated in determining how the Transactions would be reported for financial reporting purposes for the years 1996 through 2006.

**RESPONSE:**

As stated in the response to Interrogatory No. 10, Plaintiff understands Defendant's reference to reporting for "financial reporting purposes" to refer to the financial statements of Wells Fargo

& Company and consolidated subsidiaries presented in accordance with GAAP included in Plaintiff's Annual Report on Form 10-K and Quarterly Reports on Form 10-Q filed with the Securities and Exchange Commission. Also as described in the response to Interrogatory No. 10, the Transactions were accounted for and reported in accordance with GAAP consistent with WFEFI's other leveraged lease transactions. Rob Engstrom is the accountant at WFEFI responsible for booking the Transactions and other leveraged leases into InfoLease.

The individuals who participated in the adoption of FSP 13-2 included: Richard Levy, Executive Vice President and Controller; James Horton, Vice President and Tax Director; Jeff Fink, Director of Federal and State Tax Services; John Lande, Tax Manager; William Thomas, Accounting Policy Consultant; James Bean, Accounting Policy Manager; James Hanson, Director of Corporate Financial Reporting; Mark LaCount, Accounting Manager, WFEFI; and Rob Engstrom, Accountant, WFEFI.

The individuals who participated in the adoption of FIN 48 included: Richard Levy, Executive Vice President and Controller; James Horton, Vice President and Tax Director; Jeff Fink, Director of Federal and State Tax Services; Tom Nyhus, Tax Manager; William Thomas, Accounting Policy Consultant; James Bean, Accounting Policy Manager; James Hanson, Director of Corporate Financial Reporting; Dean Becker, former Tax Manager (no longer an employee of Plaintiff); and Michelle Mehr, former Tax Accountant (no longer an employee of Plaintiff).

As stated above, the Transactions were accounted for and reported in accordance with GAAP. James Hanson, Director of Corporate Financial Reporting, has general responsibility for Plaintiff's corporate financial reporting.

**INTERROGATORY NO. 14.** Identify the individuals, whether employed by plaintiff or a third-party, who participated in determining how the Transactions would be reported for bank or financial regulatory purposes for the years 1996 through 2006

**RESPONSE:**

As described in the response to Interrogatory No. 11, Plaintiff understands Defendant's reference to reporting for "bank or financial regulatory purposes" to refer to those financial regulatory reports filed by Plaintiff or its affiliates with federal bank regulators, including the Call Report and Form FR Y-9C. Also as described in the response to Interrogatory No. 11, the Transactions were accounted for and reported in accordance with GAAP consistent with WFEFI's other leveraged lease transactions. Rob Engstrom is the accountant at WFEFI responsible for booking the Transactions and other leveraged leases into InfoLease. James Hanson, Director of Corporate Financial Reporting, has general responsibility for Plaintiff's corporate regulatory reporting.

**INTERROGATORY NO. 15.** Identify the individuals, whether employed by plaintiff or a third-party, who participated in determining how the Transactions would be reported for federal income tax purposes for the years 1996 through 2006

**RESPONSE:**

James Horton, Vice President and Tax Director; Michael Newburg, former Senior Vice President and Tax Director; Jeff Fink, Director of Federal and State Tax Services; and John Lande, Tax Manager.

**DECLARATION**

I, Andrew T. Gardner, hereby declare, under penalties of perjury, that Plaintiff's foregoing Responses to the United States' Second Set of Interrogatories is true and complete to the best of my knowledge.

Andrew T. Gardner
Tax Counsel
Wells Fargo & Company

By: Joel V. Williamson

JOEL V. WILLIAMSON
Attorney of Record
Mayer Brown LLP
71 South Wacker Drive
Chicago, Illinois 60606
Telephone: (312) 701-7229

February 21st, 2008

*Counsel for Plaintiff*

CERTIFICATE OF SERVICE

I, Joel V. Williamson, hereby certify that on this 21st day of February, 2008, I caused the foregoing Plaintiff's Responses to United States' Second Set of Interrogatories to be served upon the United States by UPS and email, to the following:

Cory A. Johnson
U.S. Department of Justice
Tax Division
Court of Federal Claims Section
555 Fourth Street, N.W.
Washington, D.C. 20001
Cory.A.Johnson@usdoj.gov
*Counsel for Defendant*

Joel V. Williamson

JOEL V. WILLIAMSON
Mayer Brown LLP
71 South Wacker Drive
Chicago, Illinois 60606
Telephone: (312) 701-7229