**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**No. 06-628 T**
**(Judge Thomas C. Wheeler)**

| | |
|---|---|
| **WELLS FARGO & COMPANY and SUBSIDIARIES,** | ) |
| **Plaintiff,** | ) |
| **v.** | ) |
| **THE UNITED STATES,** | ) |
| **Defendant.** | ) |

**MOTION BY THE UNITED STATES TO INCREASE THE ALLOWABLE NUMBER OF FACT DISCOVERY DEPOSITIONS AND TO EXTEND THE FACT DISCOVERY PERIOD BY 30 DAYS, AND FOR EXPEDITED CONSIDERATION**

Pursuant to RCFC 26(b)(2)(A) and 30(a)(2), the United States respectfully requests that the Court enter an order permitting it to take up to 50 depositions in this case. The United States makes this request because every one of the witnesses that the United States seeks to depose participated directly in the transactions at issue in this case, in distinct roles, and each has unique information relevant to this case. Indeed, plaintiff admits in its discovery responses that all of these witnesses have relevant knowledge. Nevertheless, plaintiff has refused to agree to allow the United States to take more than 30 depositions.

For the reasons discussed below, the additional depositions the United States seeks should be allowed both because they are necessary to adequately develop its defenses to plaintiff's claims for a tax refund of over $40 million, and because they will permit the United States to efficiently present this case to the Court at trial or on summary judgment.

Because of the current discovery schedule, the United States also requests that the Court consider this motion on an expedited basis.

**BACKGROUND**

This case concerns the tax consequences of 27 different "sale-in, lease-out" (SILO) tax shelters entered into by plaintiff during the years 1997 through 2002. *See* IRS Notice 2005-13, 2005-13 I.R.B. 630 (identifying SILOs as "listed" tax avoidance transactions). Each one of these 27 SILOs involves multiple constituent transactions and agreements, and many different parties (about eight, on average), including the tax-indifferent public transit agencies and foreign corporations that served as counter-parties in the transactions and sold tax benefits to plaintiff, banks (both foreign and domestic), trust companies, appraisers, "service contract" opinion providers, and other financial institutions.

As the Court is aware, the parties have been discussing presenting only a subset of the 27 transactions for trial. The subset of 5 transactions that the parties are currently proposing to focus on at trial, however, still involves a total of *27 different entities* that had substantial involvement. Through discovery conducted to date, we have learned that for many of these entities numerous employees performed significant work on the transactions, and that each individual employee has relevant (and, often, unique) information. Of course, a large number of plaintiff's employees also were involved. Accordingly, the total number of relevant fact

witnesses in this case, in just a subset of the transactions, is a significant multiple of the already large number of entities that were substantially involved. Indeed, there are over 100 individuals who were involved in just the contemplated representative subset of transactions, and who have relevant information. (*See e.g.* Plaintiff's Responses to United States' First Set of Interrogatories, which lists some of the entities and persons with relevant knowledge, attached hereto as Exhibit A).[1]

Over the past several months, the United States has been engaged in obtaining discovery from plaintiff and other participants in the SILO shelters. The United States initially pursued interrogatories and document discovery, both because it was necessary to obtain the relevant documents and because it was necessary to review the documents and interrogatory responses to determine whether it would be feasible to present representative transactions, and then to determine which of the 100 plus individuals involved in the transactions would potentially be witnesses in this case, and would, therefore, need to be deposed. (Of course, obtaining and reviewing the relevant documents was also a necessary predicate to taking productive depositions.) The United States has issued over 30 subpoenas for documents, and has received from third parties and plaintiff over 32,000 documents, containing over half a million pages.

