# In the United States Court of Federal Claims

No. 06-628T

(Filed: January 8, 2010)

```
*******************************  *
                                 *
WELLS FARGO & COMPANY            *
AND SUBSIDIARIES,                *
                                 *   Tax Refund Suit; Sale In/Lease
                 Plaintiff,      *   Out   (SILO)   Tax   Shelters;
                                 *   Depreciation    and    Interest
                                 *   Deductions;  Substance   Over
v.                               *   Form   Doctrine;   Genuine
                                 *   Indebtedness;   Economic
THE UNITED STATES,               *   Substance.
                                 *
                 Defendant.      *
                                 *
*******************************  *
```

*David F. Abbott*, with whom were *Joel V. Williamson*, *William A. Schmalzl*, *Thomas C. Durham*, *Matthew C. Houchens*, *Brian W. Kittle*, *Michael R. Emerson*, *Joy L. Mathew*, *Richard E. Kurkowski*, and *Kristin M. Mikolaitis*, Mayer Brown LLP, for Plaintiff.

*Cory A. Johnson*, with whom were *John A. DiCicco*, Acting Assistant Attorney General, *Steven I. Frahm*, Chief, Court of Federal Claims Section, *Jennifer P. Wilson*, *Joseph B. Syverson*, *Richard H. Bowles*, and *Michael J. Roney*, United States Department of Justice, Tax Division, Washington, D.C., for Defendant.

OPINION AND ORDER

WHEELER, Judge.

In this tax refund suit, Plaintiff Wells Fargo & Company ("Wells Fargo") claims $115,174,203.00 in depreciation, interest and transaction cost deductions for the tax year 2002. The deductions stem from Wells Fargo's participation in 26 leveraged lease transactions, seventeen with domestic transit agencies, and nine involving qualified technological equipment ("QTE"). Although the tax treatment of all 26 transactions is at issue in this case, the parties limited their trial presentation to five agreed transactions, allowing the Court's ruling on these five to guide the resolution of the remainder. Of the five trial transactions, four involve public transit agencies, and one is a QTE lease involving

cellular telecommunications equipment.  The four transit lessees are: the New Jersey Transit Corporation ("NJT"), the State of California Department of Transportation ("Caltrans"), the Metropolitan Transit Authority of Harris County, Texas ("Houston Metro"), and the Washington Metropolitan Area Transit Authority ("WMATA").  The lessee in the QTE lease is a Belgian entity, Belgacom Mobile, S.A. ("Belgacom").

The leveraged leases in this case sometimes are referred to as "SILO" ("sale in/lease out") tax shelters, where a tax-exempt entity such as a public transit agency transfers tax benefits for a fee to a United States taxpayer such as Wells Fargo.  The transactions involve depreciable assets such as rail cars, locomotives, or buses in the transit leases, or telecommunications equipment in the Belgacom lease.  The documentation for each transaction is extensive, but the objective is for the taxpayer, Wells Fargo, to take advantage of significant tax deductions acquired from tax-exempt entities to offset taxable income and thereby reduce overall tax liability to the United States.

In assessing Wells Fargo's claimed deductions, the Court must examine the "substance over form" doctrine to determine whether Wells Fargo acquired a depreciable ownership interest in the property, and whether Wells Fargo bears the property's burdens and benefits.  In simplest terms, the agreements comprising a SILO transaction are set up to suggest that a "sale" of property has taken place, that the property has been "leased back" to the original owner, and that a "loan" has been created to finance the transaction.  Defendant contends that the "substance" of the transactions merely is a transfer of tax benefits to avoid federal taxes.  The Court also must examine whether the circular flow of loan proceeds in these transactions creates any allowable interest deductions.  Part of this inquiry is to determine whether any genuine indebtedness has occurred, and whether the loaned funds actually were available for use by Wells Fargo to finance the "sale."  A third inquiry is whether there is any economic substance to these transactions, other than the transfer of tax benefits, that would warrant depreciation and transaction cost deductions under the Internal Revenue Code ("IRC") §§ 167 and 168, or interest deductions under IRC § 163.[1]

The Court conducted a 20-day trial in Washington, D.C. during April 6 through May 1, 2009.  The Court heard the testimony of 33 witnesses, thirteen of whom were experts.  The fact witnesses included representatives from Wells Fargo and each of the four transit agencies, as well as appraisers and consultants who participated in, or assisted in arranging, the transactions.  The expert witnesses testified in the areas of finance, economics, accounting, leveraged leases, and transit industry practices.  The Court also heard fact and expert testimony on the Belgacom transaction.  The evidentiary record consists of 5,150

---

[1] The cited sections of the Internal Revenue Code are found in 26 U.S.C. §§ 163, 167, and 168 (2006).  For convenience, the Court will refer to Internal Revenue Code provisions as "IRC § ___."

pages of trial transcript, and 1,157 documentary exhibits.  The parties submitted post-trial briefs on August 3, 2009, and reply briefs on September 17, 2009.  The Court heard closing arguments on October 22, 2009.  The Court allowed the parties to submit supplemental briefs on November 13, 2009 addressing new case law issued since the post-trial reply briefs.

Other courts have considered the tax treatment of SILO transactions, or the similar "LILO" ("lease in/lease out") transactions and, with one exception, have concluded that the taxpayer who participated in the transaction is not entitled to any of the claimed tax benefits. AWG Leasing Trust v. United States, 592 F.Supp.2d 953 (N.D. Ohio 2008); BB&T Corp. v. United States, 2007 WL 37798, at *1 (M.D.N.C., Jan. 4, 2007), aff'd, 523 F.3d 461 (4th Cir. 2008).  Two of the SILO and LILO cases have been tried to juries, and in both of those cases, the jury returned a verdict disallowing the tax deductions.  Altria Group, Inc. v. United States, No. 1:06-cv-09430, 2009 WL 874207, at *1 (S.D.N.Y. July 9, 2009); Fifth Third Bancorp & Subs. v. United States, No. 1:05-cv-350 (S.D. Ohio, April 18, 2008).  The one exception to date is Consolidated Edison Company of New York, Inc. v. United States, No. 06-305T, 2009 WL 3418533, at *1 (Fed. Cl. Oct. 21, 2009) (Horn, J.), where our Court concluded after lengthy analysis that a LILO transaction had legitimate business purposes, and allowed the claimed tax deductions.  The Court rightly observed in Consolidated Edison that each transaction "must be evaluated on its own merits."  Id.

Another SILO tax shelter case, although not a tax refund suit, is Hoosier Energy Rural Electric Cooperative, Inc. v. John Hancock Life Insurance Company, 588 F.Supp.2d 919 (S.D. Ind. 2008), aff'd 582 F.3d 721 (7th Cir. 2009).  This case arose from the 2007-2008 economic downturn, where one of the insurance entities in the transaction, Ambac Assurance Corporation, had its credit rating reduced.  The lessor, John Hancock, exercised its right to demand that Hoosier Energy find a replacement for Ambac, even though Ambac had not missed any payments.  The case involves Hoosier Energy's request for injunctive relief to maintain the status quo while Hoosier Energy seeks a replacement for Ambac.  In granting injunctive relief, the district court described the SILO transaction as a "blatantly abusive tax shelter" that is "rotten to the core."  588 F.Supp.2d at 921, 928.  The Court of Appeals affirmed the district court's grant of injunctive relief, but clarified that the agreements comprising the SILO transaction were legally enforceable under New York law, even if not an approved tax shelter under the Internal Revenue Code.  The Court of Appeals gave Hoosier Energy until the end of 2009, approximately 3-1/2 months, to find a replacement for Ambac.  582 F.3d at 730.

The Court has reviewed carefully the applicable case law and all of the evidence of record.  In brief summary, the Court finds that Wells Fargo is not entitled to the claimed tax deductions on the five trial transactions.  The SILO transactions did not grant to Wells Fargo the burdens and benefits of property ownership.  The transactions lack economic substance, and were intended only to reduce Wells Fargo's federal taxes by millions of dollars.

Although well disguised in a sea of paper and complexity, the SILO transactions essentially amount to Wells Fargo's purchase of tax benefits for a fee from a tax-exempt entity that cannot use the deductions. The transactions are designed to minimize risk and assure a desired outcome to Wells Fargo, regardless of how the value of the property may fluctuate during the term of the transactions. Indeed, nothing of any substance changes in the tax-exempt entity's operation and ownership of the assets. The only money that changes hands is Wells Fargo's up-front fee to the tax-exempt entity, and Wells Fargo's payments to those who have participated in or created the intricate agreements. The equity and debt "loop" transactions simply are offsetting accounting entries not involving actual payments, or pools of money eventually returned to the original holder. If the Court were to approve of these SILO schemes, the big losers would be the Internal Revenue Service ("IRS"), deprived of millions in taxes rightfully due from a financial giant, and the taxpaying public, forced to bear the burden of the taxes avoided by Wells Fargo.

On the issue of economic substance, the Court has considered whether there is any likelihood of profit from the five trial transactions, aside from the tax benefits. In each transaction, the parties employed equity and debt "defeasance accounts," which are types of escrow accounts intended to minimize the risks of non-payment. During the lease-back period, a return is generated from the equity defeasance account investments. The value of the equity defeasance account is expected to grow so that the tax-exempt entity can exercise the buy-out option at the end of the lease-back period without using any of its own funds. However, the equity defeasance account return is more than offset by the other costs of the transaction, including Wells Fargo's cost of funds to engage in the transaction. The end result is that the trial transactions produce an overall loss without the tax benefits, and no rational person would engage in these transactions absent the tax benefits. This conclusion is borne out by Wells Fargo's cessation of SILO transactions after the IRS began disallowing SILO tax deductions. Moreover, the profitable portion of the transactions could be realized simply by investing in the same portfolio as the equity defeasance account. The only reason to create the elaborate array of agreements comprising a SILO transaction is for Wells Fargo to obtain the tax benefits at minimal risk, and with complete assurance of the desired long-term outcome.

The SILO transactions here are offensive to the Court on many levels. A cadre of company executives, in concert with teams of well known legal and accounting firms and other consultants, regularly constructed and participated in these tax schemes for Wells Fargo, apparently blind to professional standards of care. Representatives from the Federal Transit Administration ("FTA") encouraged transit agencies to participate in SILO transactions as a way to raise additional funds, without seriously considering the probable adverse tax treatment of the transactions. Even when the IRS issued a 1999 Revenue Ruling

disallowing tax deductions from LILO transactions,[2] the participants continued on with only slight adjustments to create the SILO transactions. The Court has little sympathy for those who have lost out as a result of this decision.

The Court will set a conference with counsel during the next 45 days to determine whether any further proceedings are necessary to address the remaining 21 transactions at issue in this case. With respect to the five trial transactions, and for the reasons explained in more detail below, the Court finds for Defendant. If the parties agree that additional proceedings are not needed for the other 21 transactions, the Court will direct the Clerk to enter final judgment for Defendant, and to dismiss Plaintiff's complaint with prejudice. Further action by the Court therefore must await guidance from the parties.

## I. Findings of Fact[3]

### A. Overview of SILO Transactions

In a SILO transaction, a United States taxpayer such as Wells Fargo enters into various agreements with an entity that is not subject to federal income tax, and with financing institutions. The agreements are described as "leases," "subleases," and "loans," among others, but they are all part of a single, integrated "sale in, lease out" transaction. One witness described the agreements as a "stack [that] was almost a foot high." (Britton, Tr. 1228.)[4] In the package of agreements, each part is precisely interwoven with, and dependent upon, the others. The substance of the SILO transaction can be seen only from the entire package of agreements, not from examining the individual agreements separately. A "participation agreement" defines all of the participants and documents comprising the overall SILO transaction. (Johnson, Tr. 1650.) Each of the five trial transactions employed a participation agreement. (PX903, NJT; PX1076, Caltrans; PX1319, Houston Metro; PX1515, WMATA; PX678, Belgacom.)

---

[2] Rev. Rul. 99-14, 99-1 C.B. 835, modified and superseded by Rev. Rul. 2002-69, 2002-2 C.B. 760.

[3] This statement of the facts constitutes the Court's principal findings of fact under Rule 52(a) of the Court of Federal Claims ("RCFC"). Other findings of fact and rulings on mixed questions of fact and law are set forth in the later analysis.

[4] In this opinion, the Court will refer to the trial transcript by witness and page as "Name, Tr. ___," and to trial exhibits as "PX___" for Plaintiff's exhibits, and "DX ___" for Defendant's exhibits. The parties' pretrial stipulations of fact, filed on April 2, 2009, are referred to as "Stip. ___." For lengthy exhibits, page citations include the numerical portion of Bates numbers. Demonstrative exhibits from Plaintiff and Defendant are referred to as "PDX ___" and "DDX ___" respectively.

When considered as a whole, the SILO transaction is designed to provide the taxpayer, Wells Fargo, with: (1) a purported basis to claim large depreciation deductions as the alleged owner of rail cars, locomotives, buses, or other capital assets; and (2) interest expense deductions based upon non-recourse "loop debt" arranged with a financing institution.  "Rental" payments and "interest" payments are not actually made among the SILO participants, but are recorded as offsetting accounting entries at the affiliated entities managing the debt accounts.

The tax-exempt entity already has acquired and owns the capital assets used for a SILO transaction.  Thus, financing the tax-exempt entity's acquisition of the capital assets is not one of the transaction's objectives. (Lys, Tr. 4567; DX701 at 20240.)  The tax-exempt entity continues to hold legal title to the capital assets, and is responsible for the operation and maintenance of the assets.  (DX701 at 20240.)  Nevertheless, the taxpayer claims that ownership of the assets for tax purposes has shifted to it pursuant to one of the leases, and that it is incurring interest expense on a non-recourse loan.  The tax benefits acquired by the taxpayer did not previously hold any value, because the tax-exempt entity does not pay federal income taxes, and cannot use the deductions.  The right to claim the deductions has value only in the hands of a taxpaying entity.  The tax-exempt entity receives an up-front payment from the taxpayer as consideration for the transfer of the tax benefits.  (McCalley, Tr. 672-73; Pohl, Tr. 927-30.)  The up-front payment, often expressed as a percentage of the transaction size, provides the incentive for the tax-exempt entity to participate in the transaction.  (McCalley, Tr. 633, 672-74; Webb, Tr. 1002-03; Britton, Tr. 1206; DX329 at 623-26; PX808 at 7636.)

The tax-exempt entity has the right to terminate the SILO transaction at a future date through exercise of a "purchase option."  However, the tax-exempt entity does not actually contribute any of its own money to pay the purchase option price.  Instead, "equity funds" from the taxpayer are set aside at the inception of the transaction, invested in securities in a collateral account, and then later used to fund the purchase option price.  In this way, equity funds advanced by the taxpayer at the outset ultimately are returned to it.  The tax-exempt entity pays nothing to exercise the purchase option.

The following hypothetical diagram shows the "Equity Loop" and "Debt Loop" segments of a SILO transaction.  The Debt Loop side shows an $8.00 non-recourse loan that passes through the tax-exempt entity on the closing date, and is deposited in an account with an affiliate of the lender.  On the Equity Loop side, the taxpayer makes a $2.00 payment to the tax-exempt entity on the closing date, of which the tax-exempt entity keeps $0.50 as its incentive fee for  transferring the tax benefits to the taxpayer.  The remaining $1.50 is

deposited in an account with another affiliate of the lender, to be invested for later funding of the purchase option.



B.  The Components and Mechanics of a SILO Transaction

In a typical SILO transaction, the taxpayer, Wells Fargo, purports to lease capital assets from a tax-exempt entity under an agreement called a "head lease." The length of the head lease is set to be longer than the remaining economic useful life of the assets, so the taxpayer can assert that the head lease should be treated as a sale for federal tax purposes and claim depreciation deductions as the purported new owner. (D. Ellis, Tr. 2623, 2629; Pohl, Tr. 900.) The tax-exempt entity concurrently enters into another agreement, usually called a "sublease," where it purports to lease the assets back from the taxpayer for a shorter period of time than the head lease. After executing these documents, the tax-exempt entity continues to use the assets, just as it did before the SILO transaction. The tax-exempt entity

retains all maintenance, insurance, and other obligations associated with ownership of the property.

As payment of the "head lease rent," the taxpayer makes a single payment to the tax-exempt entity at closing. The funds for the head lease rent come from two sources: (1) the proceeds of a purported non-recourse loan, called the "debt funds;" and (2) a cash payment from the taxpayer, called the "equity funds." The tax-exempt entity, however, does not retain the head lease payment. All of the debt funds are paid immediately to an affiliate of the lender, called a "debt payment undertaker," as part of a debt defeasance arrangement. "Defeasance" is a means of reducing risk on a debt by having a third party hold the necessary funds or securities and make payments when due during the course of a transaction. See Charles J. Woelfel, The Fitzroy Dearborn Encyclopedia of Banking & Finance, 285 (10th ed. 1994); (Rupprecht, Tr. 155-56; Grossman, Tr. 2013.) The debt payment undertaker then is obligated to make the tax-exempt entity's "rent payments" on the sublease to the taxpayer. The rent payments, however, are not actually made to the taxpayer, but are made instead to the lender (the debt payment undertaker's affiliate), to satisfy the taxpayer's debt service obligations on the non-recourse loan.

The debt service obligations on the non-recourse loan are set to match, in timing and amount, the tax-exempt entity's rent payments under the sublease. (DX701 at 20241.) Thus, the debt funds given to the debt payment undertaker are sufficient to satisfy both the tax-exempt entity's sublease rental obligations and the taxpayer's debt service obligations throughout the sublease, without any additional payments by either the taxpayer or the tax-exempt entity. Id. In this loop debt structure, the debt funds flow in a circle from the lender, to the taxpayer, to the tax-exempt entity, and then back to an affiliate of the lender, all in accordance with terms agreed to by the parties at the closing of the SILO transaction. (Whitman, Tr. 1380-82, 1385; Lys, Tr. 4575-76.) The taxpayer, however, claims interest deductions for tax purposes throughout the sublease term.

Like the debt funds, most of the equity funds contributed by the taxpayer, and nominally paid to the tax-exempt party as part of the head lease payment, are immediately paid as a fee to the "equity payment undertaker" at closing, as part of an equity defeasance arrangement. (Whitman, Tr. 1382-83.) The remaining portion of the equity funds is retained by the tax-exempt entity as its inducement fee for entering into the SILO transaction. (Lys, Tr. 4567-68.) The funds paid to the equity payment undertaker typically are invested in government bonds or other high-grade debt securities, and are referred to as the "equity collateral." As with the debt defeasance arrangement, the tax-exempt entity does not have access to these funds during the term of the sublease. At the end of the sublease, when the tax-exempt entity can exercise the "purchase option," the funds held by the equity payment undertaker provide exactly the amount due from the tax-exempt entity to terminate the transaction.

The tax-exempt entity thus does not need to use any of its own funds to exercise the purchase option. The equity payment undertaker simply repays the taxpayer's equity funds with a predetermined return, in a second circular flow of funds. From the date of closing, the taxpayer claims to be the owner of the capital assets, with the right to assert depreciation deductions on its taxes, even though the tax-exempt entity continues to use and maintain the assets, just as it had done before the SILO transaction. (McCalley, Tr. 653.)

C. The Two Types of SILOs

1. Lease to Service Contract SILO Transactions

At the end of the sublease period, the tax-exempt entity has the unilateral right to exercise a pre-funded purchase option, and terminate the SILO transaction. In a "lease-to-service contract" SILO transaction, if the tax-exempt entity does not exercise its purchase option, the taxpayer then can select between one of two options: (1) it can require the tax-exempt entity to transfer the assets to the taxpayer, described as "the return option" in the transaction documents; or (2) it can require the tax-exempt entity to arrange a so-called service contract for the operation of the assets, described as "the service contract option." (Shuman, Tr. 2378-79; Shinderman, Tr. 3753-55.)

If the tax-exempt entity does not exercise the purchase option, and the taxpayer then elects the service contract option, the tax-exempt entity becomes obligated to arrange for the service contract, many of the terms for which are specified in the SILO closing documents. If the taxpayer chooses, the tax-exempt entity also becomes obligated to locate an "operator" for the assets, which must be an entity other than the "service recipient," the entity for whom the assets are operated. The tax-exempt entity typically is required to arrange for refinancing of the original non-recourse loan. (Lys, Tr. 4524.) Like the original loan, the refinancing loan must be non-recourse.

For the service contract option, the SILO documents specify the amount and timing of the payments, even though the beginning of the hypothetical service contract would not begin until at least twenty years in the future. These terms are set in advance so that the service contract will provide the necessary funds to repay any non-recourse refinancing loan, if one could be obtained, without the taxpayer having to contribute any of its own funds. The intent is for the taxpayer to receive its original equity contribution, along with the same or similar return that it would receive if the tax-exempt entity had exercised the purchase option. From the inception of the SILO transaction, the taxpayer is guaranteed to receive back its equity contribution with the specified return. The taxpayer also is insulated from any meaningful risk exposure associated with "ownership" of the assets.

Alternatively, if the taxpayer elects the return option, the tax-exempt entity likely would be required to find replacement equipment within an eleven or twelve-month period. Such a short period for this purpose would pose a significant challenge for transit agencies. The typical procurement cycle for new vehicles in the bus and rail industry ranges from two to six years, depending on the number of railcars or buses to be procured and the transit agencies' total fleet and operating needs. (Wilson, Tr. 4266-68; Salci, Tr. 3442-46, 3450-51; Britton, Tr. 1196; Weinman, Tr. 4121-29.) While the actual construction of new railcars, for example, could take approximately two years, the procurement process also would include substantial planning, engineering, and testing before acceptance and revenue operation could occur. This process would require a minimum of five years before new railcars could be placed into service. (Weinman, Tr. 4124-25.) The transit agencies thus would need to consider a possible new procurement well in advance of deciding whether to exercise the fixed purchase option. (Wilson, Tr. 3450-51; Salci, Tr. 4267-68.) If they decline the fixed purchase option, the transit agencies would not know whether Wells Fargo would elect the return option or the service contract option until eleven or twelve months prior to the termination date. Thus, the structure of the end of sublease choices strongly encourages the tax-exempt entity to exercise the fixed purchase option.

## 2. QTE SILO Transactions

A QTE SILO differs from a lease-to-service contract SILO in some respects. First, the tax-exempt entity's purchase option typically is earlier than the end of the sublease period, and is often called an "early buyout option" or "EBO." Second, the taxpayer usually does not have the option to force the tax-exempt entity to enter into a service contract at the end of the sublease if the tax-exempt entity does not exercise the EBO. In general, the participants executed QTE SILOs before the SILO "industry" developed the service contract feature. Third, the QTE SILOs typically impose strict conditions on the tax-exempt entity if it declines the EBO and must transfer the equipment to the taxpayer. The so-called "return conditions" typically require the tax-exempt entity to return the equipment in "as new" condition, with the most recent hardware and software releases from the equipment manufacturer included. Due to these onerous conditions, the tax-exempt entity is motivated to exercise the EBO and terminate the SILO.

## D. Safe-Harbor Leases and LILO Transactions – Predecessors to SILOs

In 1981, Congress enacted laws that permitted leasing transactions with tax-exempt entities, often referred to as "safe-harbor leasing rules." See Economic Recovery Tax Act, Pub. L. No. 97-34, 95 Stat. 172 (1981); see also Staff of the Joint Committee on Taxation, 97th Cong., General Explanation of the Revenue Provisions of the Tax Equity and Fiscal Responsibility Act of 1982, at 45-62 (Dec. 31, 1982) ("TEFRA Bluebook"). Under the safe-harbor leasing rules, a transaction could qualify as a sale and lease-back for tax purposes if

it met the safe-harbor criteria, regardless of whether the lessor could only obtain a profit on the transaction by taking tax benefits into account, and regardless of whether the lessor obtained the substantive benefits and burdens of ownership of the property as a result of the transaction.  TEFRA Bluebook at 50-51.  Safe-harbor leasing criteria permitted a sale-lease-back transaction even if it was nothing more than a "tax benefit transfer." Id. at 51-52.  Safe-harbor leases in many respects were similar to SILO transactions.  The enactment of the safe-harbor leasing rules led to a proliferation of leasing transactions whose sole purpose was tax avoidance.  Id.