In addition to written and document discovery, the United States has already conducted depositions of many of the individuals who directly worked on plaintiff's SILO transactions,

---

[1]Attached as Exhibit B is a list of the entities that appear to have been *substantially* involved in just the five transactions that the parties are currently considering focusing on at trial. (An agreement regarding trial presentation of a subset of transactions has not been finalized or presented to the Court). This list of involved entities is not exhaustive, and does not include, for example, the trusts formed to enter into the leases and other agreements or all of the law firms that acted as counsel.

including 8 of the 22 fact witnesses disclosed by plaintiff pursuant to RCFC 26, and 7 other witnesses identified by plaintiff (and the United States) as having knowledge of the transactions. Counsel for the United States has conducted 15 depositions to date, and we currently anticipate conducting up to 35 additional depositions.[2] In its own interrogatory answers, plaintiff admits that all of these individuals, and/or the entities by which they were employed, have information relevant to this case. (*See* Exhibit A, Responses to Interrogatory Nos. 1 and 2)

At this point, the United States cannot state with certainty the exact number of depositions that it will ultimately conduct. As we continue to review the documents produced and to depose witnesses, we continue to modify our list of anticipated depositions. For example, in some instances, the testimony of one witness has led us to cancel other anticipated depositions. In other instances, the testimony of one witness has led us to conclude that we need to conduct other depositions that we previously viewed as potentially unnecessary. The following examples illustrate both situations:

- After deposing Mark de Trempe and Don Roback from Cornerstone (an "arranger" of some of the SILO transactions), we concluded that they appeared to be more knowledgeable than the other two Cornerstone witnesses we had considered deposing, Trent Mabe and Jay Sill, and thus decided not to depose those individuals.
- During the depositions of Anthony Zavadil and Jonathan Savar of Macquarie

---

[2]Attached as Exhibit 2 is a listing of the fact depositions conducted by the United States to date, and the fact depositions that the United States currently anticipates conducting, including a reference to the entity with which the individual was associated, and an indication of whether the plaintiff disclosed the individual as a potential witness in the case, pursuant to RCFC 26(a).

Corporate Finance, the witnesses testified that Mike Ziemke was primarily responsible for preparing the "pricing runs," and thus would be more knowledgeable about the pricing runs that Macquarie prepared in connection with the Houston Metro transactions. As a result of such testimony, the United States needs to also take the deposition of Mr. Ziemke.

- During the depositions of two of the "arrangers" of plaintiff's SILO shelters, Jonathan Savar (from Macquarie and Capstar) and John Hackett (from Capstar), the witnesses testified that Wells Fargo's tax counsel was most knowledgeable about particular structural elements of the SILO transactions, including the negotiations with third parties and the financial terms of the transactions. For example, Hackett testified that the most knowledgeable person with respect to the overall transaction structure and, in particular, the end-of-initial-lease-term options, is tax counsel for the equity investor. As a result of this testimony, the United States currently anticipates taking the deposition of Phil Spector, who participated in four of the five proposed representative transactions, and perhaps other counsel who participated in the SILO transactions.
- In his deposition, Rick Daubenspeck, an appraiser, testified that John Oates, Mark Rigel, and Nicholas Mermigas prepared large portions of the appraisal reports for the NJT and Belgacom transactions, and disclaimed any knowledge about those portions, even though he signed the reports. As a result of this testimony, the United States needs to depose these three named individuals as well.

Notably, the United States has learned in conducting certain depositions that some of the witnesses *identified by plaintiff* as trial witnesses pursuant to RCFC 26 do not have much relevant information, either because of a lack of memory and preparation or because they were not sufficiently involved contemporaneously with the transactions. The following examples illustrate this point:

- Phyllis Grossman, identified by plaintiff as a trial witness who would testify about the Belgacom transaction, remembered very little about the terms of the transaction, and identified other Wells Fargo employees as authoring relevant documents.
- Phil Nguyen testified that he lacked knowledge because he was not involved in many aspects of the Houston Metro transactions, indicating that John Hackett of Capstar and Francis Britton, a former Houston Metro employee, were involved and would thus have greater knowledge. As a result, we concluded that we needed to depose Hackett and Britton in order to obtain information on the subjects as to which Nguyen disclaimed knowledge.
- William Harsh of Mercer Management Consulting, a consulting firm that prepared opinions on several aspects of the service contract options present in the CALTRANS, WMATA, and NJT transactions, identified Mark Alexander and Collister Johnson, Jr., as the authors of these opinions, and testified that Mercer relied exclusively on the opinion of Mr. Johnson in reaching some of the conclusions in its reports.