Just one year later, in 1982, Congress shut down safe-harbor leasing transactions. Congress enacted laws that limited the tax benefits available for safe-harbor leases entered into between July 1, 1982 and January 1, 1984, and repealed the safe-harbor leasing rules thereafter.  Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. No. 97-248, 96 Stat. 324 (1982); TEFRA Bluebook at 54.  Congress took this action because of "the tax avoidance opportunities that safe-harbor leasing had created," and "adverse public reaction to the sale of tax benefits."  TEFRA Bluebook at 53.

In 1984, Congress enacted what is known as the "Pickle Rule."  By this rule, Congress intended to limit the tax benefits associated with leasing transactions involving tax-exempt entities by requiring the taxpayer to depreciate the value of the leased assets over a longer time period than otherwise would be required.  Deficit Reduction Act, Pub. L. No. 98-369, 98 Stat. 494 (1984).  The Pickle Rule required any leased tax-exempt property to be depreciated on a straight-line basis over an assigned asset class, or 125 percent of the lease term, whichever was longer.  Deficit Reduction Act, § 31; Shinderman, Tr. 2781; DX704A at 7-8.  Congress added IRC § 7701(e), which requires arrangements denominated as "service contracts" to be treated as leases if they are "properly treated" as such, and the arrangement meets other relevant factors.  (DX704A at 8.)

After the repeal of safe-harbor leasing and the enactment of the Pickle Rule, some taxpaying entities sought ways to structure transactions that would allow the purchase of tax benefits from tax-exempt entities, but would not run afoul of the Pickle Rule.  One of these was the LILO transaction.

The typical LILO transaction is similar to the SILO transaction, described above.  The taxpayer purports to lease assets from a tax-exempt entity, and then immediately lease them back to the tax-exempt entity for a shorter period.  See Rev. Rul. 2002-69; Maxim Shvedov, CRS Report of Congress: Tax Implications of SILOs, QTEs and Other Leasing Transactions with Tax Exempt Entities, pp. 8-9 (Nov. 30, 2004) ("CRS Report").  As in a SILO, the tax-exempt entity continues to use the property just as it did before the LILO transaction, and remains responsible for the maintenance and operation of the asset during the lease-back period.  A portion of the head lease is prepaid, and is funded largely with a purported non-

recourse loan that is defeased in a loop debt structure.  The timing and amount of the tax-exempt entity's sublease rental payments and the taxpayer's debt service payments on the non-recourse loan match exactly, so neither party makes any out-of-pocket payments during the lease-back period.

Also, as in a SILO, the taxpayer makes an "equity investment" with its own funds, most of which is paid as an "equity undertaking fee" to an equity undertaker.  The remainder is paid to the tax-exempt entity as its inducement fee for transferring the tax benefits.  The funds paid to the equity undertaker are used to purchase securities that pay a fixed rate of return, which matches the amount needed for the tax-exempt entity to exercise the purchase option at the end of the sublease term.

There are two principal differences between LILO and SILO transactions.  In a LILO tax shelter, the head lease term is structured to span less than 80 percent of the remaining useful life of the assets, so the taxpayer can assert the head lease is *not* equivalent to a sale for tax purposes.  See CRS Report at 12.  Instead, the taxpayer claims to have a leasehold interest in the assets for tax purposes, and claims deductions for its purported rental obligations, not depreciation deductions associated with an ownership interest, thereby avoiding the Pickle Rule.  The LILO transaction is structured so that the rental deductions are claimed more quickly than taxable income is realized on the sublease, thereby creating a tax benefit for the taxpayer.

The second difference between LILO and SILO transactions is the description of the options available to the taxpayer at the end of the lease-back period if the tax-exempt entity does not exercise the purchase option.  In a LILO transaction, the taxpayer can (1) require the tax-exempt entity to surrender the assets to the taxpayer for its own use; (2) lease the assets to a third party ("the replacement lease option"); or (3) compel the tax-exempt entity to lease the property under a renewal lease.  See Rev. Rul. 2002-69.  If the taxpayer elects either of the latter two options, it would be obligated to make a second "deferred rent" payment at the end of the sublease period.  Id.  However, because of offsetting rents under the renewal or replacement lease, the taxpayer never needs its own funds to satisfy the deferred rent payment.  Similar to the service contract option in a SILO transaction, the renewal and replacement lease options in a LILO transaction are structured so that the taxpayer obtains a return of its equity and has an expected after-tax return as if the tax-exempt entity had exercised the purchase option.  See BB&T, 523 F.3d at 464-65 (LILO structured "in a way that essentially eliminates any risk of economic loss").

E.  Regulatory and Legislative Responses to LILO and SILO Transactions

In 1999, the Treasury Department issued amendments to IRC § 467 that effectively eliminated the market for LILO transactions.  Under these amendments, the taxpayer in a LILO transaction had to treat the prepayment of the head lease rent as a loan for tax purposes, and the rental income as interest on that loan, thereby eliminating the tax benefit generated by the prepayment of the head lease.  See Treas. Reg. § 1.467-4 (1999).  Also in 1999, the IRS issued Revenue Ruling 1999-14, holding that taxpayers could not take rental payment or interest deductions in LILO transactions because they lack economic substance.  Later, in Revenue Ruling 2002-69, the IRS held that LILO transactions did not satisfy the substance-over-form doctrine.  See Rev. Rul. 2002-69.  In light of these IRS actions, taxpayers and tax-exempt entities, including public transit agencies, stopped engaging in LILOs.  ( McCalley, Tr. 629; Pohl, Tr. 898-99; Webb, Tr. 1054-55; Whitman, Tr. 1342; D. Ellis, Tr. 2742; Shinderman, Tr. 3782; DX722, Schroeder Dep., at 39.)

These new rulings and regulations, however, did not end the attempts of taxpayers to create tax benefits from leases involving tax-exempt entities.  The lawyers, promoters, and arrangers involved with LILOs next developed the SILO structure.  (McCalley, Tr. 626-27, 630; Whitman, Tr. 1339; Hackett, Tr. 3569; Shinderman, Tr. 3783-84; DX722, Schroeder Dep., at 39-40.)  Since the target of the new IRS provisions was the rental and interest payments involved in LILO transactions, the provisions did not apply to depreciation deductions derived from the taxpayer's purported ownership of assets in SILO transactions.  The issuance of the final regulations under IRC § 467 led to the creation of SILO transactions with lease-to-service contract options.  Under the Pickle Rule, the lease term over which the taxpayer must depreciate property does not include service contracts that satisfy the requirements of IRC § 7701(e).  In a lease-to-service contract SILO, the taxpayer asserts that the service contract period tacked on at the end of the sublease is *not* included in the lease term for purposes of the Pickle Rule.  On this basis, the taxpayer claims the depreciation deduction over a shorter time period, thus increasing its value to the taxpayer because of the time-value of money.

The promoters and arrangers proposed the SILO transaction to taxpayers and tax-exempt entities as a replacement to the LILO structure.  (Webb, Tr. 999-1003; DX200; DX722, Schroeder Dep., at 33-35.)  Arrangers, such as Allco Financial Corporation ("Allco"), typically were paid a percentage of the transaction size on a contingent fee basis.  If the parties did not complete the transaction, the arrangers did not receive any payment.  (Whitman, Tr. 1299-301, 1333-34; Hackett, Tr. 3577-79.)

The market for SILO transactions continued until 2004, when Congress enacted the American Jobs Creation Act of 2004, Pub. L. No. 108-357, 118 Stat. 1418 (2004) ("AJCA"), amending the IRC to eliminate the purported tax benefits associated with LILO and SILO

transactions.  See also IRS Notice 2005-13, 2005-1 C.B. 630.  Congress made these Code amendments to "curtail[] the ability of a tax-exempt entity to transfer . . . tax benefits to a taxable entity."  Staff of the Joint Committee on Taxation, 108th Congress, General Explanation of Tax Legislation Enacted in the 108th Congress, at 420 (May 2005).  Congress was concerned that taxpayers were "attempting to circumvent" the Pickle Rule "through the creative use of service contracts with . . . tax-exempt entities," and were thereby frustrating the purpose of the Pickle Rule to "prevent tax-exempt entities from using leasing arrangements to transfer the tax benefits of accelerated depreciation on property they used to a taxable entity."  Id.  Although the AJCA provisions relating to LILO and SILO transactions applied prospectively, the AJCA's legislative history states that the amendments to the Code were "not intended to affect the scope of any other present-law tax rules or doctrines applicable to purported leasing transactions," and that "[n]o inference is intended regarding the appropriate present-law tax treatment of transactions entered into prior to the effective date."  H.R. No. 108-755 at 660 (2004).

The AJCA created an exemption for SILO transactions involving public transit agency purchases of transportation equipment using federal subsidies administered by the FTA, where the transit agency had submitted an application to the FTA, permitting the use of the federally subsidized transportation equipment in the SILO transaction. AJCA, § 849(b).  The AJCA exemption applies to "qualified transportation property," defined as property where an application: (1) had been submitted to the FTA after June 30, 2003 and before March 14, 2004; (2) had been approved by the FTA before January 1, 2006; and (3) included a description of and value of the property.  Id.  None of the public transit agency transactions at issue in this case fall within these established time frames.

F.  Wells Fargo's Leasing History

Wells Fargo began in business in 1852 as a provider of stagecoach service, mail delivery, banking services, freight delivery, and passenger transportation.  Over the years, Wells Fargo evolved into a diversified financial services company.  In 1998, Norwest Corporation acquired Wells Fargo and changed its name to Wells Fargo & Company.  After this merger, Wells Fargo continued Norwest's historical leasing business, which had existed since the 1970s.  (Rupprecht, Tr. 79-80, 88-89.)  Norwest's equipment finance company became known as Wells Fargo Equipment Finance, Inc., or "WFEFI."  (Rupprecht, Tr. 78.) In 2000, Wells Fargo acquired First Security Bank Corporation, which also had a leasing business.  (Johnson, Tr. 1488-89.)

Wells Fargo has engaged in many leasing transactions, including leveraged leases, involving rail cars, buses, and a variety of other assets.  In this respect, Wells Fargo is similar to other large banks that maintain significant leasing portfolios.  See AWG, 592 F.Supp.2d at 962.  For a short time, however, Wells Fargo engaged in the transactions at issue, which

-14-

differed from those it had done previously, and from those it has done since. Wells Fargo still engages in traditional leveraged lease transactions. (Johnson, Tr. 1791.)

Following the enactment of the AJCA in 2004, Wells Fargo and others stopped entering into new leveraged lease-to-service contract transactions because the market for them ceased to exist. (McCalley, Tr. 632; Webb, Tr. 1063-64; Britton, Tr. 1204-05; Johnson, Tr. 1790-91.) Many of the LILO and SILO arrangers went out of business, or stopped promoting SILOs, after enactment of the AJCA. (Whitman, Tr. 1348-50; Hackett, Tr. 3573.) Wells Fargo had closed lease-to-service contract transactions in 2003 that involved buses, and which were approved by the IRS because of the AJCA exemption regarding FTA approval. These bus transactions were with the Chicago Transit Authority, PACE (a suburban bus service in Chicago), and AC Transit (a San Francisco-Oakland area bus service). (Johnson, Tr. 1528-29.)

For all of its leveraged lease transactions, Wells Fargo typically engaged in an extensive due diligence and approval process. The due diligence included a careful credit review by the Credit Department, and an equipment review by the Equipment Department. (Johnson, Tr. 1555-57; Grossman, Tr. 1985.) Wells Fargo employed the guidelines from a "Front End Guidance" document developed by Phyllis Grossman in evaluating whether to go forward with a proposed transaction. (Grossman, Tr. 1978-79; PX34; PX73; DX529.) Ms. Grossman was a Vice President of Norwest Equipment Finance, Inc. from 1990 to 1998, and was responsible for overseeing the leveraged lease portfolio. (Grossman, Tr. 1974-76.) She originated the Belgacom transaction. (Grossman, Tr. 1984-85.) The "Front End Guidance" document described requirements relating to lessee credit quality, equipment, service contracts, yield/return requirements, and concentration limitations. (PX34; PX73; PX451.) Wells Fargo's analysis always involved a tax capacity review, designed to assure that sufficient taxable revenue existed against which to offset the expected tax deductions from the transaction. (Rupprecht, Tr. 161-62; Grossman, Tr. 2046-47.)

Investors in leveraged leases such as Wells Fargo are motivated in part by the pattern of earnings available under accepted accounting procedures. (J. Ellis, Tr. 3113-16.) The Financial Accounting Standards Board ("FASB") is responsible for promulgating accounting rules, known as Generally Accepted Accounting Principles ("GAAP"), pursuant to authorization from the Securities and Exchange Commission. (J. Ellis, Tr. 3082-83.) One of the accounting rules is FAS 13, Accounting for Leveraged Leases. (J. Ellis, Tr. 3083-3085; PX2.) FAS 13 contains criteria for determining whether a transaction qualifies as a leveraged lease. (PX1663A at 14-15; PX2.) If FAS 13 applies, the lessor is required to allocate its expected income from the transaction to the periods when it has a positive investment. (J. Ellis, Tr. 3112-14.) The pattern of earnings often is referred to as "front-loaded earnings." (Shinderman, Tr. 3947-48.)

Under FAS 13, a leveraged lease has three separate phases of investment: (1) a positive investment phase in the early years when the investor's cumulative cash outflows exceed its inflows; (2) a negative investment phase when the cumulative cash flows exceed the cumulative cash outflows; and (3) a positive investment phase in the later years when cumulative cash flows again are positive.  (PX1663A at 7; PDX 9, J. Ellis.)  FAS 13 does not alter the total income attributed to the transaction, but simply changes the timing of the income under GAAP.  (J. Ellis, Tr. 3130-32, 3143-44; PX1663A at 19; PDX 20, J. Ellis.)

G.  Wells Fargo's Trial Transactions

All of the domestic transit SILOs differed from traditional leveraged leases by including a service contract option at the end of the sublease period.  (Oram, Tr. 499-500; DX626 at 20088.)  The transactions were unusual in providing the lessor, Wells Fargo, with a choice at the end of the sublease period to impose a service contract or any sort of forced renewal.  Wells Fargo's representative testified that "[u]sually, all choices are given to the lessee."  (Oram, Tr. 554-55.)

The negative amortization, or interest roll-up, of the non-recourse debt in the SILO transaction also was an unusual feature that had the effect of increasing Wells Fargo's claimed interest deductions.  (D. Ellis, Tr. 2724-25; Gould, Tr. 2892-93; DX626 at 20089.)

Wells Fargo made its equity investment in the five trial transactions through trusts.  On behalf of Wells Fargo, each trust entered into various transaction agreements.  (Johnson, Tr. 1650-51; Stip. 1.1.2, NJT; Stip. 1.2.2, Caltrans; Stip. 1.3.2, WMATA; Stip. 1.4.2, Houston Metro; Stip. 1.5.1.3, Belgacom.)  The following are the names and dates of the Wells Fargo trusts for each trial transaction: (1) NJT – January 31, 2001 trust with State Street Bank (Stip. 1.1.2); (2) Caltrans – December 18, 2001 trust with State Street Bank (Stip. 1.2.2); (3) WMATA – September 10, 2002 trust with Wilmington Trust Company (Stip. 1.3.2); (4) Houston Metro – April 15, 2002 trust with Wells Fargo Bank Northwest (Stip. 1.4.2); and (5) Belgacom – December 19, 1997 trust with First Security Bank (Stip. 1.5.1.3).  Wells Fargo reported each trust's income and expenses as its own.

Although SILOs were different from traditional leveraged leasing transactions, Wells Fargo nevertheless prepared credit approval presentations ("CAPs") just as it did for other transactions.  In these CAPs, Wells Fargo representatives described the transactions to obtain internal approval.  A CAP exists for each of the five trial transactions.  (DX44, Belgacom; PX1000, Caltrans; PX821, NJT; PX1229, Houston Metro; PX1430, WMATA.)

Each CAP identifies the parties involved, the arranger promoting the transaction, and describes the structure of the transaction.  (See, e.g., PX1000 at 11247; PX821 at 35882.)  In particular, the CAP summarizes the defeasance arrangements, the service contract option

-16-

(or other options in Belgacom), the mechanisms in place to remove any risk, and the expected yield, with tax benefits, to Wells Fargo. For the transit SILOs, the transaction is described both in narrative and schematic form. For example, an exhibit to the Caltrans CAP depicts an overview of the transaction: Caltrans receives an "up-front benefit," the non-recourse loop debt amounts are immediately returned through the debt defeasance arrangement to the American International Group ("AIG"), and Wells Fargo's equity investment is placed in the equity defeasance arrangement, pledged to Wells Fargo, and then eventually returned to it. (PX1000 at 11306; see also PX821 at 35886, NJT; PX1229 at 252721, Houston Metro; PX1430 at 233394, WMATA; DX15 at 1299, Belgacom.)

After review, Wells Fargo executives approved the transactions by signing the CAP. Wells Fargo's tax department performed the final review, certifying that Wells Fargo had enough "tax capacity" to use the tax benefits it expected to claim from each transaction. (DX44 at 222361, Belgacom; PX1000 at 11249, Caltrans; PX821 at 35883, NJT; DX829 at 26162, Houston Metro; PX1430 at 233352, WMATA.) Having sufficient "tax capacity," i.e., other taxable income against which to apply the expected depreciation and interest deductions, was a necessary condition for Wells Fargo to enter into each SILO transaction. (Rupprecht, Tr. 161-62; Johnson, Tr. 1892-93; Shinderman, Tr. 3811-13; PX73 at 43088; DX455.)

"Tax capacity" was important to Wells Fargo because the reduction in taxes, resulting from the depreciation and interest it intended to claim, provided the source of Wells Fargo's return on the transaction. (Rupprecht, Tr. 176-77.) In the Caltrans transaction, for example, the CAP states "the yield in this transaction is dependent upon Wells Fargo's ability to depreciate the equipment over 125% of the base Lease Term (33.75 years) using the Pickle method and to deduct the interest expense on the non-recourse debt." (PX1000 at 11280.) According to the CAP, Wells Fargo expected a yield, including the tax benefits, of 11.45% in Caltrans. (PX1000 at 11246, 11280; Johnson, Tr. 1851.) Recognizing that tax benefits might be disallowed, however, Wells Fargo also calculated a return without tax benefits. According to the CAP, this return would be only 2.6%, which is less than Wells Fargo's cost of funds for the transaction. (PX1000 at 11280; Johnson, Tr. 1846-47, 1854.) Wells Fargo's reliance on tax benefits for the return also is present in each of the other trial transactions. (PX821 at 35881, 35912, NJT; PX1229 at 252648, 252681, Houston Metro; PX1430 at 233350, 233382, WMATA; DX44 at 222361, 222363, Belgacom.)

The SILO trial transactions were facilitated by so-called "arrangers," such as Allco Finance, Capstar Partners LLC ("Capstar"), or ABN AMRO Bank Lease Advisory (Belgacom) ("ABN AMRO"), who worked on behalf of the tax-exempt entities. (McCalley, Tr. 624.) The arrangers identified the equipment owned by the tax-exempt entity that would be suitable for use in a SILO transaction. (McCalley, Tr. 591-92, 640-41; Whitman, Tr. 1271-73.) Using preliminary appraisals of value and remaining economic useful life, the

arrangers estimated the tax benefits that could be generated from a SILO transaction. (McCalley, Tr. 640-41.) Once the arranger and the tax-exempt entity decided to go forward, the arranger began to solicit bids from prospective U.S. taxpayers to enter into a SILO transaction utilizing the identified equipment. (McCalley, Tr. 592; Whitman, Tr. 1274.) The arranger sometimes lined up the entities that would act as loop debt provider and equity payment undertaker, or solicited separate bids to fill these roles. (Whitman, Tr. 1353-55.) The competitive bids received from prospective equity investors contained specific information about the structure of the proposed SILO, including "pricing runs" that show the inducement fee to the tax-exempt entity.

Wells Fargo also retained its own "arrangers," such as Trinity Advisors, Cornerstone Financial, Macquarie Corporate Finance, or Fleet Capital Leasing ("Fleet"), to provide assistance. Wells Fargo's arrangers developed the various schedules and numerical terms to be included in the SILOs, with a view to maximizing the "after tax yield" to Wells Fargo from the SILOs. The arrangers calculated the schedules and reports, called "ABC reports," using a proprietary software program. (Whitman, Tr. 1366-67;  Hackett, Tr. 3587.)  The ABC reports took into account the value of the equipment, the term of the head lease, the closing date of the transaction, Wells Fargo's combined state and federal income tax rate, the interest rate on the non-recourse loan, and the rate of return on the equity collateral. Applying complex mathematical formulas, the ABC reports produced Wells Fargo's equity investment, the sublease rent schedules, the non-recourse loan repayment schedules, the loan amortization schedules, the purchase option price and payment schedule, the stipulated loss and termination value schedules, and the service contract basic fee schedule. (Whitman, Tr. 1372; Hackett, Tr. 3586-92.) In the transit SILOs, the arrangers used the software to assure that Wells Fargo's after-tax yield would be the same regardless of whether the fixed purchase option or the service contract option was selected.

As noted, all of the trial transactions employed a loop debt structure.  A lender purportedly lends funds on a non-recourse basis to Wells Fargo, and on the closing date, the funds are paid to a debt payment undertaker, which in all cases is an affiliate of the lender. (Lynch, Tr. 3671-72.) The debt payment undertaker uses the funds to repay the non-recourse loan. The corporate parents whose affiliates served as lenders and debt payment undertakers were AIG, Financial Security Assurance ("FSA"), and Rabobank (for Belgacom). The debt defeasance structure permitted the loop debt providers to avoid having to include the non-recourse loans on their balance sheets. The lenders and debt payment undertakers entered into arrangements that obviated the need for the debt payment undertaker to make actual payments to the lender.

For each transaction, Wells Fargo received an appraisal of the property that would be the subject of the SILO. (Rivello, Tr. 2137-39; PX717; PX842; PX1015; PX1255; PX1448.) As part of their promotion of the transactions, the arrangers typically hired the appraisers,

before any taxpayer had committed to the transaction. In Caltrans and WMATA, for example, the arranger Allco retained Ernst & Young to appraise the railcars. (Whitman, Tr. 1298-1301; Rivello, Tr. 2170-71, 2201-02; PX983; PX1413.) If a transaction failed to close, Allco paid the appraiser's fees. If the transaction did close, Wells Fargo paid a fee to Allco, and a portion of this fee went to the appraiser. (Whitman, Tr. 1299-1301, 1403-04.)

The purported reason for the appraisal was to determine the "fair market value" of the property that would be subject to the SILO. In fact, however, the arrangers and appraisers worked together to *increase* the valuation of the SILO property, and thereby *increase* the "price" to be paid for the property. (McCalley, Tr. 643-44; Whitman, Tr. 1334-35.) Lessee advisors also worked to increase the property's appraised valuation. (Hackett, Tr. 3604-05.) The appraisals included "soft costs," such as interest during a construction phase, managing the build process, and the creation of training manuals, among others. (Whitman, Tr. 1352-53; Rivello, Tr. 2204-06.) With all parties to the transaction working to inflate the property's value, since a higher value would result in the greatest benefit to all, there were no negotiations of terms as would occur in a typical sale of property. A higher value of the property benefitted all parties. (McCalley, Tr. 643-644; Webb, Tr. 1022-24.) Even though the appraiser was assessing the value of property owned by the tax-exempt entities, the appraisal report, with one exception, was not shared with them. (McCalley, Tr. 645-47, 688; Pohl, Tr. 911-12; Webb, Tr. 1024; Britton, Tr. 1213-14; Hackett, Tr. 3601.) WMATA received a brief summary of the fair market value and useful life of its property on the day of closing. (Pohl, Tr. 913-14; DX423.)