The United States' need to conduct additional depositions, however, is also based on the fact that plaintiff refused to admit certain facts, in response to requests to admit (because of a claimed lack of personal knowledge) and because plaintiff has not provided certain information in its responses to interrogatories. For example, plaintiff has denied knowing whether the foreign counter-parties in the SILOs are claiming ownership of the assets subject to the SILOs for tax purposes, as plaintiff is also doing.[3] The United States also needs to depose the banks and financial institutions involved (AIG, Rabobank and FSA) regarding the documents they have produced, to establish the facts concerning the purported non-recourse loans that were part of the SILO structure and for which plaintiff claims interest deductions. Plaintiff has denied personal knowledge of some of these facts–facts the United States believes will show that the loans are "loop debt" for which plaintiff is not entitled to deductions under section 163 of the Internal Revenue Code. *See e.g. BB&T v. United States*, 523 F.3d 461 (4th Cir. 2008); and *AWG Leasing Trust, KSP Investments, Inc., as Tax Matters Partner v. United States*, 2008 WL 2230744 (N.D. Ohio 2008). Additionally, plaintiff claims that it entered into the SILO transactions as a part of its normal leasing business, and has stated that it intends to present testimony of its current employees to demonstrate this. The United States will depose these current employees to investigate this claim. Some of the transactions, however, were actually entered into by First Security Corporation, a bank that merged with plaintiff after it separately entered into its own SILO transactions. These SILO transactions entered into by First Security are also at issue in this

[3] This is called a "double-dip": both parties to the SILO claim the tax benefits of ownership of the assets. Plaintiff claims the tax benefits under U.S. law and the foreign counter-party claims tax benefits under foreign law. Plaintiff produced documents showing that it was aware of the double-dip in this case, yet it refused to admit to such knowledge in its responses to requests for admissions.

case, although plaintiff is now the one claiming the purported tax benefits, and thus defendant needs to depose the former employees of First Security who have relevant knowledge.

All of the fact depositions the United States seeks to take are clearly relevant both to preparing this case for trial, and to helping the parties and the Court determine whether this case is susceptible of disposition by summary judgment. And, if a trial is necessary, completing this necessary discovery now will allow the parties to present the case in an orderly and efficient manner, which will be a significant task even though only a subset of the 27 transactions will be the focus of a trial. In particular, completing all necessary discovery now will provide a record that will allow the parties to prepare a meaningful stipulation of facts for trial. Completing the necessary deposition discovery of third parties also will likely reduce the burden on the dozens of third-parties involved: it will help the parties determine what facts concerning the third parties can be stipulated for trial, which third parties need to be subpoenaed as witnesses for trial (and travel to Washington), which witnesses' testimony can be presented by deposition (pursuant to RCFC Appendix A, §15(b)), and which potential witnesses do not need to appear at trial at all.

The burden and costs to third-parties–and, indeed, the parties to this case–also could be drastically reduced if this case is, in fact, susceptible to disposition by summary judgment. Completing the necessary, relevant depositions will allow the parties to determine whether summary judgment motions are appropriate.

## ARGUMENT

## I.

## THE COURT SHOULD INCREASE THE NUMBER OF DEPOSITIONS ALLOWED IN THIS CASE BECAUSE THE REQUIREMENTS OF RCFC 26(b)(2) ARE SATISFIED HERE

Rule 30(a)(2)(A) of the Rules of the Court of Federal Claims limits the number of depositions any party can take to ten. This default rule applies generally to all cases. The Court is given discretion, therefore, to adjust this default rule, and increase the number of depositions to accommodate the needs of a particular case. *See*, RCFC 30(a)(2). Rule 30(a)(2) provides that leave of Court to increase the number of depositions "shall be granted to the extent consistent with the principles stated in RCFC 26(b)(2)." The relevant principles are:

> (i) whether the discovery is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive; (ii) whether the party seeking discovery has had ample opportunity by discovery in the action to obtain the information sought; and (iii) whether the burden or expense of the proposed discovery outweighs the likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues.