Donald Oram of Wells Fargo's Equipment Management Division reviewed the draft appraisals and related documents prior to closing. Mr. Oram recorded his conclusions about the appraisals in short memoranda or in the CAP. (PX822; PX999; PX1226; PX1426; DX44; Oram, Tr. 505-08.) Mr. Oram did not review the final appraisals before preparing his memoranda because they were unavailable. (Oram, Tr. 509-14.) Mr. Oram often thought the appraisers' valuations were too high. (Oram, Tr. 514-23; PX999; PX1226; DX223.) Nevertheless, Mr. Oram approved the appraisal for each trial transaction based upon the protections provided in the financial structure, not based on the value of the equipment. In the Caltrans SILO, for example, Mr. Oram wrote:

> This transaction relies on structure, not collateral support, to mitigate our booked residual risk. This risk is effectively mitigated through the use of Service Contracts, Cash Defeasance accounts, and a requirement to purchase Residual Value Insurance.

(PX999 at 164632.) In his WMATA and Houston Metro memoranda, Mr. Oram explained that the service contract option and cash defeasance accounts provided "leverage" to Wells

Fargo, and the means to ensure payment of its expected return.  (PX1226 at 165085; PX1426 at 60831.)

Wells Fargo retained outside law firms, such as Winston & Strawn, King & Spalding, or Watson, Farley & Williams, as tax counsel in all of the SILO transactions.  The law firms worked with Wells Fargo's arrangers to develop the particular SILO structures reflected in Wells Fargo's bids, and prepared the transactional documents, often using previous SILO deals as "precedent documentation."  The law firms also were involved in the generation of the appraisal reports and the "service contract opinion reports," which addressed the commercial feasability of the service contract.  (Rivello, Tr. 2199; Shuman, Tr. 2409-12.)

The parties stipulated to the documents comprising each of the five trial transactions.  (Joint Stip., April 2, 2009.)  Each of the SILOs included a participation agreement listing the operative documents, and providing that execution of all of the operative documents was a condition precedent to the transaction.  (PX678, PX757, Belgacom; PX833-34, NJT; PX1076-77, Caltrans; PX1319-20, Houston Metro; PX1515, WMATA.)

The parties and basic terms of each of the five trial transactions are set forth below.

     1.  <u>New Jersey Transit</u>

On September 13, 1999, NJT distributed a request for proposals ("RFP") to arrangers and potential equity investors, indicating its interest in entering into one or more leasing transactions involving 45 light-rail vehicles and 650 transit buses.  (PX808 at 7636; Webb, Tr. 969.)  Kinki Sharyo of Japan manufactured the light-rail vehicles, and NJT used these vehicles in service on its Hudson-Bergen Light Rail System.  (PX808 at 7636.)  After receipt of initial proposals and three or four rounds of revisions, NJT accepted a bid submitted by Capstar and Fleet to serve as arranger and equity investor.  (Webb, Tr. 969, 971-73; Hackett, Tr. 3575-76; DX331 at 7686.)  Ultimately, Fleet syndicated a portion of the transaction so that Wells Fargo could participate.  (Webb, Tr. 990-91; Hackett, Tr. 3575-76.)

Wells Fargo's transaction with NJT closed on February 1, 2001.  (PX906.)  NJT leased twenty light rail vehicles to Wells Fargo for 50 years, to February 1, 2051.  Wells Fargo simultaneously leased the vehicles back to NJT for just under 25 years, to January 2, 2026.  (PX904 at 180481; PX906-09.)  NJT placed the rail cars in service on the Hudson-Bergen line on April 15, 2000.  (Webb, Tr. 960-61; PX842 at 37431.)  NJT retained the right to exclusive use, possession and quiet enjoyment of the vehicles, and remained solely responsible for the operation, maintenance, repair and insurance of the vehicles, just as before the transaction.  (PX906 at 180419-21; PX908 at 180350-52.)

Marshall & Stevens served as the appraiser. (PX824 at 1825.) AIG Financial Products ("FP") (Cayman) Limited served as the lender, while AIG-FP Special Finance (Cayman) Limited and AIG Matched Funding Corporation were the payment undertakers. Id. The law firms of O'Melveny & Meyers and White & Case were involved as counsel to the lender, surety bond provider, and payment undertaker. Id. Watson, Farley & Williams served as tax counsel for Wells Fargo. Id. The FTA had contributed federal funds toward the purchase of the light-rail vehicles, and thus had to approve the proposed SILO transaction. The FTA provided its approval to NJT on December 26, 2000. (PX828.)

## 2. California Department of Transportation

On April 21, 1999, Caltrans distributed an RFP seeking a leveraged lease advisor. (DX192.) On July 12, 1999, Caltrans also distributed an Invitation for Bids for new proposals for "creative financing of the Caltrans rail fleet." (DX197 at 4938.) In this invitation, Caltrans noted the recent IRS ruling regarding LILO transactions, and explained that Caltrans "has rejected all prior proposals received as a consequence of our most recent invitation now superceded [sic] by events." Id. Caltrans selected Allco as the arranger, and Trinity Advisors as a lessor advisory firm. (Whitman, Tr. 1271-72, 1285-86.) Wells Fargo submitted a proposal to Caltrans through Trinity. (Whitman, Tr. 1286.)

Wells Fargo's transaction with Caltrans closed on December 18, 2001. (PX1079.) Caltrans leased six locomotives and twelve intercity passenger rail cars to Wells Fargo for 70 years, to December 18, 2071. Id. Wells Fargo simultaneously leased the vehicles back to Caltrans for just over 27 years, to January 1, 2029. (PX1077 at 10252; PX1079-83.) The locomotives and passenger cars had been placed into service in 2001, and were separated into two equipment lots. (PX1015 at 11391, 11395.) Equipment Lot 1 included six General Motors F59PHI Locomotives, and Equipment Lot 2 included six Alstom Cab/Baggage Coaches, one Alstom Custom Class Coach, one Alstom Café Coach, and four Alstom Trailer Coaches. (PX1080 at 10297; PX1015 at 11387; PX1082 at 10368, Lot 1; PX1083 at 10989, Lot 2.) Caltrans retained the right to exclusive use, possession and quiet enjoyment of the vehicles, and remained solely responsible for the operation, maintenance, repair and insurance of the vehicles, just as before the transaction. (PX1079 at 10281-83; PX1081 at 10308-12.)

Ernst & Young served as the appraiser. (PX1004.) AIG-FP Funding (Cayman) Limited served as non-recourse lender, and AIG-FP Special Finance (Cayman) Limited and AIG Matched Funding Corporation served as payment undertakers. (PX1000 at 2436-37.) The FTA did not contribute any federal funds for the Caltrans assets, so the FTA did not need to approve the SILO transaction. (Whitman, Tr. 1278.) The law firm of King & Spalding represented Wells Fargo in this transaction. (PX1000 at 11255.) FSA provided a surety

bond for "Equity Strip Exposure Risk," the difference between Wells Fargo's investment and the partial cash defeasance.  Id. at 11247.

### 3.  Houston Metro

In early 1999, Houston Metro distributed an RFP for a lease advisor, seeking advice on leveraged leases, including which of its assets would be appropriate for a leveraged lease. (McCalley, Tr. 584; Britton, Tr. 1172-73.)  Houston Metro received multiple responses to the RFP, and ultimately selected Capstar and McCalley Consulting to share the position of lessee advisor.  (McCalley, Tr. 583-84; Britton, Tr. 1174-75, 1177, 1199-1200; DX259.) Capstar and McCalley prepared an offering memorandum and circulated it to potential equity investors.  (McCalley, Tr. 591-92.)

Wells Fargo's transaction with Houston Metro closed on May 2, 2002.  (PX1320 at 24777.)  This transaction consisted of 286 buses divided into three equipment lots based upon bus type and year placed in service.  (PX1255 at 26241; Britton, Tr. 1177-78.)  Equipment Lot 1 consisted of 45 commuter buses manufactured by Motor Coach Industries ("MCI") and 126 transit buses manufactured by New Flyer of America, which were placed in service in late 2001.  Equipment Lot 2 consisted of 41 transit buses manufactured by New Flyer which were placed in service in 2001.  Equipment Lot 3 consisted of 74 transit buses manufactured by New Flyer, which were placed in service during 2000.  (PX1255 at 26239, 26256-58, 26263, 26276; PX1325 at 24899-902; PX1326 at 25273; PX1327 at 25352-54.)

Houston Metro leased the transit and commuter buses to Wells Fargo for a term of 50 years, to May 2, 2052.  Wells Fargo simultaneously leased the buses back to Houston Metro for terms that ended on January 1, 2013, January 1, 2014, and January 1, 2015.  (PX1320 at 24777; PX1322-27.)  Houston Metro retained the right to exclusive use, possession and quiet enjoyment of the buses, and remained solely responsible for the operation, maintenance, repair and insurance of the buses, just as before the transaction.  (PX1322 at 24806-09; PX1324 at 24839-44.)  Comerica Bank also closed a similar transaction with Houston Metro on May 2, 2002.  (PX1380.)  King & Spalding served as Wells Fargo's tax counsel.

FSA served as the non-recourse lender.  (PX1229 at 252648.)  FSA also provided a surety bond covering the Equity Strip Exposure Risk, and ACE Guaranty Re, Inc. provided secondary support for FSA's obligations.  Id.  The FTA had provided federal grant funds for the purchase of Houston Metro's buses, and thus the FTA approved Houston Metro's SILO transaction with Wells Fargo and Comerica Bank.  (PX1243, PX1245.)

A former Houston Metro executive understood that LILO and SILO "leveraged leases" were mechanisms "whose purpose is to transfer depreciation benefits from Metro,

which [as] a government agency could not use them, to someone who could in return for a cash benefit to Metro." (Britton, Tr. 1169; DX317 at 09-0002.)

### 4. <u>Washington Metropolitan Area Transit Authority</u>

Through an RFP process, WMATA selected Allco to serve as arranger and Public Finance Management to serve as WMATA's financial advisor. (Pohl, Tr. 853; Whitman, Tr. 1265, 1271-72.) Allco introduced WMATA to Wells Fargo, who was selected to serve as the equity investor. (Pohl, Tr. 856; Whitman, Tr. 1265.) Allco's role in the WMATA transaction was similar to its involvement in the Caltrans transaction. (Whitman, Tr. 1289.)

Wells Fargo's transaction with WMATA closed on September 10, 2002. (PX1515.) WMATA leased 42 subway cars to Wells Fargo for 80 years, to September 10, 2082. Wells Fargo simultaneously leased the cars back to WMATA for just over 18 years, to January 1, 2021. (PX1515 at 59651; PX1516-19.) WMATA retained the right to exclusive use, possession and quiet enjoyment of the vehicles, and remained solely responsible for the operation, maintenance, repair and insurance of the vehicles, just as before the transaction. (PX1516 at 59718-20; PX1518 at 59744-49, 59757.) WMATA used documents from earlier LILO transactions as templates or "precedent documents" for its SILO transaction with Wells Fargo. (Pohl, Tr. 917.)

An Italian firm, Breda, manufactured these Series 3000 heavy subway cars for WMATA. (PX1430 at 233351.) The subway cars were divided into two equipment lots based upon in-service dates. (PX1448 at 62320-21, 62330; Pohl, Tr. 852, 919.) Equipment Lot 1 consisted of 38 subway cars placed into service in 1985. Equipment Lot 2 consisted of four subway cars placed into service in 1987. (PX1448 at 62330; PX1519 at 60816; PX1520 at 60692.) At the closing date for this transaction, the subway cars were undergoing an overhaul and were projected to be placed back in service between 2002 and 2005. The rebuilt cars were expected to be in "as new" condition. (PX1448 at 62320-21.)

AIG-FP Funding (Cayman) Limited served as the non-recourse lender. (PX1430 at 233351.) Ambac Assurance Corporation provided a surety bond to cover the Equity Strip Exposure Risk. <u>Id.</u> AIG Matched Funding Corporation served as the debt and equity payment undertaker. (PX1430 at 233355.) The King & Spalding law firm represented Wells Fargo in this transaction. (PX1430 at 233359.) The FTA had provided federal funds to WMATA for the purchase of the subway cars, and thus the FTA approved WMATA's SILO transaction with Wells Fargo. (PX1442-43.)

5. Belgacom Mobile, S.A.

Belgacom selected ABN AMRO to serve as "advisor, arranger and project manager" for the Belgacom transaction. (PX475 at 2035.) Belgacom instructed ABN AMRO "to seek underwritten offers from a select number of US equity investors." (PX475 at 2036.) Wells Fargo's predecessor, Norwest, became involved in the Belgacom transaction after receiving an equity information memorandum from ABN AMRO, which provided information on the transaction's equipment, terms, and economics. (Grossman, Tr. 2028-30; PX475.)

Wells Fargo's transaction with Belgacom closed on December 19, 1997. (PX688.) Belgacom was Wells Fargo's first cross-border leasing transaction. (Rupprecht, Tr. 154; Oram, Tr. 507; Grossman, Tr. 2007-08.) This transaction consisted of two lots of GSM[5] cellular telecommunications equipment, numbered 1997-3 and 1997-4. Belgacom granted Wells Fargo equipment rights to the 1997-3 lot for just over fifteen years, to January 2, 2013, and to the 1997-4 lot for just over fourteen years, to January 2, 2012. (PX686-87; PX765-66.) Stichting Stella, a Dutch special purpose entity created by Belgacom, leased the same equipment from Wells Fargo for terms ending on July 2, 2011 (lot 1997-3) and July 2, 2010 (lot 1997-4). (PX679-80; PX758-59.) Stichting Stella simultaneously leased the equipment back to Belgacom, also until July 2, 2011 and July 2, 2010 respectively. (PX681-82; PX760-61.) Even with Stichting Stella involved as an intermediary, Belgacom retained the right to exclusive use, possession and quiet enjoyment of the equipment, and remained solely responsible for the operation, maintenance, repair and insurance of the equipment, just as before the transaction. (PX681 at 83305-07, 83313; PX686 at 8598, 8603.)

The Lot 1997-3 equipment was manufactured by Alcatel and consisted of the two main parts of a Base System Subsystem, known as the Base Station Controller and the Base Transceiver Station. (PX717 at 9519-21, 9551-58.) The Lot 1997-4 equipment was manufactured by Nokia, and consisted generally of the same types of equipment. (PX717 at 9521-23, 9560.)

For the Belgacom transaction, Wells Fargo was part of a consortium assembled by Ameritech. (DX44 at 222362; DX183 at 1440.) Ameritech was the lessor for lot 1997-1, and the Bank of Montreal was the lessor for lot 1997-2. (PX671 at 1061.) These 1997-1 and 1997-2 transactions closed on December 22, 1997.

Wells Fargo recognized in its Belgacom credit approval presentation that the SILO "transaction differs from the traditional leveraged lease in that the debt obligation will be

---

[5] "GSM" is a popular Global System for Mobile communications, used throughout the world.

fully cash defeased from the inception of the transaction, and the equity investor [Norwest Equipment Finance, Inc.] will be substantially cash defeased." (DX44 at 222361.)

In 1999, Wells Fargo and Belgacom executed a Substitution Agreement for the 1997-3 transaction. (PX595.) The parties agreed to substitute "replacement equipment," separately acquired by Belgacom, for the equipment originally identified in the 1997-3 transaction. Id. at 9921.

### H. Other SILO Characteristics

#### 1. Tax-Exempt Entity's Use and Possession of the Assets

In each SILO transaction, the tax-exempt entity had acquired and was using the property before it entered into the transaction. (Pohl, Tr. 915; Webb, Tr. 989; Bronte, Tr. 1116-17; Britton, Tr. 1212; DX15 at 1294, 1304; DX44 at 222362.) The WMATA rail cars had been in operation for up to seventeen years prior to the SILO transaction. (Pohl, Tr. 915.) Despite the execution of the lease documents, the SILO transaction did not alter the tax-exempt entity's continuing use of the SILO property. Also, the transit agencies did not segregate or treat the SILO rail cars or buses any differently than their other equipment. (Pohl, Tr. 921-22; Webb, Tr. 985, 999; Bronte, Tr. 1119; Britton, Tr. 1219-20.) Caltrans, for example, has spent millions of dollars of its own money to overhaul the rail cars subject to the SILO transaction. (Bronte, Tr. 1121-23; DX252 at 54-56.) There is no evidence that the transit agencies entered into SILOs as a way to dispose of the rail cars or buses. The transit agencies needed their rail cars and buses at the time of entering into the SILO transactions, and they expected to continue using these assets in service. (Pohl, Tr. 921-22; Webb, Tr. 1071; Bronte, Tr. 1118; Britton, Tr. 1198.)

Similarly, Belgacom did not alter its use of the cellular telecommunications equipment in any way as a result of the SILO transaction. Just as before the SILO, Belgacom continued as the legal owner of the property, and claimed tax ownership and depreciation deductions under Belgian law. (DX186 at 002-03; DX703.) Thus, Wells Fargo and Belgacom were both claiming tax ownership and depreciation deductions in their respective countries for the same equipment.

#### 2. Termination of the SILO Through a Pre-funded "Purchase Option"

Each SILO transaction, like a LILO, contains a mechanism for the tax-exempt entity to terminate the transaction, the pre-funded "purchase option." In the transit SILOs, the "fixed purchase option" ("FPO") arises at the end of the lease-back terms. (PX908 at 180367, NJT; PX1081 at 10325, Caltrans; PX1324 at 24857, Houston Metro; PX1518 at 59767, WMATA.) In the Belgacom SILO, "early buy-out options" ("EBOs") arise 3-1/2

years before the end of the lease-back terms. (PX757 at 9187; PX758 at 9237.) In each transaction, the tax-exempt entity can exercise its option simply by giving notice to Wells Fargo. Exercise of the option then terminates the SILO, including the head leases or equipment agreements, and the SILO ends. The SILO property has never left the possession or control of the tax-exempt entity.

The tax-exempt entities do not use any of their own funds to exercise the FPO or EBO and terminate the transaction. The options are fully funded with money supplied by Wells Fargo at closing. The "books are cleared" by offsetting accounting entries and the return to Wells Fargo of the money it put into the transaction. This money had been set aside in a secure account for Wells Fargo's benefit until the FPO or EBO date. (McCalley, Tr. 634; Shinderman, Tr. 3771-72; PX821 at 35910; PX1229 at 252680; PX1430 at 233381; PX1000 at 11278; DX44 at 222363.)

Wells Fargo required the tax-exempt entities to state in Tax Indemnity Agreements that they had not, at the time of closing, made any determination on whether to exercise the FPOs or EBOs. (PX912 at 180248.) Wells Fargo required these statements to support its claim for tax benefits. The evidence, however, strongly supports a conclusion that the FPOs and EBOs would almost certainly be exercised to terminate the transactions. Id. For example, William Bassett of Caltrans testified "the probabilities were very high that we would exercise that . . . ." (Bassett, Tr. 4077.) Capstar's John Hackett wrote to Houston Metro that "we fully anticipate that you will buy the buses back with the defeasance proceeds . . . ." (DX276 at 180.) In the NJT transaction, the request for board approval of the SILO described the projected completion date as "approximately 26 years" from approval, which is the FPO date at the end of the lease-back. (DX345 at 4500; Webb, Tr. 1060-61.) NJT has engaged in other similar transactions with purchase option dates that have already passed, and in every case, NJT has exercised the option to terminate the transaction at that point. (Webb, Tr. 1066-68.) The EBO dates in the Belgacom SILO also have passed, and in both lots, Belgacom exercised the EBOs. (PX653, PX658.) Defendant's expert, Dr. Thomas Lys, confirmed that the FPO was nearly certain to be exercised. (Lys, Tr. 4506.)

### 3. Wells Fargo's Options if the FPOs Were Not Exercised

In the transit SILOs, if the transit agency failed to terminate the transaction through exercise of the purchase option, Wells Fargo then would have two choices: (a) to demand the delivery of some or all of the rail cars or buses to Wells Fargo for resale; or (b) to require the transit agency to arrange a "service contract" at the transit agency's expense. Wells Fargo also could combine these choices by electing the delivery of some vehicles, and a service contract as to other vehicles. Under the service contract procedure, the transit agency, or another entity which the transit agency must find and propose for Wells Fargo's approval, would have to use the vehicles for a defined multi-year term after the end of the

lease-back period.  (PX908 at 180368-70, NJT; PX1081 at 10326-29, Caltrans; PX1324 at 24858-60, Houston Metro; PX1518 at 59769-71, WMATA.)  The service contract term varied from seven to fourteen years among the four transit SILOs.  (PX904 at 180481, NJT; PX1077 at 10252, Caltrans; PX1320 at 24777, Houston Metro; PX1515 at 59651, WMATA.)  The transit agency would not know which choice Wells Fargo would make until only eleven or twelve months before losing its equipment, or being required to use it under a new service contract.  (See, e.g., DX706 at 22-25.)

If Wells Fargo elected to impose a service contract, the transit agency would not only need to arrange a service contract, but also fulfill other requirements: (a) find an "operator" acceptable to Wells Fargo to run the transit service, and negotiate an operating agreement; (b) arrange for refinancing of the outstanding non-recourse debt; (c) in Caltrans and WMATA, obtain and pay for a letter of credit for the benefit of the refinancing lender; (d) in Caltrans, WMATA, and Houston Metro, procure and pay for residual value insurance in coverage amounts specified at closing, for the benefit of Wells Fargo; (e) satisfy the equipment's physical "return conditions;" and (f) at Wells Fargo's request, enter into new defeasance arrangements for the benefit of Wells Fargo, to secure payment of amounts owed to Wells Fargo under the service contract.  (PX904 at 180469, 180476; PX908 at 180368-71, NJT; PX1077 at 10246, 10252; PX1081 at 10326-29, Caltrans; PX1320 at 24777; PX1324 at 24858-59, Houston Metro; PX1515 at 59651; PX1518 at 59769-72, WMATA; DX706A at 7-20; PX821 at 35882; PX1000 at 11252, 11256, 11278; PX1229 at 252653, 252680; PX1430 at 233356-57, 233381; Johnson, Tr. 1765-66.)

Other service contract requirements in each SILO are:  (i) arrange for the purchase of additional equipment by the service recipient, if necessary; (ii) arrange for the service recipient to have rights to land and infrastructure, if necessary; (iii) satisfy Wells Fargo's credit policies by the service recipient; and (iv) provide an "opinion of independent tax counsel" selected by Wells Fargo stating that entry into the service contract by the transit agency, or anyone related to it under IRC § 168(h)(4) will not "result in any material adverse federal income tax consequences" to Wells Fargo, if the transit agency wants to be the service recipient, and continue to use its equipment.  (See, e.g., PX1515 at 59643; PX1518 at 59769.)

The transit agency must meet all of the above requirements in the eleven to twelve months after Wells Fargo provides notice that it intends to impose a service contract.  If the transit agency fails to meet all of the service contract conditions and requirements, the transaction effectively would revert to the FPO.  (See, e.g., PX908 at 180377, §§ 16(h)(A), 17(i)-(j); PX1518 at 59772.)

4. Belgacom's Exercise of the EBOs

The Belgacom SILO did not contain the service contract option. Instead, the agreement provided that if Belgacom did not terminate the SILO at the EBO dates, the lease-backs would continue for another 3-1/2 years until the end of their original terms. At that point, Belgacom would need to comply with significant "return conditions." (Rupprecht, Tr. 168; PX679 at 8252; PX758 at 9236-37.) Belgacom would be required to purchase the equipment, renew the lease-back for up to four one-year terms, or surrender the equipment to Wells Fargo. (PX679 at 8252-53; PX758 at 9236-37.) Any renewals or purchase would be at specially defined "fair market rental value" or "fair market sales value," which assumed that the return conditions had been satisfied. (PX678 at 8210; PX757 at 9193.)