From the outset, in the Joint Preliminary Status Report, the parties advised the Court (at p. 7) that, in light of the large number of transactions and entities involved in this case, "substantial discovery" would be required. Recognizing that fact, plaintiff agreed several months ago to enlarge the number of defendant's depositions to 30 fact witnesses, from the general limit of ten in RCFC 30(a)(2)(A). It has now become clear, however, because of both the number of transactions at issue and the number of individuals with relevant knowledge, that 30 depositions

is not sufficient. Nonetheless, plaintiff has refused to agree to defendant's request to enlarge the number beyond 30, complaining generally that additional depositions are costly and asserting that *plaintiff* believes "thirty depositions is an adequate number to permit Defendant to prepare its case." Plaintiff has not disputed–because it cannot–that the additional depositions that the United States seeks will likely produce relevant, admissible evidence. *See* RCFC 26(b)(1).

As we explain below, all of the principles in RCFC 26(b)(2) justify the Court's increasing the number of depositions to be take by the United States in this case. Broadly stated, this is simply not the kind of case to which the general limit of only 10 depositions applies, or to which an arbitrary limit of 30 should apply. This case involves 27 SILO transactions, each of which involved at least eight different entities and reams of transactional and related documents. Indeed, when it has suited its purposes, plaintiff has claimed that these transactions "were individually negotiated, and they are distinct in their facts and terminology . . . ." (Plaintiff's response to United States' first set of requests to admit.) Thus, the extent of relevant, necessary discovery is a direct consequence of the large number of SILO transactions engaged in by plaintiff (and put at issue in its Complaint), and the even larger number of individuals and entities involved in each transaction.

To deny the United States the opportunity to depose obviously relevant witnesses–who, plaintiff admits, had direct involvement in the transactions, and have relevant information–would both unfairly prejudice the United States' defense against plaintiff's claims and unfairly advantage plaintiff. Plaintiff is apparently intending to tell its side of the story at trial by presenting as witnesses its own employees, as well as a few employees of the third parties involved in the transactions. Plaintiff–based on its own first-hand knowledge from having

participated in the transactions–is certainly entitled to cherry-pick its trial witnesses based on who it believes will be helpful to its case. The United States, which did not participate in any of the transactions and thus has no independent knowledge, must be allowed to seek evidence during discovery from both plaintiff's disclosed trial witnesses and the other individuals who admittedly had direct involvement in the transactions at issue, and who may have information that contradicts plaintiff's claims. Because so many different third parties were directly involved in the separate SILO transactions, the number of witnesses who have information relevant for discovery purposes in this case clearly is much greater than the 22 witnesses that plaintiff has selected for its own trial purposes, and is certainly much greater than the 30 to which plaintiff has agreed.

### A. The Testimony the United States Seeks Is Neither Unreasonably Cumulative or Duplicative, nor Obtainable from Another Source

The United States has identified approximately 37 witnesses–in addition to the 15 already deposed–that had direct involvement in the transactions at issue, and should have personal knowledge of relevant, admissible information. (See Exhibit C).[4] These witnesses include (i) eleven current or former employees of plaintiff; (ii) "arrangers" and consultants who solicited the tax-indifferent entities and other participants for the SILO transactions, and helped structure the transactions; (iii) appraisers upon whom plaintiff relies for its claims regarding fair market value and useful life of the assets involved, and for its claims that the assets were "sold" to it and then immediately "leased" back to the original owners; (iv) service contract opinion providers; (v) banks that provided the non-recourse "loop debt" for which plaintiff claims interest

[4] These 52 witnesses include all but 3 of the 22 witnesses disclosed by plaintiff, which 3 witnesses are current or former employees of the United States Federal Transit Administration.