Upon entering into the Belgacom SILO, Wells Fargo expected Belgacom to terminate the transaction at the EBO point. (Rupprecht, Tr. 160-61, 167, 173-74.) Wells Fargo stated in its CAP that "[t]he EBO is expected to be exercised." (DX44 at 222364.) Wells Fargo described the return conditions as "strict and onerous," and one of the reasons that Belgacom would exercise the pre-funded EBO. Id. In annual reviews of the Belgacom SILO, Wells Fargo stated:

> The lease provides an early buyout option to the Sublessee in the 10th year and [Wells Fargo] is expecting Belgacom to exercise this option. The original return provisions of the lease were written with the intention of being overly onerous to make the lease-end return of any equipment an unattractive option.

(PX622 at 241813; see also PX199, PX626-27, PX635, DX702 at 20408-09.) As expected, Belgacom terminated both the 1997-3 and 1997-4 SILOs in 2007 and 2008 by exercising the EBOs. (PX653, PX658, PX741; Rupprecht, Tr. 204.)

I. The SILO's Financial Structure

The financial structure of the SILOs, though composed of multiple components, effectively consists of two circular flows of money, a debt loop and an equity loop. In the debt loop, the SILO's head lease seemingly provides for a large payment at closing from Wells Fargo to the tax-exempt entity. Each payment is funded by the proceeds of a non-recourse loan made to Wells Fargo, and from a smaller investment by Wells Fargo. In each SILO, however, all the proceeds of the non-recourse loan are given immediately to a debt payment undertaker, which is an affiliate of the lender. Also, most of Wells Fargo's contribution is transferred to an equity payment undertaker, which is intended to fund the FPO or EBO at a later date. The tax-exempt entity receives only a modest incentive payment at closing.

The sublease in each SILO seemingly provides for rent payments by the tax-exempt entity to Wells Fargo during the lease-back period. However, the tax-exempt entity does not supply any of its own funds to pay rent. Instead, the debt payment undertaker agrees to make the rent payments from the proceeds it received from its affiliate at closing. Wells Fargo does not receive rent payments because it has assigned its rights to the lender as collateral for the non-recourse loan. The rent payments are set to match in timing and amount the payments due on the non-recourse loan. (Lynch, Tr. 3700.) Thus, during the lease-back period, the rental and debt service obligations are satisfied by offsetting book-keeping entries within the lender and debt payment undertaker group, and no cash changes hands between the parties to the leases.[6]

At the FPO and EBO dates, the "purchase" by the tax-exempt entity terminating the transaction is funded by a combination of (a) the money supplied by Wells Fargo and set aside in the equity payment undertaking arrangement, and (b) the termination of the outstanding debt by either a final payment from the debt payment undertaker to the lender, or the offset of a "prepaid rent loan," payable to the tax-exempt entity at that time against the purchase price. In all cases, the tax-exempt entity does not supply any funds to exercise the FPO or EBO, and the original non-recourse debt is paid without Wells Fargo having to supply any funds. The money set aside in the equity payment undertaking arrangement is returned to Wells Fargo. This "equity loop" may be extended past the FPO or EBO dates if the transaction is not terminated at this point. If so, the SILO structure still provides for the return of Wells Fargo's entire investment to it.

1. Cash Flow at Closing – The Incentive Fee

The SILO's cash flow at closing is reflected in the memorandum prepared for each transaction. (DX356, NJT; DX80, Belgacom; PX1022, Caltrans; PX1380, Houston Metro; PX1590, WMATA.) The incentive fee paid to the tax-exempt entity typically was a percentage of the equipment's appraised value, higher for rail cars and lower for buses. (McCalley, Tr. 673-74.) The incentive fee was the only monetary benefit that the tax-exempt entity received. Id.

a. New Jersey Transit

At the closing on February 1, 2001, Wells Fargo transferred an "equity commitment" of $10,909,392.76 to an account at State Street Bank, and the non-recourse lender, AIG-FP Funding (Cayman) transferred $60,650,607.24 to the same account. (DX356 at 35855.) State Street Bank then transferred these combined funds of approximately $71.5 million to

_____

[6] An exception exists in the Belgacom transaction, where Merrill Lynch, the equity payment undertaker, makes a few payments to Wells Fargo during the lease-back period.

an account assigned to NJT as the head lease payment. However, the $60,650,607.24 loan proceeds were immediately taken out of the NJT account, pursuant to the Debt Payment Agreement, and transferred to AIG-FP Special Finance (Cayman), the debt payment undertaker. (DX356 at 35856.) Pursuant to an Equity Payment Agreement, $7,022,180.25 was transferred from the NJT account to AIG Financial Products (Jersey), the equity payment undertaker. Id. NJT received and retained only $3.8 million of the $71.5 million head lease payment. (DX356 at 35857; PX907 at 180411; Webb, Tr. 1031-38.)

### b. California Department of Transportation

In Caltrans Lots 1 and 2, Wells Fargo's equity commitment of $14,524,125.24 and the non-recourse loan proceeds of $54,005,874.76 from AIG-FP Funding (Cayman) were transferred to separate bank accounts. These amounts were then assigned to Caltrans to pay the head lease basic rent of $68.5 million. However, the $54,005,874.76 loan proceeds were immediately reassigned to AIG-FP Special Finance (Cayman) pursuant to the Debt Payment Agreement. The $14,524,125.24 equity contribution from Wells Fargo was also transferred to AIG Matched Funding Corporation, the equity payment undertaker, to pay the equity undertaking fee. Caltrans received its incentive fee from what remained of the equity contribution after a letter of credit was purchased and after AIG Matched Funding Corporation subtracted fees of approximately $6.9 million. (PX1022.)

### c. Washington Metropolitan Area Transit Authority

In WMATA Lots 1 and 2, Wells Fargo's equity commitment of $21,052,000.00 and non-recourse loan proceeds of $77,648,000.00 were transferred to two bank accounts. These accounts were assigned to WMATA as payment of the head lease rent of $98.7 million. However, pursuant to the Debt Payment Agreement, WMATA immediately assigned the non-recourse loan proceeds to AIG-FP Special Finance (Cayman). In order to pay the Equity Letter of Credit fee for the equity undertaking arrangement, Wells Fargo's equity contribution of $21,052,000.00 was transferred to AIG Matched Funding Corporation. After AIG Matched Funding Corporation subtracted its fee of approximately $16.2 million, WMATA received its incentive payment of $4.8 million. (PX1590.)

### d. Houston Metro

In Houston Metro Lots 1 through 3, Wells Fargo transferred an equity commitment of $13,531,054.00 to an account at a Wells Fargo affiliate, and the lender, FSA, transferred $70,849,945.55 to the same account. These combined funds of approximately $84.3 million were transferred to an account assigned to Houston Metro as the head lease payment. However, pursuant to the Debt Payment Agreement, the $70,849,945.55 loan proceeds were immediately transferred out of Houston Metro's account, and paid to Premier International,

an affiliate of FSA, the debt payment undertaker. Approximately $11.3 million of Wells Fargo's equity commitment was used to purchase securities in order to fund the equity payment arrangement. The securities were transferred to a custodial account at Wells Fargo where they were held as collateral and pledged to Wells Fargo. Houston Metro thus received an up-front benefit of only $2.1 million at closing. (PX1380.)

### e. Belgacom Mobile, S.A.

In Belgacom lot 1997-3, Well's Fargo's equity commitment of $5,625,082.14 was combined with the non-recourse loan proceeds of $19,855,005.24 and then transferred to a bank account assigned to Belgacom as required in the Equipment Agreement. The $25.5 million was transferred to Stichting Stella, Belgacom's Dutch special purpose entity, under the sublease. However, the non-recourse loan proceeds of $19,855,005.24 were immediately transferred back to an affiliate pursuant to the Deposit Agreement. Under the Equity Payment Undertaking Arrangement, Stichting Stella immediately transferred $4,494,000.00 to Merrill Lynch. Belgacom received only $1.1 million as its incentive payment. Belgacom 1997-4 was a similar transaction, though in smaller amounts. (DX80 at 308-27; DX187.)

### 2. Loop Debt and the Debt Payment Undertakings

Each SILO transaction includes a non-recourse loan and debt payment undertaking agreement provided by affiliated entities. Pursuant to these agreements, and the participation agreements, all of the non-recourse loan proceeds in each transaction were returned, as a non-refundable fee at closing, to the affiliate of the lender acting as the debt payment undertaker. In return for the fee, the debt payment undertaker agreed to make payments to the lender that match, in timing and amount, the debt service payments owed to the lender on the non-recourse debt. Thus, the debt service and debt undertaking payment schedules are mirror images of each other. The lender also received a security interest in the payments owed by the debt payment undertaker. As a result, the loan in each transaction effectively is repaid with the loan proceeds themselves at closing. This circular, secured intra-bank flow of funds is called "loop debt." (McCalley, Tr. 656-57; Webb, Tr. 1045-47; Whitman, Tr. 1385; Johnson, Tr. 1793; Mortimer, Tr. 3642-44; Schroeder, DX722 at 52; DX582 at 253912.) Wells Fargo employed this type of loop debt and debt payment undertaking arrangement in each of the five trial transactions.

### a. New Jersey Transit

The NJT Debt Payment Agreement requires NJT to pay an undertaking fee of $60,650,607.24 to AIG-FP Special Finance (Cayman) at closing, the same amount of the non-recourse loan that AIG-FP Funding (Cayman) made to Wells Fargo, and that Wells Fargo transferred to NJT at closing as part of the head lease payment. (PX910; PX911 at

180265; PX913 at 255686.)  Payment of this fee to AIG-FP Special Finance (Cayman) was "absolute, unconditional and irrevocable," and NJT had no further "right, title or interest" to the fee.  (PX913 at 255686-87.)  In return, AIG-FP Special Finance (Cayman) agreed to make certain scheduled payments to AIG-FP Funding (Cayman), the lender in the transaction, so long as the Debt Payment Agreement was pledged to AIG-FP Funding (Cayman), but otherwise to Wells Fargo, or as designated by Wells Fargo and NJT.  (PX913 at 255687, 255703.)  Under the loan agreement, Wells Fargo pledged and assigned all rights to payments by AIG-FP Special Finance (Cayman) under the Debt Payment Agreement to the lender, AIG-FP Funding (Cayman).  (PX910 at 180274-75; PX913 at 255689, §3.04(b); PX915.)

The scheduled payments under the Debt Payment Agreement exactly match in timing and amount the payments due to AIG-FP Funding (Cayman) on the non-recourse loan it nominally made to Wells Fargo, as well as NJT's rental payments under the sublease.  (PX909 at 180314; PX910; PX911 at 180269; PX913 at 255703.)  The one exception is the final year of the sublease when the debt payment undertaker has agreed to make a payment of $93,866,709.58, but there is no rental payment due at that time.  (PX913 at 255703; PX909 at 180314.)  This final payment is, instead, intended to fund one of the payments due under the FPO, and would be made by AIG-FP Special Finance (Cayman) to AIG-FP Funding (Cayman) because a $93 million final loan payment is scheduled for the FPO date.  (PX909 at 180342; PX911 at 180269.)  As a result of this arrangement, NJT does not use any of its own funds to pay rent under the sublease or to fund the $93 million nominal payment for the FPO.  The sublease rent is satisfied by the nominal payments from AIG-FP Special Finance (Cayman) to AIG-FP Funding (Cayman).  Similarly, Wells Fargo does not use any of its own funds to pay the non-recourse loan, and the loan proceeds return immediately to the consolidated AIG group.  (Lynch, Tr. 3669-75, 3700.)  The rental schedule and the FPO amount are determined by the software and mathematical model used to structure the transactions.  (Webb, Tr. 1056-57.)

The circular flow of funds on the debt side of the transaction is completed within one day.  On the closing date, AIG-FP Funding (Cayman) received the $60,650,607.24 principle for the non-recourse loan from AIG-FP Investment Company (Bermuda) Limited, the parent company for both AIG-FP Funding (Cayman) and AIG-FP Special Finance (Cayman).  These funds are routed through the NJT SILO at closing, first as the non-recourse loan from AIG-FP Funding (Cayman) to Wells Fargo, then as part of the head lease payment to NJT, and then as the fee paid to AIG-FP Special Finance (Cayman).  (Lynch, Tr. 3675; DX358.)  The $60,650,607.24 is returned to AIG-FP Investment Company (Bermuda) Limited, also on the closing date.  Thus, the funds started with and are returned to AIG within one day, and the "payments" on the non-recourse loan and of the sublease rent consist of AIG internal accounting entries.

The offsetting payments under the non-recourse loans and the debt payment undertakings match in timing and amount, and therefore the interest rate on the non-recourse loan equals the implicit interest rate in the debt payment agreement. (Webb, Tr. 1046-47; PX829 at 37394; PX911 at 180265; DX15 at 1305; DX187 at 19816; DX236; PX1085.) Further, there is no funding cost for the non-recourse loan because the loan proceeds are returned immediately to the lender group.  Except for momentarily passing through designated accounts on the day of closing, the loan principle does not leave the lender and debt payment undertaker group.  (Whitman, Tr. 1385.)  The loan and debt payment undertaking effectively cancel each other out.  Reflecting this reality, the non-recourse loan does not appear on AIG's consolidated books.  (Lynch, Tr. 3700.)  Rabobank, the parent of the lender and debt payment undertaker in Belgacom, also netted the non-recourse loan against the debt payment for a consolidated effect of zero.  (DX187 at 19820, 20053.)

For Wells Fargo, the purpose of the loop debt arrangement was to set up a tax deduction for the loan interest.  As ABN AMRO stated in its Belgacom proposal, although the "cash flow is circular, there is a small tax benefit available by having a higher debt rate since the US Lessor gains a higher tax deduction from the higher interest charge."  (DX12 at 1120; see also Johnson, Tr. 1788.)

### b.  California Department of Transporation

The Caltrans Debt Payment Agreement requires Caltrans to pay an undertaking fee of $54,005,874.76 to AIG-FP Special Finance (Cayman), the same amount of the non-recourse loan that AIG-FP Funding (Cayman) made to Wells Fargo.  Payment of this fee was "absolute, unconditional and irrevocable" and Caltrans had no further "right, title or interest" to the fee.  (PX1085; PX1086; PX1088 at 10415.)  In return, AIG-FP Special Finance (Cayman) agreed to make certain scheduled payments to AIG-FP Funding (Cayman) and to Wells Fargo.  (PX1088 at 10416, 10433-34.)  Under the loan agreement, all rights to payments under the Debt Payment Agreement were assigned to AIG-FP Funding (Cayman) as collateral for the loan.  (PX1089; PX1084 at 11009-11; PX1088 at 10418 §3.04(b).)

The scheduled payments under the Debt Payment Agreement exactly match in timing and amount the payments due to AIG-FP Funding (Cayman) on the non-recourse loan it nominally made to Wells Fargo, as well as Caltrans' rental payments under the sublease. (PX1085 at 11049; PX1086 at 1055; PX1088 at 10433-34; PX1082 at 10369; PX1083 at 10990; DX701 at 20385.)  As a result of this arrangement, Wells Fargo does not use its own funds to pay the non-recourse loan, nor does Caltrans use its own funds to pay rent under the sublease.  (DX701 at 20340-41.)  As in NJT, AIG completed the loop of funds within its consolidated group, sending the $54 million debt undertaker fee back to AIG-FP Investment Company (Bermuda) Limited, the parent and ultimate source of the non-recourse loan funds, after it was received by AIG-FP Special Finance (Cayman).  (DX243.)

In Caltrans, the non-recourse loans for Equipment Lots 1 and 2 from AIG-FP Funding (Cayman) are designed to be paid by AIG-FP Special Financing (Cayman) in 2011 and 2012. (PX1085 at 11049; PX1086 at 11050.)   Because the loan payments, debt undertaking payments and sublease rental payments always match, these large loan payments within AIG mean that, on paper, Caltrans also makes large prepayments of sublease rents in 2011 and 2012. However, Caltrans does not actually give any funds to Wells Fargo. This arrangement is deemed to create "prepaid rent loan balances" because the prepayments to Wells Fargo are treated as a loan from Caltrans to Wells Fargo. (PX1082 at 10371; PX1083 at 10992.)   By the FPO date, the prepaid rent loan balances increase to an amount greater than the original non-recourse loan.   Wells Fargo does not pay any interest to Caltrans during this time. (PX1082 at 10371; PX1083 at 10992.)   Upon exercise of the FPO, these balances are offset in Wells Fargo's books against the FPO "purchase price."   (PX1083 at 10992, 11005 (see footnotes); PX1082 at 10371, 10383 (see footnotes); DX701 at 20342, ¶¶ 34-35.)   Thus, Caltrans differs from NJT in that the debt payment undertaker is no longer a part of the transaction at the FPO point, and instead of the debt payment undertaker funding a portion of the FPO, as in NJT's case, the debt portion of the FPO is funded by offsetting the prepaid loan against the FPO.   (PX1082 at 10371; PX1083 at 10993; DX701 at 20342.)   However, just as in NJT, Wells Fargo and Caltrans do not exchange funds upon exercise of the FPO, nor does Caltrans need to supply any of its own funds to exercise the FPO.   The remaining portion of the FPO is funded by the Equity Payment Undertaking Agreement.   See, e.g., DX701 at 20340; PX1091 at 10470; PX1082 at 10383; PX1000 at 11278 ("[l]essee has all the cash necessary (in the defeasance funds) to purchase the Equipment at the FPO point.")

### c.  Washington Metropolitan Area Transit Authority

The WMATA Payment Agreement provides for WMATA's payment of an up-front fee of $77,648,000.00 to AIG-FP Special Financing (Cayman), the same amount of the non-recourse loan.   Payment of this fee was "absolute, unconditional, and irrevocable," and WMATA had no further "right, title or interest" to the fee.   (PX1525 at 59878; PX1524 at 60604, 60611.)   In return, AIG-FP Special Funding (Cayman) agreed to make certain scheduled payments to AIG-FP Funding (Cayman), so long as the agreement was pledged to AIG-FP Funding (Cayman), but otherwise to Wells Fargo.   (PX1525 at 59879, 59901-02.) Under the loan agreement, Wells Fargo pledged all rights to payments under the Payment Agreement to AIG-FP Funding (Cayman).   (PX1523 at 59837-38; PX1525 at 59899.)

The scheduled payments under the Debt Payment Agreement exactly match in timing and amount the payments due to AIG-FP Funding (Cayman) on the non-recourse loan it nominally made to Wells Fargo, as well as the rent due under the sublease. (PX1524 at 60610, 60617; PX1519 at 60817; PX1520 at 60693; PX1525 at 59901-02; DX701 at 20386.) As a result, Wells Fargo does not use its own funds to pay the non-recourse loan, nor does WMATA use its own funds to pay the sublease rent.   (DX701 at 20346-48.)   AIG also

-34-

completed the loop of funds within its consolidated group, sending the $77.6 million debt undertaker fee back to AIG-FP Investment Company (Bermuda) Limited, the parent and ultimate source of the non-recourse loan funds, on the day of closing. (DX427-29.)

WMATA, like Caltrans, was designed to have the non-recourse lender paid off before the FPO date, creating the appearance of a large prepayment of rent on paper. (PX1524 at 60610, 60617; PX1519 at 60817; PX1520 at 60693.) Thus, just as in Caltrans, a "prepaid rent loan balance" is created, and grows until the FPO date, at which time it is used as an offset to the FPO price upon exercise of the FPO. WMATA and Wells Fargo do not exchange funds, and the FPO is fully funded without WMATA supplying any funds. (PX1519 at 60819, 60829; PX1520 at 60695, 60705; DX701 at 20349; PX1430 at 233381 ("[l]essee will have all the cash necessary (in the defeasance funds) to purchase the Equipment at the FPO point."))

### d.  Houston Metro

The Houston Debt Payment Agreement requires Houston Metro to pay an undertaking fee of $70,849,945.55 to Premier International Funding, the same amount of the three non-recourse loans for three lots of buses. Payment of this fee to Premier International Funding was "absolute, unconditional and irrevocable," and Houston Metro had no further "right, title or interest" to the fee. (PX1333 at 25014-15; PX1329-31.) In return, Premier International Funding agreed to make certain scheduled payments to FSA Global Funding, the lender in the transaction, so long as the Debt Payment Agreement was pledged to FSA Global Funding, but otherwise to Wells Fargo. (PX1333 at 25015, 25031-33.) Under the loan agreement, all rights to payments under the Debt Payment Agreement were pledged to FSA Global Funding. (PX1333 at 25017, § 3.4; PX1334; PX1328 at 24936-37.)

The scheduled payments under the Debt Payment Agreement exactly match in timing and amount the payments due to FSA Global Funding on the non-recourse loan it nominally made to Wells Fargo, as well as the rent due under the leases. (PX1329 at 24973; PX1330 at 24978; PX1331 at 24983; PX1333 at 25031-33; PX1325 at 24903; PX1326 at 25274; PX1327 at 25355; DX701 at 20387-89.) These payments were guaranteed by Financial Security Assurance. (PX1335-37.) The one exception for all three lots is in the final year when Premier International Funding, the debt payment undertaker, is scheduled to make payments, but there are no rental payments due at that time. (PX1325 at 24909; PX1333 at 25031; DX701 at 20357, ¶ 80.) Thus, Wells Fargo does not use its own funds to pay the non-recourse loan. Similarly, Houston Metro does not need to contribute any funds to pay rent. (DX701 at 20356.)

Houston Metro also incorporated the "prepaid rent loan balance" feature, in part. Just as in WMATA and Caltrans, large, early payments of the loan balance by the debt payment

undertaker to the lender, and equal payments of rent create a prepaid loan balance that grows on Wells Fargo's internal books, and is then used to partially offset the FPO price, when the FPO is exercised. (PX1325 at 24905, 24909; DX701 at 20357.) As a result, Houston Metro does not supply any funds to exercise the FPO. (PX1229 at 252680 ("[l]essee has all the cash necessary (in the defeasance funds) to purchase the Equipment at the EBO point."))

Premier International Funding, the debt payment undertaker, and FSA Global Funding, the lender, are affiliates. FSA Global Funding Group completed the loop of funds within this transaction, just as AIG did in the other SILO transactions. (Mortimer, Tr. 3626-31.) Premier International Funding sent the $70.8 million debt undertaker fee it received back to FSA Global Funding, the initial source of the non-recourse funds. (Mortimer, Tr. 3632-35, 3642-44; DX664.)

### e. Belgacom Mobile, S.A.

In the 1997-3 Belgacom SILO, the Deposit Agreement requires Stichting Stella, Belgacom's special purpose entity, to make a deposit with Rabo Merchant Bank. Stichting Stella agreed that it would have no right to seek return of the deposit, equal to the amount of the non-recourse loan provided by De Lage Landen, Rabo Merchant Bank's affiliate. (PX701 at 8497; PX684.) In return, Rabo Merchant Bank agreed to make certain scheduled payments. (PX701 at 8506.) These scheduled payments match in timing and amount the payments due to De Lage Landen on the non-recourse loan, as well as the rent due under the lease up to the EBO date, with one exception. (PX683 at 8385; PX684 at 8573; PX701 at 8506; PX679 at 8272.) On January 2, 2004 and January 2, 2005, Merrill Lynch was scheduled to make payments on the non-recourse loan and lease rents under the equity defeasance arrangement for those two dates. Merrill Lynch's payments were made to Wells Fargo, because the debt undertaking payments alone fully paid the loan payments due on those dates. (PX679 at 8272; PX701 at 8506; DX701 at 124-25.) Thus, Wells Fargo recovered some of the money set aside in the equity defeasance arrangement before the EBO.