deductions; and (vi) the tax-indifferent counter-parties that allegedly sold assets to plaintiff, and simultaneously leased them back. The testimony of these additional witnesses will not be duplicative, and is not obtainable from another source. To the contrary, each of these witnesses will provide information about his or her specific and unique role in the transactions and will help explain the documents that he or she produced. For example, the bank representatives should have information relevant to whether plaintiff actually obtained the use of any funds pursuant to the non-recourse "loop debt," such that plaintiff would be entitled to deduct related interest. The appraisers and "service contract" opinion providers will likely have information–that the individuals deposed so far have *disclaimed* having–about the purported bases for the appraisals and service contract opinions upon which plaintiff relies for its claims in this case. Representatives of the counter-parties should have information relevant to whether plaintiff actually took on the "benefits and burdens" of ownership of the property subject to the SILOs (which the counter-parties owned and used prior to the SILO transaction, and continued to use after the SILO transactions), or whether plaintiff did not take on the benefits and burdens of ownership, and thus nothing really changed.[5]

As noted above, plaintiff has disclosed 22 individuals it intends to call as trial witnesses. But this list includes representatives of *only 9 of the 27 different entities* involved in the 5 transactions currently proposed as representatives for trial. Thus plaintiff's 22 trial witnesses do

---

[5] Documents produced to date by counter-parties and advisors undercut plaintiff's claims in this case. The documents indicate that the primary purpose of the SILO transactions was to "reduce taxable obligations" of, and to effect a "transfer of tax benefits" to, plaintiff. Another indicates that the counter-party that purported to "sell" its assets in the SILO transaction, "would retain the ownership and use of its equipment." The United States needs to depose these counter-parties and advisors about these documents.

not include representatives from the majority of the participants in the SILO transactions. For example, plaintiff's disclosed witnesses do not include any representatives from the non-recourse lenders involved (*e.g.* AIG, Rabobank, and FSA), any witnesses from CALTRAN, or any witnesses from several of the arrangers and other advisors involved. Plaintiff also omits most of the individuals who purportedly prepared or contributed to appraisals and service contract opinions for the transactions, and upon which plaintiff purportedly relied. It should not be surprising, therefore, that the United States' list of potential *discovery* deposition witnesses exceeds 50. In fact, these depositions are needed just to obtain information from each of the different individuals and entities that had distinct and direct roles in the SILO transactions at issue.

Finally, given all the work that is necessary just to adequately discover the facts relevant to the 27 transactions at issue, and to prepare for trial or summary judgment on a subset of the transactions, the United States has no intention of engaging in cumulative or duplicative discovery. To the contrary, as noted above, the United States has modified the list of individuals it seeks to depose based on the facts and needs of the case, as they develop.

### B. The United States Has Not Yet Had an Opportunity to Discover the Information Sought

To date, the United States has deposed 15 individuals. Eight of these individuals were identified by plaintiff as witnesses that it intends to call at trial. The other 7 individuals deposed by the United States were directly involved in the representative SILO transactions as appraisers, arrangers, or employees of a counter-party. (See Exhibit C.) The relevance of, and need for, this deposition discovery cannot be disputed.

The United States currently intends to also depose another 9 of the individuals disclosed by plaintiff as witnesses that it will call at trial. These additional witnesses include employees of plaintiff and third parties involved in the SILO transactions. (See Exhibit C.) Even after these 24 depositions, however, the United States will not yet have had the opportunity to depose representatives of the majority of the 27 entities that participated in the SILOs, and will not yet have had the opportunity to depose most of the individuals listed in Exhibit C, who all admittedly had *direct and substantial involvement in,* and have *unique knowledge* of the SILO transactions. Thus, if the United States is limited to 30 depositions in this case, it will not have had the opportunity for complete discovery of even the already reduced subset of SILO transactions that the parties intend to present at trial.

The additional depositions are thus clearly needed to provide the United States the opportunity for necessary, relevant discovery. For example, discovery regarding the appraisal upon which plaintiff relies for the Belgacom SILO transaction may, in and of itself, require 4 depositions. Mr. Daubenspeck, who was deposed on August 26, was one of the authors of a 1997 appraisal for the Belgacom SILO, but he disclaimed any knowledge about large portions of it. He identified John Oates, who has not yet been deposed, as the only individual who could explain the bases for certain conclusions. Another appraisal was obtained in 1999 in connection with a substitution of property involved in the Belgacom transaction. Three different appraisers are listed as having prepared that appraisal. If a similar division of labor was followed with the 1999 appraisal, two of these appraisers may need to be deposed (one is deceased). The same issue may occur with the appraiser for the CALTRAN, WMATA, and Houston METRO transactions. That appraiser's deposition is scheduled for September 8.