Under the Deposit Agreement, Deposit Deed of Pledge and Deposit Deed of Repledge, Wells Fargo directed Rabo Merchant Bank to make the deposit agreement payments to De Lage Landen at De Lage Landen's account at Rabo Merchant Bank and Rabobank Nederland, De Lage Landen's common parent. Wells Fargo agreed that all rights to payments by Rabo Merchant Bank were pledged and assigned to De Lage Landen. (PX701 at 8498, §2.04; PX691-92.) Thus, Wells Fargo does not use its own funds to pay the non-recourse loan, and similarly, Belgacom does not use any of its funds to pay the rent under the lease. (DX701 at 20362.) As in the other SILOs, Rabo Merchant Bank, the debt payment undertaker, transferred the $19 million undertaker fee back to Rabobank Nederland, the common parent and ultimate source of the non-recourse loan funds. (DX187.) Though

the amounts are different, the Deposit Agreement structure in Belgacom 1997-4 is the same. (PX758-59; PX762-63; PX780.)

### 3. Equity Loop and Equity Payment Undertakings

Each SILO transaction contains an equity payment undertaking arrangement. (PX916, NJT; PX1091-92, Caltrans; PX1347-52, Houston Metro; PX1527, WMATA; DX102, PX693-94, PX732, Belgacom.)  Under these arrangements, the bulk of Wells Fargo's contributions to the head lease payments, i.e., everything but the incentive payment, was paid immediately to an equity payment undertaker at closing (WMATA, NJT, Caltrans, Belgacom), or used directly to buy securities pledged to Wells Fargo (Houston Metro).  In return for a fee, the equity payment undertaker agreed to make scheduled payments to Wells Fargo, and to maintain specified amounts of collateral to fund the FPO or EBO on the appropriate dates.  In the Houston Metro SILO, the securities were purchased in amounts that would do the same.  The equity payment undertaker was another affiliate of the lender and debt payment undertaker group.  Within AIG, the equity undertaking agreement often is referred to as a "GIC," or "guaranteed investment contract."  (DX207 at 13750.)

The payments and collateral under the equity payment arrangements were not subject to any claims by the non-recourse lenders, and could not be accessed by the tax-exempt entity, unless Wells Fargo already had been paid what it was due under the SILO transaction, or consented to a satisfactory replacement to the equity payment arrangement.

The equity payment arrangements for each trial transaction are described below.

### a. New Jersey Transit

In the NJT transaction, the Equity Payment Agreement requires NJT to pay a fee of $7,022,180.25 to AIG Financial Products (Jersey) at closing.  These funds are Wells Fargo's investment at closing, minus NJT's incentive payment.  Payment of this fee was "absolute, unconditional and irrevocable," and NJT has no further "right, title or interest" to the fee. (PX916 at 8373.)  In return, AIG Financial Products (Jersey) agreed to make four payments in 2026, the year of the FPO.  (Webb, Tr. 1027-30; PX916 at 8390.)  These payments are to be made to Wells Fargo, unless upon satisfaction of certain conditions, Wells Fargo directs that they be made to NJT or someone else.  (PX916 at 8375.)  The payments in 2026 match in timing and amount the final installment payments for the FPO.  (PX904 at 180481; PX909 at 180342; PX916 at 8390.)  Thus, under the Equity Payment Agreement, Wells Fargo receives four payments from AIG Financial Products (Jersey) of approximately $7.4 million each, totaling $29.6 million.  This is the amount to which Wells Fargo's original investment has grown in the 25 intervening years, upon the exercise of the FPO in 2026.  (PX829 at

37395.)  NJT is not required to provide any of its own funds to pay the FPO amount. (DX701 at 20333-34, ¶10; PX821 at 35910.)

After receipt of the Equity Undertaking Fee at the NJT SILO closing, AIG Financial Products (Jersey) was required to purchase securities in an amount at least equal to the $7 million fee, and place them with a custodian.  (Webb, Tr. 1036-37; PX916 at 8371, 8377-78; PX919.)  This collateral was then pledged to Wells Fargo to secure AIG Financial Products (Jersey)'s obligation to make the FPO payments, or any early termination payments.  (Webb, Tr. 1041; PX916 at 8377; PX919.)  The collateral had to be maintained over the life of the lease-back in increasing amounts, according to an "Accreted Value" schedule, eventually growing to an amount that equals the FPO payments due in 2026.  (Webb, Tr. 1039-40; Johnson, Tr. 1843-44, 1901; PX916 at 8392.)  Currently, the collateral is in place in the required amounts, and subject to Wells Fargo's security interest.  (Webb, Tr. 1038; Johnson, Tr. 1919-20; DX636 at 20110.)  The Equity Payment Agreement, the payments due under it, and the collateral held by the custodian, all are expressly exempt from any claims by the non-recourse lender, AIG-FP Funding (Cayman).  (Johnson, Tr. 1882-83; PX904 at 180463; PX910 at 80274-76.)

Because of these financial arrangements, Wells Fargo is not dependent upon NJT or the value of NJT's equipment, to obtain a return of its investment upon exercise of the FPO. The practical effect of the financial arrangements is the same as if Wells Fargo had invested directly in the equity collateral securities.  (Lys, Tr. 4571; DX701 at 20266-67.)

### b.  California Department of Transportation

In Caltrans Lots 1 and 2, the Equity Payment Agreements require Caltrans to pay an equity undertaking fee of $6,888,391.61 to AIG Matched Funding Corporation at closing. Payment of this fee was "absolute, unconditional and irrevocable," and Caltrans has no further "right, title or interest" to the fee.  (PX1091 at 10454; PX1092 at 11063.)  In return, AIG Matched Funding Corporation agreed to make three payments in each lot in 2029, the year of the FPO.  (PX1091 at 10470; PX1092 at 11079.)  These payments are to be made to Wells Fargo, unless upon satisfaction of certain conditions, Wells Fargo directs that they be made to Caltrans or someone else.  (PX1091 at 10456.)  The payments in 2029 match in timing and amount the three payments in each lot required for the FPO.  (PX1082 at 10383; PX1083 at 11005.)  The remainder of the nominal FPO price is satisfied by offsetting the outstanding amount of the "prepaid rent loan balance" against the purchase price.  (PX1082 at 10371, 10383; PX1083 at 10992, 11005.)  As a result, the only funds transferred by any party at the FPO are those from AIG Matched Funding Corporation to Wells Fargo.  Under the Equity Payment Agreement, Wells Fargo receives payments from AIG Matched Funding Corporation of approximately $35.4 million, upon exercise of the FPO in 2029.  (DX701 at 20342.)

After receipt of the equity undertaking fee at the Caltrans closing, AIG Matched Funding Corporation was required to purchase securities in an amount at least equal to the fee, and place them with a custodian. (PX1091 at 10458-59; PX1092 at 11067-68.) This collateral was then pledged to Wells Fargo to secure AIG Matched Funding Corporation's obligation to make the FPO payments, or any early termination payments. (PX1091 at 10458-59; PX1095-98.) The collateral must be maintained over the life of the lease-back in increasing amounts, according to an "Accreted Value" schedule, eventually growing to an amount that equals the FPO payments due in 2029. (PX1091 at 10471-75; PX1092 at 11080-84.) Currently, the collateral is in place in the required amounts, and subject to Wells Fargo's security interest. (Johnson, Tr. 1919-20; DX636 at 20110.) The Equity Payment Agreement, the payments due under it, and the collateral held by the custodian, are all expressly exempt from any claims by the non-recourse lender, AIG-FP Funding (Cayman). (PX1084 at 11009-11; PX1077 at 10233; Johnson, Tr. 1883.)

### c.  Washington Metropolitan Area Transit Authority

In WMATA Lots 1 and 2, the Equity Letter of Credit Agreement requires WMATA to pay an equity undertaking fee of $16,250,206.86 to AIG Matched Funding Corporation at closing. (PX1527 at 59912.) Payment of this fee was "absolute, unconditional and irrevocable," and WMATA has no further "right, title or interest" to the fee. (PX1527 at 59914.) In return, AIG Matched Funding Corporation agreed to make three payments in each lot in 2021, the year of the FPO. (PX1528 at 60794; PX1529 at 60751.) These payments are to be made to Wells Fargo, unless Wells Fargo directs that they be made to WMATA or someone else. (PX1528 at 60775; PX1529 at 60732.) The payments in 2021 match in timing and amount the three payments in each lot required for the FPO. (PX1520 at 60705; PX1519 at 60829.)

As in Caltrans, the remainder of the nominal price in WMATA is satisfied by offsetting the outstanding amount of the "prepaid rent loan balances" that were created by the prepayment of the sublease rent against the purchase price. As a result, the only funds transferred by any party at the FPO are those from AIG Matched Funding Corporation to Wells Fargo. (PX1519 at 60819, 60829; PX1520 at 60695, 60705.) Under the Equity Letter of Credit Agreement, Wells Fargo receives payments from AIG Matched Funding Corporation totaling approximately $40.97 million upon exercise of the FPO in 2021. (DX701 at 20349.)

After receiving the equity undertaking fee at closing, AIG Matched Funding Corporation was required to purchase securities in an amount at least equal to the fee, and place them with a custodian. (PX1527 at 59916; PX1528 at 60783; PX1529 at 60740.) This collateral was pledged to Wells Fargo to secure AIG Matched Funding Corporation's obligation to make the FPO payments, or any early termination payments. (PX1539-42.)

The collateral had to be maintained over the life of the lease-back in increasing amounts, according to an "Accreted Value" schedule, eventually growing to an amount that equals the FPO payments due in 2021.  (PX1528 at 60783, 60795-98; PX1529 at 60740, 60752-55.)  Currently, this collateral is in place in the required amounts, and subject to Wells Fargo's security interest.  (Johnson, Tr. 1919-20; DX636 at 20111.)  The Equity Letter of Credit Agreement, the payments due under it, and the collateral held by the custodian, are all expressly exempt from any claims by the non-recourse lender, AIG-FP Funding (Cayman).  (PX1523 at 59837-38; PX1515 at 59626-27.)

### d. Houston Metro

In Houston Metro Lots 1 through 3, the Participation Agreement requires Houston Metro to purchase, and place in a custodial account, highly rated securities with a fair market value at closing of $11,370,996.50.  (PX1319 at 24672, 24694, 24699, 24703; PX1320 at 24750, 24753; PX1380 at 25723.)  The securities are pledged to Wells Fargo.  (PX1347-52.)  The securities were purchased in amounts, and with yields, such that they are sufficient to fund the FPOs.  (PX1319 at 24672, 24693-706; PX1387 at 25745; PX1388 at 25750; PX1389 at 25755; PX1325 at 24909; PX1326 at 25281; PX1327 at 25360.)  Part of the FPO price in Houston Metro is satisfied within Wells Fargo's book entries by offsetting the outstanding amount of "prepaid rent loan balances" that were created by an early payment of part of the loop debt and sublease rent, against the purchase price.  Another part of the FPO price is satisfied by the debt payment undertaker paying the non-recourse loan.  As a result, the only transfer of funds by any party at the FPO is the transfer of securities or their cash value to Wells Fargo from the custodial account.  Thus, at the FPO, Wells Fargo receives a total of $24,996,089.00.  (PX1325 at 24909; PX1326 at 25281; PX1327 at 25360; DX701 at 20357 (Lot 1).)  The securities in the custodial accounts are expressly exempt from any claims by FSA Global Funding, the non-recourse lender.  (PX1328 at 24936-37; PX1320 at 24757.)

### e. Belgacom Mobile, S.A.

In the Belgacom 1997-3 transaction, the Additional Collateral Deposit Agreement requires Stichting Stella, Belgacom's special purpose entity, to pay a fee of $4,494,000.00 to Merrill Lynch Capital Services at closing.  (DX102 at 9610.)  In return, Merrill Lynch Capital Services agreed to make certain payments in 2004-2008 to Wells Fargo, unless Wells Fargo directed otherwise.  Wells Fargo had a security interest in the agreement, and its scheduled payments. (DX102 at 9610.)  The final five payments in 2008, in conjunction with the payments scheduled under the Deposit Agreement, fully fund the five installments due under the EBO.  (DX102 at 9615; PX679 at 8283; DX636 at 20108-09; DX701 at 20363.)  Though the amounts are different, the result in Belgacom 1997-4 is similar:  Wells Fargo receives payments from Merrill Lynch upon exercise of the EBO.  (PX732 at 9639.)

As in all the other SILOs, the Additional Collateral Security Deposit Agreement and the payments owed by Merrill Lynch were expressly exempt from any claims by the lender, De Lage Landen.  (PX683 at 8356-58; PX762 at 9040-42.)  However, unlike the equity undertaking agreements in the other SILOs, the Additional Collateral Deposit Agreements in Belgacom also provided for a partial return of Wells Fargo's equity before the EBO.  For example, in the 1997-3 lot, Merrill Lynch made three payments to Wells Fargo in 2004, 2005,  and 2006.  (DX102 at 9615; DX636 at 20109.)

### 4.  No Cash Flow Except Tax Benefits During Lease-back Term

Based upon the financial arrangements described above, no rental payments actually are made by the tax-exempt entities, no rent actually is received by Wells Fargo, and no payments actually are made on the purported loan during the lease-back terms, except on paper.  No cash has changed hands.  (Webb, Tr. 1041-42; Lys, Tr. 4576.)  The pricing runs for each transaction contain reports showing "free cash," which is cash to Wells Fargo from rent after debt service.  (Whitman, Tr. 1363-64.)  The NJT pricing run shows zero free cash to Wells Fargo for the 25 years up to the FPO date in 2026.  (PX829 at 37395.)  The other transactions show the same result, except for Belgacom, where there is zero free cash until Merrill Lynch makes a few cash payments to Wells Fargo prior to the EBO date under the equity payment arrangement.  (Whitman, Tr. 1364-65; PX1014 at 11513, 11539, Caltrans; PX1249 at 25785; PX1250 at 25814; PX1251 at 25843, Houston Metro; PX1436 at 60908, WMATA; PX503 at 188164, 188259, Belgacom; DX102; PX732.)

The pricing runs for each transaction contain another report, the statements of tax and cash flow, showing how Wells Fargo expects to obtain positive cash flow from the SILOs before the FPO or EBO dates.  The positive cash flow results from the depreciation and interest deductions Wells Fargo intends to claim.  In the NJT transaction, the positive cash flow is shown as "After Tax Cash."  (PX829 at 37397.)  In other transactions, the positive cash flow is called "cash taxes."  (Whitman, Tr. 1367-69; PX1014 at 11521, 11523, 11545, 11547, Caltrans; PX1249 at 25786, Houston Metro, Lot 1; PX503 at 188179-84, Belgacom; PX1436 at 60915-16, 60939-40, WMATA.)  These reports show positive cash flow to Wells Fargo solely from a reduction in income taxes in each year up to the FPO date for the transit SILOs, and for each year in Belgacom up to the EBO date, except for those years where a payment is received from Merrill Lynch.  This "cash" is attributable to the income taxes that Wells Fargo has avoided due to the SILO transactions.

Wells Fargo will pay its taxes at the end of the SILO transactions, 15 to 25 years after the closing, upon exercise of the FPO or EBO, and receipt of the equity payment undertaking funds.  The deferral of taxes for 15 to 25 years, and the reduction of taxes in the interim, has substantial economic value to Wells Fargo.  (D. Ellis, Tr. 2752; J. Ellis, Tr. 3176-79; DX708 at 20637-39, 20650-57; DX619 at 186686-87.)  For the tax year at issue in this case, 2002,

Wells Fargo's net reduction in taxable income for the five trial transactions alone is $18,230,793.00.  (Stip. ¶ 3, at 31.)

### 5.  Termination Value and Stipulated Loss Value Schedules

In the event of an early termination of the leases or subleases before the FPO or EBO dates, the SILO structure requires the tax-exempt entity to pay a defined Termination Value or Stipulated Loss Value.  Wells Fargo set these values in amounts that would be sufficient, at any time, to pay the non-recourse debt and make a payment to Wells Fargo to return its investment and provide the expected yield, including tax benefits, even though the transaction ended early.  (Webb, Tr. 1043-44; Whitman, Tr. 1372-75; Johnson, Tr. 1881-82; Shinderman, Tr. 3763; DX207 at 13752; DX708 at 20644-49.)  The SILO documents include detailed schedules of the termination and stipulated loss values.  (PX909 at 180326-41, NJT; PX1083 at 10993-11004; PX1082 at 10372-82, Caltrans; PX1325 at 24906-08, 24910-11; PX1326 at 25277-80; PX1327 at 25358-59, 25361-62, Houston Metro; PX1519 at 60821-28; PX1520 at 60697-704, WMATA; PX679 at 8273-82; PX758 at 9257-66, Belgacom.)

Payment of the non-recourse debt upon early termination would be accomplished through payment of an early termination amount by the debt payment undertaker to the non-recourse lender.  Neither Wells Fargo nor the tax-exempt entity would contribute funds to pay the non-recourse debt on an early termination, just as they would not under any other circumstance.  The loop debt simply would end early.  (PX913 at 255687, 255703; PX911 at 180269, NJT; PX1088 at 10416-17, 10434, Caltrans; PX1333 at 25031-33, Houston Metro; PX1525 at 59901-02, WMATA; PX701 at 8496, 8498, 8507-10, Belgacom; Johnson, Tr. 1881; DX708 at 20644; PX821 at 35889; PX1000 at 11310.)

In the transit SILOs, payment of the equity portion of the termination and stipulated loss values to Wells Fargo would be funded by a combination of payments by the equity payment undertaker, or sale of the equity collateral, and payments from the "strip surety policies" purchased at the closings.  Wells Fargo required "strip surety policies" to be purchased at the closings.  (McCalley, Tr. 634-35; Webb, Tr. 1045; PX918; PX921; PX1104-06; PX1535-36; PX1538; PX1338-45.)  Under the strip surety policies, the insured agreed, in return for a premium, to make certain defined payments upon an early termination that, in combination with early termination amounts payable under the equity defeasance arrangements, equal the equity portion of the termination and stipulated loss values due Wells Fargo.  (Webb, Tr. 1043; Whitman, Tr. 1375-76; Shinderman, Tr. 3762; PX821 at 35882, 35889; DX708 at 20644-49; PX1000 at 11248; PX1229 at 252649-50; PX1430 at 233351.)  The payments under the strip surety policy are exempt from any claims by the non-recourse lender.  (PX834 at 37231, NJT; PX1077 at 10233, Caltrans; PX1320 at 24757, Houston Metro; PX1515 at 59626, WMATA.)

The Belgacom transaction does not include a strip surety policy. However, Belgacom still is obligated to pay the full termination and stipulated loss values to Wells Fargo, including any difference between the amount paid by Merrill Lynch under the equity payment undertaking arrangement and the amount owed as a termination and stipulated loss value. Wells Fargo obtained a guarantee of Belgacom's obligations to make these payments from Belgacom's parent, Belgacom S.A., which was majority-owned by the Belgian government. (DX44 at 222363.) Wells Fargo also required Belgacom to post a letter of credit that would cover any amount not covered by the equity defeasance if its credit rating were to fall below A+ (Standard & Poor's), and to post a letter of credit for the entire termination and stipulated loss value if Belgacom's rating fell below A- (A3 by Moody's). (DX91 at 9652; PX678 at 8178-79, 8203, 8220; PX757 at 9163-64, 9186, 9203.)

As a result of these arrangements, Wells Fargo has a financial structure in place to repay its investment plus a return upon any early termination, regardless of the value of the SILO property at that point. (Johnson, Tr. 1882; Shinderman, Tr. 3796; DX708 at 20644-49.)

### 6. The Post-EBO/FPO Financial Structure

If a transit agency fails to terminate the SILO transaction at the FPO date, Wells Fargo has the option to impose a service contract. The SILO participation agreement includes as an exhibit a pro forma service contract, as well as a schedule of "Basic Fees" required to be paid to Wells Fargo under a service contract. (Johnson, Tr. 1771; PX903 at 180571-93, NJT; PX1076 at 10198-99, Caltrans; PX1319 at 24721-46, Houston Metro; PX1515 at 59674-97, WMATA.) The Basic Fees thus were specified in advance, and determined by a software program, according to the desired economic constraints specified by Wells Fargo. As noted, Wells Fargo relied upon Warren & Selbert's ABC program, a widely used pricing software program in the leasing industry, to price its SILO transactions. (Johnson, Tr. 1596, 1600.) There is no evidence of any negotiation of any of these Basic Fees. (Webb, Tr. 1057-59; Shuman, Tr. 2418.) Other fees, such as service fees and operating fees related to the cost of providing transit service were left for later determination if a service contract could be arranged and an operator found. (See, e.g., PX930 at 180573, 180576-79.)

If Wells Fargo selects the service contract option, the transit agency must arrange for refinancing the outstanding balance of Wells Fargo's original loop debt or the prepaid rent loan created by the prior prepayment of sublease rent and of the loop debt. (PX834 at 37237; PX835 at 37136, NJT; PX1081 at 10327, Caltrans; PX1324 at 24859, Houston Metro; PX1518 at 59769, WMATA.) If the refinancing can be obtained, then Wells Fargo does not use any of its own funds to pay the original lender or the prepaid loan balance at the FPO date. The outstanding "debt" simply is rolled over to the service contract term and then paid as one of the service contract's Basic Fees.

The Basic Fees were set in amounts that would amortize the new refinancing non-recourse loan and provide a return to Wells Fargo, including recovery of its initial investment, sometimes in conjunction with residual value insurance. (See, e.g., PX1000 at 11255; PX821 at 35888; PX1229 at 252653; PX1430 at 233357; DX701 at 202243, ¶ 26; Shinderman, Tr. 3773-74; Lys, Tr. 4572-73.) The Basic Fees were based upon an assumed interest rate for the new non-recourse debt. If the actual interest rate differed from the assumption, the Basic Fees would be adjusted to preserve Wells Fargo's "Net Economic Return." Thus, only the transit agency assumed any interest rate risk. (See, e.g., PX903 at 180571-72; PX904 at 180470; PX908 at 180348-49; PX1076 at 10198-99; PX1077 at 10238-39; PX1319 at 24721-22; PX1320 at 24764; PX1515 at 59632, 59674-75; DX701 at 20249, 20257; Gould, Tr. 2910.)

The purpose of the Basic Fees is shown in the pricing runs. In Caltrans Lot 1, for example, the SILO documentation included a schedule of Basic Fees. (PX1076 at 10220.) In the pricing run, the Basic Fees are labeled as "advance rent," and will pay the refinancing loan, as well as return Wells Fargo's investment to it. For Lot 1, Wells Fargo invested $5.4 million in 2001, and will receive cash totaling $15.3 million in 2029 through 2043, the period of the service contract. A final payment of $14.7 million in 2043 represents the proceeds of residual value insurance that Wells Fargo would collect. Caltrans would purchase this insurance for Wells Fargo's benefit at the inception of the service contract. (PX1014 at 11512; PX1022 at 226056; PX1076 at 10220; PX1077 at 10252; PX1081 at 10327.) Thus, during the service contract, just as on exercise of the FPO, Wells Fargo would not use any of its own funds to pay any debt service, and would recover its investment, regardless of the equipment value. The pre-set Basic Fees are independent of the equipment value at the time of the service contract. The other transit SILOs possess these same characteristics. (PX1320 at 24777; PX1324 at 24859; PX1515 at 59651; PX1518 at 59771.)

Wells Fargo also set the Basic Fees in advance to recover the same desired yield as it would have received upon exercise of the FPO. (Webb, Tr. 1058-59; Whitman, Tr. 1398-99, 1401-02; Johnson, Tr. 1771, 1807-09.) The yield calculations for both the FPO term and the full service contract term are shown in the pricing runs for each lot and each transaction. (PX1014 at 11508, Caltrans Lot 1, 7.12%; PX1014 at 11534, Caltrans Lot 2, 7.13%; PX829 at 37385, NJT, 7.4%; PX1436 at 60905, WMATA Lot 1, 8.3%; PX1436 at 60928, WMATA Lot 2, 8.3%; PX1250 at 25773, Houston Metro Lot 1, 7.5%; PX1249 at 25802, Houston Metro Lot 2, 7.5%; PX1251 at 25831, Houston Metro Lot 3, 7.5%.) Thus, if a transit agency failed to exercise the FPO, Wells Fargo reserved the ability to maintain its desired return through the service contract.