Additional depositions are also necessary because this case involves thousands of pages of transactional documents and financial spreadsheets, and, contrary to the popular maxim, documents don't always "speak for themselves." Only with the additional depositions will the United States have the opportunity to examine the different and numerous authors of these relevant documents, and obtain information about the use and meaning of the documents, before trial.

### C. The Importance of the Issues, Needs of this Case, the Amount in Controversy and the Importance of the Discovery Outweigh Any Possible Burden to Plaintiff

In this case, plaintiff is seeking a tax refund for the year 2002 of over $40 million relating to its participation in SILO tax shelters. These shelters, and their alleged yearly benefits, continue for up to 25 years, however, and plaintiff has claimed, and apparently intends to claim (if the shelter's tax benefits are upheld), additional tax benefits in other tax years totaling hundreds of millions of dollars. The IRS has designated these SILOs as "listed" tax avoidance transactions. *See* IRS Notice 2005-13, 2005-13 I.R.B. 630. And, to date, the courts have agreed, disallowing the alleged tax benefits of LILO and SILO transactions. *See BB&T v. United States* and *AWG Leasing Trust, KSP Investments, Inc., as Tax Matters Partner v. United States*. The importance of the issues and the amount in controversy clearly far outweigh any possible burden to plaintiff of an additional 20 depositions in this case. Any burden is also far outweighed by the fact that the additional depositions are undeniably necessary in this case. The number of depositions is an unavoidable consequence of the large number of third parties and individuals involved in the large number of SILO transactions at issue.

## II.

## THE COURT SHOULD EXTEND THE CLOSE OF FACT DISCOVERY BY 30 DAYS

Without question, this case requires a substantial amount of discovery, and the United States has been diligently pursuing that discovery. Production of the relevant documents by plaintiff and the third parties has taken a significant amount of time, however, and is, in fact, still ongoing.[6] Moreover, as discussed above, the progress of discovery to date has indicated the need for numerous additional depositions in this case. In order to allow adequate time for this additional discovery, including the necessary travel and coordination with third parties' schedules, the United States requests that the Court extend the close of fact discovery in this case from October 31 to November 30, 2008. This extension need not affect the current trial date of April 6, 2009. The United States also believes that the extension is necessary because we have not yet received any response to our requests, pursuant to the U.S. - Belgian tax treaty, for information from the Belgian tax authorities regarding the Belgacom SILO at issue in this case. Plaintiff has identified, pursuant to RCFC 26, three individuals from Belgium that it intends to call as trial witnesses. The United States is seeking documents from Belgium as well as depositions of these Belgian witnesses identified by plaintiff. Unfortunately, the United States anticipates that it is likely that the requested documents and information will not be received by the end of October.

---

[6] For example, AIG just produced documents last week in response to a subpoena issued by the United States, but has still not produced all the requested documents. AIG was substantially involved in the SILO transactions as the provider of "loop debt" and defeasance arrangements. The United States also has not yet received a complete production from plaintiff.

## CONCLUSION

For all the above reasons, the United States requests that the Court enter an order permitting the United States to take up to 50 depositions in this case, and enlarging the fact discovery period by 30 days to and including November 30, 2008.

Respectfully submitted,

*s/ Cory A. Johnson*
CORY A. JOHNSON
Attorney of Record
U.S. Department of Justice
Tax Division
Court of Federal Claims Section
Post Office Box 26
Ben Franklin Station
Washington, D.C. 20044
TEL: (202) 307-3046
FAX: (202) 514-9440
Cory.A.Johnson@usdoj.gov

JOHN A. DICICCO
Acting Assistant Attorney General
STEVEN I. FRAHM
Acting Chief, Court of Federal Claims Section
JENNIFER P. WILSON
Trial Attorney
JOSEPH B. SYVERSON
Trial Attorney
RICHARD H. BOWLES
Trial Attorney

*s/ Mary M. Abate*
Of Counsel

September 2, 2008