Wells Fargo acknowledged in the CAPs its option to recoup its entire investment through the service contracts. Wells Fargo stated: "Using a worst case assumption – that the value of the Equipment on return is much less than the amount expected by the appraiser or

[Wells Fargo], the Service Contract Option would be selected." (PX821 at 35910; PX1000 at 11278; PX1229 at 252680; PX1430 at 233381.) The service contract was intended as a mechanism to protect Wells Fargo's investment from any residual value risk after the lease-back period. (Johnson, Tr. 1775.) If the transit agency failed to exercise the FPO, Wells Fargo could elect the service contract and thereby extract the Basic Fees to have its investment repaid in full, just as if the FPO had been exercised. (Johnson, Tr. 1765-76, 1885-87; Shinderman, Tr. 3797-99, 4018-19.)

Wells Fargo also reserved the right to require full defeasance of the service contract obligations, including the payment of Basic Fees. Wells Fargo stated in its CAPs that "[a]t the option of the Lessor [Wells Fargo], the Service Contract portion of the transaction may be fully defeased . . . ." (PX1000 at 11252, 11256, Caltrans; PX821 at 35887, 35909, NJT; PX1229 at 252653, 252680, Houston Metro; PX1430 at 233371, 233381, WMATA.) The defeasance would include requiring "defeasance or collateral up to 100% of [Wells Fargo's] equity . . . ." (See, e.g., PX1000 at 11252.) The defeasance also would include the non-recourse loan that had to be obtained at the inception of the service contract. Wells Fargo recognized that, given the increased amount of the new loan, and the decreased value of the equipment at that point, "the Non-Recourse Lender is not likely to make a loan . . . that is not defeased." (PX1000 at 11278, Caltrans; PX1430 at 233381, WMATA; PX1229 at 252680, Houston Metro; PX821 at 35891, NJT.) Wells Fargo acknowledged that it could require debt and equity defeasance for each of the four transit SILOs during the service contract. (Johnson, Tr. 1765-68.) Wells Fargo's "Front End Guidance" for SILO transactions requires defeasance of equity and debt. (DX529 at 43090.)

The defeasance requirements for each transaction are explained in the Wells Fargo CAPs. For example, Exhibit D to the Caltrans CAP shows the effect of full equity and debt defeasance during the service contract period, after the 2029 FPO date. (PX1000 at 11311.) First, equity defeasance of $35 million (100 percent) would have to be in place immediately. This amount is approximately equal to the amount payable by AIG Matched Funding Corp., the equity payment undertaker, at the FPO date. If the FPO were not exercised, the $35 million would be rolled over into a new arrangement to secure and pay part of the Basic Fees due to Wells Fargo. This structure is shown in the "Equity Defeasance Value" column of Exhibit D. Unlike the lease-back term, however, no strip surety policy would be needed during the service contract because the equity defeasance funds equal Wells Fargo's "book investment" from the inception of the service contract. Id.

Similarly, the $115.6 million refinancing loan in Caltrans would be fully defeased immediately. This structure is shown in the "Defeased Non-Recourse Debt" column of Exhibit D. Thus, if Caltrans does not exercise the FPO, the entire amount of the loan proceeds would be placed in a defeasance arrangement, just as the loop debt loan proceeds

were at the closing of the transaction.  Id.  The only payments at the start of the service contract are Caltrans' letter of credit and residual value insurance costs.

The above requirements for full defeasance also apply to the other transit SILO transactions, and the result would be the same.  Wells Fargo would have a financial structure in place securing the recovery of its investment through the Basic Fees, the refinancing loan would be repaid without either party having to use any of its own funds, and the transit agencies would receive no cash flow if they failed to exercise the FPO, and instead entered into the service contract.  (See PX1229 at 252726, Houston Metro; PX1430 at 233400, WMATA; PX821 at 35890, NJT.)  As Wells Fargo stated in its CAPs, "[d]ue to the transaction structure, the Equity Investor is well protected throughout the life of the lease and potential service contract term."  (PX1000 at 11254; PX1430 at 233359; PX1229 at 252656.)

In the Belgacom transaction, if Belgacom failed to exercise the EBOs, the lease would continue for approximately 3-1/2 more years.  However, the equity defeasance arrangements with Merrill Lynch terminate at the EBO dates, and therefore Belgacom would be required to establish new equity defeasance arrangements, or provide other collateral acceptable to Wells Fargo, to secure the remaining rents due under the leases after the EBO.  (PX757 at 9164; PX678 at 8179; PX732; DX102.)  The Merrill Lynch payments in 2007 and 2008, under the original equity payment arrangement, would be rolled over into the new equity undertaking arrangement for Wells Fargo's benefit, and any remainder would be kept by Belgacom.  (DX701 at 62, 67.)

The non-recourse debt did not need to be refinanced at the EBO dates, however.  Pursuant to the Debt Payment Undertaking Deposit Agreements entered into at closing, the loans would remain fully defeased after the EBO date.  Thus, no new defeasance arrangements needed to be made.  (PX701 at 8506; PX683 at 8385; PX780 at 9330; PX762 at 9069.)  Pursuant to the Deposit Agreements, the loans are paid off by the debt payment undertaker approximately one year after the EBO dates, but before termination of the leases.  Thus, in each lot, Wells Fargo would receive "free cash" from rent payments due at the EBO date and afterwards that are not necessary to pay the lender.  (PX679 at 8272; PX758 at 9256; PX503 at 188164, 188259.)  This free cash allows Wells Fargo to recoup its investment in each lot regardless of the equipment's value after the EBO.  (See, e.g., PX503 at 188142-43.)  For example, in Belgacom transaction 1997-3, Wells Fargo made an investment of $5,625,082.14 at closing.  If the EBO is not exercised, Wells Fargo would receive this investment back through three payments providing free cash totaling approximately $6.4 million on and after the EBO date.  Id. at 188164.  Wells Fargo also recoups its investment if the EBO is exercised.  Just as with the transit SILOs, the Belgacom SILO transaction was constructed so that the after-tax yields in both scenarios are equal.  Id. at 188141.  The return of Wells Fargo's investment and yield is protected by defeasance arrangements both before and after the EBO.

The post-EBO structure in Belgacom is similar to the service contract structure in the transit SILOs. The structure is meant to assure repayment of Wells Fargo's investment, just as the post-FPO service contracts are meant to assure repayment of Wells Fargo's investment in the transit SILOs. The defeased equity loop is extended beyond the EBOs and FPOs if the SILO transaction still exists at that point.

## J. The Likelihood That FPOs and EBOs Would Be Exercised

Although Wells Fargo protected its investment from risk of loss through the financial structure described above, the SILO transactions were designed to make exercise of the purchase options virtually certain. From the inception of the transactions, the economic effects of the alternatives were so onerous and detrimental that a rational tax-exempt entity would do nothing other than exercise the options. (PX1426 at 60831; PX1226 at 165085.)

### 1. The Transit SILOs

As previously noted, if the transit agency failed to exercise the FPO, Wells Fargo could require the transit agency to enter into a service contract or demand the return of the equipment. The service contract not only is a mechanism to protect Wells Fargo's residual value, but the ability of Wells Fargo to impose the service contract requirements and pre-set fees affects the likelihood that the transit agency will exercise the FPO. (See DX701 at 20242.) Many of the expert witnesses at trial testified as to the probability that the transit agency would elect the FPO instead of becoming subject to the service contract or the return of the equipment. (See, e.g., Lys, Tr. 4562.)

If the transit agency did not exercise the FPO, Wells Fargo would have sole discretion to decide the next step in the transaction. The transit agency would be forced to accept whichever option, service contract or loss of equipment, Wells Fargo deemed to be in its best interest. This uncertainty, and the short time (eleven months) that the transit agency would have to implement Wells Fargo's selected option, would weigh heavily in favor of exercising the FPO. (See, e.g., Weinman, Tr. 4122-26; Wilson, Tr. 4264-70; DDX4; DX706.)

Either of the two options that Wells Fargo could select would present the transit agency with significant obstacles, costs, and disadvantages. The transit agency could avoid these problems simply by exercising the FPO. Loss of the transit agency's equipment would require replacement. All of the transit agencies involved in the trial transactions needed their equipment to meet increasing public demands for their transit service. Yet, the replacement of transit equipment within eleven months after receiving Wells Fargo's notice would be extremely difficult or impossible. (Britton, Tr. 1196; McCalley, Tr. 613-14; Weinman, Tr. 4125-27; Wilson, Tr. 4258, 4267-72.)

-47-

Similarly, imposition of the service contract would require the transit agency to begin operating its equipment under a new arrangement with Wells Fargo as the "service provider" and another third party as the "operator," or to find another transit agency that would be willing to take the aged equipment and have Wells Fargo be its "service provider" for transit services, again through an operator. (Weinman, Tr. 4196-98; Wilson, Tr. 4266.) Service contracts are used for some transit services, but are rare in the United States, and virtually non-existent for heavy rail systems such as WMATA's. (McCalley, Tr. 616-17; Wilson, Tr. 4280-83.) Service contracts typically are used with new services, and are not imposed on existing transit services. Federal labor protection laws and rules present obstacles to the substitution of third-party operators for current transit employees. (Britton, Tr. 1230-31; Shuman, Tr. 2415-16; Salci, Tr. 3455-56, 3469, 3473-74; Wilson, Tr. 4284-86, 4289, 4298; DX706; DX711.) Significant technological and compatibility issues may complicate any transfer of equipment from one transit system to another. (See, e.g., DX705.)

By simply exercising the FPO, the transit agencies may avoid all of the difficulties that Wells Fargo might impose upon them. Exercising the FPO does not require the transit agencies to supply any of their own funds. The transit agency through the FPO notice may terminate the SILO transaction, retain its equipment, and reserve to itself all of the decision-making regarding its transit fleet. (See, e.g., Britton, Tr. 1226-27.)

Defendant's expert, Professor Thomas Lys, provided a compelling economic analysis of the SILO transaction. (DX701; DX708; DDX5.) According to Professor Lys, exercising the FPO is the most advantageous option for transit agencies in virtually all circumstances. (Lys, Tr. 4505-06, 4562-67; DX701 at 20261-69, 20276-81, 20285-87, 20290-93.) In a rare situation where the FPO is not the best option, such as where the equipment value is low, the transit agencies could not meet the requirements of the service contract, or would find the service contract prohibitively expensive, and the FPO would be forced upon them anyway. (Lys, Tr. 4515-16, 4548-62; DX701 at 20261-65, 20277-81, 20285-86, 20290-91; DX708 at 20640-41.) Each transit agency would view exercising the FPO and keeping its equipment as providing greater value than would be realized under the service contract or from losing its equipment. (DX701 at 20261, 20285, 20290-91, 20366, 20368-69, 20371-72, 20374-77.)

If the equipment value is low, a transit agency would find it difficult or impossible to arrange a non-recourse loan as required by Wells Fargo to refinance the original SILO loan. A prospective lender is unlikely to make a non-recourse loan where the value of the loan greatly exceeds the value of the equipment. Even if a lender could be found, some additional collateral, such as a letter of credit, would be needed to cover the difference between the low equipment value and the high loan value. (Lys, Tr. 4515-16, 4548-62; Gould, Tr. 2891, 2918-19, 2921-23; DX701 at 20276-82.) Large letters of credit increase the transit agency's cost to the point that any financial incentives not to exercise the FPO due to low equipment

values are eliminated.  (DX701 at 20263-65, 20276-81, 20285-87, 20291-92, 20366, 20368-69, 20371-72, 20374-79.)

### 2.  Belgacom

Although Belgacom already has exercised its EBOs, Professor Lys also analyzed whether the EBO was the economically dominant option in that transaction.  The model used by Professor Lys is slightly different for Belgacom due to differences from the transit SILOs, but the approach fundamentally is the same.  Simply stated, Professor Lys compares the payoffs and costs of the alternatives on a present value basis.  He concluded that the EBO was the best financial option for Belgacom for all reasonably foreseeable equipment values at the EBO date.  (DX701 at 20304-09, 20381-82; DX703 at 20430.)  Moreover, Belgacom exercised the EBO when presented with that option in 2008.

### K.  Lack of Non-tax Economic Benefit

Professor Lys analyzed whether, absent the claimed tax benefits, but considering all the costs, Wells Fargo had a reasonable prospect of earning a profit, assuming that the FPOs and EBOs would be exercised.  Professor Lys analyzed the cash flows from the SILO on a net present value basis, a common method used to evaluate investments.  (Lys, Tr. 4510; Graves, Tr. 5047.)  Professor Lys determined that, although Wells Fargo will realize a return on the amount invested in the equity defeasance account, the net present value at closing is less than Wells Fargo's costs of entering into each SILO.  The incentive fees and transactional costs that Wells Fargo pays at closing are not invested in the equity accounts, and do not contribute to any earnings or cash flow.  Absent the tax benefits, Wells Fargo would lose money in the SILO transactions, and the SILOs would not constitute a prudent investment of funds.  (DX701 at 220270.)  Wells Fargo would have been better off investing its funds directly into the equity fund accounts rather than paying incentive fees to tax-exempt entities and transaction costs to SILO participants.  (Lys, Tr. 4511-12.)

In Caltrans, for example, Wells Fargo's cost of entering into the SILO transaction was approximately $17.7 million.  This amount consisted of (1) a $14.5 million contribution to the SILO transaction, of which $6.9 million was placed in the equity payment undertaking arrangement and $7.6 million was paid to Caltrans as an incentive fee, and (2) $3.2 million in transaction costs.  Even though Wells Fargo will realize a return on $6.9 million upon exercise of the FPO in 2029, it is apparent that a rational business enterprise would not pay an extra $10.8 million simply for the right to invest $6.9 million.  Without the tax benefits, the invested amount ($6.9 million) is less than the incentive fee and transactional costs ($10.8 million) of entering into the SILO.  (Lys, Tr. 4577-79; DDX 5 at 22.)  The same is true for the other SILOs as well.  (DX701, at 20367, 20370, 20373, 20380, 20383.)

Under this analysis, the only reason for the SILO transactions was to acquire the tax benefits. When the net present value of the tax deductions claimed during the lease-back term and the tax payments made upon exercise of the FPO or EBO are added to the present value of the cash flows at the FPO and EBO dates, the net present value of the SILO transactions turns positive. Thus, when the tax deductions are considered, the return to Wells Fargo exceeds the cost of entering into the transaction. (Lys, Tr. 4578-80; DX701 at 20367, 20370, 20373, 20380, 20383.) With substantial tax deductions taken early in the transaction, and the non-tax recoupment of cash investments and tax payments on nominal profits occurring later in the transaction, the tax deductions have a greater net present value. (Lys, Tr. 4580-83; DX708 at 20650-57.)

Professor Lys also examined the profitability of the SILOs by adding the positive cash flows over time and subtracting the costs over time, without converting the amounts to a present value. (Lys, Tr. 4583-85; DX701 at 20249-50, 20271-72.) As in the net present value analysis, Professor Lys based these calculations on the FPOs and EBOs being exercised. The cash flows to Wells Fargo are the payments from the equity undertaking arrangements. Wells Fargo's costs are its contributions to the SILO transactions, consisting of the incentive fees to the tax-exempt entity, the amounts placed in the equity undertaking arrangement at closing, and its transaction costs. Since Wells Fargo borrows much of the money needed to fund its operations, Professor Lys added as a cost the interest paid by Wells Fargo to fund its contributions to the SILOs. Based upon Wells Fargo's structure of 90% debt and 10% equity, Professor Lys determined that an interest cost should be attributed to 90% of Wells Fargo's contribution to the SILO as a cost of funding its participation. (Lys, Tr. 4584-85; DX701 at 20271.) As estimates for the interest cost, Professor Lys used the debt rate in the SILO's non-recourse loan, and the cost of funds actually used by Wells Fargo in evaluating the SILOs. (Lys, Tr. 4584-85.) Accounting for all of these costs, the return on each SILO transaction, without tax benefits, is negative. (Lys, Tr. 4585-86; DX701 at 20271-72, 20282-83, 20287-88, 20293-94, 20309.)

Referring again to Caltrans as an example, although AIG Matched Funding Corp. pays Wells Fargo an estimated $35 million in 2029 upon exercise of the FPO, Wells Fargo would incur $51 million in costs in the years up to 2029. (DX701 at 20283.) The same pattern exists in the other SILOs. Id. at 20271-72, 20288, 20294-95, 20310. Wells Fargo's Richard Johnson acknowledged these facts at trial. For the Caltrans transaction, Mr. Johnson agreed that, without tax benefits, the cash-on-cash rate of return is less than the cost of funds he used to evaluate the transaction. (Johnson, Tr. 1854.) Phyllis Grossman, the originator of the Belgacom transaction and the "Front End Guidance" document, agreed that "the reason you did leveraged leases is because of this accelerated depreciation." (Grossman, Tr. 2022.) She explained that, without the depreciation and the interest deductions, "there's no value in having this." (Grossman, Tr. 2046-47.)

L.  The Role of the Federal Transit Administration

The FTA is a federal agency within the Department of Transportation ("DOT") responsible for making grants to public transit agencies under the authority provided by the Urban Mass Transportation Act of 1964.  (PX365, Steinmann Dep., at 20.)[7]  The FTA formerly was known as the Urban Mass Transportation Administration ("UMTA").  (Marx, Tr. 792.)  FTA grants are made to fund the acquisition of capital assets by public transit agencies, including rail cars and buses.  (PX365, Steinmann Dep., at 20.)  Public transit agencies receiving FTA funds are subject to the regulatory mandates of the FTA.  (Marx, Tr. 706, 708; Pohl, Tr. 859-60; Webb, Tr. 960; Britton, Tr. 1184.)  Thus, FTA approval was required for transactions involving equipment purchased in whole or in part with federal funds.  (Britton, Tr. 1184.)

During the period 1995 through 2003, FTA representatives participated in conferences and meetings across the country promoting the use of leveraged lease transactions.  (Marx, Tr. 699-700; PX365, Steinmann Dep., at 39, 50.)  Members of the FTA's Office of Budget and Policy, and the Chief Counsel's Office participated on FTA's behalf.  (Marx, Tr. 700; McCalley, Tr. 587-88; PX163 at 825; PX365, Steinmann Dep., at 44-45, 70.)  Mr. William Sears, the FTA's Chief Counsel, presented guidelines about the FTA's review process, and the structural elements of leveraged lease transactions.  (McCalley, Tr. 588; PX163 at 825-37.)

The FTA promoted leveraged lease transactions, including sale-leaseback transactions, because they provided significant private funding to transit agencies for capital programs.  (Marx, Tr. 705; PX169 at 14660; PX365, Steinmann Dep., at 21-26.)  The FTA prepared presentations for distribution at transit industry conferences, and advised transit agencies of the potential for financing from leveraged leases.  (Marx, Tr. 699, 702; PX365, Steinmann Dep., at 42.)  The attendees at these conferences included representatives from transit agencies, banks, and financial firms.  (Marx, Tr. 701.)

In September 1998, the FTA published a handbook entitled "Innovative Financing Techniques for America's Transit Systems," which included a section regarding domestic leveraged lease transactions.  (Marx, Tr. 695-97; PX19.)  Mr. Marx developed the handbook "as a promotional document" to encourage transit agencies to consider innovative financing techniques.  (Marx, Tr. 697-98.)  The FTA also posted information on its website about leveraged leases.  (Marx, Tr. 699; PX365, Steinmann Dep., at 41-42.)

---

[7]  The FTA designated Richard Steinmann as its deponent at the FTA's Rule 30(b)(6) deposition. (PX366.)  The deposition testimony of Mr. Steinmann is found in PX365 and PX375.

If a transit agency had purchased equipment with federal funds, in whole or in part, the agency had to obtain FTA approval of any leveraged lease regarding that equipment. (Marx, Tr. 706; PX365, Steinmann Dep., at 68; McCalley, Tr. 593; Britton, Tr. 1184; Pohl, Tr. 859-60; Whitman, Tr. 1275-76.) The FTA's approval of leveraged leases came in the form of a letter from the Office of the Administrator. (Marx, Tr. 757-58; PX966, NJT; PX1245, Houston Metro; PX1591, WMATA.)

The FTA published its criteria for approval of sale-leaseback transactions in "Circular 7020.1, Cross-Border Leasing Guidelines," issued in April 1990. (Marx, Tr. 787-90; PX365, Steinmann Dep., at 100-01; PX4.) The FTA issued this circular in response to cross-border transactions being arranged at that time, but the FTA continued to use the circular as guidance for later domestic transactions, including LILOs and SILOs. (McCalley, Tr. 667-68; Marx, Tr. 789-90.) In Circular 7020.1, the FTA required the transit agency to demonstrate that it will have "continuing control and use" of the FTA-funded "equipment in mass transit service." (PX4.)

The FTA did not mandate the use of defeasance arrangements in transactions involving transit equipment. The FTA's concern was to assure that the equipment remained in public transit use, and defeasance arrangements were one way to achieve this objective. (PX365, Steinmann Dep., at 117, 119-20; Marx, Tr. 792-93.) Defeasance arrangements typically were included in all SILO and LILO transactions, whether or not they involved transit equipment. According to FTA's records, the FTA consented to 97 SILOs and LILOs. (PX235 at 334.) Yet, U.S. taxpayers were involved in approximately 400 SILOs alone, with claimed tax deductions in excess of $35 billion. See Mayer Brown LLP v. I.R.S., 562 F.3d 1190, 1194 (D.C. Cir. 2009) (Freedom of Information Act appeal denying law firm's request for IRS settlement guidelines in LILO transactions). While the FTA consented to some SILOs and LILOs, the large majority of them did not involve the FTA, and yet all of these transactions have similar defeasance arrangements. (McCalley, Tr. 668-69; Webb, Tr. 1068–69; Whitman, Tr. 1343-47; DX196 at 4863-66.)

To initiate the FTA review process, the transit agency submitted a proposal letter and package of documents to the FTA. (Marx, Tr. 708-11; McCalley, Tr. 595; Whitman, Tr. 1275-76; PX824, NJT; PX1425, WMATA.) Proposal letters typically included a summary of the transaction, a table of participants, the transit agency's benefit, the transaction expenses, and the anticipated closing date. (McCalley, Tr. 595; Marx, Tr. 714.) FTA personnel understood the identities and roles of the lease participants. (Marx, Tr. 714; PX824 at 1825.)

Potential leveraged lease transactions were reviewed by the FTA's Office of Budget and Policy, Office of Chief Counsel, and Office of the Administrator. (PX163 at 835; PX365, Steinmann Dep., at 70.) The Office of Budget and Policy reviewed the economics

of proposed leveraged leases, including transaction costs and the value of the transit agency's benefits. (PX365, Steinmann Dep., at 71.)  The Office of Chief Counsel reviewed the legal features of proposed leveraged leases.  (Marx, Tr. 707; PX365, Steinmann Dep., at 71-72.) These offices then made a recommendation to the Office of the Administrator indicating whether a transaction should be approved. (Marx, Tr. 729-30, 757; PX365, Steinmann Dep., at 72, 95-96; PX97, NJT; PX1243, Houston Metro; PX1442, WMATA.)  The time required for FTA review typically exceeded two months.  (Marx, Tr. 708, 723; PX365, Steinmann Dep., at 85; McCalley, Tr. 600.)  Since the transactions could not close until the FTA provided its approval, closings sometimes were delayed while awaiting FTA's approval. (McCalley, Tr. 601; Marx, Tr. 708.)

Between 1995 and 2002, the FTA required the equity investor to submit an opinion that the proposed transaction would be "tax positive."  (Marx, Tr. 720; McCalley, Tr. 602; PX375, Steinmann Dep., at 29-30.)  A transaction is "tax positive" if, when all the tax deductions and the ultimate tax payments are balanced over the life of the transaction, the U.S. Treasury will receive more in taxes than it gives up in deductions.  (Marx, Tr. 719; Whitman, Tr. 1330-31; PX365, Steinmann Dep., at 144-45.)  The "tax positive" analysis, however, does not include any present value calculations. (McCalley, Tr. 670.)  It assumes that $100 in tax deductions in 2001 is worth the same as $100 in tax payments in 2029.  The FTA would not approve a leveraged lease transaction without this tax-positive representation. (PX365, Steinmann Dep., at 28, 153.)  The FTA had no statutory or regulatory authority to approve the tax deductions that Wells Fargo claims from the SILO transactions.  (Marx, Tr. 808-09; PX365, Steinmann Dep., at 186.)

On November 17, 2003, Senator Charles Grassley (Iowa), Chair of the Senate Finance Committee, sent a letter to Norman Mineta, Secretary of DOT, inquiring about the FTA's approval of SILO transactions, and requesting information about these transactions. (PX223.)   Senator Grassley referenced the March 1999 Department of Treasury "enforcement actions" against LILO transactions, and then stated "[y]ou can imagine our surprise when we discovered that in February 2000, the [FTA] issued guidance entitled 'Financing Techniques for Public Transit,' which listed LILOs as a funding technique."  Id. at 1.  Senator Grassley referred to one manager of a tax-exempt entity who described these transactions as "[p]eople giving him money which he never had to pay back, for doing something that he was already doing."  Id.  Senator Grassley concluded by stating "I am certain that you share my concern that bridges, water lines, sports stadiums, and subway systems constructed with taxpayer dollars are being used by big corporations to shelter billions of dollars in taxes through bogus depreciation deductions."  Id. at 2.

On November 26, 2003, Pamela Olson, the Department of the Treasury's Assistant Secretary (Tax Policy), sent a letter to Secretary Mineta stating that "the cost of these [SILO] transactions to the Federal Treasury is significantly higher than the benefits to the

municipalities," and "should no longer be permitted by the Department of Transportation." (PX224.)  After DOT's receipt of the letters from Senator Grassley and Ms. Olson, the FTA stopped approving leveraged lease transactions. (Marx, Tr. 763-64; PX375, Steinmann Dep., at 42.)  Thereafter, FTA limited its review only to Qualified Transportation Property ("QTP") transactions permitted by the American Jobs Creation Act of 2004.  (Marx, Tr. 769-70; PX375, Steinmann Dep., at 44.)

M.  Expert Witnesses

The Court received the testimony and reports of thirteen expert witnesses during the trial.  The expert witnesses for Wells Fargo were: (1) Dr. David Ellis, an expert in cross-border and domestic leveraged leases; (2) Christopher Gould, an expert consultant to the leasing industry; (3) Michael Coyne, a consultant in the design, analysis and testing of commercial wireless telecommunication networks; (4) Jeffrey Ellis, a consultant on complex accounting issues relating to leases; (5) Larry Salci, an expert in the transit industry, especially the operation of transit facilities and railcars; (6) Bente Villadsen, an expert in financial analysis and accounting; and (7) Frank Graves, a consultant on investment planning, risk analysis, and asset valuation.

Defendant's expert witnesses were: (1) Morris Shinderman, an expert in leasing and asset financing; (2) Michael Weinman, an expert in the passenger railcar industry, including the design and maintenance of rail equipment; (3) Nigel Wilson, an expert in urban public transportation; (4) W. Cooper Chastain, an expert in mobile telecommunications; (5) Dr. Thomas Lys, an expert in financial economics; and (6) Bernard Peeters, an expert in Belgian tax law.

The Court found all of the expert witnesses highly qualified and helpful to the analysis of the relevant issues.  In particular, the Court found most valuable the expert testimony and report of Dr. Thomas Lys, a professor for some 28 years at Northwestern University's Kellogg School of Management.  The outcome of this case is heavily fact-dependent on the circumstances of each transaction.  In the Court's view, Professor Lys correctly analyzed the pivotal issues of whether the tax-exempt entities would be likely to exercise their fixed purchase options, whether Wells Fargo ever acquired the burdens and benefits of ownership, and whether, aside from the tax benefits, there was any economic substance to these transactions.  Professor Lys performed the most comprehensive analysis of the trial transactions.

Wells Fargo's expert, Dr. David Ellis, while well qualified in all aspects of leveraged leases, was less convincing in asserting that the characteristics of the five trial transactions were typical of leveraged leases that have existed for decades.  Clearly, the SILO transactions here were unique in many respects, and were not typical of other leveraged leases.  (See

Rupprecht, Tr. 155; Oram, Tr. 499-501.)  The many individual agreements comprising the SILO transactions may have been created to look like leveraged leases, but in the main, they were not.  Wells Fargo's transactional risks that Dr. Ellis described actually were reduced to *de minimis* levels through the various defeasance arrangements, insurance policies, termination payments, and other protections, set forth in the agreements.

The Court also was impressed with the transit industry experts of both parties, particularly Wells Fargo's Mr. Larry Salci.  However, much of this testimony was directed to whether the service contract and equipment return options represented viable alternatives if the fixed purchase options were not exercised.  These viewpoints effectively were trumped by the economic analysis of Dr. Lys, who established beyond doubt that no tax-exempt entity in its right mind would fail to exercise the fixed purchase option.  The near certain exercise of this option at the end of the lease-back period renders moot what might or might not happen after the FPO date passes.

Dr. Lys effectively captured the essence of the five trial transactions.  The leases did not achieve any financing objective of the tax-exempt entity, because these entities already owned the subject equipment.  (Lys, Tr. 4567.)  The leases did not achieve any refinancing objective, because 95 percent of the funding went directly into defeasance accounts, and was not available to the tax-exempt entity.  (Lys, Tr. 4567-68.)  Wells Fargo did not acquire the benefits and burdens of ownership, because it was never subject to increases or decreases in asset value.  At all times, the tax-exempt entity retained the risk of fluctuation in asset value. (Lys, Tr. 4569-71.)  Aside from the tax benefits, the transactions would not, and did not, produce any profit to Wells Fargo.  Examined on either a net present value basis or a nominal accounting basis, these deals are not profitable.  (Lys, Tr. 4578-79, 4585-86.)  As Dr. Lys testified, "The only thing that makes this investment reasonable is the tax benefits.  Absent tax benefit, it is a dog."  (Lys, Tr. 4579.)

Considering all aspects of the trial transactions, the only purpose was for Wells Fargo to pay an inducement fee to a tax-exempt entity and thereby acquire tax deductions to offset other Wells Fargo taxable income.  No other business reason for the transactions exists.

## II.  Discussion

### A.  Standards for Decision

The Court conducts a *de novo* review in tax refund suits.  See George E. Warren Corp. v. United States, 135 Ct. Cl. 305, 314, 141 F.Supp. 935, 940 (1956) ("[t]he tax laws contemplate a trial *de novo*"); Gingerich v. United States, 77 Fed. Cl. 231, 240 (2007) ("[a] tax refund suit is a *de novo* proceeding.").  Thus, a tax refund suit "is not an appellate review of the administrative decision that was made by the IRS; instead, the Court must make an

independent decision as to whether the taxpayer is due a refund." D'Avanzo v. United States, 54 Fed. Cl. 183, 186 (2002) (citing Int'l Paper Co. v. United States, 36 Fed. Cl. 313, 322 (1996)).  In conducting a *de novo* review, the Court must give "no weight . . . to subsidiary factual findings made by the [IRS] in its internal administrative proceedings." Id. (quoting Cook v. United States, 46 Fed. Cl. 110, 113 (2000)).

In a tax refund suit, the plaintiff bears the burden of proving that it has overpaid its taxes for the year in question in the exact amount of the refund sought.  See Helvering v. Taylor, 293 U.S. 507, 515 (1935); Lewis v. Reynolds, 284 U.S. 281 (1932); Dysart v. United States, 169 Ct. Cl. 276, 340 F.2d 624 (1965).  The burden of proof includes "both the burden of going forward and the burden of persuasion." Gingerich, 77 Fed. Cl. at 240 (quoting Sara Lee Corp. v. United States, 29 Fed. Cl. 330, 334 (1993)).  In meeting its burden, the plaintiff must prove its case by a preponderance of the evidence. Ebert v. United States, 66 Fed. Cl. 287, 291 (2005).  To prevail in this suit, Wells Fargo must carry its burden of proving that it is entitled to the deductions it has claimed for depreciation, interest, and transaction costs in connection with the SILO tax shelters.

B.  The Substance of the Transactions Determines Their Tax Treatment.

A primary guiding principle of tax law is that the substance, not the form, of a transaction determines its tax consequences.  Gregory v. Helvering, 293 U.S. 465, 469-70 (1935).  In applying this principle, courts look to the "objective economic realities of a transaction rather than to the particular form the parties employed." Frank Lyon Co. v. United States, 435 U.S. 561, 573 (1978).  The forms, titles, or labels on the parties' various agreements are not controlling. Id.; see also, Comm'r v. Court Holding Co., 324 U.S. 331, 333 (1945) (courts should not "permit the true nature of a transaction to be disguised by mere formalisms."); BB&T Corp. v. United States, 523 F.3d 461, 471 (4th Cir. 2008) (taxpayer may not "claim tax benefits . . . by affixing labels to its transactions that do not accurately reflect their true nature."); Halle v. Comm'r, 83 F.3d 649, 655 (4th Cir. 1996) ("surrounding circumstances and economic realities" will overcome any "presumption" generated by the transaction's form.).

In the present case, Wells Fargo asserts that it was the owner for tax purposes of the equipment used in the WMATA, Houston Metro, NJT, Caltrans, and Belgacom SILO transactions, and therefore is entitled to claim depreciation deductions for the equipment under IRC §§ 167 and 168.  Wells Fargo's burden is to show that, in substance, it became the owner of the SILO equipment, not merely that it intended to become the owner, or that the transactional documents label it the owner. See Frank Lyon, 435 U.S. at 572-73.

-56-

1. <u>No Benefits and Burdens of Ownership</u>

A taxpayer's claim of property ownership will not be respected unless the taxpaying entity actually bears the current "benefits and burdens of ownership." <u>Coleman v. Comm'r</u>, 16 F.3d 821, 826 (7th Cir. 1994) (citing <u>Frank Lyon</u>, 435 U.S. at 582-84). The possibility of future ownership is not sufficient. Rather, the issue is whether the "transaction, as it stands at the time in question, sufficiently shifts the benefits and burdens of ownership such that the transaction should, for tax purposes, be treated as if it were a sale." <u>Kwiat v. Comm'r</u>, 64 T.C.M. (CCH) 327, 1992 WL 178603, at *8 (1992). Wells Fargo thus must prove that it acquired the benefits and burdens of ownership when it entered into the SILO transactions during 1997 - 2002.

Determining the attributes of ownership in any particular case largely is a factual inquiry. The "critical fact," however, is whether the taxpayer has undertaken "substantial financial risk" of loss of its investment, based on the value of the underlying property. <u>Coleman</u>, 16 F.3d at 826. As the Supreme Court explained in <u>Frank Lyon</u>, the important inquiry is "whose capital was committed to the [property] . . . [and therefore, who is] entitled to claim depreciation for the consumption of that capital." 435 U.S. at 581. In the <u>Frank Lyon</u> case, the Supreme Court respected a sale/leaseback transaction because the taxpayer was, in fact, exposed to a "real and substantial risk" of whether it could repay a recourse loan and whether it could "recoup its investment." <u>Id.</u> at 576-77, 579. In contrast, in <u>Swift Dodge v. Comm'r</u>, 692 F.2d 651 (9th Cir. 1982), the court held that an agreement purporting to be a lease was not a genuine lease because the user of the property, and not the lessor, bore the burdens of ownership. The user was responsible for insurance, expenses, and taxes, and most "importantly," the user also "assumed the risk of depreciation." <u>Id.</u> at 654; <u>see also</u> <u>Aderholt Specialty Co. v. Comm'r</u>, 50 T.C.M. (CCH) 1101, 1985 WL 15115, at *1 (1985) (re-characterizing lease because the purported lessor had no risk of loss); <u>cf.</u> <u>Estate of Thomas v. Comm'r</u>, 84 T.C. 412, 435 (1985) (respecting sale/leaseback because taxpayer "bore risk" that it could not "recoup its cash outlay.").

Other courts have addressed the tax treatment of LILO and SILO transactions similar to Wells Fargo's, and have applied the above principles. With one exception, the court disallowed the claimed tax deductions. <u>AWG Leasing Trust v. United States</u>, 592 F.Supp.2d 953 (N.D. Ohio 2008); <u>BB&T Corp. v. United States</u>, 2007 WL 37798, at *1 (M.D.N.C., Jan. 4, 2007), <u>aff'd</u>, 523 F.3d 461 (4th Cir. 2008). In the <u>AWG</u> and <u>BB&T</u> cases, the court concluded that the taxpayer lacked a substantial risk of loss to its initial cash outlay in the transaction. In the cases involving jury trials, the jury returned a verdict each time disallowing the claimed tax benefits. <u>Altria Group, Inc. v. United States</u>, No. 1:06-cv-09430 (S.D.N.Y. July 9, 2009); <u>Fifth Third Bancorp & Subs. v. United States</u>, No. 1:05-cv-350 (S.D. Ohio, April 18, 2008). The one exception to date is <u>Consolidated Edison Company of</u>

New York, Inc. v. United States, 2009 WL 3418533, at *1 (Fed. Cl. Oct. 21, 2009), to be discussed below.

In AWG, the taxpayer entered into a SILO transaction like those at issue here, with a head lease, lease, and purchase option.  Debt and equity undertaking payment arrangements funded the loop debt, rent and purchase option.  Just as in the Wells Fargo SILOs, if the tax-exempt entity did not elect the purchase option, the taxpayer could impose a service contract. AWG, 592 F. Supp.2d at 966-72.

In summarizing its reasons for concluding that the SILO transaction did not transfer a depreciable ownership interest to plaintiffs, the district court observed that:

> (i) no substantive benefits or burdens of ownership are transferred between the parties during the Initial Leaseback Period; (ii) no significant cash flows between the parties exist during the Initial Leaseback Period; (iii) the AWG transaction creates little, if any, risk for the Plaintiffs throughout the Head Lease; and (iv), most importantly, it is nearly certain that AWG will exercise the Fixed Purchase Option in 2024, thus ensuring that Plaintiffs never actually acquire economic ownership of the Facility.

Id. at 981-82.  The court further noted that "[t]he Plaintiffs did not take legal title of the Facility," and that "[s]imply described, the Plaintiffs enjoyed almost none of the attributes of ownership during the sublease term to 2024." Id. at 982-83.  In holding that the taxpayer did not acquire any of the benefits and burdens of ownership, the court stated that "the structure . . . effectively protects the Plaintiffs from any possible risk of financial loss, including the loss of its initial [] equity investment," whether or not the purchase option is exercised. Id. at 983.

In BB&T, the taxpayer entered into a LILO transaction.  There was a lease and lease-back with different lengths.  There was a fully funded purchase option that the tax-exempt entity could exercise to terminate the transaction.  There were debt and equity payment undertaking arrangements that funded the loop debt, sublease rent and purchase option. BB&T, 523 F.3d at 466-70.  The taxpayer could impose a renewal lease if the purchase option were not exercised.  In upholding summary judgment, and determining that the taxpayer did not retain significant and genuine attributes of a lessor, the court held:

> First, each right and obligation BB&T obtained under the Head Lease it simultaneously returned to [the lessee] via the Sublease for the duration of the Basic Lease Term, leaving BB&T only a right to make an annual inspection of the Equipment.  Second, although the

transaction ostensibly provides for the exchange of tens of millions of dollars in rental payments during the Basic Lease Term, the only money that has (and that may ever) change hands between BB&T and [the lessee] is the $6,228,702 BB&T provided as [the lessee's] "incentive for doing the deal." (J.A. at 325.) [The lessee] has therefore not only continued to use the Equipment just as it had before the transaction, it has done so without paying anything to BB&T. Third, [the lessee], through the purchase option, can unwind the transaction without ever losing dominion and control over the Equipment or having surrendered any of its own funds to BB&T, and has no economic incentive to do otherwise. BB&T therefore does not expect [the lessee] to "walk away" from the Equipment. (J.A. at 85.) Finally, regardless of whether [the lessee] bucks this expectation, the structure of the transaction insulates BB&T from any risk of losing its initial $12,833,846 investment in the government bonds or incurring the obligation to invest additional funds.

Id. at 473.

Like the transaction structures in AWG and BB&T, the Court concludes here that Wells Fargo does not have any funds at risk. In each of the five trial transactions, Wells Fargo employed 100 percent loop debt, where the debt payment undertaker and the non-recourse lender were affiliates, and the entire loan proceeds immediately were transferred back to the lender group at closing. The equity defeasance account also was deposited with an affiliate of the lender. In three of the five trial transactions (WMATA, NJT, Caltrans), AIG was the lender, meaning that at closing, all of the transaction funds were deposited with an AIG affiliate, except for the inducement fee paid to the tax-exempt entity. The loan proceeds were not invested in the property or equipment, or retained by either the tax-exempt entity or Wells Fargo. Moreover, the debt and equity undertaking payment arrangements eliminated the need for the tax-exempt entity to actually pay rent under the lease-backs, or for Wells Fargo to actually make any debt service payments. The "rent" and "debt" payments in each SILO simply are accounted for as offsetting entries within the lender group. The debt will be completely paid without Wells Fargo having to supply any funds, whether the FPOs and EBOs are exercised or not. In contrast, in Frank Lyon, the taxpayer alone was liable for repayment of recourse debt, "to which it exposed its very business well-being." Frank Lyon, 435 U.S. at 576-77, 582. The taxpayer also was dependent upon the lessee for payment of rent to service the debt. Id.

The Court also must examine as an element of property ownership whether Wells Fargo assumed any risk that the property would decline in value. In each of the five trial

transactions, Wells Fargo's investment was immediately placed in an equity defeasance arrangement, in which it had a security interest, and to which the lender had no recourse. Upon any early termination of a SILO, Wells Fargo would receive the equity portion of the Termination Value or Stipulated Loss Value payments. These payments are funded by the proceeds of the equity defeasance arrangements and a strip surety policy so that Wells Fargo recovers its initial investment plus the interest earned on the equity collateral, regardless of any decline in value of the SILO equipment. Upon exercise of the FPOs and EBOs, Wells Fargo receives a return on its investment as if it had invested directly in a portfolio established in the equity defeasance arrangement, without regard to the value of the SILO equipment. Wells Fargo's "Net Economic Return" is guaranteed simply by the SILO transaction structure. See AWG, 592 F.Supp.2d at 983-84 (termination value payments protect taxpayer's investment); BB&T, 523 F.3d at 470 (letter of credit provided to support early termination payments).

Even if the FPOs were not exercised in the transit SILOs, a decline in the value of the SILO property would not prevent Wells Fargo from recouping its entire investment in each transaction. The ability of Wells Fargo to put a service contract in place assures recovery of its initial investment plus the desired yield through the service contract's Basic Fees and the residual value insurance that must be purchased for its benefit. Wells Fargo's Richard Johnson testified that "[t]he service contract was, as I have noted before, designed to protect our residual value." (Johnson, Tr. 1775.) The renewal lease in BB&T and the service contract in AWG served the same function. BB&T, 523 F.3d 468-69; AWG, 592 F.Supp.2d at 971-72, 984.

In the Belgacom transaction, the service contract is not necessary for Wells Fargo to recover its investment. The remainder of the Lease automatically is continued after the EBO, if the EBO is not exercised, and Wells Fargo recoups its investment from the post-EBO Lease payments alone.

This case is very different from Frank Lyon, where the lessee had renewal options, but the exercise of the options was at the lessee's unconstrained choice, and the taxpayer did not have the ability to impose a renewal upon the lessee. In Frank Lyon, the taxpayer's investment return was dependent upon the property's value, and its initial investment was at risk if the property declined in value. As the Supreme Court observed, the lessee in Frank Lyon could choose not to exercise its renewal options and "walk away" from the property at the end of the lease-back. Frank Lyon, 435 U.S. at 583. The taxpayer thus was "gambling" that the rents it might otherwise obtain after the lease-back would be sufficient to "recoup its investment." Id. at 579.

Here, Wells Fargo is not gambling at all. Its minimum return is fixed from the start, and if necessary, Wells Fargo can force the tax-exempt entities to stay in the game, with the

predetermined results, to recoup its initial investment. The elimination of any risk from the taxpayer's initial investment and return is a distinguishing feature of both SILOs and LILOs. (Shinderman, Tr. 3752-53, 3783, 3797-98, 4017-19; DX1664, Ex. 16.)

### 2. No Transfer of Rights and Duties of Ownership at Closing

The Court must consider whether any rights and duties of ownership of the SILO equipment transferred to Wells Fargo at closing. See BB&T, 523 F.3d at 473; AWG, 592 F.Supp.2d at 982-83. Here, the Court finds that WMATA, NJT, Caltrans, Houston Metro, and Belgacom all retained legal title, as well as the right to exclusive possession, use and quiet enjoyment of the SILO property throughout the lease-back term. The tax-exempt entity also remained responsible for all maintenance and insurance. They retained the right to all profits, and were responsible for all losses, resulting from the operation of the equipment. In substance, nothing changed for the tax-exempt entities from before the SILO transaction, except they had given up tax deductions that they could not use in the first place.

In the Belgacom transaction, Belgacom continued to claim tax ownership and tax deductions for the equipment under Belgian law, (DX186, DX703), while Wells Fargo claimed tax ownership and tax deductions under U.S. law. Thus, Belgacom sold to Wells Fargo, for a fee, only the right to claim tax deductions under U.S. law. Although the interpretation of Belgian tax law is beyond the purview of the Court, the Belgacom SILO transaction created a "double dip" where one party claims tax ownership under Belgian law, and another party claims tax ownership under U.S. law.

### 3. No Payments During the Lease-back Period

The Court has examined the evidence to determine the extent to which payments, if any, occurred between the lessee and lessor during the SILO lease-back period. In the five trial transactions, the Court has identified only a circular flow of funds between the lender's affiliated entities, and no payments at all between the lessee and lessor, except for the incentive fee to the lessee at the time of closing. See BB&T, 523 F.3d at 473; AWG, 592 F.Supp.2d at 982-83. Although the Head Leases and Equipment Agreements seemingly provide payments of millions of dollars, all of those funds, other than the incentive fee payment, were immediately diverted to debt payment undertakers, as part of the loop debt, or to equity undertaking arrangements, where the funds were invested in securities and pledged to Wells Fargo until the FPO date. Due to the offsetting rent and debt schedules, no other money changes hands after closing, and the tax-exempt entities continue to use their property as before the SILO transaction, without paying anything to Wells Fargo.

Not a single dollar of the SILO funds was used to purchase or build the SILO equipment. Rather, the circular flow of funds results in the lender and Wells Fargo receiving

all of their cash back at a later date. The five trial transactions thus are significantly different from the sale/leaseback in <u>Frank Lyon</u>, where the sale proceeds actually were used to construct the lessee's new building. 435 U.S. at 565-66. There, the transaction had a commercial purpose. In this case, however, the tax-exempt entities sold their tax benefits to Wells Fargo for relatively modest incentive fees, and Wells Fargo invested in the equity undertaker's portfolio of securities. As the Fourth Circuit explained in <u>BB&T</u>:

> [We,] like the district court, conclude that in substance, the transaction is a financing arrangement, not a genuine lease and sublease. All that BB&T has done is paid [the lessee] approximately $6 million dollars to sign documents meeting the formal requirements of a lease and sublease, arranged a circular transfer of funds from and then back to ABN [the lender/debt payment undertaker], and invested approximately $12 million in government securities.

<u>BB&T</u>, 523 F.3d at 475.

This Court agrees with the Fourth Circuit's description of the SILO transactions, except that the Fourth Circuit perhaps has been too charitable. The heart of these transactions is that Wells Fargo paid a fee to tax-exempt entities to acquire valuable tax deductions that the tax-exempt entities could not use. Wells Fargo also invested an amount with an equity undertaker that it could have done directly, without involving any tax-exempt entities or their equipment. Aside from these two elements, the circular flow of funds adds nothing to the transaction, except to eliminate any risk to Wells Fargo and to produce more claimed tax deductions. The involvement of lenders like AIG, appraisers like Ernst & Young, and law firms like King & Spalding is "window dressing" serving only to generate fees and lengthy documents to give the SILOs an appearance of validity. The Indiana district court hit the mark when it described the SILO as a "blatantly abusive tax shelter" that is "rotten to the core." <u>Hoosier Energy Rural Elec. Coop., Inc. v. John Hancock Life Ins. Co.</u>, 588 F.Supp.2d 919, 921, 928 (S.D. Ind. 2008), <u>aff'd</u> 582 F.3d 721 (7th Cir. 2009).

Certainly, taxpayers are entitled to structure their affairs with an eye on the tax consequences, and to minimize the taxes they might legally owe. <u>Superior Oil Co. v. Mississippi</u>, 280 U.S. 390, 395-96 (1930); <u>BB&T</u>, 523 F.3d at 471. In <u>Helvering v. Gregory</u>, 69 F.2d 809, 810 (2d Cir. 1934), <u>aff'd</u> 293 U.S. 465 (1935), Judge Learned Hand observed that "[a]ny one may so arrange his affairs that his taxes shall be as low as possible; he is not bound to choose that pattern which will best pay the Treasury; there is not even a patriotic duty to increase one's taxes." <u>Id.</u> The Court, however, agrees with the district court in <u>Hoosier Energy</u> that this principle must yield when an abusive SILO tax shelter is involved:

> That principle does not apply to the [Hoosier Energy] SILO transaction, at least based on the record before the court at this point. For the reasons stated, the transaction appears to have had one motivating force: abusive and fraudulent use of tax deductions by a party who had no significant benefits or burdens of ownership of the property in question. The volume of paper used to dress up this central purpose does not affect its core illegality.

Hoosier Energy, 588 F.Supp.2d at 930.

The IRS was entitled to view these SILO transactions for what they are, not what they purport to be. As the Fourth Circuit observed in BB&T, citing an Abraham Lincoln riddle from Rogers v. United States, 281 F.3d 1108, 1118 (10th Cir. 2002), "How many legs does a dog have if you call a tail a leg?"

> The answer is 'four,' because 'calling a tail a leg does not make it one.' Id. Here, BB&T styled the LILO as a lease financed by a loan, but did not in substance acquire a genuine leasehold interest or incur genuine indebtedness. Accordingly, . . . whether it has 'reached the point where the tax tail began to wag the dog,' Hines, 912 F.2d at 741, we conclude that the Government was entitled to recognize that tail for what it was, not what BB&T professed it to be.

BB&T, 523 F.3d at 477. The Court agrees fully with the Fourth Circuit's analysis in BB&T, and concludes that, looking at the substance of the SILO transactions, Wells Fargo did not become the owner for tax purposes of the SILO equipment, and is not entitled to the depreciation amounts claimed.

## C.  Whether Wells Fargo is Entitled to Interest Deductions

IRC § 163(a) provides a deduction for "interest paid or accrued within the taxable year on indebtedness." To claim this deduction, a taxpayer must prove that the payment is "compensation for the use or forbearance of money." Deputy v. du Pont, 308 U.S. 488, 498 (1940). The indebtedness also must be genuine and serve a useful purpose. Knetsch v. United States, 364 U.S. 361, 365-66 (1960). The indebtedness must be in substance, and not merely in form. BB&T, 523 F.3d at 475. The fact that a purported borrower may sign a loan document providing for a legal obligation to repay the loan does not alone give the debt any substance. Id. at 476.

In the present case, the Court concludes that Wells Fargo cannot claim an interest deduction from the non-recourse loop debt. All of the loan proceeds in each SILO transaction were immediately returned to an affiliate of the lender, acting as debt payment undertaker, and then to the common parent, the original source of the funds. (Lynch, Tr. 3675.) On the day of closing, the loan funds were routed through the accounts shown on the cash flow memos, and the lenders did not relinquish the use of the money except for the brief one-day loop. Neither Wells Fargo nor the tax-exempt entity ever had the use of the funds. The full proceeds were paid to the debt payment undertaker as a non-refundable fee, and became an asset solely of the debt payment undertaker. (See, e.g., PX1088 at 10415; DX243.) The debt payment undertaker then agreed to make the debt service payments on the loop debt. Thus, Wells Fargo did not need to pay any principle or interest on the loan, and the loan proceeds effectively were used to repay the loan. The economic reality of the non-recourse loan was reflected in the lender's own internal accounting for the loop debt. In three of the trial transactions, AIG eliminated the loan from its books through offsetting entries, and in Belgacom, Rabobank assigned the loan a "zero solvency rating." (Lynch, Tr. 3700; DX187 at 19820.)

The Fourth Circuit stated with regard to similar loop debt, it is "difficult to see how the 'interest' [] paid could represent 'compensation for the use or forbearance of money.'" BB&T, 523 F.3d at 476 (citing Halle, 83 F.3d at 652). The district court in AWG reached the same conclusion, finding that the "loans at issue lack any substantive business purpose other than creating this 'loop debt' between the Plaintiffs, AWG, and the German banks to generate tax benefits for the Plaintiffs." AWG, 592 F.Supp.2d at 993. In Belgacom, ABN AMRO acknowledged that, while the "cash flow is circular," there is a "tax benefit" to the purported borrower. (DX12 at 1120.)

Except for Consolidated Edison, all of the SILO and LILO transaction cases that have considered a tax deduction for loop debt interest have denied the claim. BB&T, 523 F.3d at 475-77; AWG, 592 F.Supp.2d at 990-94; Fifth Third, No. 1:05-cv-350 (S.D. Ohio, April 18, 2008) (jury verdict); Altria, No. 1:06-cv-09430 (S.D.N.Y. July 9, 2009) (jury verdict); see also, Hines v. United States, 912 F.2d 736, 741 (4th Cir. 1990) (interest expense in sale/leaseback disallowed where "the lease and debt payments between the three parties [lessor, bank, lessee] were structured to be offsetting. The circularity meant that the transaction became self-sustaining after the payments at closing with virtually no further financial input necessary from any of the parties."); Flecyn v. United States, 691 F.Supp. 205, 212 (C.D.Cal. 1988) (interest deductions disallowed because the loan and interest payments "were simply parts of a circularization of funds."). The Court agrees that Wells Fargo is not entitled to an interest deduction attributable to the loop debt on the non-recourse loan.

D.  <u>Whether the Transactions Have Any Economic Substance</u>

Wells Fargo is not entitled to its depreciation, transaction cost,  and interest deductions if the SILO transactions lack economic substance.  The Federal Circuit has held that "the economic substance doctrine require[s] disregarding, for tax purposes, transactions that comply with the literal terms of the tax code but lack economic reality."  <u>Coltec Indus., Inc. v. United States</u>, 454 F.3d 1340, 1352 (Fed. Cir. 2006), <u>cert. denied</u> 549 U.S. 1206 (2007).  Under the economic substance doctrine, Wells Fargo must prove that the SILO transactions had (1) objective economic substance, and (2) a non-tax business purpose. <u>Coltec</u>, 454 F.3d at 1355-56; <u>H.J. Heinz Co. v. United States</u>, 76 Fed. Cl. 570, 583-85 (2007). If Wells Fargo fails to meet either requirement, the claimed deductions should be disallowed.

In <u>Coltec</u>, the taxpayer sold one of its businesses in 1996 for a gain of $240.9 million. The taxpayer then met with its tax advisors from Arthur Andersen to discuss a strategy for offsetting the gain.  Arthur Andersen proposed a tax avoidance transaction that involved three steps.  First, the parent company would reorganize a dormant subsidiary into a special purpose entity.  Second, the parent would transfer property and contingent liabilities to the newly reorganized subsidiary in exchange for stock in that subsidiary.  Third, the subsidiary would sell the stock to a third party for a nominal sum, creating a significant loss because the sale price of the stock would be drastically lower than its basis.  Using this form of transaction, the taxpayer generated a $378.7 million capital loss that could be offset against the aforementioned $240.9 million capital gain.  <u>Coltec</u>, 454 F.3d at 1343.

Although <u>Coltec</u> is not a SILO or LILO tax shelter case, the creation of a transaction for the purpose of avoiding taxes is the same in <u>Coltec</u> as it is here.  The Federal Circuit held that the transaction employed "had no meaningful economic purpose, save the tax benefits to Coltec," and that the "transaction must be ignored for tax purposes."  <u>Id.</u> at 1347.  Citing <u>Rothschild v. United States</u>, 407 F.2d 404 (Ct. Cl. 1969) and <u>Gregory v. Helvering</u>, 293 U.S. 465 (1935), the Federal Circuit observed:

> [O]ur predecessor court in *Rothschild* stated, "Gregory v. Helvering requires that a taxpayer carry an unusually heavy burden when he attempts to demonstrate that Congress intended to give favorable tax treatment to the kind of transaction that would never occur absent the motive of tax avoidance."  407 F.2d at 411 (quoting *Diggs v. Comm'r of Internal Revenue*, 281 F.2d 326, 330 (2d Cir. 1960)).  Other circuits have similarly held that "[e]conomic substance is a prerequisite to the application of any Code provision allowing deductions [and therefore that] . . . [t]he taxpayer has the burden of showing that the form of the transaction accurately

reflects its substance, and the deductions are permissible." *In re CM Holdings, Inc.*, 301 F.3d at 102.

Coltec, 454 F.3d at 1355-56; see also Frank Lyon, 435 U.S. at 584 (Noting that a transaction must not be "shaped solely by tax avoidance features"); Jade Trading, LLC v. United States, 80 Fed. Cl. 11, 48 (2007) ("The objective economic substance test requires that a taxpayer prove that a transaction had a 'realistic financial benefit' beyond tax avoidance." (quoting Coltec, 454 F.3d at 1356 n.16).)

## 1. Reasonable Possibility of Any Non-tax Profit

In examining objective economic substance, the taxpayer's subjective motivation is not relevant or determinative. Coltec, 454 F.3d at 1356. Instead, each transaction must be examined objectively, and a determination must be made whether the transaction provided a reasonable possibility of profit, exclusive of tax benefits. Id.; see also Black & Decker Corp. v. United States, 436 F.3d 431, 441-42 (4th Cir. 2006); Gilman v. Comm'r, 933 F.2d 143, 146-47 (2d Cir. 1991); Rice's Toyota World, Inc. v. Comm'r, 752 F.2d 89, 91 (4th Cir. 1985); Stobie Creek Invs., LLC v. United States, 82 Fed. Cl. 636, 672-73 (2008); Jade Trading, 80 Fed. Cl. at 48. Further, where the non-tax benefits are deferred over multiple years, present value adjustments to the future benefits are appropriate to assess the transaction's "actual and anticipated economic effects." ACM P'ship v. Comm'r, 157 F.3d 231, 259 (3rd Cir. 1998); see also United States v. Broderson, 67 F.3d 452, 457 (2d Cir. 1995) ("[S]um of payments in a lease stream does not accurately represent the value of the lease stream because it fails to account for the time value of money.").

Applying these principles here, the Wells Fargo SILO transactions lack objective economic substance. The source of the non-tax, economic benefit to Wells Fargo, when the SILOs terminate at the FPOs and EBOs, is simply the return of its investment from the equity defeasance arrangements in 15-25 years, plus the interest earned. Wells Fargo could have realized this same return simply by investing in the portfolio of the equity defeasance arrangement, without involving the transit agencies, or Belgacom, or their equipment, in any way. Moreover, as Defendant's expert, Professor Lys, demonstrated, the net present value of these non-tax investment proceeds is less than the total cost to Wells Fargo of participating in the transactions. On a net present value basis, each SILO is a losing proposition without the tax benefits. (DX701.) The net loss of each SILO is due to: (a) the significant transaction costs that Wells Fargo paid to arrangers, law firms, appraisers, insurers and lenders to create the intricate agreements that it hoped would provide millions in tax deductions, and insulate it from any risks; (b) the incentive payment that Wells Fargo had to pay to the tax-exempt entities to purchase their tax deductions and gain their participation in the SILO; and (c) the cost of funds to Wells Fargo to engage in the transactions. Though the

mountains of paper defy comprehension without careful study, the bottom line is that the SILOs provide no reasonable possibility of profit at all, absent a claim for the tax deductions.

Wells Fargo's cost of funds alone turns the SILOs into a losing proposition. Wells Fargo's witness, Richard Johnson, agreed that the cash-on-cash, non-tax return calculated is less than Wells Fargo's cost of funds for its leasing business. (Johnson, Tr. 1854, 1966-67; see also, PX1000 at 11280.) Thus, aside from the net present value analysis and the lengthy deferral of payments until the FPO and EBO dates, there was no reasonable possibility of profit from the SILOs simply because the expected non-tax investment return was less than Wells Fargo's cost of funds.

The district court in AWG held that the SILO did have economic substance because the internal rate of return, absent tax benefits, was approximately 3.4 percent. AWG, 592 F.Supp.2d at 980. The court found that the taxpayer could have "expected to make a small, but guaranteed, pre-tax profit" sufficient to establish economic substance. Id. In the present case, when all transactional and funding costs are considered, the non-tax return is negative. Thus, if not for the tax deductions, no rational business entity would seriously contemplate a SILO transaction. See Stobie Creek, 82 Fed. Cl. at 691 ("[A] reasonable investor would take into account the costs and fees associated with entering and completing a transaction in evaluating whether an investment had a reasonable possibility of making a profit."). The Court concludes that, absent the claimed tax benefits, the five SILO transactions presented at trial lack objective economic substance.

## 2. Existence of Any Non-tax Business Purpose

Wells Fargo's SILO transactions lack subjective economic substance because there was no non-tax business purpose. See Coltec, 454 F.3d at 1355. Without the claimed tax benefits, and without the company's tax capacity to use the claimed tax benefits, Wells Fargo would not have entered into the SILO transactions. (Johnson, Tr. 1892.) As noted, "tax capacity" refers to the company having other revenue from business operations against which the SILO tax deductions could be applied and thereby reduce taxes. The motivating reason for the Wells Fargo SILOs was the desire to reduce the company's taxes as much as possible. There were no non-tax reasons that would justify Wells Fargo's entering into these transactions.

The lack of any arms' length negotiations of many substantive terms is a further indication of a questionable transaction. The key terms of the SILOs were determined by tax considerations, and Wells Fargo's constraints to eliminate risk. The transaction terms were more the product of a software model, than any negotiations or commercial realities. (Webb, Tr. 1055-56; Britton, Tr. 1227; Whitman, Tr. 1372; Hackett, Tr. 3587-92.) There is precious little evidence of the parties negotiating a rent schedule, an interest rate on the non-recourse

loan, or amortization schedules of the loan based upon any commercial realities. As Defendant's expert, Morris Shinderman, observed, and Plaintiff's Mr. Gould agreed, the enormous negative amortization of the non-recourse loan schedules is unusual, and not what would be seen in a normal commercial leasing transaction. (Shinderman, Tr. 3760-61, 3766; Gould, Tr. 2892-93.) The effect of the "interest roll-up" simply is to increase claimed interest deductions. (Shinderman, Tr. 3780-81; D. Ellis, Tr. 2724-25.) The large rent prepayments, on paper, in the WMATA and Caltrans SILOs also are very unusual. (Shinderman, Tr. 3769.) In Belgacom, the equipment selected for the transaction was based entirely upon tax considerations. The parties were intent upon using equipment that was "qualified technological equipment" under the U.S. tax code. (DX15 at 1304.)

Similarly, the Court found the appraisals of the fair market value and the remaining useful life of the SILO equipment to be suspect in all five trial transactions. As an example, the 45 NJT light-rail vehicles had an acquisition cost of $144 million, but Marshall & Stevens appraised them at $160 million. (Webb, Tr. 1020-22; PX808; PX824.) Some of the fair market value appraisals of the Belgacom equipment also were "far too high." (Chastain, Tr. 4395.) All parties to the SILO transactions would benefit from higher appraisals pushed to the limits of reality. A higher fair market value and longer useful life would make the value of the transaction larger, increasing the available tax deductions to Wells Fargo, and also increasing the transaction fees to the other participants. From the vantage point of the tax-exempt entities, they received cash at closing in exchange for tax deductions that they could not use, but otherwise nothing changed. The reference in Senator Grassley's November 17, 2003 letter to the statement of a knowledgeable municipal manager is most telling: "People giving him money which he never had to pay back, for doing something that he was already doing." (PX223.)

Wells Fargo asserts that it structured the SILO transactions to comply with FAS 13, and to take advantage of the "front-loading" of income required under FAS 13. Wells Fargo argues that the desire to recognize "front-loading" under FAS 13 is a legitimate non-tax business objective that gives the SILO transactions economic substance. However, the Court concludes that the financial benefits of improper tax deductions cannot provide a non-tax business purpose for the transaction. Such a bootstrap argument has been rejected in other cases:

> [The taxpayer's] intended use of the cash flows generated by the [transaction] is irrelevant to the subjective prong of the economic substance analysis. If a legitimate business purpose for the use of the tax savings "were sufficient to breathe substance into a transaction whose only purpose is to reduce taxes, [then] every sham tax-shelter device might succeed."

Am. Elec. Power, Inc. v. United States, 136 F.Supp.2d 762, 791-92 (S.D. Ohio 2001), aff'd, 326 F.3d 737 (6th Cir. 2003) (quoting Winn-Dixie Stores, Inc. v. Comm'r, 113 T.C. 254, 287 (1999), aff'd, 254 F.3d 1313 (11th Cir. 2001)).

Finally, while it is true that "the tax laws affect the shape of nearly every business transaction," Frank Lyon, 435 U.S. at 580, it is also true that "there is a material difference between structuring a real transaction in a particular way to provide a tax benefit (which is legitimate), and creating a transaction, without a business purpose, in order to create a tax benefit (which is illegitimate)." Coltec, 454 F.3d at 1357. Here, the SILO was nothing more than a sequel to the LILO structure that the IRS determined was without any economic substance. See Rev. Rule 1999-14. Once the SILO structure came to the attention of the IRS, and the tax benefits again became unavailable, taxpayers immediately stopped entering into SILOs, just as happened with LILOs. The SILO transaction simply was another way to transfer tax deductions from tax-exempt entities that could not use them.

E. The Consolidated Edison Case is Distinguishable.

In the recent decision in Consolidated Edison Company of New York, our Court allowed the taxpayer's 1997 tax year deductions in a LILO transaction. In that case, a utility, Con Ed, entered into a transaction with a Dutch utility known as Electriciteitsbedrijf Zuid-Holland, N.V. ("EZH"). The facility subject to the transaction was a "gas-fired, combined cycle cogeneration plant" located in the Netherlands, known as "RoCa3." Con Ed, 2009 WL 3418533, at *1. In the 1990s, Con Ed provided electricity to over eight million people in New York City and Westchester County, New York. The New York Public Service Commission ("PSC") regulated all of Con Ed's operations prior to the mid-1990s, when the PSC deregulated New York State electric companies to encourage competition. The PSC ordered Con Ed and other utilities to submit plans describing how they would restructure their operations to create a more competitive market. The plans were to include proposed corporate structures, including unregulated subsidiaries, that would achieve the PSC's restructuring goals. Id. at *2.

The PSC authorized Con Ed to invest in unregulated subsidiaries that would later participate in energy infrastructure projects and market technical services worldwide. In pursuit of these company objectives, Con Ed sought to enter into one or more LILO investments to offset losses it expected to sustain as a result of deregulation in New York State, including losses from divestiture of some of its assets. Id. at *3. Against this background, Con Ed invested in the Dutch utility plant as a way to expand its international investments, diversify its assets, and develop strategic alliances abroad. Id.

The Court found a legitimate business purpose in Con Ed's LILO investment, and ruled that the transaction was not made simply to achieve tax avoidance. Specifically, the Court noted the following non-tax reasons for Con Ed to engage in this venture:

> [T]he ability to pursue new opportunities and alternatives in a deregulated market; the expectation of making a pretax profit through the RoCa3 Transaction; plaintiff's entry into Western European energy markets; the potential for benefits from the output of the RoCa3 Facility due to the life of the plant beyond the Sublease Basic Term; technical benefits to Con Ed of operating a state of the art plant in its own field of expertise; the ability to further develop and share Con Ed's own cutting edge technology; and environmental benefits, including gaining expertise, while involved with a world-class, environmentally friendly plant and improving plaintiff's environmental public image.

Id. at *89.

Con Ed is a distinctly unique case, easily distinguishable from Wells Fargo's SILO transactions. The fact that a New York utility would want to invest in a Dutch utility for all of the reasons mentioned above presents a materially different set of circumstances than are presented here. In the course of its 159-page slip opinion, the Court in Con Ed repeatedly emphasized the fact-dependent basis for the outcome, stating:

- "[E]ach transaction . . . must be evaluated on its own merits," id. at *1;

- "The conclusions of the court offered in this opinion are based on the specific and unique facts which led to, and were part of, the RoCa3 Transaction," id.;

- "The [expert] reports in the record before the court . . . are specific to the RoCa3 Transaction and Facility and should be reviewed on their own merits, and not compared to separate, unrelated transactions, which do not even invoke electric generating facilities," id. at *5;

- "[E]ach LILO transaction is developed and formed differently, based on specific relationships, the chronology, the financial relationships, the nature of the property involved, and any number of other variables," id. at *38;

- Determining whether the taxpayer has acquired a true leasehold interest in the property "is a question of fact which must be ascertained from the intention of the parties as evidenced by the written agreements read in light of the attending

facts and circumstances," id. at *43 (citing Grodt & McKay Realty, Inc. v. Comm'r, 77 T.C. 1221, 1237 (1981);

• In critiquing the position of a key Government expert, the Court noted "[f]or the most part, his testimony failed to address the unique characteristics of the RoCa3 Transaction," id. at *52;

• "[T]he parties have presented volumes of exhibits and testimony, including expert testimony, unique to the RoCa3 Transaction, id. at *122;

• "After presiding over the lengthy trial, examining and reexamining the trial transcripts and exhibits entered into the record and reviewing the written submissions of the parties, the court is persuaded, as is evident throughout this opinion, that the plaintiff has established, through its witnesses and the exhibits, that the RoCa3 Transaction was a unique LILO transaction, which provided tax and bookkeeping advantages to the plaintiff; was, in form, a true lease; possessed economic substance; and, therefore, should be respected as qualifying for the tax deductions claimed." Id. at *128.

The Court in Con Ed distinguished AWG and BB&T by observing that "considerations of economic substance are factually specific to the transaction involved." Id. at *115. Applying that same test here, which this Court agrees is correct, the present case is much more like AWG and BB&T. The five Wells Fargo trial transactions lack economic substance, and therefore the claimed deductions must be denied.

### III.   Conclusion

Based upon the foregoing, the Court denies Plaintiff's claim for a tax refund as to the WMATA, NJT, Caltrans, Houston Metro, and Belgacom transactions presented at trial. The Court will schedule a status conference with counsel for the parties during the next 45 days to address the need for further proceedings, if any, regarding the remaining transactions at issue. If further proceedings are not necessary, the Court will enter a final judgment in favor of Defendant, and dismiss Plaintiff's complaint with prejudice. Pursuant to RCFC 54(d), the Court finds that Defendant is the prevailing party, and awards costs to Defendant.

IT IS SO ORDERED.

s/Thomas C. Wheeler
THOMAS C. WHEELER
Judge